2013-1545

——————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

——————————————

AbbVie Inc. and AbbVie Biotechnology Limited,

*Plaintiffs-Appellees*,

v.

The Mathilda and Terence Kennedy Institute of Rheumatology Trust,

*Defendant-Appellant*.

——————————————

Appeal From The United States District Court
For The Southern District of New York
In Case No. 11-cv-2541, Judge Paul A. Crotty.

——————————————

## PRINCIPAL BRIEF FOR APPELLANT

——————————————

John P. White
Norman H. Zivin
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400

Mark A. Perry
  *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Wayne M. Barsky
Timothy P. Best
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 552-8500

*Attorneys for Defendant-Appellant*
*The Mathilda and Terence Kennedy Institute of Rheumatology Trust*

# CERTIFICATE OF INTEREST

Counsel for appellant The Mathilda and Terence Kennedy Institute of Rheumatology Trust, certifies the following:

1.     The full name of every party or amicus represented by me is:

The Mathilda and Terence Kennedy Institute of Rheumatology Trust (currently known as The Kennedy Trust for Rheumatology Research).

2.     The name of the real party in interest (if the party in the caption is not the real party in interests) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Cooper & Dunham LLP**
John P. White
Norman H. Zivin
Robert T. Maldonado

**Gibson, Dunn & Crutcher LLP**
Mark A. Perry
Wayne M. Barsky
Timothy P. Best
Megan Fluckiger
Azar Mouzari
Adam Yarian
Charles J. Boudreau
William G. Jenks

/s/ Mark A. Perry
Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ................................................................1

INTRODUCTION ................................................................1

STATEMENT OF THE ISSUES................................................................3

STATEMENT OF THE CASE................................................................3

STATEMENT OF FACTS ................................................................4

SUMMARY OF THE ARGUMENT ................................................................13

STANDARDS OF REVIEW ................................................................16

ARGUMENT ................................................................17

    I.    The ODP Doctrine Is Inapplicable Here As A Matter Of Law...........17

    II.    The '442 Patent Is Not Invalid Under The ODP Doctrine Correctly Applied ................................................................28

        A.    The District Court Misconstrued Key Claim Limitations ........30

            1.    Active Disease ................................................................32

            2.    Co-Administering ................................................................36

        B.    The District Court Erred In Concluding That The Challenged Claims Are Not Patentably Distinct ......................43

            1.    At Least Claim 2 Of The '442 Patent Is A Patentably Distinct Species Of The Generic '766 Patent Claims................................................................44

            2.    The District Court Erred In Failing To Consider Evidence Of Unexpected Results ................................55

CONCLUSION ................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Dredging Co. v. Miller,*
  510 U.S. 443 (1994) ...................................................................................22

*Amgen Inc. v. F. Hoffmann-La Roche Ltd.,*
  580 F.3d 1340 (Fed. Cir. 2009) ..................................................................45

*Apple, Inc. v. ITC,*
  725 F.3d 1356 (Fed. Cir. 2013) ..................................................................59

*Arcelormittal France v. AK Steel Corp.,*
  700 F.3d 1314 (Fed. Cir. 2012) ..................................................................41

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.,*
  543 F.3d 657 (Fed. Cir. 2008) ............................................................... 17, 18

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,*
  776 F.2d 281 (Fed. Cir. 1985) ....................................................................59

*In re Baird,*
  16 F.3d 380 (Fed. Cir. 1994) ......................................................................45

*Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.,*
  592 F.3d 1340 (Fed. Cir. 2010) ..................................................................19

*In re Braat,*
  937 F.2d 589 (Fed. Cir. 1991) ........................................................ 23, 46, 49

*Cook Biotech Inc. v. Acell, Inc.,*
  460 F.3d 1365 (Fed. Cir. 2006) ..................................................................35

*Cybor Corp. v. FAS Techs., Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998) ..................................................................16

*In re Cyclobenzaprine Hydrochloride*
  *Extended-Release Capsule Patent Litig.,*
  676 F.3d 1063 (Fed. Cir. 2012) ........................................................ 55, 59, 60

*In re Dillon*,
    919 F.2d 688 (Fed. Cir. 1990) ...............................................................55

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
    689 F.3d 1368 (Fed. Cir. 2012) .......................................... 16, 23, 29, 45

*In re Emert*,
    124 F.3d 1458 (Fed. Cir. 1997) .............................................................55

*In re Fallaux*,
    564 F.3d 1313 (Fed. Cir. 2009) .............................................................21

*Fromson v. Advance Offset Plate, Inc.*,
    755 F.2d 1549 (Fed. Cir. 1985) .............................................................57

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*,
    972 F.2d 1272 (Fed. Cir. 1992) .............................................................46

*In re Goodman*,
    11 F.3d 1046 (Fed. Cir. 1993) ...............................................................45

*In re Hubbell*,
    709 F.3d 1140 (Fed. Cir. 2013) ..................................................... 20, 23

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) .............................................................33

*In re Kaplan*,
    789 F.2d 1574 (Fed. Cir. 1986) ................................. 44, 45, 46, 47, 49

*Kao Corp. v. Unilever U.S., Inc.*,
    441 F.3d 963 (Fed. Cir. 2006) ...............................................................59

*In re Kollman*,
    595 F.2d 48 (C.C.P.A. 1979) .................................................................61

*In re Longi*,
    759 F.2d 887 (Fed. Cir. 1985) ....................................................... 44, 55

*In re Lyons*,
    364 F.2d 1005 (C.C.P.A. 1966) .............................................................55

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ...........................................................16

*In re Metoprolol Succinate Patent Litig.*,
494 F.3d 1011 (Fed. Cir. 2007) ...........................................................18

*Microsoft Corp. v. i4i Ltd. P'Ship*,
131 S. Ct. 2238 (2011) .......................................................................16

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) .............................................................................22

*Network Commerce, Inc. v. Microsoft Corp.*,
422 F.3d 1353 (Fed. Cir. 2005) ...........................................................34

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ...........................................................18

*Perricone v. Medicis Pharm. Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) ...........................................................24

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
518 F.3d 1353 (Fed. Cir. 2008) ...........................................................29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 33, 35

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ...........................................................26

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) .............................................. 18, 27, 55

*Quantum Corp. v. Rodime, PLC*,
65 F.3d 1577 (Fed. Cir. 1995) .............................................................17

*In re Sarett*,
327 F.2d 1005 (C.C.P.A. 1964) .............................................. 45, 46, 49

*Seachange Int'l, Inc. v. C-Cor Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ...........................................................38

*In re Soni,*
    54 F.3d 746 (Fed. Cir. 1995) ....................................................... 56, 60

*Sud-Chemie, Inc. v. Multisorb Techs.,*
    554 F.3d 1001 (Fed. Cir. 2009) ...........................................................60

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.,*
    611 F.3d 1381 (Fed. Cir. 2010) ...........................................................18

*Symbol Techs., Inc. v. Opticon, Inc.,*
    935 F.2d 1569 (Fed. Cir. 1991) ...........................................................27

*Tokai Corp. v. Easton Enters., Inc.,*
    632 F.3d 1358 (Fed. Cir. 2011) ...........................................................26

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007) ...........................................................41

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................... 35, 41

*In re Vogel,*
    422 F.2d 438 (C.C.P.A. 1970) ...........................................................46

**Statutes**

28 U.S.C. § 1292(c)(2) .........................................................................1

28 U.S.C. § 1295(a) .............................................................................1

28 U.S.C. § 1338(a) .............................................................................1

28 U.S.C. § 2201(a) .............................................................................1

35 U.S.C. § 102 ..................................................................................12

35 U.S.C. § 102 (1996) .......................................................................21

35 U.S.C. § 103 ....................................................................... 10, 12, 44

35 U.S.C. § 120 ..................................................................................20

35 U.S.C. § 154 ............................................................................ 19, 20

35 U.S.C. § 154 (1988) ...................................................................20

35 U.S.C. § 253 ............................................................................23

35 U.S.C. § 282(a) ........................................................................16

35 U.S.C. § 282(b) ........................................................................17

**Rules**

Fed. R. Civ. P. 54(b) .......................................................................1

**Other Authorities**

Mark A. Lemley & Kimberly A. Moore,
*Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63 (2004) ...................24

*Manual of Patent Examining Procedure* (8th ed. rev. 9, Aug. 2012) ........ 23, 44, 60

Emerson Stringham, *Double Patenting* (1933) ................................................. 45, 47

## STATEMENT OF RELATED CASES

One other case could potentially be affected by this appeal: *AbbVie Inc. & AbbVie Biotechnology Ltd. v. The Kennedy Trust for Rheumatology Research*, No. 13-cv-1358 (S.D.N.Y.).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1338(a) & 2201(a) and entered partial final judgment pursuant to Fed. R. Civ. P. 54(b) on July 2, 2013. The notice of appeal was timely filed on August 1, 2013, and this Court has jurisdiction under 28 U.S.C. §§ 1292(c)(2) & 1295(a).

## INTRODUCTION

The nonstatutory doctrine of obviousness-type double patenting ("ODP") was developed under pre-1995 law to curb unjust timewise extensions of the right to exclude by a common patent owner who successively obtained issued claims not patentably distinct from previously issued claims. The statutory and policy reasons for this doctrine were eliminated when the Patent Act was amended in 1995 to measure patent term from claimed priority date rather than issue date. The patent-in-suit issued from an application filed after the effective date of the 1995 amendment. This appeal presents the Court with the opportunity to make clear that, as a matter of law, such an issued patent may not be invalidated by a district court under the ODP doctrine.

On the merits, the district court misconstrued key claim terms of both patents, errors which led it to conclude that the claims of the challenged patent were not patentably distinct from those of the reference patent. Further, the district court erroneously found that limitations of the challenged patent were "encompassed" by, and thus obvious in light of, the reference patent, even though a patentee may patent a species of a previously patented genus. These legal errors obscured the critical and undisputed fact that the challenged patent claims methods of treating particular patients—those with the most advanced disease state, who are not responding to conventional treatment—to achieve clinical results including the reduction or elimination of signs and symptoms of rheumatoid arthritis ("RA"), a result that was wholly unexpected by a person of skill in the art ("POSA"). The reference patent, by contrast, is directed to *any* patient diagnosed with RA, including drug-naïve patients and patients in remission, and requires *only* that the biological activity of tumor necrosis factor-alpha ("TNFα") is inhibited, whether such inhibition makes the patient feel better or not. This breakthrough invention provides the successful (and life-improving) treatment of extremely sick people in a way that was not obvious from the claims of the reference patent.

## STATEMENT OF THE ISSUES

**I.** Whether the district court erred in applying the ODP doctrine to the patent-in-suit, which issued from an application filed after the 1995 amendment to the Patent Act eliminated the statutory and policy reasons for the doctrine; and

**II.** Whether the district court erred in invalidating the challenged claims of the patent-in-suit under the ODP doctrine (assuming its applicability), because, properly construed, at least claim 2 of the challenged patent is patentably distinct from any claim of the reference patent.

## STATEMENT OF THE CASE

The Mathilda and Terence Kennedy Institute of Rheumatology Trust, now the Kennedy Trust for Rheumatology Research ("Kennedy"), owns U.S. Patent Nos. 7,846,442 and 6,270,766. The reference '766 patent issued August 7, 2001 and expired October 8, 2012. It broadly claims methods of treating individuals with RA by co-administering an antibody and methotrexate in "therapeutically effective" amounts, defined simply as an inhibition of TNFα's biological activity. A151-179, at A170 (19:18-26); A178. The challenged '442 patent issued December 7, 2010 and will expire August 21, 2018. It claims a specific treatment regimen applied to a particular cohort of RA patients to achieve a substantial clinical result. A115-150, at A150.

AbbVie Inc. and AbbVie Biotechnology Ltd., formerly Abbott Laboratories, Inc. and Abbott Biotechnology Ltd. (collectively "AbbVie"), are sublicensees of the Kennedy patents. A4012-A4029, at A4015. AbbVie sued Kennedy for a declaratory judgment of invalidity of the '442 patent for ODP, arguing that each challenged claim is not patentably distinct from claims of the '766 patent.

After a bench trial, the district court (Crotty, J.) issued a decision and judgment concluding that claims 1-7, 13-14, and 17-20 of the '442 patent are invalid over claims 8-14 of the '766 patent for ODP. A4-A110, at A110.

## STATEMENT OF FACTS

The reference '766 patent claims a broad genus of methods of treating rheumatoid arthritis, while the challenged '442 patent claims a narrower species of treatment methods. The ultimate question is whether the latter are patentably distinct from the former; the Examiner said "yes," but the district court said "no."

**1.** RA is a lifelong, chronic, multisystem autoimmune disease without a known cause or cure. A4049-A4059, at A4052. The persistent inflammation characteristic of RA can cause symptoms such as pain and disability and signs such as cartilage destruction, bone erosion, and joint deformities. *Id.* Before the critical date (August 1, 1995), there were several chemical disease-modifying anti-rheumatic drugs ("DMARDs") approved to treat RA. A4058-A4059. One of these was methotrexate, a drug whose biological effects generally persist for at least 3-4

weeks in RA patients to whom it has been administered for at least one month. A1296-A1297; A1520; A1607. Methotrexate was effective in alleviating symptoms associated with RA in some individuals but did not have a positive effect on long-term signs of RA such as joint deterioration. A5982. In addition, methotrexate was known to have toxic effects. A4058-A4059; *see also* A1519, A1593, A1599.

As an autoimmune disease, RA is mediated by autoantibodies produced within an individual which attack part of the individual's body. These autoantibodies are produced by certain immune system cells called T-cells. Given the role of T-cells in RA, some scientists researching treatments focused their early efforts on targeting proteins, including CD4, expressed on the surface of T-cells, to inhibit production of autoantibodies. A1468-A1470.

Other research focused on a protein called TNFα and demonstrated that it could induce inflammation in RA sufferers. A1462-A1463; A1627-A1628. Given TNFα's role in the disease, researchers—including Kennedy's inventors, Professors Maini and Feldmann—focused on using biologic TNFα antagonists to block TNFα's activity. *See*, *e.g.*, A1462-A1463.

Professors Maini and Feldmann performed three initial trials using only an experimental anti-TNFα monoclonal antibody, cA2 (later called infliximab and marketed as Remicade®). These studies involved switching from prior DMARD

5

therapy to treatment with cA2 after a "washout" period (during which no DMARD was given) was completed (*i.e.*, administration of DMARD was discontinued for at least four weeks prior to starting administration of the antibody). A4030-A4039; A4040-A4042; A4043-A4048. These studies demonstrated short-term benefit of cA2 but also significant limitations for long-term therapy. A1497-A1498.

Armed with these results, Kennedy's inventors undertook a radically new clinical trial. Unlike the previous studies of anti-TNFα antibody, this trial did not involve a "washout," and thus the biological effects of methotrexate did not cease before the patients received the anti-TNFα antibody. A1520. Patients received either (a) anti-TNFα antibody co-administered adjunctively with ongoing methotrexate; or (b) anti-TNFα antibody co-administered sequentially immediately upon discontinuance of methotrexate; or (c) methotrexate and a placebo. A171-A175 (21:1-12 & Tables 1-6).

A very high percentage of patients to whom the anti-TNFα antibody was administered adjunctively with continued methotrexate achieved a significant reduction in both the signs and the symptoms of RA, approaching remission or near-remission. A174 (27:61-65); A176 (31:39-44). Patients who received sequential co-administration of anti-TNFα antibody therapy after discontinuance of methotrexate (*i.e.*, patients to whom methotrexate was not administered after administration of the anti-TNFα antibody began) had a better response than patients receiving

methotrexate and placebo but far less benefit than patients who received adjunctive treatment. *See*, *e.g.*, A1673. For at least the first month of the trial, these sequential co-administration patients benefitted from both methotrexate and cA2. This was due to the fast onset of antibody efficacy, the persistent effect of methotrexate for at least 3-4 weeks, and the lack of a washout. A1517-A1518; A1562. Patients to whom only methotrexate was administered achieved no meaningful benefit.

The results of this trial led to pioneering and breakthrough insights that fundamentally changed the treatment of RA. Kennedy filed a continuation-in-part application which led to the '766 patent, issued August 7, 2001. Since Kennedy claimed priority to an earlier application it had filed in 1992, the '766 patent expired October 8, 2012. Claim 9 of the '766 patent recites:

> A method of treating rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to an individual in therapeutically effective amounts wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks.

A178 (35:59-67).

The '766 patent covered a broad genus of methods of treating individuals having rheumatoid arthritis with an anti-TNFα antibody and methotrexate. Included within this genus is:

- treating RA in *any* **"individual in need thereof,"** including patients who are drug-naïve, and who have varying levels of disease, including remission;

- **"co-administering"** antibody and methotrexate in *various* modes;

- using an **"anti-tumor necrosis factor alpha antibody"** that acts by any of *several* different mechanisms; and

- administering the antibody and methotrexate in *any* **"therapeutically effective amounts,"** specifically defined as amounts that inhibit the biological activity of TNFα.

A178 (emphases added).

In 2005 Kennedy filed the application that issued as the '442 patent in which Kennedy claimed a novel method of treating the most difficult to treat RA patients—individuals suffering from active disease who had not received any significant benefit from methotrexate—by a particular mode of adjunctively administering a narrowly defined type of antibody that works through a specifically recited mechanism of action, to produce a substantial therapeutic benefit. Claim 2 of the '442 patent (rewritten as an independent claim) recites:

The method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual,

wherein the anti-human tumor necrosis factor-α antibody or fragment thereof

(a) binds to an epitope on human tumor necrosis factor-α,

8

      (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and

      (c) is administered at a dosage of 0.01-100 mg/kg, and wherein such administration reduces or eliminates signs and symptoms associated with rheumatoid arthritis

wherein (a) methotrexate is administered at an interval of a week or weeks, and (b) the anti-human tumor necrosis factor-α antibody or fragment thereof is administered multiple times,

each such administration being separated by an interval of a week or weeks from the prior administration.

A150 (35:2-21).

      Thus, claim 2 of the challenged '442 patent covers a species of RA treatment within the genus of treatment methods claimed in the '766 patent, and requires:

- The treatment of individuals possessing a particular, severe level of **"active disease"**;

- Who are taking methotrexate but receiving little or no therapeutic benefit from it;

- By **"adjunctively"** co-administering with ongoing methotrexate an anti-human-TNFα antibody;

- Which antibody works by a **particular mechanism**;

- Administered in a particular dosage range and at specific time-intervals;

- Thereby providing a substantial therapeutic benefit: substantially reducing or eliminating both **"signs"** and **"symptoms"** of RA;

A150 (emphases added).

      The same PTO Examiner reviewed both the '442 application and the '766 application. *See generally* A5393-A5658; A5659-A6013. The Examiner initially

9

rejected the '442 claims on several grounds including ODP, reasoning that in light of the '766 claims "it would have been obvious to optimize the dosing and dosing regimens of both the conventional methotrexate treatment … as well as the anti-TNFα antibodies in the treatment of rheumatoid arthritis." A5852-A5853, A5937-A5938. He also rejected the then-pending claims for obviousness under 35 U.S.C. § 103 over the published version of Kennedy's 1992 application from which the '766 patent claimed priority. A5933-A5937.

In response to the rejection, Kennedy cited evidence that one of ordinary skill at the critical date would not have had a reasonable expectation of achieving the specific therapeutic result claimed in the '442 patent (reduction or elimination of signs and symptoms of RA) in this particular patient cohort—*i.e.*, individuals with active disease. A5908-A5913, A5985-A5991. Kennedy also argued that the documented results of using the '442 method of treatment were unexpected, further demonstrating the nonobviousness of the invention. A5908-A5913, A5985-A5991. The Examiner ultimately agreed with Kennedy, explaining that because the "claimed methods are drawn to treating rheumatoid arthritis in patients … whose *active disease* has been incompletely controlled by previous treatment with methotrexate," the later-issued claims "are deemed to be an unobvious species" of the earlier-issued genus claims. A6007 (emphasis added).

**2.** Janssen Pharmaceuticals, Inc. (formerly Centocor, Inc.), a subsidiary of Johnson & Johnson, is the exclusive licensee of Kennedy's patent portfolio (A6014-A6031); AbbVie obtained its sublicense from Centocor. A4015. Janssen markets an anti-TNFα antibody under the trademark Remicade®. AbbVie markets its anti-TNFα antibody under the trademark Humira®. These two blockbuster drugs are used according to methods specifically claimed in the '442 patent and broadly claimed in the '766 patent. These drugs are among the five leading selling drugs in the world, accounting for billions of dollars in annual sales. A1112; A1404-1408.

For many years, AbbVie failed to pay appropriate royalties to Kennedy pursuant to the sublicense; an arbitral panel eventually ordered AbbVie to pay the royalties owed on its sale of Humira® used according to the '766 claims. A1112-A1113; A1115; A1127-A1128. Centocor/Janssen also paid royalties on Remicade® used according to the '766 claims. Neither party challenged the validity of that patent. Furthermore, AbbVie enjoyed the protection of a sublicense that expressly covered potential new patents. A1118-A1121. Yet, upon issuance of the '442 patent AbbVie elected to challenge the validity of the '442 patent rather than fulfill its contractual obligations, and filed this declaratory judgment action. A4000-A4011, at A4010.

11

The thrust of AbbVie's invalidity argument is that the '442 claims were obvious.  However the closest "art" was Kennedy's earlier-issued '766 patent, which was not prior art as to Kennedy.  *See* 35 U.S.C. § 102.  AbbVie chose not to contend that the '442 claims were invalid under the statutory requirement of nonobviousness (*id.* § 103) but instead relied solely on the *nonstatutory* doctrine of obviousness-type double patenting—the very basis the Examiner had considered and ultimately rejected in allowing the '442 patent to issue.

Kennedy moved to dismiss the suit, arguing that passage of the Uruguay Round Agreements Act ("URAA") eliminated the statutory and policy reasons for the ODP doctrine.  A194.  Because the '442 patent issued from an application filed after the URAA became effective on June 8, 1995, Kennedy argued that ODP was inapplicable as a matter of law.  The district court denied this motion.  A111-A114; A110, n.31.

The district court held a bench trial in September 2012 and, in July 2013, issued a judgment that claims 1-7, 13-14, and 17-20 of the '442 patent are invalid for ODP.  A1-A3.  In its accompanying opinion, the district court misconstrued a key limitation of the challenged claims ("active disease") to mean "patients with continuing signs and symptoms of rheumatoid arthritis."  A92 (¶345).  The court also misconstrued a key limitation of the reference '766 patent claims ("co-administering") to exclude sequential co-administration of two drugs, such as "the

discontinuing of methotrexate therapy and then initiating anti-TNFα therapy alone." A86 (¶318).

In evaluating the differences between the challenged and the reference claims, the court repeatedly concluded that elements of the challenged claims were obvious in view of the corresponding elements of the reference claims because the challenged claims were "encompassed" by or "included within" the reference claims. *See*, *e.g.*, A85-A86 (¶317); A89 (¶330); A95 (¶354); A96 (¶361); A97 (¶¶363, 366); A106-A107 (¶400). While the district court recited the rule that a later species is not necessarily obvious over a prior genus (A80), it repeatedly failed to apply that rule and presumed that because the challenged claims were a species falling within the genus claimed in the reference patent, the challenged claims were not, and could not be, patentably distinct from the reference claims. Moreover, although the Examiner had allowed the patent on the basis of unexpected results, and Kennedy presented substantial objective evidence of such results (A1324-A1326; A1672-A1673), the court ignored certain of this evidence and as to other evidence concluded that it was "not supported by the data." A99-A100 (¶¶373-74).

## SUMMARY OF THE ARGUMENT

The district court's conclusion that the '442 patent is invalid under the ODP doctrine should be reversed.

**I.** The URAA amendment to the Patent Act, effective June 8, 1995, eliminated both the statutory and the policy reasons for the ODP doctrine by tying patent term to priority date rather than issue date. Because the challenged patent issued from an application filed after June 8, 1995, the ODP doctrine is inapplicable as a matter of law. Moreover, because the '442 patent claimed a later priority date, Kennedy had to overcome additional prior art including a published version of the 1992 priority application from which benefit was claimed by the '766 patent. Thus, there was no unjust timewise extension, as the Examiner correctly concluded.

**II.** The ODP doctrine (assuming its applicability) requires (A) properly construing disputed claim terms, and (B) determining the differences between the challenged and reference claims, and whether each challenged claim as a whole is patentably distinct from—*i.e.* not obvious over—the reference claims. The district court erred at each step of the ODP analysis.

**A.** The district court committed two claim construction errors. First, the court misconstrued a key limitation of the challenged claims ("active disease") by not adhering to the explicit definition of this term in the specification. Second, the court adopted an improper construction for a key limitation of the reference claims ("co-administering") by ignoring intrinsic evidence and excluding a specific em-

14

bodiment in the specification, namely sequential co-administration of the anti-TNFα antibody and methotrexate.

**B.**    These claim construction errors directly contributed to the court's failure to recognize the differences between the challenged and reference claims, as well as its erroneous conclusion that they are not patentably distinct notwithstanding objective indicia of nonobviousness including unexpected results.

**1.**    The challenged claim of the '442 patent is a species of the genus claimed in the reference '766 patent. The district court committed an error of law by concluding that the challenged claim was not patentably distinct from the reference claims because the former were "encompassed" by the latter. An issued claim to a genus may be followed by a later issued claim to a patentably distinct species. For example, the proper construction of "active disease" requires that the patient cohort addressed by the challenged claims is a subset (the most difficult-to-treat patients who are failing on conventional therapy) of the individuals covered by the reference claims (all individuals with RA in need of treatment, which includes both drug-naïve patients and patients in remission). Furthermore, the challenged claims require achieving a specific high level of response in those difficult-to-treat patients, whereas the reference claims merely require inhibition of TNFα's biological activity (a result so minimal that the patient might never notice). By blurring these distinctions, the court overlooked evidence that one of ordinary skill

would not have expected to achieve the claimed substantial reduction in both signs and symptoms in these hard-to-treat patients.   The specific treatment method claimed in the '442 patent is patentably distinct from the generic treatment methods claimed in the '766 patent.

**2.**   A district court must consider all objective evidence of nonobviousness, including evidence that the claimed invention achieves results that would not have been expected at the time of invention.   The district court erroneously disregarded objective evidence of unexpected results, overriding the Examiner's contrary conclusion.

## STANDARDS OF REVIEW

An issued patent is presumed valid.   35 U.S.C. § 282(a).   Invalidity must be proven by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'Ship*, 131 S. Ct. 2238, 2242 (2011); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001).   The ultimate conclusion that a patent is invalid under the ODP doctrine is reviewed *de novo*.  *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1376 (Fed. Cir. 2012).   Underlying factual determinations are reviewed for clear error.  *Id.*   Claim constructions are reviewed *de novo*.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

## ARGUMENT

The district court committed two separate yet equally fatal errors in concluding that the '442 patent is invalid under the non-statutory doctrine of obviousness-type double patenting:  *First*, the ODP doctrine does not apply to this case as a matter of law because the challenged patent issued from an application filed after the Patent Act was amended in 1995 to eliminate the statutory and policy reasons for the ODP doctrine.  *Second*, at least claim 2 of the '442 patent is not invalid under the ODP doctrine (assuming its applicability) because the challenged species claim is patentably distinct from the reference genus claims.  To reach the contrary conclusion, the district court misconstrued key claim terms, failed to appreciate the patentably distinct differences between the claims, and ignored objective evidence of unexpected results.

## I.    The ODP Doctrine Is Inapplicable Here As A Matter Of Law

A district court may invalidate an issued patent only on the basis of the defenses enumerated in 35 U.S.C. § 282(b), unless "a provision of the Patent Act not falling within the literal scope of section 282 … provide[s] a defense of … invalidity."  *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 664 (Fed. Cir. 2008) (citing *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995)).

The ODP doctrine does not fit within any of Section 282's categories of available defenses; nor does any other provision of the Patent Act authorize an ODP defense today. As this Court has recognized, the ODP doctrine is, ultimately, "grounded in public policy." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1297 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 940 (2013). The doctrine's alternative moniker—"*nonstatutory* double patenting" (*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009) (emphasis added))— confirms that it is not a statutory defense to validity in federal court litigation once a patent has issued.

To be sure, this Court has on rare occasion invalidated issued patents under the ODP doctrine in infringement litigation. *See*, *e.g.*, *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381 (Fed. Cir. 2010); *In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011 (Fed. Cir. 2007). In every such case, however, the challenged patent was issued from an application filed before the URAA amended the Patent Act, effective June 8, 1995, to change the basis for measuring patent term for patents issued from such applications from issue date to earliest claimed priority date.

As explained below, the 1995 amendment abrogated whatever statutory toehold the ODP doctrine might have had. *Cf. Aristocrat*, 543 F.3d at 661-64 (noting that "Congress made it clear in various provisions of the statute when it intended to

create a defense of invalidity or noninfringement"). Indeed, this Court has recognized the importance for the ODP doctrine of the change from issue date to claimed priority date:

> The doctrine of obviousness-type double patenting is an important check on improper extension of patent rights through the use of divisional and continuation applications, *at least for patents issued from applications filed prior to the amendment of 35 U.S.C. § 154 to create twenty-year terms running from the date of the earliest related application.*

*Boehringer Ingelheim Int'l GMBH v. Barr Labs., Inc.*, 592 F.3d 1340, 1346 (Fed. Cir. 2010) (emphasis added).

This case thus presents an important legal question of first impression: May the ODP doctrine be applied to invalidate a patent issued on an application filed after the June 8, 1995 effective date of the URAA? For two related reasons, that question (which has not yet been resolved by this Court) should be answered in the negative—both in general, and on the particular facts of this case.

**1.** As a matter of law, the ODP doctrine cannot be invoked to invalidate patents—such as the '442 patent—issued on an application filed after the URAA became effective on June 8, 1995. This amendment to the Patent Act eliminated the statutory and policy reasons for the ODP doctrine by tying patent term to priority date rather than to issue date. *See* 35 U.S.C. § 154. The patent-in-suit issued from an application filed after June 8, 1995. Therefore, the challenged claims of the '442 patent cannot be invalidated under the ODP doctrine.

19

**a.** Patents issued from applications filed prior to June 8, 1995 had 17-year statutory terms that began on the date of issuance. 35 U.S.C. § 154 (1988). Then as now, patent applicants were permitted to file one or more "continuing applications," which claimed priority to a previously filed patent application but could issue later. *Id.* § 120. Neither the Examiner nor a patent challenger could assert prior art arising between the filing date of the continuation application and an earlier claimed priority date.

The ODP doctrine developed to curb abuses, made possible by continuation practice, by prohibiting the issuance of claims in a second patent that expired later than the claims in a first patent, and which were not "patentably distinct" from the claims in the first patent. *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (internal quotation marks omitted). This situation arose where the "claims are not identical" but the successive claim "is not patentably distinct from the reference claim(s) because [it] is either anticipated by, or would have been obvious over, the reference claim(s)." A5852.

**b.** Patents issued from applications filed after June 8, 1995 have a 20-year statutory term measured from the earliest priority date claimed, regardless of actual filing or issue dates. *See* 35 U.S.C. § 154. Time spent on prosecution reduces the patent's enforceable term. The statute also allows patentees to claim a later priority date to obtain a later date of patent expiry. However, when this right is exer-

cised the applicant must overcome potentially invalidating prior art available between the earlier and later claimed priority dates. *See* 35 U.S.C. § 102 (1996).

This Court has never applied the ODP doctrine to invalidate a patent issued from an application filed after June 8, 1995. Indeed, only two ODP cases involving patents issued from such applications have reached this Court: *Hubbell* and *In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009). In *Fallaux*, the Court recognized the "limited force" justifying the continued application of ODP to police against unjustified timewise extensions of patents issued from applications filed after June 8, 1995:

> It is true that the unjustified patent term extension justification for obviousness-type double patenting has limited force in this case. *Indeed, this is surely true of many double patenting rejections today, in no small part because of the change in the Patent Act from a patent term of seventeen years from issuance to a term of twenty years from filing. See* 35 U.S.C. § 154; Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).

*Id.* at 1318 (emphasis added). Importantly, both *Fallaux* and *Hubbell* were direct appeals from PTO rejections, and in neither case did the applicant dispute the general applicability of the ODP doctrine to post-URAA applications.

The Court has not reviewed *any* cases in which the ODP doctrine was asserted as an invalidity *defense* to a patent *issued* on a post-URAA application in federal court litigation. Thus, while the district court observed that "[n]o court has ever held that the [ODP] doctrine is eviscerated by the [1995] amendments to the

Patent Act" (A113), this Court has never invoked the ODP doctrine to invalidate, in the context of infringement litigation, a presumptively valid patent issued from an application filed after the URAA. The Court is thus confronted with an issue of first impression.

To affirm the judgment below, this Court would have to decide—and announce—that an issued patent, imbued with the statutory presumption of validity, may be invalidated on the basis of a judge-made doctrine, the statutory and policy reasons for which have been eliminated by Congress through the URAA. Kennedy has a property right in its patent that cannot be defeated without the clearest of statutory justifications; yet, applying the ODP doctrine in these circumstances would be wholly without legislative authorization.

The Supreme Court has repeatedly held that judge-made law "should look primarily to [the] legislative enactments for policy guidance" (*Miles v. Apex Marine Corp.*, 498 U.S. 19, 27 (1990)), and "is to be developed, insofar as possible, to harmonize with the enactments of Congress in the field" (*Am. Dredging Co. v. Miller*, 510 U.S. 443, 455 (1994)). The post-URAA legislative framework eliminates any need or justification for the ODP doctrine as an invalidity defense in federal court litigation involving an issued patent. As more patents issued from post-URAA applications are later litigated, the continuing availability of the ODP doctrine as a defense in infringement cases involving such patents becomes a matter of

increasing interest to the bench and bar.  The Court should take this opportunity to declare as a matter of law that the ODP doctrine has no applicability to patents issued from applications filed after June 8, 1995; and the judgment below should be reversed for this reason alone.

**2.**  Even if the URAA were not a *per se* bar to the application of the ODP doctrine to patents issued on post-amendment applications, this significant statutory change precludes applying the ODP doctrine to the patent-in-suit.

"The doctrine of double patenting seeks to prevent the *unjustified* extension of patent exclusivity beyond the term of a patent."  MPEP § 804 (8th ed. rev. 9, Aug. 2012) (emphasis added); *see*, *e.g.*, *Eli Lilly*, 689 F.3d at 1376.  During prosecution, an applicant may overcome a double patenting rejection by disclaiming the additional term of the second patent.  35 U.S.C. § 253.  Even without a terminal disclaimer, there is no double-patenting objection if an extension of the right to exclude is not unjust.  *See In re Braat*, 937 F.2d 589, 594-95 (Fed. Cir. 1991).

The district court made the conclusory assertion that "[t]he equities do not favor such an 'unjustified timewise extension of the right to exclude granted by a patent.'"  A110 (quoting *Hubbell*, 709 F.3d at 1145).  But the unique circumstances of this case do not fit this justification for the ODP doctrine, which is designed to "prevent claims in separate … patents that … claim inventions so alike that

23

granting both exclusive rights would effectively extend the life of patent protection." *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1373 (Fed. Cir. 2005).

Kennedy did not, and could not, obtain an unjust timewise extension because its applications were *both* filed and pursued under post-URAA law that prevents continuation applications from circumventing the Congressionally mandated patent terms. Because the post-URAA statute contains limitations on patent terms, the ODP doctrine is no longer necessary as a judicially enforceable curb on unjust extensions of the right to exclude. "[W]ith the shift to a patent term measured from the first filing date, the problem will generally take care of itself." Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63, 82 (2004).

The application for Kennedy's '766 reference patent, with each claim drawn to a genus of treatments for rheumatoid arthritis, was filed in 1996 and claimed priority to an earlier 1992 application. The later-filed and -issued '442 challenged patent, with each claim drawn to species of RA treatments falling within the '766 patent's genus claims, was filed in 2005 and claimed a 1996 priority date. Consequently, the Examiner asserted four additional years' prior art, including a published version of the '766 patent's 1992 priority document, against the '442 patent during prosecution. A5847-A5852, A5932-A5937. Indeed, the Examiner initially rejected the second application for statutory obviousness in light of the 1992 doc-

ument, which was prior art as to Kennedy as a result of post-1995 legislative changes. A5933-A5937. Kennedy "earned" its entitlement to the later priority date and corresponding expiration date for the '442 patent by overcoming this statutory rejection, which it would not have faced under the pre-URAA regime. The self-policing aspect of the URAA amendment to the Patent Act thus worked precisely as designed. There is nothing unjust about the term of the '442 patent.

The relevant dates of Kennedy's patents are depicted below:

| Patent No. | '766 patent | '442 patent |
|---|---|---|
| Claimed Priority Date | October 8, 1992 | August 1, 1996 |
| Filing Date | August 1, 1996 | September 12, 2005 |
| Issue Date | August 7, 2001 | December 7, 2010 |
| Expiration Date | October 8, 2012 | August 1, 2016 (August 21, 2018 with PTA per 35 U.S.C. § 154) |
| Enforceable Term (Right to Exclude) | 11 years 2 months 1 day | 7 years 8 months 14 days |

The Examiner who reviewed *both* patent applications was well aware of this sequence of events. He concluded that the claims of the '442 patent were allowable over the prior art arising between 1992 and 1996, including—critically—the

content of the 1992 priority application and the claims of the '766 patent. He specifically found, and detailed his reasons for finding, that the '442 claims were not subject to an ODP rejection. A6007. The Examiner is presumed to have done his job correctly. *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011); *see also PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008).

As the Examiner understood, there was nothing unjust or inequitable about the term of Kennedy's '442 patent, since the quid pro quo was overcoming considerable additional prior art. A6007-A6008. Nor did he demand the administrative remedy for an ODP rejection (*i.e.*, a terminal disclaimer). Rather, the Examiner withdrew the ODP rejection and deemed the invention of the '442 patent "an unobvious species" of the '766. A6007. Thus, there was no extension, much less an unjust (or unjustified) one. Kennedy was justly entitled to the full term of the '442 patent.

Furthermore, the PTO's finding that the claims of the '442 patent are patentable over the disclosure of the 1992 priority application is presumptively correct. Abbott has not alleged or asserted that the claims of the '442 patent are obvious over the content of the 1992 priority application or that the '766 claims were not entitled to the 1992 priority date. Therefore, it is illogical and legally incorrect that the claims of the '442 patent would have been obvious over the *claims* of the '766

patent—which cannot disclose more than the entire 1992 priority application, priority of which is attributed to the claims.

It was AbbVie's burden to prove, by clear and convincing evidence, an error in the Examiner's analysis. *See*, *e.g.*, *Procter & Gamble*, 566 F.3d at 999; *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991). Rather than hold AbbVie to its burden, the district court suggested that Kennedy practiced gamesmanship in sequentially securing the '766 and then the '442 patent. *E.g.*, A46 (accusing Kennedy of making "incorrect and not accurate" representations to the PTO during prosecution of the '766 patent). But allegedly misleading statements to the PTO are not the abuses to which the ODP doctrine is directed. Moreover, in the absence of inequitable conduct in the prosecution of the patent—which was never even alleged—such considerations (which are as unsupported as they are irrelevant) are insufficient bases for invalidating an issued patent. ODP is not a watered-down substitute for a patent challenger's inability to make out an inequitable conduct case.

Simply put, there is nothing *unjust* about affording Kennedy the full patent term authorized by Congress and allowed by the PTO, and certainly no basis for invalidating the challenged claims on this basis.

*****

The Court need go no further to reverse the judgment invalidating the challenged claims of the '442 patent. The ODP doctrine is inapplicable as a matter of law to patents issued on applications filed after June 8, 1995, including the '442 patent. Even if the Court is not prepared to rule so broadly, the doctrine cannot be applied as a matter of law in the specific circumstances of this case because Kennedy *earned* the full term of the '442 patent under the amended statute. The district court committed legal error in concluding otherwise.

## II. The '442 Patent Is Not Invalid Under The ODP Doctrine Correctly Applied

Assuming, *arguendo*, that the ODP doctrine applies in this case, the district court erred in invalidating the '442 patent under that doctrine. The '766 reference patent broadly claims a method of treating any individual with RA, regardless of previous treatment, if any, and including patients who are in remission, by co-administering an anti-TNFα antibody and methotrexate to achieve nothing more than an observable inhibition of TNFα's biological activity. The '442 challenged patent, by contrast, narrowly claims adjunctive co-administration that specifically reduces or eliminates both the signs and symptoms of RA in a particular cohort of patients suffering from "active disease" who achieved little or no benefit from prior administration of methotrexate alone (the "gold standard" for RA treatment)—a specialized regimen for the hardest-to-treat patients which produces a profound therapeutic benefit. Thus, the treatment method of at least claim 2 of the '442 pa-

tent is a patentably distinct species of the generic treatment methods claimed in the '766 patent.

ODP challenges are analyzed using a two-step framework. *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008). First, the court "construes the claims in the earlier patent and the claims in the later patent and determines the differences." *Id.* (internal quotation marks and alterations omitted). Second, the court "determines whether those differences render the claims patentably distinct." *Id.* A challenged claim is not patentably distinct if it is anticipated by, or obvious in light of, at least one reference claim. *Eli Lilly*, 689 F.3d at 1376. Importantly, only the *claims* of the reference patent are consulted for this purpose—the specification may be used for claim construction but not for the obviousness inquiry. *Id.* at 1378-79.

The district court erred in both steps of the analysis. First, the district court misconstrued a key claim limitation of each patent: "active disease," in the '442 claims; and "co-administering," in the '766 claims. The district court then relied on these erroneous constructions to minimize the differences between the challenged claims and the reference claims, repeatedly concluding that the claims (and claim limitations) of the '442 patent are "encompassed" by those of the '766 patent. These errors, which this Court reviews *de novo*, infected the remainder of the district court's analysis, in which the court ruled that the claims are not patently

distinct.  This ruling contrasts with the Examiner's contrary conclusion, which was based on the claimed therapeutic benefit in patients with active disease notwithstanding prior methotrexate treatment, as well as significant objective evidence of nonobviousness—including unexpected results—that the district court failed to consider properly.

### A.    The District Court Misconstrued Key Claim Limitations

A comparison of the closest claim of the reference ('766) patent and claim 2 of the challenged ('442) patent appear below (with corresponding elements color-matched):

| '766 Reference Patent | '442 Challenged Patent |
|---|---|
| **9.** A method of treating **rheumatoid arthritis** <br><br> in an **individual in need thereof** comprising <br><br> **co-administering** methotrexate and | **2.** The method of treating an **individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate** comprising <br><br> **adjunctively administering** with methotrexate therapy a **different composition** comprising |
| an **anti-tumor necrosis factor alpha antibody** or an antigen-binding fragment thereof to an individual | an anti-**human** tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) **binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors** and |
| in **therapeutically effective amounts** <br><br><br> wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks. | (c) is administered at a **dosage of 0.01-100 mg/kg,** and wherein such administration **reduces or eliminates signs and symptoms** associated with rheumatoid arthritis wherein (a) methotrexate is administered at an interval of a week or weeks, and (b) the anti-human tumor necrosis factor-α antibody or fragment thereof is administered multiple times, each such administration being separated by an interval of a week or weeks from the prior administration. |

Most of the claim terms were undisputed.  A5387-A5392; A1301.  The two

key disputed claim terms were "active disease," relating to the cohort of patients

who are the subject of the specific treatment method in the challenged '442 claims; and "co-administering," relating to the various modes of administration involved in the generic treatment method in the reference '766 claims.  The district court committed reversible error in misconstruing both of these key terms.

### 1. Active Disease

The '442 patent explicitly defines "active disease" as rheumatoid arthritis "defined by the presence of six or more swollen joints plus at least three of four secondary criteria (duration of morning stiffness $\geq$ 45 minutes; $\geq$ 6 tender or painful joints; erythrocyte sedimentation rate (ESR) $\geq$ 28 mm/hour; C-reactive protein (CRP) $\geq$ 20 mg/l)."  A142 (20:35-39).  The specification thus defines "active disease" as a disease state with particular metrics of disease activity.  *Id.*  The specification unwaveringly confines its use of the term to that definition.  *E.g.*, A148 (31:2-11, 32:63-67).

The '442 patent's definition of "active disease" describes, by objective determinants, a disease state experienced only by a particular subset of the patient population—*i.e.*, not every individual with RA (or in need of treatment for RA), but only those whose RA has manifested itself in at least six swollen joints plus at least three of four additional criteria.  It thus serves to distinguish the scope of the invention from the '766 claims, which apply to any individual in need of treatment.

Notwithstanding the express and explicit definition of the claim term "active disease" in the '442 patent, the district court construed this term to mean "patients with continuing signs and symptoms of rheumatoid arthritis." A92 (¶345). The district court thereby construed "active disease" contrary to the inventors' explicit definition, in violation of the most fundamental principles of claim construction.

Every patentee may be his own lexicographer. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("All that is required is that the patent applicant set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning"); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) ("the inventor's intention, as expressed in the specification, is regarded as dispositive"). The meaning an inventor provides in the patent's specification for a claim term must prevail over even the ordinary meaning of that term. *See Phillips*, 415 F.3d at 1316.

The district court *acknowledged* that the specification defines the claim term "active disease" in a particular way. A92 (¶342). The court said, however, that "[t]his definition of 'active disease' is appropriate when used in the context of entry to clinical trials, but would not be used by a person of ordinary skill in the art in clinical practice treating patients with rheumatoid arthritis." A92 (¶343). The question is not, however, how a clinician would have applied the term, but rather

how the patentee *defined* the term *for purpose of the claim*. The district court's decision to disregard what it recognized to be the "definition" provided *in the patent itself* was a critical legal error.

The concept of "active disease" was clearly significant to the Examiner, who requested amending the then-pending claims to specify "active disease," rather than merely disease. A6002. In his reasons for allowance, the Examiner noted that "[g]iven that that [sic] claimed methods are drawn to treating rheumatoid arthritis in patients…whose *active disease* has been incompletely controlled by previous treatment with methotrexate; the claimed methods…are deemed to be an unobvious species." A6007 (emphasis added).

Against this evidence AbbVie offered only the testimony of its expert witness, Dr. Weinblatt, who cited nothing to support his *ipse dixit* suggestion that the claim limitation "active disease" should be read to mean something other than what the specification defines it to mean. A1244; A1246. This too was error. *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005) (disapproving conclusions of an expert that were not supported "with any references to industry publications or other independent sources"). Dr. Weinblatt's unsubstantiated speculation cannot overcome the clear intrinsic evidence of the term's meaning, or else experts would have the *post hoc* power to change the

meaning of claim terms for the advantage of a party in litigation. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996).

The district court did not cite any intrinsic evidence that would support disregarding the explicit definition of "active disease" contained in the specification. Instead, the court relied entirely on extrinsic evidence—the conclusory testimony of AbbVie's expert witness. *See* A92 (¶¶343-44) (citing A1244-A1248). That was erroneous, as this Court has made clear. *Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.") (internal quotation marks omitted); *see also Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374, 1378 n.7 (Fed. Cir. 2006).

The district court's resulting construction that equated individuals with "active disease" as those "with continuing signs and symptoms of rheumatoid arthritis" impermissibly conflates all RA patients, with differing disease severities, into a single undifferentiated group. It is no accident, however, that the '766 patent claims recite "rheumatoid arthritis" whereas the '442 patent claims specify "active disease." The latter is a subset of the former: All persons with active disease have RA, but not all persons with RA have active disease. The reference patent is

broader—it claims a generic method of treatment for persons with RA, which includes drug-naïve patients, as well as patients with varying levels of disease, including remission (A1222-A1223; A1598); the challenged patent is narrower—it claims a specific method of treatment for persons with active disease. The plain language of the claims, read in light of the intrinsic evidence, teaches that the patient populations differ substantially. The district court's failure to correctly construe "active disease" minimized and effectively eliminated this vital difference between the reference and challenged patents.

## 2. Co-Administering

The method claimed in the reference '766 patent is based on "co-administering" anti-TNFα antibodies and methotrexate to patients with RA in need of treatment. The claims and specification of the challenged '442 patent unequivocally demonstrate that one way of "co-administering" an anti-TNFα antibody and methotrexate is to administer a single dose of each to the patient. The specification further explains that following administration of a therapeutically effective amount of each drug, maintenance amounts of either drug alone or both drugs together may be administered. A170 (19:35-46). Consistent with these disclosures, the specifications of both the '766 and '442 patents define how co-administering means that "TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate."

A169 (18:58-60). Thus, the '766 patent discloses that one may co-administer the two drugs as claimed by administering a single dose of methotrexate, followed by a single dose of an anti-TNFα drug, with or without preceding or successive doses of one or both drugs.

Contrary to this intrinsic evidence, the district court concluded that the co-administering claimed in the '766 patent "did not encompass the discontinuing of methotrexate therapy and then initiating anti-TNFα therapy alone." A86 (¶318). Rather, the court determined that co-administration as required by claims 8-14 of the '766 patent "encompass[es]" circumstances when treatment with methotrexate and antibody is started at approximately the same time ("concomitantly"); or either antibody or methotrexate is added ("adjunctively") to a continuing therapy of the other drug. A85-A86 (¶317) (internal quotation marks omitted). The district court further held that "co-administering" does not include administering the two drugs sequentially. A86 (¶318).

The claim language of the '766 patent clarifies that "co-administering" includes administering either single doses or multiple doses of each drug, and includes administering the drugs sequentially. A comparison of claim 8 to its dependent claim 9 demonstrates that the only additional limitation is that the anti-TNFα antibody must be administered "in a series of doses separated by intervals of days or weeks":

| 8. A method of treating rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts. | 9. A method of claim 8 wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered *in a series of doses separated by intervals of days or weeks* |
| --- | --- |

The principle of claim differentiation demands that the scope of claim 8 differ from claim 9. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005). Claim 8 is silent as to the number of anti-TNFα and methotrexate doses administered, and as to the intervals between such administrations. Thus, claims 8 and 10-14 encompass embodiments with single or multiple doses of each of the anti-TNFα antibody and methotrexate.

The specification of the '766 patent also discloses that "TNF antagonist and methotrexate can *each* be administered in *single or multiple doses* depending upon factors such as nature and extent of symptoms, kind of concurrent treatment and the effect desired." A170 (19:66-20:2); A162 (4:46-49). The patent further notes how the "TNF antagonists and methotrexate can be administered *prophylactically* or therapeutically to an individual." A169 (18:56-57) (emphasis added); A1605. Prophylactic use of the drugs would be consistent with co-administering single doses of both drugs to a patient in remission to prevent a flare-up of disease. A1603-A1605.

The specification of the '766 patent also confirms that the TNF antagonist and methotrexate can be co-administered simultaneously *or* sequentially: "TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) *or* sequentially with the administration of methotrexate." A169 (18:58-60) (emphasis added).

The specification discloses that "co-administering" can include administration of *maintenance amounts* "[o]nce a therapeutically effective amount has been administered" and that this "maintenance amount can be administered in the form of a single dose, or a series or doses separated by intervals of days or weeks." A170 (19:35-46). Thus, the '766 patent discloses co-administering the two drugs by administering *a single dose* of, for example, methotrexate, followed by (switching to) a single dose of an anti-TNFα drug.

*A fortiori*, the specification teaches that one may co-administer the two drugs as claimed by administering *multiple doses* of, for example, methotrexate, followed by switching to a single dose of an anti-TNFα drug, which might or might not be followed by additional doses of the anti-TNFα drug. Indeed, the specification includes a demonstration (the MTX- (methotrexate minus) prong of the study reported in Example 1) of precisely such a sequential co-administration.

Patients discussed in Example 1 of the specification labeled "MTX-" had been taking methotrexate for at least six months up to week -1 of the trial. A170

(20:51-53). Starting at week 0, the MTX- patients were administered five intermittent doses of the anti-TNFα antibody cA2. A171 (21:15-21).

During prosecution of the '766 patent Kennedy clarified that the term of "co-administering" extends only during the time of overlapping therapeutic presence of the two drugs. A5544. When the second drug is co-administered with prior methotrexate, the term of co-administering extends no more than one month after a final dose of methotrexate, when its carryover therapeutic effect expires. *Id.* Thus, in the context of a patient receiving prior methotrexate but then ceasing methotrexate and switching to an anti-TNFα antibody, the two drugs are co-administered, for a period of about one month.

At trial, the uncontroverted evidence—including that of the inventor, Kennedy's expert witness, *and AbbVie's expert witness*—was that the MTX- cohort of patients enjoyed a carryover effect of methotrexate for at least one month. A1296-A1297; A1520; A1607. Furthermore, cA2—the anti-TNFα antibody Kennedy's inventors tested—is a fast-acting drug, as Dr. Maini testified: "within three days of the administration [of cA2] there was an effect, a beneficial effect." A1496. Thus, for at least three weeks, between weeks 0-3, the MTX- patients experienced both the residual effect of methotrexate and the effect of the anti-TNFα antibody present at therapeutic levels. It was during this timeframe that these patients were treated

by sequentially co-administering the two drugs, as disclosed and claimed in the '766 patent.

Notwithstanding this evidence—including the specific examples in the patent itself of sequential co-administration of single doses of methotrexate and an anti-TNFα drug—the district court read the term "co-administer" restrictively to mean only concomitant or adjunctive administration of the two drugs where administration of both drugs is continued indefinitely. A85-A86 (¶317).

The district court erred by requiring ongoing treatment and thereby excluding from the scope of the '766 claims specific treatment regimens that the '766 specification explicitly states *are* examples of "co-administering": administering single doses of one or both drugs. A162 (4:48-49); A170 (19:35-46). The court also erred by excluding the cohort of patients treated as indicated in the "MTX-" arm of Example 1 from having enjoyed any term of co-administration. A170-A176 (Example 1). This limiting construction contravenes the principle that, absent an explicit disclaimer (not present here), claims should not be construed to exclude examples in the specification. *See, e.g., Arcelormittal France v. AK Steel Corp.*, 700 F.3d 1314, 1321 (Fed. Cir. 2012) ("'we normally do not interpret claim terms in a way that excludes disclosed examples in the specification'") (alteration omitted) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007)); *see also Vitronics*, 90 F.3d at 1583.

41

Instead, the court relied on the fact that the specification of the '766 patent refers to administration of cA2 "alone or in combination with methotrexate," in the context of Example 1 as irreconcilable with treating the MTX- patients as receiving antibody co-administered with methotrexate. A170 (20:43-49); A84-A85 (¶¶312-314). The district court failed to recognize that the same group of patients received both a period of sequential co-administration of both antibody and methotrexate, and a subsequent period of antibody monotherapy. For at least the first three weeks of the trial, these patients received antibody sequentially co-administered with methotrexate. For the remainder of the trial only cA2 was administered and the effect of the methotrexate dissipated.

For the same reason, during prosecution it was appropriate that Kennedy refer to patients receiving "each agent alone." A5516; A85 (¶316). It is undisputed that after therapeutic levels of one drug have dissipated, there is no further co-administration. Indeed, Kennedy asserted as much during prosecution. A5544. Moreover, the inventors' later publications (long after the invention date of the '766 patent) merely state the uncontroverted fact that at certain stages of trial, as Example 1 describes, patients received "monotherapy" or "cA2 alone." A86 (¶319). The inventor's trial testimony was consistent with this position. A1518.

None of these statements changes the uncontroverted fact that for a period of at least one month, patients in the MTX- cohort were experiencing the effects of

both methotrexate and cA2. Indeed, Dr. Maini's testimony at trial explicitly so stated. *Id.* He further testified that these patients demonstrated surprising effects due to the uncontroverted carryover effect of methotrexate. A1522-A1523; A1561-A1563. As such, none of these statements disclaims any of the many forms of co-administering set forth in the specification.

The district court committed legal error by narrowly reading the claim term "co-administering" to exclude modes of administration exemplified in the specification, including single doses, maintenance amounts, and sequential administration of antibody after methotrexate. This error was prejudicial because, as explained below, the unexpected results on which the Examiner relied in finding the '442 claims nonobvious over the '766 claims were achieved in an example employing the adjunctive mode of co-administration. The district court's erroneous claim construction, which excludes the sequential co-administration mode from the scope of the claims, was also the predicate for its erroneous refusal to consider objective evidence of unexpected results, and as such warrants reversal.

### B. The District Court Erred In Concluding That The Challenged Claims Are Not Patentably Distinct

The district court compounded its claim construction errors by making corresponding errors in comparing the differences between the challenged claims and the reference claims. First, by reading "active disease" in the challenged claims as equivalent to "rheumatoid arthritis" in the reference claims, the court suppressed

key differences in patient population and other limitations that, properly understood, show that the '442 claims recite a patentably distinct species of the generic '766 claims. Second, by reading "co-administering" to exclude a mode of administration used in an experimental example, the court was able to ignore the evidence of unexpected results on which the Examiner expressly relied in allowing the challenged patent to issue over the claims of the reference patent. Both errors warrant reversal.

### 1. At Least Claim 2 Of The '442 Patent Is A Patentably Distinct Species Of The Generic '766 Patent Claims

Each claim of the '442 patent is a species of one or more claims of the '766 patent—and the law is clear that such successive claiming is not only permissible, but "commonplace." *In re Kaplan*, 789 F.2d 1574, 1577-78 (Fed. Cir. 1986). However, the district court misapprehended this Court's authority governing similar situations, holding that the challenged species claims were obvious *because* they were "encompassed" by the generic reference claims. A89 (¶330); A95 (¶354). The court thereby committed yet another reversible error.

**a.** Related inventions are patentably distinct if they are not connected in effect and where one invention is not anticipated or rendered obvious by the other. *See* MPEP §§ 802, 804. There is no issue of anticipation here, so the second step of the ODP analysis is analogous to an inquiry into the obviousness of a claim under 35 U.S.C. § 103. *In re Longi*, 759 F.2d 887, 892 n.4 (Fed. Cir. 1985). In this

analysis the specification of the earlier patent may *not* be used as prior art against the patentee. *Amgen Inc. v. F. Hoffmann-La Roche Ltd.*, 580 F.3d 1340, 1361 (Fed. Cir. 2009). ODP focuses on preventing a patentee from claiming a later expiring obvious variant of an earlier expiring invention it has previously *claimed,* not what it has previously *disclosed. See Eli Lilly*, 689 F.3d at 1380.

The law is clear that the *same* inventor may obtain separate patents on an earlier generic invention and a later improvement or species if the latter is patentably distinct from the former. *See, e.g.*, *Kaplan*, 789 F.2d at 1578 ("'One of the simplest, clearest, soundest and most essential principles of patent law, is that a later invention may be validly patented, altho [sic] dominated by an earlier patent, whether to the same or to a different inventor'") (quoting Emerson Stringham, *Double Patenting* 207 (1933)); *In re Baird*, 16 F.3d 380, 382-83 (Fed. Cir. 1994) (Section 103); *In re Sarett*, 327 F.2d 1005, 1010-11, 1014 (C.C.P.A. 1964) (ODP). By contrast, a later genus claim is typically not patentable over an earlier patented species of that genus. *See, e.g.*, *In re Goodman*, 11 F.3d 1046, 1053 (Fed. Cir. 1993).

Thus, a subsequent, challenged patent claim may be patentably distinct from an earlier, reference claim even if both claims cover some overlapping subject matter. *Kaplan*, 789 F.2d at 1577-79. Furthermore, where the term of the earlier, reference genus patent expires before the term of the later, challenged species patent,

the claims of the unexpired later patent may validly preclude practicing some aspect of the invention claimed in an expired patent. *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278-79 (Fed. Cir. 1992); *Braat*, 937 F.2d at 594; *Sarett*, 327 F.2d at 1010-11.

Cases concerning "domination"—*i.e.*, when a broader reference claim encompasses a narrower challenged claim—illustrate circumstances where the public cannot practice certain embodiments of an expired broader claim covered by the challenged claim. *See Kaplan*, 789 F.2d at 1577-78; *Braat*, 937 F.2d at 594. As this Court has recognized, however, that "commonplace situation," by itself, "does not give rise to 'double patenting.'" *Kaplan*, 789 F.2d at 1577-78; *see also Sarett*, 327 F.2d at 1014 ("it is elementary that readability of a claim on the subject matter of another claim (domination) is neither determinative of the double patenting issue nor demonstrative that claims are directed to the same invention"). Instead, double patenting bars the challenged claim only if it is the same as the reference claim (*e.g.*, covers identical subject matter whether or not identically worded), or if it is an obvious variant of the reference claim. *In re Vogel*, 422 F.2d 438, 441-42 (C.C.P.A. 1970); *see also Braat*, 937 F.2d at 594-95; *Kaplan*, 789 F.2d at 1579-80.

In *Kaplan*, the Board of Patent Appeals and Interferences had sustained a double patenting rejection made on the basis that reference claims to a process of chemically synthesizing compounds using organic solvents "embrace[d] or en-

compass[ed]" later claims to a synthetic process using particular solvents. 789 F.2d at 1577. On review, this Court first noted that the challenged claim was an improved species of the reference claim's genus. *Id.* at 1575. The Court then reversed the rejection, discussing the Board's error in terms that are equally applicable to the district court's decision in this case:

> To use the words of which the board seemed to be enamored, the broader claim "embraces" or "encompasses" the subject matter defined by the narrower claim…. This commonplace situation is not, per se, double patenting as the board seemed to think. (See particularly the quotations from [*Double Patenting*, *supra*,] about terms such as "covered" and "embraced.")

*Id.* at 1577-78 (citation omitted).

Indeed, if it were sufficient that the second claim be subsumed within (or encompassed by) the first, then *every* species patent would fail the "patentably distinct" test since a species will *always* be a subset of its genus. While the district court recited the rule that prior art disclosure of a genus does not necessarily disclose every species within the genus (A80), the court failed to heed this well-established rule in analyzing the distinctions between the reference and challenged claims; indeed, the district court repeatedly found elements of the challenged claims obvious because they were "encompassed" by the reference claims.

**b.** The district court repeatedly conflated the challenged and reference claims even though the former are specific—and patentably distinct—species of the latter. *See*, *e.g.*, A85-A86 (¶317); A89 (¶330); A95 (¶354); A96 (¶361); A97

(¶¶363, 366); A106-A107 (¶400). Time and again, the district court disregarded the differences between the two patents on the ground that the reference claims "encompassed" (or dominated) the challenged claims. This was legal error.

For example, regarding the difference between the specific adjunctive mode of administration required by the '442 claims and the broad "co-administering" of the '766 claims, the court stated that "administering anti-TNFα antibody either adjunctively and/or concomitantly—does not distinguish . . . [the challenged claims] because, as noted above, co-administration *includes* adjunctive and/or concomitant therapy with methotrexate." A106-A107 (¶400) (emphasis added). The court thus collapsed the claims together rather than identifying the differences, as ODP analysis requires.

Importantly, the district court misidentified the differences in patient populations covered by the claims of the two patents. The reference claims of the '766 patent disclose methods of treating rheumatoid arthritis in *any* "individual in need thereof"; by contrast, the challenged claim of the '442 patent is narrowly focused on treating a patient suffering from "active disease" that is "incompletely controlled despite already receiving methotrexate." A178; A150. The court's erroneous construction of "active disease" to mean "patients with continuing signs and symptoms of rheumatoid arthritis" incorrectly erased the distinctions between the

disparate patient populations whose treatment the two patents address. A92 (¶345).

The district court went on to discuss how those populations compared with the patient population of the '766 patent: the "individual in need" of treatment. The court found that

> a person of ordinary skill in the art would not consider there to be a substantial difference between the patient populations identified by claim 8 of the '766 patent and claim 1 of the '442 patent **because** patients whose active rheumatoid arthritis is incompletely controlled despite already receiving methotrexate **would be included within** the population of patients with rheumatoid arthritis "in need of treatment thereof."

A95 (¶354) (emphasis added).

The district court's conclusion that the patient populations of the challenged claims are included within (or encompassed by) the patient populations of the reference claims is legal error, as *Kaplan* and other precedents make clear. Challenged claims cannot be invalid for ODP *because* they are dominated by reference claims; rather, challenged claims—whether or not dominated—are invalid only *if they are not patentably distinct*. *See Braat*, 937 F.2d at 594-95; *Kaplan*, 789 F.2d at 1579-80; *Sarett*, 327 F.2d at 1014.

The district court's error in conflating the challenged and reference claims through its misconstruction of "active disease" was prejudicial because this limita-

tion was critical to the Examiner's finding that the '442 patent claims are not obvious in light of the '766 patent claims:

> Given that that claimed methods are drawn to treating rheumatoid arthritis in patients who have already failed to respond to methotrexate or *whose active disease has been incompletely controlled by previous treatment with methotrexate*; the claimed methods of treating rheumatoid arthritis by adjunctively administering methotrexate with anti-TNFα antibody *in this patient population* due to unexpected results and, in turn, are deemed to be an unobvious species.

A6007 (emphasis added). The Examiner thus understood that the different "patient population[s]" covered by the reference and challenged claims was key to rendering the challenged claims patentably distinct.

The claims of the '766 patent state only that an RA patient in need of treatment is co-administered an anti-TNFα antibody and methotrexate in therapeutically effective amounts. The district court found that "an individual in need thereof," as the '766 patent recites, means a patient with RA who requires treatment. A88. The parties agreed and the court recognized that RA is a chronic disease which, once diagnosed, is never cured. *See*, *e.g.*, A7. Furthermore, the undisputed evidence of record is that while some patients may go into remission of their disease, they may still be "in need" of treatment as the '766 patent recites. *See* A1598. Thus, the '766 claims include the treatment of individuals with any level of RA that requires treatment, including individuals in remission, and individuals with no previous treatment regimen (*i.e.*, drug-naïve patients).

50

Nowhere do those claims or the prior art suggest that the most afflicted patients—those with "active disease" who received little or no therapeutic benefit from methotrexate—could achieve substantial reduction in both the signs and symptoms of RA from adjunctive administration of an anti-TNFα antibody with continued treatment with methotrexate. A POSA would not have expected that result in those patients. A1325-A1326; A1455-A1456.

Before the inventions claimed in the '442 patent, while some patients might have received some therapeutic benefit from treatment with both methotrexate and an anti-TNFα antibody (for example, per the '766 claims), many patients received insufficient therapeutic benefit from methotrexate alone, *e.g.*, they had "active disease" that was "incompletely controlled" despite prior methotrexate. A1361-A1362. Indeed, there is uncontroverted evidence that some patients received little or no therapeutic benefit. A1138; A1640. These patients nonetheless suffered all the drug's side effects without its intended benefits. A1348; A1593-A1594. The most logical course for such patients, in view of the '766 claims, would be to switch to an anti-TNFα antibody like cA2 without a washout of methotrexate. This course would prevent any flare of disease activity, due to the fast action of cA2, while the residual methotrexate dissipated over a period of weeks from the patient's system. A1820.

The district court found that a POSA would have had a reasonable expectation of successfully practicing the claimed methods of the '442 patent on the basis of the claims of the '766 patent in view of the relevant prior art. This determination was premised on AbbVie's insistence that the patients with "active disease" covered by the '442 patent were the same as the patients described in the reference claims, and that the therapeutic effects of the different treatment regimens were equivalent. A1159; A1244; A89 (¶330); A92 (¶345). But these positions reflect the same underlying error.

The '766 claims require administering the drugs in "therapeutically effective amounts" versus the more specific requirement of the '442 claims that administration significantly reduce or eliminate both signs and symptoms associated with rheumatoid arthritis in patients with "active disease." A5391; A178. A "sign" of RA is an indication of disease that is detectable by a doctor without the use of laboratory tests, such as joint deterioration; a "symptom" is an indication of disease that is experienced by the individual with the disease, such as pain. A5391.

The '766 patent explicitly defines a "therapeutically effective amount" as merely inhibiting the biological activity of TNFα. A5391; A170 (19:18-26). By further reciting that such amounts "preferably" include an amount that "significantly reduces signs and symptoms" of RA (A170 at 19:26-30), the '766 patent clarifies that a "therapeutically effective amount" does *not* require any reduction in

signs and symptoms.  On the contrary, the '766 claims merely require that there be some inhibition of the biological activity of TNFα.  The '442 patent, by contrast, requires that the therapy "reduces or eliminates the signs and symptoms" of RA.

As the Examiner explained, the nonobviousness of the '442 claims derives, in part, from the fact that the treatment claimed in the '442 patent reduces both the signs and symptoms of RA "in patients who have already failed to respond to methotrexate or whose *active disease* has been incompletely controlled by previous treatment with methotrexate," a drug known to reduce the symptoms but not the signs of RA.  A6007.

The district court found that a POSA "would understand the term 'therapeutically effective amount' to *encompass* (but not be limited to) an amount necessary to reduce or eliminate signs and symptoms of rheumatoid arthritis."  A89 (¶330). Then, in comparing this broad limitation of claim 8 of the '766 patent to a corresponding, narrower limitation of claim 1 of the '442 patent (requiring administration of the drugs to "reduce[] or eliminate[] signs and symptoms" of RA), the court found that, "[a] person of ordinary skill in the art would not consider this to be a meaningful distinction *because* the term 'therapeutically effective amount' clearly *encompasses* an amount that 'reduces or eliminates signs *or* symptoms associated with rheumatoid arthritis.'"  A97 (¶366) (emphasis added).

53

The district court's conclusion that the therapeutic results of the challenged claims are encompassed by the patient populations of the reference claims fails to acknowledge the chasm between the broad '766 claims—merely requiring some reduction of TNFα activity whether or not recognized by the doctor or patient A5391; A170 (19:18-26)—and the requirement of the narrow '442 claims of substantial reduction in both clinical "signs" *and* "symptoms." A150. This distinction is important because patient cohort whose treatment the '442 patent claims suffer from high-level "active disease"; a POSA would not have reasonably expected to achieve these specific, substantial therapeutic benefits in such patients. A1638; A1641.

The district court's erroneous construction of "active disease" profoundly distorted its analysis of whether a POSA would have had a reasonable expectation of success, and led the court to conclude, erroneously, that the challenged claims are not patentably distinct from the reference claims. The Examiner, by contrast, understood that the '442 invention is directed at a different patient population and claims substantial unexpected therapeutic benefits from a specific treatment regimen. Thus, reversal of the district court's construction of "active disease" would require reversal of the judgment of invalidity.

## 2. The District Court Erred In Failing To Consider Evidence Of Unexpected Results

Before invalidating the challenged claims, the district court was required to consider whether objective evidence of nonobviousness, including unexpected results, demonstrate that the invention would not have been obvious. *See*, *e.g.*, *Procter & Gamble*, 566 F.3d at 994; *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) ("The objective considerations, when considered with the balance of the obviousness evidence in the record, guard as a check against hindsight bias"), *cert. denied*, 133 S. Ct. 933 (2013); *accord In re Dillon*, 919 F.2d 688, 693 (Fed. Cir. 1990) (en banc) ("all evidence of the properties of the claimed compositions and the prior art must be considered in determining the ultimate question of patentability").

Evidence of unexpected results may preclude a determination of obviousness. *See*, *e.g.*, *Cyclobenzaprine*, 676 F.3d at 1079; *In re Emert*, 124 F.3d 1458, 1462 (Fed. Cir. 1997) (looking for "some indication of unexpected properties" in analyzing double patenting); *Longi*, 759 F.2d at 896 (examining a declaration concerning unexpected results to assess double patenting); *In re Lyons*, 364 F.2d 1005, 1015-16 (C.C.P.A. 1966) (evaluating whether evidence showed "an unexpected result probative of nonobviousness"). Unexpected results are relevant to an ODP analysis because logically, "that which would have been surprising to a person of

ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995).

**a.** Kennedy introduced substantial evidence that the invention of the '442 claims demonstrated significant unexpected advantages in view of the prior art and the reference claims. *See*, *e.g.*, A1324-A1326 (remission or near-remission); A1522-A1523 (MTX- patients improved); A1526-A1527 (reduction in HACA response); A1562, A1569 (MTX- patients improved); A1672-A1691 (remission, long-lasting and progressive duration of improvement, enhanced tolerance of antibody, benefit when antibody no longer present); A1696-A1697. The existence of unexpected results supports the conclusion that a challenged claim of the '442 patent is not an obvious variant of a reference claim of the '766 patent. The Examiner recognized this principle in allowing the '442 patent to issue. A6002.

The district court simply ignored much of Kennedy's evidence of unexpected results. The district court refused to credit that evidence principally because the court's construction of "co-administering" eliminated the results obtained with the sequentially co-administered MTX- patients from the analysis, leaving nothing against which to compare the results of the '442 patent's adjunctive treatment. A86 (¶318); A99 (¶¶370-72). Consequently, reversal of the district court's construction of "co-administering" (which excluded this sequential mode of co-administering the two drugs) would *require* consideration of Kennedy's substantial

evidence of unexpected results. As the Examiner recognized, that evidence irrefutably demonstrates the nonobviousness of the '442 claims. A6007. Although the "Examiner's decision … is never binding on a court," it is nonetheless "evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence." *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed. Cir. 1985).

Therefore, if the Court were to reverse the overly narrow construction afforded "co-administering" by the district court, the district court's finding of nonobviousness cannot stand. The MTX- arm of Example 1 demonstrates unexpected results of a particular treatment regimen in a specified patient population—the hardest-to-treat patients with active disease—which in part forms the basis for the '442 invention. The Examiner allowed the patent on the basis of the unexpected results that the '442 invention demonstrates; AbbVie has no evidence, much less clear and convincing evidence, that a POSA reading the *claims* of the '766 patent, and the relevant prior art, would have expected these results.

Kennedy introduced additional evidence, most of which was entirely uncontroverted, of long-lasting and progressive duration of improvement in the various parameters measured for the adjunctively co-administered patients versus the sequentially co-administered patients. A1673-A1680. Kennedy also introduced evidence of the enhanced effects of methotrexate in the claimed patient cohort, includ-

ing improved pharmacokinetics and longer half-life in the blood; enhanced toler-ance and reduced HACA responses; and therapeutic benefit in the absence of de-tectable anti-TNFα antibody. A1680-A1691.

Inexplicably, the district court wholly failed to account for Kennedy's addi-tional evidence that the therapeutic efficacy of the claimed invention of the '442 patent far exceeded any reasonable expectation of a person of ordinary skill. RA is a chronic disease without a known cure; as such, the best a patient can hope for is that his or her disease goes into remission or near remission. A1137. But it was well-known that remission was a very rare event for RA patients before the inven-tions claimed by the '442 patent. A1672; A1713.

Kennedy adduced extensive and unrebutted evidence that patients receiving the claimed therapy experience relief of signs and symptoms sufficient to approach disease remission. A1322; A1324-A1326; A1672-A1673. Indeed, AbbVie's ex-pert witness, Dr. Weinblatt, conceded as much. A1324. Furthermore, Kennedy offered testimony that this effect was most striking in the adjunctively treated co-hort of patients treated in Example 1 (labeled "MTX+"), and less striking—but still present—in the sequentially co-administered (MTX-) patients. A1673. Finally, there was evidence that skilled artisans of the time would not have expected such a result; and that they would have been skeptical that such a result could have been

58

achieved. A1325-A1326. The district court failed to grapple with or even acknowledge this uncontroverted evidence.

**b.** The district court went on to conclude that even assuming *arguendo* that Kennedy's construction of "co-administering" was correct, the other evidence Kennedy provided of unprecedented beneficial results achieved by the claimed invention should be discounted as "not scientifically prove[n]" (A86-A87 (¶320); A99-A100 (¶¶373-374)), and on that basis refused to credit PTO's determination that the inventors had proven unexpected results. A6007.

But the Examiner *accepted* Kennedy's evidence of unexpected results and issued the '442 patent upon a finding that the challenged claims were nonobvious over the reference claims. The district court committed legal error in failing to recognize that since the patent had issued on the basis of that evidence, Kennedy was entitled to rely on the same evidence presented to the PTO. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 307 (Fed. Cir. 1985) ("error as a matter of law" not to "discuss" or accord "probative value" to patentee's evidence of non-obviousness); *see also Apple, Inc. v. ITC*, 725 F.3d 1356, 1365 (Fed. Cir. 2013); *Cyclobenzaprine*, 676 F.3d at 1077- 78; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 969 (Fed. Cir. 2006).

It was AbbVie's burden to prove, by clear and convincing evidence, that the Examiner was wrong—that is, that the results *actually achieved* would have been

expected by a POSA before the critical date. *See Cyclobenzaprine*, 676 F.3d at 1078-79 & n.5. AbbVie did not carry this burden.

It is certainly true that conclusory statements cannot constitute evidence of unexpected results without factual support. *Sud-Chemie, Inc. v. Multisorb Techs.*, 554 F.3d 1001, 1003-04 (Fed. Cir. 2009); *see also Soni*, 54 F.3d at 750. Yet, Kennedy's evidence was far from conclusory: Example 1 of the specification provides detailed, quantified proof that the claimed method of treatment produced unexpected results in a particular patient cohort. A142-A147 (Example 1).

Such evidence of unexpected results need not be statistically significant or independently validated. *Soni*, 54 F.3d at 751 ("when an applicant demonstrates *substantially* improved results, as Soni did here, and *states* that the results were *unexpected*, this should suffice to establish unexpected results *in the absence of* evidence to the contrary") (emphases in original). The court's criticism of Kennedy's data that they were not sufficiently "powered" to provide statistically significant results (*e.g.*, A86-A87 (¶320); A100 (¶374)) was legally improper, as statistical significance is not required for patentability. MPEP § 2107.03 ("The applicant does not have to prove that a correlation exists between a particular activity and an asserted therapeutic use of a compound as a matter of statistical certainty.... Instead, as the courts have repeatedly held, all that is required is a reasonable correla-

tion between the activity and the asserted use"); *accord In re Kollman*, 595 F.2d 48, 56 & n.8 (C.C.P.A. 1979).

Kennedy demonstrated that the data in Example 1 distinguish the therapeutic effects in the individuals receiving sequential co-administration (*i.e.*, an overlapping period of biological effects of both methotrexate and cA2 after methotrexate therapy is discontinued and administration of antibody immediately commenced) from those receiving cA2 monotherapy or from those receiving adjunctive therapy. Drs. Maini and Lipsky pointed to data showing superadditive effects of the two drugs on duration of effect and on magnitude of effect. Moreover, these results were more pronounced for the cohort of patients receiving adjunctive therapy (labeled "MTX+") than for those receiving sequential co-administration (labeled "MTX-"). A1522-A1523; A1562; A1569; A1672-A1691. That the study was not "powered" to statistically demonstrate this effect is *a consequence of the fact that the data were surprising*.

The court also said that even if the results supported the comparison Kennedy advanced between sequential co-administration and adjunctive therapy, the data only demonstrated *expected* results (*i.e.*, because the two therapies were individually effective, together they should be more effective). A99-A100 (¶373). But the evidence showed *superadditive* effects from the adjunctive therapy, in a cohort of patients receiving negligible benefit from one of the two drugs, *including at times*

61

when at least one of the two drugs was no longer present at therapeutic levels. A1690-A1691. Such a result could not be expected from the mere addition of the two agents—and certainly AbbVie never proved as much.

The district court's cursory review of the experimental evidence overlooks the fact that while methotrexate was effective for some patients, for the patients whose treatment is covered by the '442 claims, methotrexate provides little or no therapeutic benefit, leaving them with "active disease." A1138; A1173; A1179; A1318; A1638-A1640. The undisputed fact that these two drugs show superadditive results in difficult-to-treat patients thus belies the district court's finding entirely.

Furthermore, the court stated that "the fact that patients who received adjunctive therapy showed positive residual effects of the treatment even after the level of antibody subsided would not be unexpected (particularly where the antibody treatment had an extended half-life)." A99-A100 (¶373). This statement inexplicably ignores the fact that the "extended half-life" of antibody *was one of the unexpected results demonstrated by the inventors*. As discussed above, among the unexpected results that support the nonobviousness of the '442 claims is the improved pharmacokinetics and longer half-life in the blood of the antibody that methotrexate provides when co-administered according to the '442 claims. A1680-A1691.

**c.** At the end of the day, it appears that the district court was troubled by the fact that Example 1 appears in the *specification* of both the '766 and the '442 patents. A99 (¶¶370-71); A1087; A1675-A1676; A1828-A1829. Under the ODP doctrine, however, the specification of the '766 patent cannot be considered in determining whether the '442 claims are obvious; the obviousness inquiry must turn solely on the reference *claims*. Thus, AbbVie invited the district court to construe those claims in a manner that would preclude Kennedy from relying on Example 1 (which shows the unexpected results of the '442 invention). The district court accepted that invitation, and read "co-administering" so as to exclude the MTX- patients of Example 1. A84-A86 (¶¶311-318).

Correcting the district court's construction of co-administering means that the challenged claims are supported by substantial evidence of unexpected results, which the district court improperly disregarded. As the Examiner correctly recognized, these unexpected results—that is, the ability of this new invention to successfully treat (to a surprisingly great degree) real people suffering from the most debilitating form of this crippling disease—are sufficient to render the challenged claims nonobvious over the reference claims. The judgment below should be reversed.

<div align="center">*****</div>

The district court's improper construction of "active disease" and "co-administering" led the court to ignore the differences between the challenged and reference claims—differences that render the former patently distinct from the latter. This Court should correct these errors and reverse the finding of obviousness.

## CONCLUSION

The judgment of invalidity should be reversed.


Dated:  December 2, 2013

Respectfully submitted.

By:   /s/ Mark A. Perry

John P. White
Norman H. Zivin
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400

Mark A. Perry
 *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 955-8500
F: (202) 467-0539
mperry@gibsondunn.com

Wayne M. Barsky
Timothy P. Best
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 552-8500

*Attorneys for Defendant-Appellant*
*The Mathilda and Terence Kennedy Institute of Rheumatology Trust*

CASE PARTICIPANTS ONLY

# ADDENDUM

# TABLE OF CONTENTS

Final Judgment Under Fed. R. Civ. P. 54(b) (July 2, 2013) (Dkt. 121) ................A1

Findings of Fact and Conclusions of Law (June 20, 2013) (Dkt. 120) .................A4

Order (Aug. 29, 2012) (Dkt. 80) ........................................................A111

U.S. Patent No. 7,846,442 (Dec. 7, 2010) ..........................................A115

U.S. Patent No. 6,270,766 (Aug. 7, 2001) ..........................................A151

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 7-2-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABBVIE INC. and
ABBVIE BIOTECHNOLOGY LIMITED,
          Plaintiffs-Counterclaim-
          Defendants,

          v.

THE MATHILDA AND TERENCE KENNEDY
INSTITUTE OF RHEUMATOLOGY TRUST,

          Defendant-Counterclaim-
          Plaintiff.

11 Civ. 2541 (PAC)

**[PROPOSED] FINAL JUDGMENT
UNDER FED R. CIV. P. 54(b)**

The Court held a four-day bench trial in this action from September 18 through September 21, 2012. After considering the parties' arguments, pretrial memoranda of law, and proposed findings of fact and conclusions of law, and evaluating the evidence produced at trial, including the documentary record and the testimony of the witnesses, this Court issued its Findings of Facts and Conclusions of Law on June 20, 2013, concluding that the Plaintiffs had proven by clear and convincing evidence that each of claims 1 through 7, 13, 14, and 17 through 20 of U.S. Patent No. 7,846,442 (the "'442 patent") is invalid for obviousness-type double patenting over claims 8 through 14 of U.S. Patent No. 6,270,766 (the "'766 patent") and that Defendant had failed to prove its counterclaim for a declaratory judgment that these claims of the '442 patent are not invalid. By an order dated August 10, 2012, the Court found that there were "good reasons to believe" that Defendant's other counterclaims, relating to Plaintiffs' royalty obligations, are subject to arbitration, and stayed those counterclaims pending the trial of the invalidity issues. (ECF No. 67.) While the Court has yet to issue its final ruling as to the

arbitrability of those counterclaims, it finds that there is no just reason to delay entry of final

judgment as to the validity issues that were the subject of the trial and this Court's June 20, 2013,

decision, and that there would be no unfair prejudice to either party in doing so.

NOW THEREFORE, based on the foregoing, it is hereby ORDERED AND

ADJUDGED:

(1) Claims 1 through 7, 13, 14, and 17 through 20 of U.S. Patent No. 7,846,442 are declared invalid;

(2) Final judgment is hereby entered in favor of Plaintiffs and against Defendant on Defendant's Counterclaim 1 declaratory judgment of patent validity; and

(3) The Plaintiffs are the prevailing party in this litigation and the Court awards costs to the Plaintiffs as the prevailing party.

Dated: New York, New York
       _____July 2_____, 2013

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

**A2**

**FLEMMING ZULACK WILLIAMSON ZAUDERER LLP**

RECEIVED
JUL 02 2013
CHAMBERS
HONORABLE PAUL A. CROTTY
U.S.D.J.

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

July 1, 2013

GERALD G. PAUL

**BY HAND**

Hon. Paul A. Crotty
United States District Judge
United States Courthouse
500 Pearl Street, Room 735
New York, NY 10007

> Re: AbbVie Inc. and AbbVie Biotechnology Limited v. The Mathilda
> and Terence Kennedy Institute of Rheumatology Trust
> 11 CV 2541 (PAC)

Dear Judge Crotty:

We are co-counsel for plaintiffs in the above-referenced action.

In accordance with the Court's Findings of Fact and Conclusions of Law,
issued on June 20, 2013, please find enclosed a copy of plaintiffs' proposed final
judgment under Rule 54(b) of the Federal Rules of Civil Procedure.

Respectfully,

Gerald G. Paul

Enclosure

cc: Wayne M. Barsky, Esq. (By e-mail)
Norman H. Zivin, Esq. (By e-mail)
John T. Battaglia, Esq. (By e-mail)

WRITER'S DIRECT DIAL
(212) 412-9540
gpaul@fzwz.com

**A3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 20, 2013

ABBVIE INC. and
ABBVIE BIOTECHNOLOGY LIMITED,

            Plaintiffs-Counterclaim-
            Defendants,

      v.

THE MATHILDA AND TERENCE
KENNEDY INSTITUTE OF
RHEUMATOLOGY TRUST,

            Defendant-Counterclaim-
            Plaintiff.

11 Civ. 2541 (PAC)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

FINDINGS OF FACT .................................................................................................... 3
I.     THE PARTIES ................................................................................................ 3
II.    RHEUMATOID ARTHRITIS AND ITS TREATMENT ................................................. 4
      A. Rheumatoid Arthritis ................................................................................ 4
      B. Treatment of Rheumatoid Arthritis .......................................................... 5
      C. Methotrexate ............................................................................................ 5
      D. Treatment of Rheumatoid Arthritis with Combination Therapy ................. 8
      E. Anti-Tumor Necrosis Factor Alpha Antibodies ......................................... 9
III.   KENNEDY'S DISCOVERIES ........................................................................... 11
      A. Kennedy's Early Work with cA2 .............................................................. 11
      B. Kennedy's Open Label cA2 Study ........................................................... 14
      C. Kennedy's Anti-CD4 and Anti-TNFα Combination Study ......................... 15
      D. Kennedy's Extension Study of cA2 in Humans ......................................... 15
      E. The Double-Blind Placebo-Controlled Trials of cA2 ................................. 17
IV.   OTHER RESEARCH AND PUBLICATIONS ......................................................... 18
      A. Schwieterman Discussion of Combination Treatment ............................... 18
      B. The Rankin CDP571 Trial ...................................................................... 21
      C. Higgins Report on CDP571 and Methotrexate Combination Treatment...... 22
V.    THE T-14 STUDY ........................................................................................ 23
VI.   KENNEDY'S PATENTS .................................................................................. 29
      A. The '248 Application ............................................................................... 29
      B. The '766 Patent ...................................................................................... 30
      C. The Claims of the '766 Patent ................................................................. 31
      D. The Specification of the '766 Patent ........................................................ 32
      E. Prosecution History of the '766 Patent .................................................... 39
      F. The '004 Application ............................................................................... 51
      G. The '631 Application .............................................................................. 55
      H. The '442 Patent and Specification ........................................................... 67
      I. The Claims of the '442 Patent.................................................................. 67
VII.  THE INSTANT DISPUTE ............................................................................... 70

     A. Humira ....................................................................................................... 70
     B. Abbott's Sublicenses to Kennedy's Patents ............................................... 70
CONCLUSIONS OF LAW ..................................................................................... 71
I.     JURISDICTION ............................................................................................ 71
II.    OBVIOUSNESS-TYPE DOUBLE PATENTING ......................................... 71
     A. The Doctrine of Obviousness-Type Double Patenting................................. 71
     B. Claim Construction ..................................................................................... 74
     C. Patentably Distinct Claims .......................................................................... 76
III.   THE PERSON OF ORDINARY SKILL IN THE ART ................................. 78
IV.   THE SIMILARITIES AND DIFFERENCES BETWEEN
     THE CLAIMS OF THE '766 AND '442 PATENTS ..................................... 80
     A. Construction of Claims 8 through 14 of the '766 Patent............................. 80
     B. Construction of Claims 1 through 7, 13, 14, and 17
       through 20 of the '442 Patent ..................................................................... 86
     C. The Differences Between Claims 8 through 14 of
       the '766 Patent and Claims 1 and 2 of the '442 Patent .............................. 90
     D. The Differences Between Claims 8 through 14 of
       the '766 Patent and Claims 3 through 7, and 13 of the '442 Patent ........... 98
     E. The Differences Between Claims 8 through 14 of
       the '766 Patent and Claims 14 and 17 through 20 of the '442 Patent ....... 103
CONCLUSION......................................................................................................... 107

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs-Counterclaim-Defendants Abbvie Inc. and Abbvie Biotechnology Limited (collectively, "Abbott") bring this action against Defendant-Counterclaim-Plaintiff The Mathilda and Terence Kennedy Institute of Rheumatology Trust ("Kennedy") for a declaratory judgment that each of claims 1 through 7, 13, 14, and 17 through 20 of Kennedy's U.S. Patent No. 7,846,442 (the "'442 patent") is invalid for obviousness-type double patenting over claims 8 through 14 of U.S. Patent No. 6,270,766 (the "'766 patent"). Kennedy denies that these claims of the '442 patent are invalid for obviousness-type double patenting and counterclaims for a declaratory judgment that each of these claims of the '442 patent is not invalid.[1] The Court held a

---

[1] By an order dated August 10, 2012, the Court stayed Kennedy's other counterclaims, relating to Abbott's royalty obligations, pending determination of their arbitrability. (ECF No. 67.)

A5

four-day bench trial in this action from September 18 through September 21, 2012.[2]  After considering the parties' arguments, pretrial memoranda of law, and proposed findings of fact and conclusions of law, and evaluating the evidence produced at trial, including the documentary record and the testimony of the witnesses, the Court sets forth its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).  For the following reasons, the Court concludes that each of claims 1 through 7, 13, 14, and 17 through 20 of the '442 patent is invalid for obviousness-type double patenting and that Kennedy has failed to prove its counterclaim that these claims of the '442 patent are not invalid.

## FINDINGS OF FACT

### I.    THE PARTIES

1.    As of the initiation of this action, Abbott Laboratories was an Illinois corporation with a principal place of business in Illinois and conducted business in this District.[3]  (Compl. ¶ 2, ECF No. 1.)  Pursuant to Federal Rule of Civil Procedure 25 and a Stipulation and Order Substituting Parties entered on January 11, 2013, Abbvie Inc. was substituted for Abbott Laboratories for all purposes with respect to Plaintiffs' claims and Defendant's counterclaims in this action.  (ECF No. 119.)  Abbvie Biotechnology Limited (formerly named Abbott Biotechnology Limited) is a corporation organized under the laws of Bermuda, with a place of business in Hamilton, Bermuda.  Through intermediate organizations, Abbott Biotechnology Limited was formerly owned by Abbott Laboratories.  (Compl. ¶ 3.)  The Court refers to the

---

[2]  By an order dated September 11, 2012, the Court struck Kennedy's demand for a jury trial on the issue of the validity of the '442 patent.  Abbott Labs. v. The Mathilda and Terence Kennedy Inst. of Rheumatology Trust, No. 11 Civ. 2541, 2012 WL 3965148.  (ECF No. 101.)

[3]  Throughout these Findings of Fact and Conclusions of Law, the Court may adopt, without attribution, language suggested by one of the parties, but in all such instances the Court has made such findings or conclusions based upon its own review of the evidence and the law.  To the extent that any finding of fact may be considered a conclusion of law, or vice versa, each should be considered as such.

Plaintiffs-Counterclaim-Defendants collectively as "Abbott" throughout these Findings of Fact and Conclusions of Law. At all relevant times, Abbott was engaged in the development, sale, and distribution of a broad range of pharmaceuticals and other health-care products. (Id. ¶ 2.)

2. The Mathilda and Terence Kennedy Institute of Rheumatology Trust is organized and exists under the laws of the United Kingdom, with a place of business in London, England. Kennedy is the owner of certain United States patents, including the '766 patent and the '442 patent. (Id. ¶ 5; Am. Answer ¶ 5, ECF No. 40.)

## II. RHEUMATOID ARTHRITIS AND ITS TREATMENT

### A. Rheumatoid Arthritis

3. Rheumatoid arthritis is an autoimmune disease characterized by inflammation of the joints. This inflammation, if left untreated, may result in joint pain and swelling, cartilage and bone destruction, deformity, incapacity, and potentially life-threatening complications. It may reduce life expectancy by up to a decade. At present, there is no cure for rheumatoid arthritis. Rheumatoid arthritis is estimated to affect approximately 0.6 to 1% of the U.S. population. (Tr.[4] at 136:23–137:13, 137:16–18, 138:18–19; Ex. 1408.1, Mark J. Borigini & Harold E. Paulus, "Rheumatoid Arthritis," in Treatment of the Rheumatic Diseases (Michael Weismann & Michael Weinblatt eds., 1995), at ABTKEN00444893–94.[5])

---

[4] The transcript of the trial proceedings may be found at docket entries 109, 111, 113, and 115.

[5] Throughout these Findings of Fact and Conclusions of Law, the Court may cite to portions of the record. These citations are to representative materials in the record, and should not be considered exhaustive catalogs of all support for each respective finding or conclusion. In addition, certain portions of the record were produced with two different Bates numbers; where available, the Court will cite to the materials with the Bates prefix "ABTKEN," despite this Bates pagination not always proceeding in exact chronological order.

4.   Physicians identify rheumatoid arthritis and measure its severity based on the presence of a variety of signs and symptoms, including morning stiffness, fatigue, pain, and tenderness and swelling of the joints.  (Tr. at 138:2–7, 140:17–22, 456:22–457:20.)

B.   **Treatment of Rheumatoid Arthritis**

5.   Historically, the treatment of rheumatoid arthritis would begin with nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as ibuprofen and aspirin, to reduce the pain and swelling caused by the disease.  While treating symptoms, these medications do not stop or impede the progression of the disease or the damage it causes to the body.  (Tr. at 138:20–23, 164:7–13, 164:20–165:1; Ex. 1408.1 at ABTKEN00444895–98.)

6.   For patients for whom NSAID treatment did not work, rheumatologists would frequently prescribe cortisone or corticosteroids to reduce pain and swelling.  These medications serve as anti-inflammatories, but can have negative side effects.  (Tr. at 164:14–16, 165:5–14; Ex. 1408.1 at ABTKEN00444903–06.)

7.   Beyond these treatments are disease-modifying antirheumatic drugs, or "DMARDS."  DMARDs are more effective than NSAIDs in reducing the inflammation associated with rheumatoid arthritis, but can produce more serious side effects than the above treatments.  Drugs classified as DMARDs include methotrexate, gold compounds, azathioprine, hydroxychloroquine, and sulfasalazine.  (Tr. at 165:15–166:18; Ex. 1408.1 at ABTKEN00444898–03.)

C.   **Methotrexate**

8.   Methotrexate is a drug that inhibits folic acid metabolism and was originally developed in the late 1940s for the treatment of childhood leukemia.  Reports of methotrexate's positive effects in rheumatoid arthritis patients were published in the 1950s, but methotrexate

was not adopted as a common treatment for this disease until much later. (Tr. at 166:23–167:14.)

9.   By 1985, Dr. Michael Weinblatt and others were studying the use of methotrexate to treat rheumatoid arthritis. A 1985 Weinblatt study reported on the first randomized, placebo-controlled trials of short-term methotrexate treatment for this purpose and provided evidence of the short-term efficacy of methotrexate in the treatment of rheumatoid arthritis. (Id. at 169:2–170:12; Ex. FD, Michael Weinblatt et al., "Efficacy of Low-Dose Methotrexate in Rheumatoid Arthritis," *New Eng. J. Med.* 312:818 (1985).)

10. In 1988, the Food and Drug Administration ("FDA") approved methotrexate for the treatment of rheumatoid arthritis. (Tr. at 170:24–25.)

11. Subsequent long-term, controlled trials established that methotrexate remained effective for treating rheumatoid arthritis over many years of therapy with acceptable toxicity levels. (Id. at 171:12–172:11; Ex. 1497, Michael Weinblatt et al., "Methotrexate in Rheumatoid Arthritis," *Arth. & Rheum.* 37:1492 (1994).)

12. By 1994, studies and trials "ha[d] documented the efficacy of methotrexate and ha[d] indicated that its onset of action is more rapid than other DMARDs, and patients tend[ed] to remain on therapy with methotrexate longer than they remain[ed] on other DMARDs because of better clinical responses and less toxicity." Additionally, "[b]ecause of its therapeutic benefit and toxicity profile, methotrexate [was] used before other second-line drugs by many rheumatologists." (Ex. 1403, Peter Lipsky, "Rheumatoid Arthritis," in Harrison's Principles of Internal Medicine (Kurt Isselbacher et al., eds., 13th ed. 1994), at 1654–55; Tr. at 173:8–19; see Ex. 1475, Marc Feldmann & Ravinder N. Maini, "Anti-TNF Therapy, from Rationale to Standard of Care: What Lessons Has It Taught Us?," *J. Immunology* 185:791, 792 (2010) ("By

the time the extensive, longer trials designed for drug registration were being planned (1994), the work of Michael Weinblatt and others had led to low-dose methotrexate (MTX) being widely used for the treatment of [rheumatoid arthritis] as the gold standard." (citing Ex. 1497)); cf. Ex. IB, Michael M. Ward, "Trends in the Use of Disease Modifying Antirheumatic Medications in Rheumatoid Arthritis, 1980–1995: Results from the National Ambulatory Medical Care Surveys," *J. Rheumatology* 26:546, 547–48 (1999) (stating that methotrexate was prescribed in 27% of rheumatoid arthritis patient visits from 1993 to 1995); Tr. at 592:2–16; see also Tr. at 354:2–360:22, 390:22–392:8 (noting that of patients in the Ward survey who were on DMARDs, almost half were receiving methotrexate, and percentage of rheumatoid arthritis patients on methotrexate was likely an underrepresentation because many patients were being treated by primary care physicians without expertise in rheumatology); Tr. at 719:17–722:18.)

      13. By August 1, 1995, published studies had reported that methotrexate was at least no more toxic than other DMARDs and had fewer side effects than other DMARDs. (Tr. at 172:12–18; Ex. 1497; see also Tr. at 349:11–16, 350:15–351:16 (comparing methotrexate to other DMARDs).)

      14. By this time, rheumatologists treated rheumatoid arthritis patients with doses of methotrexate ranging from 7.5 to 25 mg per week. While methotrexate may be administered either as a tablet or an injection, by the mid-1990s, methotrexate was more frequently administered in tablet form. Furthermore, by this time, it was only given on a weekly basis because more frequent administration was associated with greater toxicity risks. (Tr. at 167:23–168:13; Ex. FF, Michael Weinblatt, "Methotrexate," in Textbook of Rheumatology (4th ed., William N. Kelley et al., eds., 1993), at ABTKEN00444963.)

15. Although many patients responded favorably to methotrexate treatment for their rheumatoid arthritis, many still experienced symptoms of the disease despite methotrexate's benefits. The range of responses to methotrexate by itself ran from a significant reduction in painful and swollen joints and an improvement in function, to variable responses showing mediocre improvement, to no response at all. (Tr. at 174:7–14; see id. at 592:17–593:19.)

D.     **Treatment of Rheumatoid Arthritis with Combination Therapy**

16. By 1995, rheumatologists often would administer another drug in combination with the underlying methotrexate a patient was already receiving to patients who were not responding completely to methotrexate treatment alone. Although not universally accepted,[6] the treatment of rheumatoid arthritis with a combination of drugs (e.g., NSAIDs, corticosteroids, and DMARDs) was an established practice among rheumatologists by 1995. (Tr. at 174:25–180:2; e.g., Ex. 1408.1 at ABTKEN00444895, -00444909.)

17. By August 1, 1995, several studies had indicated that methotrexate could be more effective when used in combination with other DMARDs, as compared to methotrexate treatment alone, or methotrexate "monotherapy." (Tr. at 180:22–186:17; Ex. FA, Peter Tugwell et al., "Combination Therapy with Cyclosporine and Methotrexate in Severe Rheumatoid Arthritis," *New Eng. J. Med.* 333:137 (1995); Ex. DB, William Bensen et al., "Combination Therapy of Cyclosporine with Methotrexate and Gold in Rheumatoid Arthritis," *J. of Rheumatology* 21:2034 (1994); see also Ex. 1409, Rita Jain & Peter Lipsky, "Treatment of Rheumatoid Arthritis," *Med. Clinics of N. Am.* 81:57 (1997) (citing Exs. FA, DB); cf. Tr. at

---

[6] By 1995, there had been a number of studies on combination therapy for the treatment of rheumatoid arthritis, some of which were positive, some of which were negative, in evaluating the efficacy and risks of the specific combinations being tested. (Tr. at 375:18–376:9; e.g., Ex. 1411, David Felson et al., "The Efficacy and Toxicity of Combination Therapy in Rheumatoid Arthritis," *Arth. & Rheum.* 37:1487 (1994). But see Tr. at 371:4–374:5 (discussing potential flaws in studies).)

364:24–367:9 (noting that of the many possible combinations of DMARDs being studied in the early 1990s, some were more successful than others).)

18. Physicians in the mid-1990s who were treating rheumatoid arthritis patients with methotrexate would often continue this treatment, even if it did not provide complete relief to patients, but add another treatment on top of the background methotrexate in order to prevent losing the benefits the methotrexate was providing and in an effort to prevent flares in patients' symptoms that could arise from stopping methotrexate. (Tr. at 180:3–21; e.g., Ex. 1408.1 at ABTKEN00444909.)

E.      **Anti-Tumor Necrosis Factor Alpha Antibodies**

19. In the 1980s, researchers began to study the use of a class of therapeutics known as biologics for the treatment of rheumatoid arthritis, including the use of antibodies. Antibodies are produced naturally in the body, for example, in response to an infection, and regulate the body's immune response. (Tr. at 140:3–8, 144:8–13, 458:11–460:18.)

20. Beginning in the mid-1980s, Professors Ravinder Maini and Marc Feldmann, the named co-inventors of the '766 and '442 patents, began research on the role in rheumatoid arthritis of a group of proteins called cytokines. Their research led to the discovery of the role of a protein called Tumor Necrosis Factor Alpha, or "TNFα." (Id. at 451:10–454:8, 461:2–464:6.)

21. Professors Maini and Feldmann determined that TNFα is directly involved in the inflammatory effects of rheumatoid arthritis. In rheumatoid arthritis, TNFα present in the joints will bind to receptors on the surface of cells in the joint, which triggers an inflammatory immune response that leads to the joint damage and related signs and symptoms that are characteristic of the disease. (Id. at 143:1–24, 461:2–464:6.)

22. Through their research, Professors Maini and Feldmann discovered that blocking TNFα with a "monoclonal" antibody that specifically binds to it had positive therapeutic effects

9

**A12**

in rheumatoid arthritis patients.  Anti-TNFα antibodies function by binding to TNFα, thereby preventing the TNFα from binding to the cell-surface receptors.  By preventing the TNFα from binding to the cell-surface receptors, the immune-mediated processes associated with the disease are blocked.  (Id. at 143:25–144:18, 145:7–146:17.)

23.  The human body makes antibodies in response to foreign invaders, but typically will not make antibodies against its own proteins, such as TNFα.  Accordingly, such antibodies must be manufactured for administration to patients.  (Id. at 144:19–145:6, 187:9–190:24.)

24. Antibodies that bind specifically to TNFα differ in composition and construction, and thus trigger varying responses in the human body.  For example, a monoclonal antibody constructed completely from underlying mouse elements will be recognized as foreign in the human body, and the body will develop a response against it, known as a Human Anti-Mouse Antibody, or "HAMA," response.  (Id. at 146:18–147:9.)

25. To overcome the problem of an immune reaction to the antibody used for treatment, genetic engineering techniques are used to replace much of the mouse protein in manufactured anti-TNFα antibodies with human protein, creating what is known as a "chimeric" antibody.  In chimeric antibodies, the part of the antibody that binds to the TNFα originates from a mouse antibody while the portion of the antibody that does not bind to the target originates from a human antibody.  (Id. at 147:10–148:2.)

26. Monoclonal antibody cA2, which binds specifically to human TNFα, is an example of a chimeric antibody.  The part of the antibody that binds to the TNFα is from mouse monoclonal antibody A2, and the rest of the antibody is from a human antibody.  (Id. at 147:13–148:2; Ex. 78, Michael J. Elliott, Ravinder N. Maini, Marc Feldmann et al., "Treatment of

**A13**

Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to Tumor Necrosis Factor α," *Arth. & Rheum.* 36:1681 (1993), at KEN00349043.)

27. Although the human part of a chimeric antibody makes it appear less foreign to the body when administered to a human patient, the body may still recognize the chimeric antibody as foreign and develop an immune response to it. This is referred to as a Human Anti-Chimeric Antibody, or "HACA," response. (Tr. at 148:3–9; see Ex. 79, Michael J. Elliott, Ravinder N. Maini, Marc Feldmann et al., "Repeated Therapy with Monoclonal Antibody to Tumor Necrosis Factor α (cA2) in Patients with Rheumatoid Arthritis," *The Lancet* 344:1125 (1994), at KEN00267406.)

28. Antibodies that are comprised of fully human constituents are designed to have a low potential for detection and immune responses from the body, but some patients still develop a Human Anti-Human Antibody, or "HAHA," response to such antibodies. Humira®, which is marketed by Abbott for the treatment a number of conditions, is an example of a fully human antibody that specifically binds to TNFα. (Tr. at 148:10–25.)

## III.  KENNEDY'S DISCOVERIES

### A.  Kennedy's Early Work with cA2

29. Professor Maini became affiliated with Kennedy in 1979 and became its scientific director in 1990. Professors Maini and Feldmann began collaborating in 1985 on research into rheumatoid arthritis. (Tr. at 447:1–451:19; Ex. HA, Professor Sir Ravinder Maini Curriculum Vitae.)

30. In the mid-1980s, Professors Maini and Feldmann researched cytokines in the joints of patients with rheumatoid arthritis and, by the late 1980s, they developed the hypothesis that blocking TNFα would yield therapeutic benefits in the treatment of rheumatoid arthritis.

11

**A14**

Professors Maini and Feldmann performed experiments to test their hypothesis and, in 1990, began a trial of a hamster monoclonal anti-TNFα antibody in mice with an induced rheumatoid arthritis-like illness. (Tr. at 458:11–468:6.)

31. The results of this study, ultimately published in 1992, demonstrated a clear amelioration of the inflammation and bone and cartilage damage in the mice that were treated with the anti-TNFα antibody. (Id. at 466:14–16; Ex. JQ, Richard O. Williams, Marc Feldmann & Ravinder N. Maini, "Anti-Tumor Necrosis Factor Ameliorates Joint Disease in Murine Collagen-Induced Arthritis," *Proc. Nat'l. Acad. Sci.* 89:9784 (1992).)

32. Professors Maini and Feldmann then pursued similar experiments in humans suffering from rheumatoid arthritis, by working with companies that were making monoclonal anti-TNFα antibodies for use in human trials for other diseases. By 1991, Professors Maini and Feldmann had discussions with the company Centocor regarding the use of Centocor's anti-TNFα antibody, cA2. (Tr. at 473:10–15, 474:3–476:9.)

33. Centocor had previously developed cA2 to treat a condition known as septic shock, but Centocor's clinical trials for this use in humans were not successful. Centocor agreed to allow Professors Maini and Feldmann to use cA2 in their rheumatoid arthritis trials. (Id. at 477:3–478:1.)

34. Centocor and Kennedy entered into a research and licensing agreement, dated January 1, 1992, under which Centocor provided funding and material support for Professors Maini and Feldmann's research in return for licensing rights to any intellectual property that would result from this research.[7] (Ex. AX, Research and Licensing Agreement.)

---

[7] Pursuant to this agreement, Centocor also paid for the prosecution of any patent that derived from Kennedy's research. However, Kennedy retained the final say in the patent prosecution process. (See Tr. at 545:25–546:8.)

35. Professors Maini and Feldmann thereafter performed a study of cA2 in human rheumatoid arthritis patients in an "open label" format, in which both the physicians and patients knew that the patients were being administered cA2. This clinical investigation took place from April to June 1992, and the results were announced in September 1992 at a scientific conference organized by Professor Feldmann. These results were ultimately published in 1993. (Tr. at 478:9–481:22; Ex. 78; Ex. 1588, Dep. of Prof. Marc Feldmann at 28:14–19 (Mar. 15, 2012).)

36. This open label study showed positive results, with patients describing significant physical improvement and Professors Maini and Feldmann observing improvements in joint swelling and tenderness. (Tr. at 478:9–481:22; Ex. 78.)

37. At the same time Professors Maini and Feldmann were performing the open label study, they were also following up on their first trial of hamster monoclonal anti-TNFα antibody in mice. The first study had shown that over time the mice developed an immune response to the hamster antibody similar to the HAMA response (see supra ¶ 24), which resulted in decreased efficacy of the anti-TNFα antibody. (Tr. at 468:9–19.)

38. Professors Maini and Feldmann devised a second mouse trial to test whether the use of another antibody ("anti-CD4") in combination with an anti-TNFα antibody would yield longer-term benefits by suppressing the HAMA-like response in mice. This second study, ultimately published in 1994, showed that the combination of the anti-TNFα antibody and anti-CD4 antibody yielded superior benefits over the use of the anti-TNFα antibody alone. (Id. at 468:20–473:5; Ex. JR, Richard O. Williams, Lesley J. Mason, Marc Feldmann & Ravinder N. Maini, "Synergy between Anti-CD4 and Anti-Tumor Necrosis Factor in the Amelioration of Established Collagen-Induced Arthritis," *Proc. Nat'l. Acad. Sci.* 91:2762 (1994).)

13

**A16**

B. **Kennedy's Open Label cA2 Study**

39. In December 1993, Professors Maini and Feldmann published the final results of their initial open label clinical study involving the administration of Centocor's anti-TNFα chimeric antibody, cA2, for the treatment of rheumatoid arthritis. (Ex. 78; Tr. at 187:9–19, 481:16–22.)

40. The objective of the open label study was to evaluate the safety and efficacy of a chimeric anti-TNFα antibody in the treatment of patients with rheumatoid arthritis. (Ex. 78 at KEN00349041.)

41. The patients who participated in the open label trial were, by design, those who had failed the standard treatments of the time, including having failed a median of four different DMARDs before enrolling in the trial, with a significant percentage having received methotrexate in the past. Of the twenty patients enrolled in the trial, all had active rheumatoid arthritis, despite prior treatment with multiple DMARDs; fourteen of the twenty patients had not completely responded to prior treatment with methotrexate. (Id. at KEN00349042–43; Tr. at 189:3–15, 483:2–25.)

42. The patients in the open label trial were administered cA2 by itself, after a period of at least one month in which they ceased receiving their previous DMARD treatment, including methotrexate. Such a break in treatments is known as a "washout" period. (Ex. 78 at KEN00349043; Tr. at 189:16–21, 482:3–483:1.)

43. The patients received administrations of cA2 as infusions over staggered weeks, either in doses of 10 mg/kg of body weight over two weeks or 5 mg/kg over four weeks, but in all instances totaling 20 mg/kg. (Ex. 78 at KEN00349043; Tr. at 478:23–479:22.)

44. The open label cA2 study concluded:

> Treatment with anti-TNFα was safe and well tolerated and resulted in significant clinical and laboratory improvements. These preliminary results support the hypothesis that TNFα is an important regulator in [rheumatoid arthritis], and suggest that it may be a useful new therapeutic target in this disease. (Ex. 78 at KEN00349041; Tr. at 484:1–12.)

45. Due to the "open label" design of the study, however, Professors Maini and Feldmann could not confirm that the clinical efficacy observed was due to cA2, and not to a placebo effect in the subject patients. (Tr. at 480:5–21; see id. at 188:19–189:2.)

## C. Kennedy's Anti-CD4 and Anti-TNFα Combination Study

46. In March 1994, Professors Maini and Feldmann published the final results of their study to test whether the combination of anti-CD4 with an anti-TNFα antibody would lead to longer-term benefits by suppressing the HAMA-like response in mice. (Ex. JR; Tr. 471:24–472:3.)

47. This study concluded:

> [O]ptimal anti-TNF combined with anti-CD4 caused significantly greater reductions in paw swelling and joint erosion than those achieved by optimal anti-TNF alone. Coadministration of anti-CD4 was also effective in preventing an antibody response to the hamster anti-TNF antibody, which may have implications for long-term therapy in human disease. Thus anti-CD4 acts synergistically with anti-TNF in ameliorating established collagen-induced arthritis and this combined therapeutic approach may provide effective long-term control of rheumatoid arthritis. (Ex. JR at KEN00356475; Tr. at 472:4–473:5.)

## D. Kennedy's Extension Study of cA2 in Humans

48. Although the open label study of the use of cA2 in rheumatoid arthritis patients showed successful results for a short time period (see supra ¶¶ 39–44), continued evaluation showed that after a predictable period of time, the open label patients' rheumatoid arthritis returned. Professors Maini and Feldmann thus continued to treat a subset of the patients in the

15

open label study for a prolonged period of time to determine the long-term effects of cA2 treatment.  (Tr. at 484:15–485:13; see id. at 196:22–197:10; Ex. 79.)

49. In this subsequent "extension" study, patients received multiple doses of cA2 as infusions in response to flares of rheumatoid arthritis.  The first dose of cA2 the extension study patients received was 20 mg/kg, while the second dose was 10 mg/kg.  (Ex. 79; Tr. at 485:15–20, 489:4–22; see Tr. at 197:6–14.)

50. This study demonstrated that when rheumatoid arthritis reappeared in patients after the initial dose of cA2, subsequent doses of cA2 produced the same level of reduction in signs and symptoms of the disease, but with each successive subsequent dose, the duration of the benefits produced shortened significantly.  (Ex. 79; Tr. at 485:21–489:22; see 198:18–199:5.)

51. The extension study paper, published in October 1994, stated that the "success in demonstrating repeated responses in the same individuals suggests that regular treatment with cA2 may achieve long-term disease suppression," indicating that the antibody was an effective treatment approach for chronic rheumatoid arthritis.  (Ex. 79 at KEN00267407; Tr. at 198:1–7.)

52. Professors Maini and Feldmann also observed from the extension study that the shortened duration of response to each successive treatment of cA2 appeared to be due to the patients' developing a HACA response to the chimeric anti-TNFα antibody, cA2.  (Ex. 79 at KEN00267407; Tr. 486:4–12; see Tr. at 198:18–199:5.)

53. Professors Maini and Feldmann suggested that "[s]everal strategies could be adopted to prevent the development of antiglobulin responses to cA2, including combination therapy with traditional immunosuppressive drugs or the co-administration of specific, T-cell-directed monoclonal antibodies with the aim of inducing tolerance."  The purpose of these strategies was to reduce the human body's immune (HACA) response to the anti-TNFα antibody

16

**A19**

in order to produce a longer duration of the benefits of the cA2 administrations.  (Ex. 79 at
KEN00267407; Tr. at 199:6–24, 491:4–494:4.)

54. As of October 1994, when the extension study was published, methotrexate was a
drug known to have immunosuppressive properties.[8]  (Tr. at 199:25–201:10; Ex. 1403 at 1654;
see also Tr. at 392:9–393:11; cf. Tr. at 501:24–504:20, 557:10–561:21 (discussing
immunosuppressive properties of methotrexate when administered in high doses).)

55. The extension study also cited Professors Maini and Feldmann's combination
study of both anti-TNF and anti-CD4 antibodies in mice, and noted these two antibodies "were
synergistic in the control of murine collagen-induced arthritis, and antiglobulin responses to the
TNF blocking antibody were reduced.  The application of such combination immunotherapy
deserves further investigation in man."  (Ex. 79 at KEN00267407 (citing Ex. JR).)

E.      **The Double-Blind Placebo-Controlled Trials of cA2**

56. Following the success of the open label cA2 study, Professors Maini and
Feldmann sought to confirm its results in a double-blind, placebo-controlled trial undertaken in
several separate research centers in Europe.  (Tr. at 494:6–495:6; see id. at 190:9–16.)

57. As in the open label study, the double-blind study involved patients with
rheumatoid arthritis who "had a history of failed treatment with at least one disease-modifying
anti-rheumatic drug."  Also, the patients were withdrawn from their DMARD therapies for at
least four weeks before entering into the double-blind trial.  (Ex. 80, Michael J. Elliott, Ravinder
N. Maini, Marc Feldmann et al., "Randomised Double-Blind Comparison of Chimeric
Monoclonal Antibody to Tumour Necrosis Factor α (cA2) Versus Placebo in Rheumatoid

---

[8]  A treatment can be both an immunosuppressive and a DMARD.  (Tr. at 331:15–17.)

Arthritis," *The Lancet* 344:1105 (1994), at KEN00355972–73; Tr. at 495:7–496:9; see Tr. at 190:17–24.)

58. Participants in the double-blind study received either an infusion of placebo or cA2 antibody and were monitored for four weeks. The cA2 was administered in doses of either 1 mg/kg or 10 mg/kg. (Ex. 80 at KEN00355973; Tr. at 496:13–22.)

59. The results of the double-blind study, published in October 1994, "confirm[ed] the findings of [Professors Maini and Feldmann's] open-label trial of cA2 in a similar patient group." (Ex. 80 at KEN00355976; see Tr. at 496:17–18.)

60. As in the case of the open label study, Professors Maini and Feldmann reported that "cA2 infusions were well tolerated and few adverse events were recorded in any group." The duration of the benefits produced continued longer with the higher (10 mg/kg) dose of cA2. (Ex. 80 at KEN00355976.)

61. The double-blind study concluded that the "results show that blockade of TNFα with cA2 was highly effective and safe in the short term treatment of rheumatoid arthritis." Professors Maini and Feldmann also cited their long-term extension study results and stated that "[w]ith our accompanying results, which demonstrate repeated beneficial responses to cycles of cA2, the data define a major new direction for rational therapy in this disease." (Id. at KEN00355976 (citing Ex. 79); see id. at KEN00355972; Tr. at 498:7–17.)

## IV. OTHER RESEARCH AND PUBLICATIONS

### A. Schwieterman Discussion of Combination Treatment

62. At a conference in March 1995, leading rheumatologists and FDA representatives discussed the use of biologic agents, including anti-TNFα antibodies, in the treatment of rheumatoid arthritis. (Tr. at 206:6–207:13; Ex. 73, William Schwieterman, "Immunosuppression

in Combination with Monoclonal Antibodies," in <u>Proceedings: Early Decisions in DMARD Development IV: Biologic Agents in Autoimmune Diseases</u> (1996).)

63. By March 1995, Professors Maini and Feldmann had published three studies on the safety and efficacy of using anti-TNFα antibodies to treat rheumatoid arthritis. (<u>See</u> Exs. 78, 79, 80; <u>supra</u> ¶¶ 39, 51, 57.)

64. Professors Maini and Feldmann had also observed the synergistic benefits in the treatment of rheumatoid arthritis with anti-CD4 in combination with an anti-TNFα antibody, specifically the prevention of an immune response to the anti-TNFα antibody. (Ex. JR; <u>see</u> <u>supra</u> ¶¶ 46, 47.)

65. In addition, Professors Maini and Feldmann had suggested research into the suppression of the human immune response to anti-TNFα antibodies, including "combination therapy [of cA2] with traditional immunosuppressive drugs." (Ex. 79 at KEN00267407; <u>see</u> <u>supra</u> ¶ 53.)

66. At the March 1995 conference, Dr. William Schwieterman, from the FDA, discussed the use of biologics for the treatment of rheumatoid arthritis, and particularly the safety of combination treatments involving immunosuppressives or DMARDs and biologics such as anti-TNFα antibodies. Dr. Schwieterman stated that in such research, patient safety was the paramount concern, and cautioned that the safety of the biologic must be established first, in the "Phase I" of any study. As such, he noted that the use of "immunosuppressive agents and DMARDs should usually be minimized, if not eliminated, in Phase I studies." Dr. Schwieterman acknowledged, however, that "[t]here are cases to be made for initially studying patients who are also treated with methotrexate background therapy." (Ex. 73 at ABTKEN00445120.)

67.  In response to Dr. Schwieterman, Dr. Weinblatt raised "the issue of withdrawing people from methotrexate" before enrolling in studies of biologic therapies, stating that "[t]here are some real ethical issues . . . in asking patients to get worse in order to enroll in studies." Instead, Dr. Weinblatt suggested that "[b]ecause methotrexate is such a dominant drug in the U.S., . . . a likely study population will be patients that are incomplete responders on methotrexate.  That is the population, from both a practical and commercial standpoint, that we would be interested in looking at: not patients withdrawn from methotrexate, but rather, incomplete responders on it."  (Id. at ABTKEN00445122.)

68.  Dr. Weinblatt's question addressed the situation in which rheumatoid arthritis patients who were receiving methotrexate, even if they did not respond completely to this treatment, would experience flares in their disease activity when taken off of methotrexate, including when enrolling in trials of other therapies.  (Tr. at 208:1–209:6.)

69.  Dr. Weinblatt's suggestion was that after a biologic was shown to be safe, it should then be tested in patients who were receiving, and would continue with, methotrexate treatment.  As of March 1995, companies did not follow this practice in testing their treatments.  (Id. at 210:2–16.)

70.  Indeed, at the time of this convention, the FDA required that patients be withdrawn from methotrexate treatment before trials with biologics could begin.  Dr. Weinblatt sought to allow clinical studies with patients who remained on methotrexate treatment.  (Id. at 312:25–317:17.)

71.  Dr. Schwieterman agreed with Dr. Weinblatt's suggestion and responded that if the studies of the biologic agent alone (without methotrexate) were shown to be safe, then it

would be "perfectly appropriate to go into a methotrexate treated population." (Ex. 73 at ABTKEN00445123; see Tr. at 210:17–211:12.)

72. In discussing the structure of such trials, Dr. Weinblatt asked Dr. Schwieterman whether, after the "Phase I" to determine the safety of the biologic alone, it would make sense "instead of going into a Phase II background on methotrexate, you would repeat those [Phase I] studies in [rheumatoid arthritis] patients on methotrexate." (Ex. 73 at ABTKEN00445123; see Tr. at 211:21–25.)

73. Dr. Schwieterman responded that the FDA had "recommended the design that you mentioned to several sponsors, and it has become standard to go first alone [with the biologic] and then go with methotrexate." (Ex. 73 at ABTKEN00445123; see Tr. at 212:1–213:1.)

B. **The Rankin CDP571 Trial**

74. While Professors Maini and Feldmann were advancing their research with cA2, other researchers and institutions were also studying and experimenting with other anti-TNFα antibodies. (Tr. at 192:20–193:2.)

75. In April 1995, Professor E.C.C. Rankin and colleagues published the results of a placebo-controlled trial of a monoclonal anti-TNFα antibody known as CDP571 in patients with rheumatoid arthritis. (Ex. 1412, E.C.C. Rankin et al., "The Therapeutic Effects of an Engineered Human Anti-Tumour Necrosis Factor Alpha Antibody (CDP571) in Rheumatoid Arthritis," *British J. of Rheumatology* 34:334 (1995); Tr. at 193:6–16.)

76. The CDP571 was administered intravenously as an infusion in doses of 0.1, 1.0, or 10 mg/kg of body weight to patients suffering from rheumatoid arthritis. The CDP571 study also included a washout period where patients stopped their prior DMARD treatment before receiving any antibody. (Ex. 1412; Tr. at 193:18–194:2.)

77. The study concluded that "CDP571, an engineered human anti-TNF antibody, is well tolerated, and, after a single dose of 10 mg/kg, provides improvements in symptoms, signs, and serological markers of disease activity in patients with active [rheumatoid arthritis]." (Ex. 1412 at ABTKEN00445106, Tr. 193:12–17.)

78. Similar to the extension work that Professors Maini and Feldmann continued after the positive results of the open label study of cA2 (see supra ¶ 48), the authors of the CDP571 study continued their research after the initial results with a second infusion of the antibody in order to determine the safety and longer-term benefits of CDP571. The authors concluded that "[t]he continuation phase, although open, confirmed both the safety and beneficial effects of CDP571 in active [rheumatoid arthritis]." (Ex. 1412 at ABTKEN00445106.)

C.    **Higgins Report on CDP571 and Methotrexate Combination Treatment**

79. In July 1995, a medical news publication, reporting on recent developments in rheumatology research, stated that researchers were focusing on the method of treatment Drs. Weinblatt and Schwieterman discussed at the March 1995 conference—where patients receiving methotrexate, but still experiencing signs and symptoms of rheumatoid arthritis, would receive treatment of an anti-TNFα antibody on top of their background methotrexate. (Ex. 1575, Gill Higgins, "Cytokine Antagonism: Still A Main Attraction in Rheumatology R&D," *Inpharma* (Jul. 8, 1995); see Tr. at 215:3–24.)

80. This article stated that "the greatest potential [for developing cytokine antagonists as therapy for autoimmune diseases] appears to lie with antibodies to tumour necrosis factor-α (TNF-α) and the use of soluble receptors for TNF-α and interleukin-1 (IL-1)." (Ex. 1575 at 9.)

81. The article covered the human cA2 studies published by Professors Maini and Feldmann and the positive results shown in each. (Id. at 9–10 (citing Exs. 79, 80); see Tr. at 213:24–214:13.)

82. In addressing future studies being planned by researchers in the field, the article stated:

> The development of CDP-571 will be pursued by Bayer following its recent acquisition of the drug from Celltech. One of the key studies to be conducted will look at the possibility of combining CDP-571 with methotrexate in patients with rheumatoid arthritis who do not respond to methotrexate alone. (Ex. 1575 at 10.)

## V. THE T-14 STUDY

83. In September 1994, Professors Maini and Feldmann began a study of rheumatoid arthritis patients where anti-TNFα antibody was given, over a period of time, either alone or in combination with methotrexate, to patients who had not responded completely to previous methotrexate treatment alone. This was known as the "T-14 study." The results of the study were ultimately published in September 1998. (Ex. 1025, Ravinder N. Maini et al., "Therapeutic Efficacy of Multiple Intravenous Infusions of Anti-Tumor Necrosis Factor α Monoclonal Antibody Combined with Low-Dose Weekly Methotrexate in Rheumatoid Arthritis," *Arth. & Rheum.* 41(9):1552 (1998); Tr. at 508:10–509:8, 564:14–18; see Tr. at 231:6–17; Ex. 1051, Martin Page, "Chimeric (Human, Murine) Monoclonal Antibody (cA2) to Tumor Necrosis Factor, Methotrexate" (May 29, 1996); Ex. 1571, R.N. Maini, "Phase II Multicenter Study of Chimeric Anti-TNF Monoclonal Antibody (cA2) in Adjunct to Methotrexate Treatment in Patients With Rheumatoid Arthritis" (Sept. 16, 1999).)

84. The T-14 study was designed to evaluate the efficacy, safety, and immunogenicity (the human body's rejection of the mouse component of the chimeric antibody, or HACA

response (see supra ¶ 27)) of multiple doses of the anti-TNFα antibody cA2 (at 1, 3, or 10 mg per dose) administered as infusions to patients at weeks 0, 2, 6, 10, and 14 of a 26-week trial, either with or without weekly methotrexate doses (at 7.5 mg/kg) as well.  (Ex. 1025 at 1553; Tr. at 231:6–232:3; see Tr. 492:18–493:3, 527:16–19.)

85. The patients enrolled in the T-14 trial had each been treated with weekly methotrexate for at least six months prior to the trial.[9]  Before receiving any cA2 in the T-14 trial, the patients were "stabilized" on a fixed weekly dose of 7.5 mg/kg of methotrexate for four weeks.  (Ex. 1025 at 1553; Tr. at 519:6–16; see Tr. at 291:8–292:2.)

86. The T-14 study was the first successful study of an anti-TNFα antibody that did not include a washout period of prior DMARD therapies.  (Tr. at 311:18–312:24.)

87. The patients in the T-14 study were organized into three overarching groups—(1) patients who received methotrexate as a tablet and infusions of a placebo (instead of cA2) throughout the trial (the "control" group), (2) patients who received methotrexate as a tablet and infusions of cA2 throughout the trial, and (3) patients who received a placebo as a tablet (instead of methotrexate) and infusions of cA2 throughout the trial.  Among these three overarching groups, the patients in the T-14 study were further organized into seven separate "arms."  Within the control group, there was only one "arm," in which patients received weekly doses of 7.5 mg/kg of methotrexate as a tablet, while receiving infusions of placebo at the designated weeks of the trial.  Within the group who received methotrexate and cA2 throughout the trial, there were three arms, in which the patients received weekly doses of 7.5 mg/kg of methotrexate as a tablet, while receiving infusions of cA2 at the designated weeks in doses of either 1, 3, or 10

---

[9]  As Professors Maini and Feldmann described in the published article on the T-14 study, the patients enrolled in the study "had taken [methotrexate] once a week at a dosage of 7.5-15 mg/week . . . . This relatively low pretreatment dosage . . . was in the range used in clinical practice in Europe when the protocol was designed in 1994."  (Ex. 1025 at 1553; see supra ¶ 14.)

mg/kg, respectively.  Within the group who received placebo and cA2 throughout the trial, there were also three arms, in which the patients received weekly placebo tablets while receiving infusions of cA2 at the designated weeks in doses of either 1, 3, or 10 mg/kg, respectively.  The designated weeks of the trial during which the infusions of either cA2 or placebo were administered were weeks 0, 2, 6, 10, and 14.  (Ex. 1025 at 1553; Tr. at 514:6–515:15.)

88. The published article on the T-14 study visualized the administration groups and arms in Table 1, with the three arms for patients who received methotrexate and each respective dose of cA2 throughout the trial being indicated as "MTX+" and the three arms for patients who received placebo and each respective dose of cA2 throughout the trial being indicated as "MTX-":

Table 1.  Baseline patient characteristics and clinical and laboratory indices of disease activity*

|  | Placebo plus MTX (n = 14) | cA2 | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | 1 mg/kg | | 3 mg/kg | | 10 mg/kg | |
|  |  | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 14) | MTX− (n = 15) |

(Ex. 1025 at 1555.)

89. The T-14 study results showed that patients in the group who continued to receive the weekly methotrexate while also receiving infusions of cA2 (for each cA2 dose) showed longer lasting results than those patients in the group who only received cA2 (and not methotrexate) throughout the trial.  (Id. at 1552; Tr. at 525:18–527:5.)

90. The T-14 study results also showed that for the patients who continued to receive the weekly methotrexate during the trial, in addition to the duration of response, the magnitude of the body's response to the cA2 treatment was increased as well.  (Tr. at 527:6–15.)

91.  Professors Maini and Feldmann further confirmed their hypothesis from their earlier studies with mice that the immunogenicity of cA2 (the body's HACA response) was dramatically reduced by administration in combination with methotrexate.  (Id. at 527:16–19.)

92. Specifically, Professors Maini and Feldmann noted that "coadministration of cA2 at 1 mg/kg with MTX [methotrexate] appeared to be synergistic, prolonging the duration" of the body's positive response to cA2, and that this increased durational response was due to methotrexate reducing the body's immune response to the chimeric antibody. (Ex. 1025 at 1552; see id. at 1561 (observing that "[t]he difference in pharmacokinetics of cA2 at 1 mg/kg very likely reflects the immunogenicity of cA2, since the incidence of HACA was 53% in the group not receiving MTX and only 15% when MTX was administered concomitantly. Based on these data, we suggest that the apparent synergy of the action of cA2 plus MTX is based in part on the decreased immunogenicity of cA2 given simultaneously with MTX"); Tr. at 283:22–284:25.)

93. Professors Maini and Feldmann summarized the conclusions of the T-14 study in a 1997 abstract titled "Low Dose Methotrexate Suppresses Antiglobulin Responses and Potentiates Efficacy of a Chimeric Monoclonal Anti-TNF Antibody Given Repeatedly in Rheumatoid Arthritis," *Arth. & Rheum.* 40(9 Suppl.):A571 (1997). (Ex. 1023; see Tr. at 576:21–577:6, 579:2–20.) This abstract stated:

> In this multicentre, placebo-controlled trial of cA2 (Centocor Inc.), given as a monotherapy or combined with MTX, we sought to establish whether the regimen we used a) induced immunological tolerance to cA2; and b) was effective therapy during and beyond the period of cA2 administration. […]
> The frequency of human anti-cA2-antibody (HACA) responses in patients receiving cA2 as monotherapy at 1, 3 and 10 mg/kg was 53%, 21% and 7% respectively, and in cA2 plus MTX treated groups was 17%, 7% and 0% respectively. (Ex. 1023.[10])

94. In the published article on the T-14 study in the peer-reviewed journal *Arthritis and Rheumatism*, Professors Maini and Feldmann described the treatment given to the overarching group of patients who had been receiving methotrexate prior to the trial, had been

---

[10] The conclusion that methotrexate suppresses the anti-cA2 response was also described by Professors Maini and Feldmann in a recent publication. (Ex. 1475 at 792.)

stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of cA2, had stopped receiving methotrexate at the beginning of the infusion treatment, and had received infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as cA2 "monotherapy" or "without methotrexate."  (Ex. 1025 at 1553, 1560; Tr. at 232:4–18; see Tr. at 564:14–576:8.)

95. In the same article, Professors Maini and Feldmann described the treatment given to the overarching group of patients who had been receiving methotrexate prior to the trial, had been stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of cA2, had continued receiving the same weekly methotrexate throughout the infusion treatment, and had received infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as "combination therapy when coadministered" or "combination therapy."  (Ex. 1025 at 1553, 1560; Tr. at 232:19–233:3; see Tr. at 564:14–576:8.)

96. Professors Maini and Feldmann distinguished in this published study between these two overarching sets of patient groups as receiving either cA2 "alone or in combination with" methotrexate.  (Ex. 1025 at 1552; see id. (distinguishing between patients receiving cA2 "with or without MTX [methotrexate]"); id. (noting that "[w]hen cA2 at 1 mg/kg was given with low-dose MTX, synergy was observed"); see also Tr. at 564:14–576:8.)

97. Similarly, in the abstract of the T-14 study, Professors Maini and Feldmann identified these two sets of patient groups as having received either cA2 "monotherapy" or "combined with [methotrexate]."  (Ex. 1023; Tr. at 578:20–579:20.)

98. In a January 1997 letter to the *New England Journal of Medicine*, enclosing a manuscript on the T-14 study, Professor Maini summarized the manuscript by stating that "[i]t describes the control of symptoms of rheumatoid arthritis by repeated intravenous monoclonal anti-TNFα antibody alone, and in combination with low-dose weekly methotrexate, in a

randomized placebo-controlled trial." (Ex. 1052, Letter from R.N. Maini to Jerome P. Kassierer, Editor-in-Chief, *New Eng. J. Med.* (Jan. 29, 1997), at KEN00042592; Tr. at 582:6–21.)

   99. In an October 1997 letter to the journal that published the T-14 study, Professor Maini submitted a manuscript and described the protocols of the T-14 study: "Treatment was with cA2 alone or in combination with methotrexate while the placebo group continued to receive methotrexate." (Ex. 1603, Letter from R.N. Maini to William P. Arend, Editor, *Arth. & Rheum.* (Oct. 28, 1997), at KEN00362659; Tr. at 579:21–581:13; see also Ex. 1602, R.N. Maini, Abstract, "Interference with the Cytokine Cascade via Monoclonal Anti- TNFα Antibody," EULAR (1997) ("In this presentation, the results of a multi-centre European trial in which infusions of anti-TNF antibody are given at monthly intervals either as monotherapy, or in combination with low dose methotrexate (MTX) once a week, over a period of 14 weeks, is presented."); Tr. at 581:15–582:4.)

   100. In a January 2003 email from Professor Feldmann to Professor Maini, concerning their joint research on rheumatoid arthritis and treatment with anti-TNFα antibodies for submission for the Lasker Prize, Professor Feldmann described the results of the T-14 study as showing that "the efficacy of anti-TNF antibody is shown to be more durable when co-administered with methotrexate." (Ex. 1036, E-mail from Marc Feldmann to Ravinder Maini (Jan. 13, 2003), at KEN00219466, Tr. 535:8–537:21; see also Ex. GX (inscription on Albert Lasker Clinical Research Award "for discovery of anti-TNF therapy as an effective treatment for rheumatoid arthritis and other autoimmune diseases"); Tr. at 537:22–539:2.)

   101. In all these materials, Professors Maini and Feldmann used the same language as that of the T-14 study and distinguished between cA2 "alone" and "in combination with" methotrexate. (Tr. at 582:22–24.)

102.     Excluding the materials submitted in support of the '442 and '766 patents, Professors Maini and Feldmann never referred to the group of patients who had been receiving methotrexate prior to the trial, had been stabilized on a weekly methotrexate dose of 7.5 mg/kg for four weeks before receiving infusions of antibody, had stopped receiving methotrexate at the beginning of the infusion treatment, and had received only infusions of cA2 at weeks 0, 2, 6, 10, and 14 of the trial as having received either "co-administration" or "sequential co-administration" treatment.  (Id. at 569:13–570:4.)

103.     On the contrary, in their published works in peer-reviewed journals and their communications with the editorial staff of several peer-reviewed journals and each other, Professors Maini and Feldmann identified those patients who did not receive weekly methotrexate throughout the T-14 trial as having received cA2 "alone" or cA2 "monotherapy."

104.     Furthermore, in these same materials and communications, Professors Maini and Feldmann identified those patients who did receive weekly methotrexate throughout the T-14 trial as having received cA2 in "co-administration with" methotrexate, or in "combination with" methotrexate, or as "combination therapy" with methotrexate.

VI.     **KENNEDY'S PATENTS**

A.     **The '248 Application**

105.     On October 8, 1992, Kennedy filed U.S. Patent Application No. 07/958,248 ("the '248 application"), which lists Marc Feldmann, Ravinder Maini, and Richard Williams as inventors and is entitled "Treatment of Autoimmune and Inflammatory Disorders." (Ex. 1068.1 at ABTKEN00008981, -00009002; Tr. at 539:8–25.)

106.     The "Summary of the Invention" in the '248 application states that the invention "pertains to the discovery that combination therapy, involving the use of anti-CD4

29

**A32**

antibodies in conjunction with anti-TNF antibodies, produces markedly superior results than the use of each agent alone in the treatment of autoimmune or inflammatory disease, particularly in rheumatoid arthritis." (Ex. 1068.1 at ABTKEN00008985.)

107.    The '248 application primarily discusses combination therapy involving an anti-CD4 antibody and an anti-TNF antibody, but the "Detailed Description of the Invention" section of the '248 application further states that "[o]ther anti-inflammatory drugs, such as the anti-rheumatic drugs methotrexate or cyclosporin A, can be administered in conjunction with the anti-CD4 antibody or the anti-TNF antibody." (Id. at ABTKEN00008991.)

B.    **The '766 Patent**

108.    The United States Patent and Trademark Office ("PTO") issued the '766 patent on August 7, 2001. The '766 patent names Marc Feldmann and Ravinder Maini as inventors and is entitled "Anti-TNF Antibodies and Methotrexate in the Treatment of Arthritis and Crohn's Disease." The assignee of the patent is the Kennedy Institute of Rheumatology. (Ex. 1, Ex. 1419.1 at ABTKEN00000077; Tr. at 107:21–108:7, 152:18–153:10.)

109.    Kennedy had filed the underlying application that led to the '766 patent, U.S. Patent Application No. 08/690,775 (the "'775 application"), on August 1, 1996. (Ex. 1, Ex. 1419.1 at ABTKEN00000068, -00000078; Tr. at 153:2–10.)

110.    The '766 patent is part of a family of related patent applications traceable to the filing of the '248 application on October 8, 1992. Through several intervening applications, the '766 patent has an effective filing date of October 8, 1992. (Ex. 1; Ex. 1419.1 at ABTKEN00000077.) By statute, the '766 patent expired twenty years from this date, on October 8, 2012. See 35 U.S.C. § 154(a)(2).

**A33**

C.     **The Claims of the '766 Patent**

111.     Claim 8 of the '766 patent, an independent claim, recites:

A method of treating rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts.  (Ex. 1 at col. 35, lines 59–63.)

112.     Claims 9 through 14 of the '766 patent each depend, either directly or indirectly, on claim 8 and add additional limitations to the method of treating rheumatoid arthritis recited in claim 8.  (Id. at col. 35, line 64–col. 36, line 51.)

113.     Specifically, claims 9 through 14 of the '766 patent recite:

9. A method of claim 8 wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks.

10. A method of claim 8 wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

11. A method of claim 10 wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:1 or SEQ ID NO:2.

12. A method of claim 10 wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

13. A method of claim 12 wherein the chimeric antibody is monoclonal antibody cA2.

14. A method of claim 8 wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof.  (Id.)

D.  **The Specification of the '766 Patent**[11]

114.  The specification of the '766 patent states that

[t]he present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy produces a rapid and sustained reduction in the clinical signs and symptoms of the disease.  (Ex. 1 at col. 2, line 33–39.)

115.  The specification also states that the invention "relates to a method of treating and/or preventing rheumatoid arthritis in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts."  (Id. at col. 2, line 66–col. 3, line 3.)  The specification continues that the invention relates "to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from TNF-mediated disease as adjunctive and/or concomitant therapy to methotrexate therapy, with good to excellent alleviation of the signs and symptoms of the disease."  (Id. at col. 4, lines 31–36.)

116.  According to the specification,

an "anti-tumor necrosis factor antibody" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo.  Anti-TNF antibodies useful in the methods and compositions of the present invention include monoclonal, chimeric, humanized, resurfaced and recombinant antibodies and fragments thereof which are characterized by high affinity binding to TNF and low toxicity (including human anti-murine antibody (HAMA) and/or human anti-chimeric antibody (HACA) response).  (Id. at col. 7, lines 26–34.)

---

[11] As discussed infra (see supra ¶ 280), the Court considers the specification of the '766 patent only for the purposes of construction of its claims.  See Eli Lilly v. Teva Parenteral Medicines, Inc., 689 F.3d 1368, 1378–81 (Fed. Cir. 2012).

117.     The specification discloses the chimeric antibody cA2, which has since been designated as "infliximab" and marketed under the brand name Remicade®.  (Id. at col. 9, lines 50–64; see Tr. at 147:19–20.)

118.     The specification lays out several possible routes of administration (Ex. 1 at col. 18, lines 36–48), and states that the two therapies can be administered at different frequencies from each other:  "TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate.  For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy."  (Id. at col. 18, lines 58–62.)

119.     The specification provides that the antibody and methotrexate are each administered in a "therapeutically effective amount," which means "that administration of TNF antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered."  (Id. at col. 19, lines 18–26.)

120.     The specification further explains that "[a] therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease." (Id. at col. 19, lines 26–30.)

121.     The specification of the '766 patent contains three examples.  (Id. at col. 20, line 37–col. 34, line 49.)  The examples are based on human clinical trials involving rheumatoid arthritis patients.  (Id.; Tr. at 155:10–156:5.)

122.     These three examples were included in the '775 application.  (Ex. 1419.1 at ABTKEN00000118–47.)

123.     Example 1 of the '766 patent is drawn from the T-14 study undertaken by Professors Maini and Feldmann.  (Tr. at 155:10–20; see id. at 508:10–13; see also ¶¶ 83–92.) This study was designed to evaluate the safety and efficacy of chimeric anti-TNFα antibody cA2 in multiple infusions, alone or in combination with methotrexate, in the treatment of rheumatoid arthritis patients.  (Ex. 1 at col. 20, lines 43–49; see Ex. 1025 at 1552.)

124.     The specification of the '766 patent notes that the patients enrolled in the T-14 study had been previously treated with methotrexate for at least six months, although they still had "active disease."  (Ex. 1 at col. 20, lines 51–56; see also supra ¶ 85.)  A patient had "active disease," as used in Example 1, if he or she had six or more swollen joints plus as least three of four secondary conditions, such as prolonged morning stiffness or tender or painful joints.  (Ex. 1 at col. 20, lines 56–61; see Tr. at 158:5–8.)

125.     Although the patients in the T-14 study were taking methotrexate and still had active disease, that does not mean the patients were necessarily receiving no benefit from the methotrexate treatment.  By August 1995, it was understood that rheumatoid arthritis patients treated with methotrexate might exhibit partial relief of their symptoms, but still have active disease.  (See, e.g., Ex. FF at ABTKEN00444962; Ex. 1408.1 at ABTKEN00444909; Tr. at 174:25–177:3.)  As described in the '766 patent, there is no way to determine if the T-14 study participants were partial responders to chronic methotrexate treatment or complete nonresponders.

126.     The specification of the '766 patent recounts, as described above (see supra ¶ 87), that the T-14 study was designed with separate "arms" to compare the effect of

34

various doses of an anti-TNFα antibody alone or in combination with methotrexate. (Ex. 1 at col. 20, lines 43–49; id. at col. 21, lines 13–24.)

127.    The specification also states that the anti-TNFα chimeric antibody cA2 was administered to study participants by intravenous infusion. (Id. at col. 21, lines 2–12.)

128.    As the specification notes, the patients were randomly placed into one of seven treatment arms. The patients in the control arm received methotrexate tablets and infusions of a placebo throughout the trial. The patients in the three arms that received methotrexate tablets and antibody infusions throughout the trial received methotrexate at 7.5 mg a week and either 1, 3, or 10 mg/kg of cA2, respectively. The patients in the three arms that received placebo tablets and cA2 infusions throughout the trial received weekly placebo instead of methotrexate and received either 1, 3, or 10 mg/kg of cA2, respectively. (Id. at Table 1.) Patients received antibody (or placebo) infusions at weeks 0, 2, 6, 10, and 14 of the trial. (Id. at col. 21, lines 15–18.) There was no washout period between the last dose of "stabilizing" methotrexate and the assignment of patients to their treatment arm for the trial. (Tr. at 521:4–7.)

129.    The specification visualized the administration groups and arms in Table 1, with the three arms for patients who received methotrexate and each respective dose of cA2 throughout the trial being indicated as "MTX+" and the three arms for patients who received placebo and each respective dose of cA2 throughout the trial being indicated as "MTX-":

TABLE 1

| | | | | | | | | Treatment effect |
|---|---|---|---|---|---|---|---|---|
| Baseline Disease Characteristics Joint Counts | | | | | | | | |
| Treatment Groups | | | | | | | | |
| Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | All | |
| MTX+ | MTX+ | MTX– | MTX+ | MTX– | MTX+ | MTX– | Patients | p-value |

(Ex. 1 at col. 21–22.)

130.     The specification explains that patients in the study were evaluated at various intervals for 26 weeks using six primary disease-activity assessments and the Paulus index, which is used by rheumatologists to measure the clinical response to drugs in clinical trials.  (Id. at col. 21, line 24–col. 22, line 23; Tr. at 142:3–22.)

131.     The specification of the '766 patent further recounts that in the T-14 study, high clinical response rates were obtained with a multiple dose regimen of 3 mg/kg of cA2 in combination with weekly doses of 7.5 mg of methotrexate.  Similar results were also obtained at the higher dose of 10 mg/kg of cA2 with weekly doses of 7.5 mg of methotrexate.  The specification states that the 3 mg/kg dose of cA2 is "preferable to the 1 mg/kg plus methotrexate regimen because better pharmacokinetics are obtained, virtually no immune response was detected and the clinical response is better sustained following the last treatment with cA2."  (Ex. 1 at col. 31, lines 23–34.).

132.     The specification states that "the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients."  (Id. at col. 31, lines 44–48.)

133.     Tables 2 through 5 of the specification of the '766 patent tabulate the results of the T-14 study, and, like Table 1, identify the treatment the groups of patients received as either "MTX+" or "MTX-" depending on whether during the infusion period of the trial they received cA2 and methotrexate or cA2 alone, respectively.  (See id. Tables 2–5.)

134.     The specification of the '766 patent summarized the T-14 study, stating that "the results of this study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in [rheumatoid arthritis] patients whose

36

**A39**

disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks." (<u>Id.</u> at col. 31, lines 35–40.)

135.     The synergy reported in the T-14 study, as submitted in the '775 application and recited in the '766 patent specification, is based on a comparison of the results of co-administration of both drugs to the results of the administration of either drug alone. (Ex. 1419.1 at ABTKEN00001235–37; Tr. at 237:17–243:12.)

136.     Example 2 of the '766 patent reported a clinical study in which rheumatoid arthritis patients with active disease despite receiving chronic methotrexate treatment were given either the anti-TNFα antibody cA2 or a placebo. (Ex. 1 at col. 31, line 60–col. 32, line 3; Tr. at 155:21–25.)

137.     "Active disease" for Example 2 is defined the same as in Example 1. (Ex. 1 at col. 31, line 65–col. 32, line 3.)

138.     In this study, the patients received a weekly dose of 10 mg of methotrexate for at least four weeks prior to the study and then received a single administration of either the antibody cA2 or a placebo at a dose of 5, 10, or 20 mg/kg. (<u>Id.</u> at col. 31, line 54–65, Table 7; Tr. at 237:17–243:12.)

139.     All of the patients in the study continued to receive a weekly dose of 10 mg of methotrexate throughout the duration of the twelve week trial. No patients in this study received antibody alone without methotrexate. (Ex. 1 at col. 32, lines 22–24.)

140.     The specification of the '766 patent explains a single dose of antibody cA2, particularly at the 10 mg/kg and 20 mg/kg doses, produced a clinical response that was sustained for as long as twelve weeks after a single treatment. (<u>Id.</u> at col. 32, line 67–col. 33, line 4.)

141.    The specification states that "the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate."  (Id. at col. 33, lines 19–23.)

142.    Example 3 of the '766 patent specification is a continuation of the clinical trial described in Example 2.  Twenty-three patients from the study were administered 10 mg/kg of antibody cA2 in an open label format at weeks 12, 20, and 28.  During this period of the extension study, the patients continued to receive methotrexate administered at a dose of 10 mg/week.  (Id. at col. 33, lines 35–50; Tr. at 156:1–5.)

143.    As in Example 2, none of the patients in Example 3 received antibody alone.  (Ex. 1 at col. 33, lines 35–49.)

144.    In all three examples in the '766 patent specification, the clinical studies involved "adjunctive" therapy, wherein patients who had active rheumatoid arthritis, despite receiving methotrexate, continued to receive weekly methotrexate, and infusions of anti-TNFα antibody (at some interval) were added to this treatment.  (Tr. at 159:6–9; see id. at 515:20–25; see generally Test. of Dr. Michael Weinblatt (describing and defining "adjunctive" therapy as adding one therapy to another, ongoing treatment).[12])

145.    The adjunctive therapy shown in the three examples of the '766 patent specification is one of three possible methods of "co-administration" of methotrexate and an anti-TNFα antibody.  In the parlance of "genus" and "species," "co-administration" is the

---

[12] To the extent that the testimony of Abbott's expert, Dr. Weinblatt, and Kennedy's expert, Dr. Lipsky, conflicted, the Court credits Dr. Weinblatt's testimony.  While both are eminently qualified as experts and leaders in the field of rheumatology, Dr. Weinblatt's testimony was clearer, more consistent, more responsive, and more reflective of the other evidence in the record.  Furthermore, his demeanor was the same on cross-examination as it was on direct.  On the other hand, Dr. Lipsky appeared to regard almost any question, other than from Kennedy's counsel, as an opportunity to engage in a debate.  Dr. Lipsky's frequently argumentative and non-responsive testimony detracted from his substantive points.

"genus" under which there are three "species," or possible methods of co-administration, or ways to give two drugs to a patient: (1) treatment with methotrexate and antibody is started at the same time; (2) treatment with antibody is begun first and treatment with methotrexate is then added later while treatment with antibody continues; or (3) treatment with methotrexate is begun first and treatment with antibody is then added later while treatment with methotrexate continues. The latter two methods of co-administration constitute "adjunctive" therapy. (Tr. at 224:1–19.)

146. The '766 patent only provides examples where patients received adjunctive anti-TNFα antibody therapy with continuing methotrexate treatment. The examples do not include any situations in which patients began both drugs at the same time or started antibody first and added methotrexate; such treatment scenarios were (and are) unlikely because patients frequently were put on methotrexate treatment first and their responses evaluated to such treatment alone, before antibody treatment was considered, due to both the heightened intensity and expense of antibody treatment. (Id. at 224:20–225:11.)

E. **Prosecution History of the '766 Patent**

147. The original '775 application, filed on August 1, 1996, from which the '766 patent issued, included a total of 31 claims. (Ex. 1419.1 at ABTKEN00000068, -00000154–57.)

148. Claim 1 in the '775 application was directed toward "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor antibody or fragment thereof to the individual, in therapeutically effective amounts." (Id. at ABTKEN00000154.)

149. Claim 10 in the '775 application was directed toward "[a] method for treating or preventing rheumatoid arthritis in an individual in need thereof comprising co-

administering methotrexate and an anti-tumor necrosis factor antibody to the individual, in therapeutically effective amounts." (Id. at ABTKEN00000155.)

150. Claims 11 and 12, which were dependent on Claim 10, referred to methods in which the anti-TNFα antibody and methotrexate were administered "simultaneously" and "sequentially," respectively. (Id.)

151. Through several intermediate steps, Kennedy in the '755 application claimed priority back to the '248 application and its filing date of October 8, 1992. (Id. at ABTKEN00000079.)

152. On March 3, 1997, in the first "Office action," the PTO rejected the pending claims. (Id. at ABTKEN00000587–95.) The PTO examiner denied the claimed priority date of the '248 application, stating that certain of the claims were not supported by the earlier applications that related back, and deemed the filing date of the claims to be August 1, 1996. (Id. at ABTKEN00000588.) The examiner also rejected the claims under 35 U.S.C. §§ 103 and 112. (Id. at ABTKEN00000588–94.)

153. Kennedy filed a response on September 3, 1997, "Amendment A," which included amendments to the specification and claims, arguments responding to the objections and rejections set forth by the examiner in the first Office action, and Kennedy's reply to the examiner's denial of a priority date for the '775 application back to the earlier filed applications. (Id. at ABTKEN00000620–45, -00000656–57.)

154. In Amendment A, Kennedy argued against the examiner's rejections under 35 U.S.C. §§ 103 and 112, referring to the claimed invention as "co-administration" or "co-administering" of methotrexate and anti-TNFα antibody (or antagonist). (Id. at ABTKEN00000627, -00000630, -00000644–45.)

40

**A43**

155.     Kennedy stated, "Applicants have exemplified the claimed methods using monoclonal anti-TNFα antibody cA2 in patients with active rheumatoid arthritis (see specification, e.g., Examples 1-3)."  (Id. at ABTKEN00000628.)

156.     Kennedy responded to the examiner's rejections under 35 U.S.C. § 103 by arguing that the claimed co-administration methods resulted in unexpected results.  Specifically, Kennedy argued that it had

> demonstrated the unexpected result that combination therapy with methotrexate and an anti-TNFα antibody produced a rapid and sustained reduction in the clinical signs and symptoms of the treated autoimmune disease (see specification, e.g., page 4, lines 2-8; and Example 2). Applicants also demonstrated the unexpected and dramatic result that combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results than the results obtained with each agent alone, particularly at low doses of methotrexate (see specification, e.g., page 4, lines 9-19[13]; Examples 1-3). The magnitude of these results in the treatment of autoimmune or inflammatory disease could not have been reasonably predicted from the cited references, as illustrated in, for example, Figures 1A, 2A, 3A, 4A, 5A and Figure 7 of the specification.  (Id. at ABTKEN00000644.)

157.     The data that Kennedy relied on to establish unexpected results of the claimed co-administration methods included Examples 1, 2, and 3 of the specification.  (Id.)

158.     In referring to the unexpected results that "combination therapy" produced, as compared to "each agent alone," this latter designation covered both the group of patients in Example 1 who received methotrexate and infusions of placebo (instead of antibody) throughout the T-14 study, as well as the group of patients who stopped receiving methotrexate at the beginning of the infusion treatment and received infusions of antibody throughout the trial.

---

[13] Here, the specification states that: "The present invention is also based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, *when administered adjunctively* with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone."  (Ex. 1419.1 at ABTKEN00000082 (emphasis added).)

41

Kennedy's description of these two groups in Amendment A as having received "each agent alone" corresponds to what Professors Maini and Feldmann referred to as "monotherapy" in their published article on the T-14 study. (Tr. at 234:5–235:1; Ex. 1025 at 1553, 1560.)

159.　　On December 9, 1997, the PTO mailed a second Office action, again rejecting all of the pending claims. (Ex. 1419.1 at ABTKEN00000659–66.) In this action, the examiner again denied Kennedy's claim for priority, stating that Kennedy had not provided adequate support for the priority of the asserted claims, and as a result, the effective filing date of the '755 application remained August 1, 1996. (Id. at ABTKEN00000660.)

160.　　In rejecting Kennedy's unexpected results argument, the examiner noted, with respect to Example 1, that

> the instant specification discloses that: the results of the study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in [rheumatoid arthritis] patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks. . . . Accordingly, the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients. (Id. at ABTKEN00000663.)

161.　　With regards to Example 2, the examiner stated that

> the instant specification discloses that: the results of the study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate. . . . Accordingly, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating [rheumatoid arthritis] in patients. (Id.)

162.　　The examiner rejected the pending claims, despite recognizing that Examples 1 and 2—demonstrating adjunctive therapy—showed improved treatment results. (Id.)

42

**A45**

163.    On June 8, 1998, Kennedy responded to the second Office action with "Amendment B." (Id. at ABTKEN00000997–1016.)  Kennedy argued that the '775 application was entitled to the priority filing date of the '248 application, stating that "[a]t page 10, lines 6-9, the '248 application specifically recites the use of methotrexate in conjunction with an anti-TNF antibody." (Id. at ABTKEN00000998.)  As such, Kennedy argued that "the '248 specification provides support for these claims" and "[a]ccordingly, the claims are entitled to a priority date of October 8, 1992, the filing date of the '248 application." (Id. at ABTKEN00000999.[14])

164.    In response to the examiner's rejection under 35 U.S.C. § 112, first paragraph, that the specification did not sufficiently enable the claimed methods, Kennedy argued that "the present specification provides human clinical data of the claimed co-administration." (Id. at ABTKEN00001001 (emphasis omitted).)

165.    In Amendment B, Kennedy responded to the examiner's rejection under 35 U.S.C. § 103 by noting first that "Applicants' invention relates to methods of treating . . . rheumatoid arthritis (claims 10-17) . . . in an individual comprising co-administering methotrexate and an anti-TNFα antibody[.]" (Id. at ABTKEN00001004.)

166.    In response to the examiner's rejection for obviousness and the examiner's comments in the second Office action with regard to Examples 1 and 2 of the specification, Kennedy repeated its argument that those examples demonstrated unexpected results of combination therapy with methotrexate and a TNFα antagonist, stating:

> the Examiner's summary of the results disclosed in Example 1 is consistent
> with Applicants' assertions relating to the same example:  that

---

[14] Although not directly at issue in this obviousness-type double patenting challenge, Professor Maini testified that—contrary to Kennedy's representations to the PTO throughout the patent prosecution process that the 1992 '248 application supported the claims of co-administration of methotrexate and an anti-TNFα antibody—these representations were incorrect and not accurate because at the time of the '248 application the inventors had not yet conceived of the use of methotrexate in combination with anti-TNFα antibody for the treatment of rheumatoid arthritis. (Tr. at 539:3–551:25.)

combination therapy with methotrexate and anti-TNFα produced markedly superior results than the results obtained with each reagent alone, particularly at low doses of methotrexate and that significant improvement of the combination therapy was observed even in comparison to where optimal dosages of anti-TNFα antibody were administered alone (see Amendment A at page 25). The Examiner's summary of the results disclosed in Example 2 is also consistent with Applicants' assertion relating to the same example: that combination therapy with methotrexate and anti-TNFα antibody produced a rapid and sustained reduction in the signs and symptoms of the treated autoimmune disease (see Amendment A at page 25). (Id. at ABTKEN00001006–07.)

167.    On September 1, 1998, the PTO mailed an Office action rejecting the pending claims for the third time and denying Kennedy's request for the priority date of the '248 application. (Id. at ABTKEN00001124–28.)

168.    In denying Kennedy's asserted priority to the '248 application, the examiner stated that the '775 application's "limitations drawn to modes of administration encompassing 'simultaneously,' 'sequentially' and 'multiple doses' do not appear to receive written support or priority to" the '248 application, and "it does not appear that these various modes of administration as they encompass the instant combination of anti-TNF antibodies (or TNF antagonists) and methotrexate are supported in" the '248 application. (Id. at ABTKEN00001125.)

169.    The examiner again rejected Kennedy's claims as being obvious under 35 U.S.C. § 103 in view of several references in the prior art. (Id. at ABTKEN00001126–28.) Responding to Kennedy's argument that the combination of methotrexate and an anti-TNFα antibody showed unexpected results, the examiner explained that

applicant's arguments rely, in large part, to asserted *synergistic effects disclosed in the instant examples, however it is noted that such effects were observed with certain patient populations with certain dosing. Such particular patient populations and particular dosing regimens are not claimed*. (Id. at ABTKEN00001127 (emphasis added).)

44

170.     After the third Office action was made final (see id. at ABTKEN00001128), Kennedy filed a Notice of Appeal on March 1, 1999, and an Appeal Brief on September 3, 1999, appealing the rejection of all the claims remaining in the application.  (Id. at ABTKEN00001131–82.)

171.     The Appeal Brief argued that

> [t]he present invention relates to the discovery that a TNFα antagonist can be administered to patients suffering from a TNF-mediated disease (such as an autoimmune or inflammatory disease) as adjuvant or concomitant therapy to methotrexate therapy, with a rapid and sustained reduction in the clinical signs and symptoms of the disease.  The present invention also relates to the unexpected discovery that a multiple dose regimen of a TNFα antagonist can be administered to patients suffering from a TNF-mediated disease as adjuvant or concomitant therapy to methotrexate therapy, with a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone.  (Id. at ABTKEN00001137.)

172.     Kennedy also argued "that the pending claims are entitled to a priority date of October 8, 1992, the filing date of the '248 application," again relying, inter alia, on "page 10, lines 6-9, [of] the '248 application[, which] specifically recites the use of methotrexate in conjunction with an anti-TNF antibody."  (Id. at ABTKEN00001139.)

173.     Kennedy further contested the examiner's rejections for obviousness under 35 U.S.C. § 103, again relying on Examples 1, 2, and 3 of the specification as evidence of the unexpected results of combination therapy, stating that

> Appellants demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced unexpected synergistic effects between methotrexate and the TNFα antagonist (see, e.g., Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification).  Appellants also demonstrated the unexpected result that significantly reduced immunogenicity of anti-TNFα antibodies was obtained with combination therapy with methotrexate (see, e.g., page 57, line 30 to page 60, line 4, including Table 6, of the specification).  Appellants further demonstrated

45

**A48**

the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see specification, e.g., page 4, lines 8-18; Examples 1-3 . . .).  (Id. at ABTKEN00001154.)

174.    On November 23, 1999, the PTO examiner reopened prosecution by issuing a fourth Office action.  (Id. at ABTKEN00001183–98.)  The examiner determined that the '248 application did support certain claims of the '775 application, including claim 10, which was directed to treating rheumatoid arthritis, and granted these claims an effective filing date of October 8, 1992.  (Id. at ABTKEN00001184.)  The examiner maintained the rejection of certain claims under 35 U.S.C. § 112, first paragraph, for lack of enablement.  (Id. at ABTKEN00001187–88.)  The examiner also rejected all of the claims under 35 U.S.C. § 102(e) as being anticipated by several references, as well as under 35 U.S.C. § 103.  (Id. at ABTKEN00001189–97.)

175.    In response to Kennedy's arguments regarding the asserted synergistic benefits disclosed in Examples 1, 2, and 3, the examiner elaborated on one of the bases for the previous rejections and stated in the fourth Office action that

> [A]pplicant[s'] arguments rely, in large part, to the asserted synergistic effects disclosed in the instant examples.  *Applicant[s'] asserted synergistic effects are based on the comparison of each therapeutic modality used separately.  Also, it has been noted that such effects were observed with certain patient populations with certain dosing*.  *The putative synergistic effects relate to a particular multiple dose regiment of* [sic] *based upon cA2 and methotrexate therapy in rheumatoid arthritis patients whose disease is incompletely controlled by methotrexate* (see page 62, paragraph 3 and page 66, paragraph 3 of the specification).  *Such particular patient populations and particular dosing regimens are not claimed.*  Also, it is noted that such effects observed with certain patient populations with certain dosing regimens does not discount the well known use and expectation of success in combining therapeutic agents to treat diseases.  (Id. at ABTKEN00001196 (emphasis added).)

176. The examiner thus noted that of the three overarching treatment groups of patients—those who entered the study on methotrexate and continued receiving methotrexate and placebo, those who entered the study on methotrexate, continued to receive methotrexate, and also received antibody, and those who were receiving methotrexate, ceased receiving methotrexate at entry, but received antibody during the study—the putative synergistic benefits were experienced by the second (i.e., the group who stayed on methotrexate and received adjunctive cA2 treatment). The examiner explained that the unexpected results did not extend to the more broadly claimed "co-administration" methods generally (i.e., the evidence of unexpected results proffered only supported claims for the cA2 adjunctive therapy "species," not the entire "genus" of co-administration). (Tr. at 239:7–241:4.) As such, the examiner refused to allow a broader claim to all ways of co-administering methotrexate and anti-TNFα antibody, as the evidence in Examples 1, 2, and 3 were not necessarily representative of the broader coverage sought, but merely of the cA2 adjunctive therapy.

177. The examiner continued:

> The nonobviousness of a broader claim can be supported by evidence based on unexpected results from testing a species contained within the claim if one of ordinary skill in the art would be able to determine a trend in the exemplified data which would allow the artisan to reasonably extend the probative value thereof to the broader claim. . . . Here, however, . . . it does not appear that the specification provides sufficient objective evidence to extend unexpected results showing contained herein based upon the asserted synergistic effects of this combination therapy in rheumatoid arthritis patients who were resistant to conventional therapy with methotrexate. (Ex. 1419.1 at ABTKEN00001197 (citations omitted).)

178. The examiner highlighted this distinction in comparing the scope of the methods claimed in the '248 application and the '775 application:

> [A]pplicant[s'] assertion of synergistic results based upon by [sic] the limited clinical results [in] rheumatoid arthritis patients who were resistant to conventional therapy with methotrexate in the instant application

47

**A50**

appears inconsistent with applicant[s'] assertion of priority; wherein [the '248 application] simply disclosed that other anti-inflammatory agents such as methotrexate can be administered in conjunction with anti-TNF antibodies.  (Id.)

179.    On May 23, 2000, Kennedy mailed a response, "Amendment C," to the fourth Office action, in which it amended two claims and argued that all the claims in the subject application should be entitled to the same benefit of a priority date of the '248 application. Kennedy also continued to argue against the 35 U.S.C. § 112, first paragraph, rejection based on lack of an enabling disclosure.  (Id. at ABTKEN00001216–39.)

180.    In response to the examiner's rejections for obviousness under 35 U.S.C. § 103, Kennedy asserted that the clinical data in the specification evidenced that

> Applicants demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced unexpected synergistic effects between methotrexate and the TNFα antagonist (see, e.g., Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification). . . . Applicants further demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see specification, e.g., page 4, lines 8-18; Examples 1-3 . . .).  (Id. at ABTKEN00001235.)

181.    Kennedy's argument compared the group of patients who received methotrexate and placebo and the group who stopped receiving methotrexate at entry but received infusions of antibody throughout the study, to the group of patients who continued to receive methotrexate and also received antibody infusions, and asserted that there was an unexpected synergistic response when the two drugs were combined.  (Tr. at 237:17–239:6.)

182.    Responding to the examiner's statements in the fourth Office action that the synergistic effects were observed only with "certain patient populations with certain dosing," and that "[s]uch particular patient populations and particular dosing regimens are not claimed," Kennedy argued that

48

**A51**

> [t]here is no technical reason to believe that the synergistic effects exemplified in the specification by combination therapy with methotrexate and a TNFα antagonist is limited to a certain patient population. That is, ***there is no technical reason to believe that treatment with a combination of methotrexate and a TNFα antagonist, in accordance with Applicants' teachings, would not yield the superior therapeutic effects described in the subject application. The superior therapeutic effects are due to co-administration of methotrexate and a TNFα antagonist*** functionally limited to therapeutically effective amounts, as described in the specification. (Ex. 1419.1 at ABTKEN00001236 (emphasis added).)

183.    Thus, Kennedy, drawing supporting data from the clinical trials in Examples 1, 2, and 3, in which a TNFα antagonist was administered as adjunctive therapy to patients with an inadequate response to ongoing methotrexate treatment, argued that these data were representative of the broader genus of "co-administration" of methotrexate and a TNFα antagonist to treat patients with rheumatoid arthritis (i.e., Kennedy argued that the results observed in the cA2 adjunctive treatment group were representative of what one would expect when co-administering methotrexate and anti-TNFα antibody generally). (Tr. at 241:5–242:13.)

184.    In its prosecution of the '775 application, Kennedy did not distinguish between the antibody adjunctive treatment group, in which patients on continuing methotrexate were given infusions of cA2, and either of the other possible methods of co-administration—starting patients on both antibody and methotrexate at the same time or starting patients on antibody first then adding methotrexate treatment later—because the T-14 trial did not study either of these methods. (Id. at 242:14–23.)

185.    Furthermore, in the entirety of the '766 patent file history, Kennedy never suggested that there was an additional form of co-administration—distinct from one in which antibody was administered as adjunctive therapy to ongoing methotrexate—in which antibody was administered as "sequential co-administration" to the methotrexate therapy. (Id. at 242:24–243:4; see also id. at 564:1–13.)

186.     As Professor Maini testified at trial, this is consistent with the subsequently published article on the T-14 study, in which the patients who received infusions of cA2 were described as being given antibody either "alone or in combination with" methotrexate, and where "co-administration" referred to the group who had received cA2 adjunctive therapy added to ongoing methotrexate treatment.  Professor Maini testified that the patients who stopped receiving methotrexate upon entry to the T-14 trial at week 0 and received infusions of cA2 throughout the trial were not referred to in the published study as having received "sequential co-administration" because the phenomenon of these patients experiencing superior results at the beginning of the trial was not "scientifically proven to be due to sequential co-administration . . . [and] because it was not scientifically proven, as a scientist, I did not think it was appropriate to draw attention to a phenomenon that I could not scientifically support, and therefore, I haven't referred to it."  Professor Maini explained that this phenomenon "wasn't the subject of what I believed that our study had proven conclusively, which was adjunctive therapy."  (Id. at 564:14–570:24; see id. at 523:9–525:15.)

187.     After a June 13, 2000 interview between the examiner, Kennedy's counsel, Professor Feldmann, and others, Kennedy filed a Supplemental Amendment on August 7, 2000, and indicated that at the interview Kennedy and the PTO examiner had agreed that each of the pending claims was entitled to a priority date of October 8, 1992, the filing date of the '248 application.[15]  (Ex. 1419.1 at ABTKEN00001242–53.)

---

[15] With the PTO's acquiescence to the 1992 priority date of the '248 application, Kennedy was able to avoid much prior art in its ultimately successful prosecution of the '766 patent.  See 35 U.S.C. § 102(b).  Regardless of whether this was an appropriate action to take (see supra n.14), Kennedy's repeated claims to the priority date of the '248 application demonstrate its strategy to avoid this prior art even though it resulted in an earlier expiration date of the '766 patent.

50

**A53**

188.     On October 25, 2000, the examiner issued a Notice of Allowability indicating that the application, and all the claims therein, were allowable.  (Id. at ABTKEN00001288.)  The examiner's reasons for allowance indicated that the pending claims were deemed allowable upon reconsideration of Kennedy's amended claims and arguments, and in view of the unexpected results.  (Id. at ABTKEN00001290.)

189.     On August 7, 2001, the PTO issued the '766 patent.  (Ex. 1.)

F.     **The '004 Application**

190.     Shortly after the Notice of Allowability of the '766 patent, on January 3, 2001, Kennedy filed Application No. 09/754,004 (the "'004 application") as a continuation application of the '775 application.  The '004 application named Professors Maini and Feldmann as inventors and the Kennedy Institute of Rheumatology Trust as assignee.  (Ex. 1423.1 at ABTKEN00032566–32710.)

191.     The '004 application claimed priority to the '248 application through the same series of applications as the '775 application.  (Id. at ABTKEN00032646.)

192.     Original claim 1 was directed to "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts."  (Id. at ABTKEN00032701.)

193.     Original claim 29 was directed to "[a] method for treating or preventing rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts."  (Id. at ABTKEN00032703.)

51

**A54**

194.    Original claims 30 and 31 were directed to methods of claim 29 wherein the TNFα antagonist and methotrexate were administered "simultaneously" and "sequentially," respectively.  (Id. at ABTKEN00032703–04.)

195.    In an Office action mailed December 9, 2002, the examiner rejected all of the pending claims.  (Id. at ABTKEN00033087–88.)  The examiner did not grant the '004 application the benefit of the October 8, 1992 filing date of the '248 application, explaining that the priority applications did not support the pending claims.  Accordingly, the filing date of the '004 application was deemed to be August 1, 1996.  (Id. at ABTKEN00033090.)

196.    The examiner also rejected the pending claims on several grounds under 35 U.S.C. §§ 101, 102, 103, 112 and under the judicially-created doctrine of obviousness-type double patenting over claims the '766 patent.  (Id. at ABTKEN00033091–95.)

197.    On June 17, 2003, Kennedy submitted an amendment in response to the December 9, 2002 Office action.  Kennedy amended its claims and the first paragraph of the specification and maintained the asserted priority date of the '248 application.  (Id. at ABTKEN00033122–23, -00033098, -00033111–12, -00033099.)  Kennedy characterized the invention as "methods for treating or preventing an inflammatory disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts."  (Id. at ABTKEN00033100.)

198.    Kennedy argued that its invention was not obvious under 35 U.S.C. § 103 by, in part, highlighting the claimed

> unexpected results of treating an inflammatory disorder with a combination of methotrexate and a TNF antagonist.  These results are exemplified by the data set forth in Figures 1A, 2A, 3A, 4A, 5A and Table 4 of the specification.  [Kennedy also draws] the Examiner's attention to the unexpected result that combination therapy with methotrexate and a TNF antagonist produced high clinical response rates for significantly

longer durations in comparison with that obtained with treatment with each therapeutic modality separately (see, e.g., page 3, lines 18-24, Examples 1-3; particularly, page 35, lines 5-8, page 37, lines 1-3, pages 36-37 (Table 3), pages 38-39 (Table 4), page 46, line 24 through page 47, line 8 of Example 1; page 48, line 20 through page 50, line 8 of Example 2; and page 51, lines 8-32 of Example 3).  (Id. at ABTKEN00033105.)

199.     The June 17, 2003 amendment did not respond to the examiner's obviousness-type double patenting rejection.  (Id. at ABTKEN00033098–33112, -0033122–23.)

200.     On November 4, 2003, the examiner mailed another Office action rejecting the pending claims.  (Id. at ABTKEN00033334–41.)  The examiner stated that while Kennedy's amendment again sought the October 8, 1992 priority date of the '248 application, it "did not address" the examiner's position that the pending claims were not supported by the earlier application; accordingly, the examiner maintained the August 1, 1996 effective filing date.  (Id. at ABTKEN00033336.)  The examiner also rejected Kennedy's arguments in response to the rejections under 35 U.S.C. §§ 102 and 103.  (Id. at ABTKEN00033337–40.)

201.     In the November 4, 2003 Office action, the examiner also stated that in the absence of any rebuttal from Kennedy to the examiner's rejection under the doctrine of obviousness-type double patenting, "[i]t appears that applicant has acquiesced to the double patenting rejection of record."  (Id. at ABTKEN00033340.)

202.     On February 4, 2004, Kennedy sent its response to the November 4, 2003 Office action, again repeating the argument that the '004 application was entitled to the 1992 priority date of the '248 application, and specifically argued that "[a]t page 10, lines 6-9, the '248 Application specifically teaches the use of methotrexate in conjunction with an anti-TNF antibody."  (Id. at ABTKEN00033345.)

203. In responding to the rejections for obviousness under 35 U.S.C. § 103, Kennedy relied on the same evidence of unexpected results as in the prior amendment. (Id. at ABTKEN00033351–52; see supra ¶ 198.)

204. Kennedy also stated that it inadvertently failed to respond to the examiner's obviousness-type double patenting rejection. Kennedy stated that it intended to file a terminal disclaimer with regards to the '766 patent "once the claims are otherwise in condition for allowance." (Ex. 1423.1 at ABTKEN00033355.)

205. On March 26, 2004, the examiner mailed an Advisory Action maintaining the prior rejections (id. at ABTKEN00033357–59), to which Kennedy responded in a supplemental amendment on August 6, 2004 (id. at ABTKEN00033366–402). The supplemental amendment referenced a May 4, 2004 notice of appeal and a July 27, 2004 interview with the examiner. (Id. at ABTKEN00033401.)

206. The August 6, 2004 supplemental amendment included a chart in furtherance of Kennedy's argument that each of the pending claims in the '004 application was supported by the 1992 '248 application through intermediate patents and applications. (Id. at ABTKEN00033372–73.)

207. In response to the examiner's rejection under 35 U.S.C. § 103, Kennedy again argued that the claimed co-administration methods showed unexpected results, relying on the same clinical data as before. (Id. at ABTKEN00033378–83.)

208. Kennedy responded to the obviousness-type double patenting rejection based on the '766 patent by arguing that the rejection was moot as to the canceled claims and that with respect to the other claims, Kennedy intended to file a terminal disclaimer for the '766 patent. (Id. at ABTKEN00033383–84.)

209.    On March 11, 2005, the examiner mailed an Office action rejecting all of the pending claims.  (Id. at ABTKEN00033455–64.)  Kennedy did not respond to this Office action, and the '004 application was abandoned.  (Id. at ABTKEN00033475–76.)

G.    **The '631 Application**

210.    On September 12, 2005, Kennedy filed U.S. Patent Application No. 11/225,631 (the "'631 application").  The '631 application named Professors Maini and Feldmann as inventors.  (Ex. 1420.1 at ABTKEN00001307–11.)

211.    The original '631 application included 38 claims (id. at ABTKEN00001364–67), but a concurrently filed preliminary amendment canceled all the claims except for independent claim 1 (id. at ABTKEN00001386–89.)  Claim 1 was directed to "[a] method for treating or preventing a tumor necrosis factor-mediated disease in an individual in need thereof comprising co-administering methotrexate and a TNFα antagonist to said individual, in therapeutically effective amounts."  (Id. at ABTKEN00001388.)

212.    The original '631 application claimed benefit to the '248 application, filed October 8, 1992, through the same series of applications as the '775 and '004 applications.  (Id. at ABTKEN00001387.)

213.    Kennedy filed a second preliminary amendment on January 12, 2006, and revised the first paragraph of the specification, while still asserting the benefit of the October 8, 1992 date.  (Id. at ABTKEN00001392–94.)

214.    On January 18, 2007, Kennedy filed a third preliminary amendment, which canceled claim 1 (in addition to previously canceled claims 2 through 38), and added 33 new claims, which were all method claims.  (Id. at ABTKEN00001414–27.)

55

215.     The new claims began at claim 39, which was directed toward:

[a] method of treating an individual suffering from a human tumor necrosis factor-mediated disease comprising adjunctively administering with methotrexate an anti-human tumor necrosis factor-α antibody or a fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or a fragment thereof (a) binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and (c) is administered at a dosage of 0.01-100 mg/kg/day.  (Id. at ABTKEN00001419.)

216.     Similarly, claim 41 of the amended '631 application was directed toward:

[a] method for adjunctive treatment of an individual suffering from rheumatoid arthritis who is already being treated with methotrexate weekly comprising administering an anti-tumor necrosis factor-α antibody or a fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is administered to the individual multiple times, each such administration (i) being separated by an interval of weeks from the prior administration, and (ii) delivering 0.01-100 mg/kg/day of the anti-human tumor necrosis factor-α antibody or fragment thereof.  (Id. at ABTKEN00001420.)

217.     In response to a December 21, 2007 Office action requiring restriction of the claimed invention pursuant to 35 U.S.C. § 121 (see id. at ABTKEN00001430–35), on June 23, 2008, Kennedy filed an amendment, which, in part, amended the first paragraph of the specification setting forth the claimed priority to the '248 application and deleted the four oldest prior applications.  As so amended, the '631 application claimed the benefit of the August 1, 1996 priority date of the '775 application instead of the October 8, 1992 priority date of the '248 application.[16]  (Id. at ABTKEN00004539.)

218.     On April 15, 2009, the examiner mailed an Office action, in which the examiner acknowledged the amended claim to a priority date and rejected or withdrew all the

---

[16] By asserting the August 1, 1996 priority date, Kennedy needed to overcome additional prior art, see 35 U.S.C. § 102(b), but also extended the expiration date of the invention claimed in the '631 application, see id. § 154.  (See also supra n.15.)

56

A59

pending claims on various grounds, including under 35 U.S.C. § 103, and for obviousness-type

double patenting over claims 1 through 14 of the '766 patent. (Id. at ABTKEN00006935–46.)

219.      In explaining the rejection for obviousness-type double patenting, the

examiner stated:

> Although the conflicting claims are not identical, they are not patentably
> distinct from each other because the patented claims anticipate or render
> obvious the instant claimed methods, as the instant and patented claims are
> drawn to the same or nearly the same methods of treating arthritis with the
> anti-TNFα antibodies and methotrexate to meet the needs of the patient.
>
> It is well settled that discovery of an optimum value of a result effective
> variable in a known process is ordinarily within the skill of the art. . . .
>
> As manipulating combination therapy was known and readily practiced by
> the ordinary artisan at the time the invention was made, it would have
> been obvious to optimize the dosing and dosing regimens of both the
> conventional methotrexate treatment as a disease modifying anti-
> rheumatic disease drug treatment (e.g., DMARDs) as well as the anti-
> TNFα antibodies in the treatment of rheumatoid arthritis. (Id. at
> ABTKEN00006945–46 (internal citations and quotations omitted).)

220.      On August 5, 2009, the examiner held an interview with Professor

Feldmann and Kennedy's representatives. (Id. at ABTKEN00007107.)

221.      On September 15, 2009, Kennedy filed a response to the April 15, 2009

Office action, including amendments to the claims and remarks, and a summary of the interview

held on August 5, 2009. (Id. at ABTKEN00007108–77.) In the interview summary, Kennedy

stated that its proposed amendments to the claims were being made to

> make clear that the present invention involved the treatment of patients
> with active arthritis whose disease is incompletely controlled despite
> already receiving methotrexate by *adjunctively* administering with
> methotrexate therapy a different composition comprising an anti-human
> tumor necrosis factorα antibody or a fragment thereof to the individual.
> (Id. at ABTKEN00007110 (emphasis added).)

222.     In addition, Kennedy's summary of the interview recounted that, with respect to the obviousness-type double patenting rejection over the '766 patent, "Applicants noted that claims 1-14 of the ['766] patent . . . are not directed to the same patient population as is claimed in the present application and are not directed to adjunctive therapy."  Kennedy further recounted that "Applicants also noted that their claimed present invention provides unexpected results that demonstrate that the claimed invention is not obvious over claims 1-14 of the '766 Patent."  (Id. at ABTKEN00007117.)

223.     Kennedy responded to the rejections under 35 U.S.C. § 103 by arguing that the prior art combinations of methotrexate with other arthritis therapies did not provide the benefits obtained by adjunctively administering an anti-TNFα antibody to a patient already receiving methotrexate.  Specifically, Kennedy stated that

> [a]s discussed above, ***combination therapy includes numerous different types of associations such as simultaneous, sequential, separate, parallel, or intermittent administration of two or more therapeutic agents***.  The choice of a TNF-antagonist in adjunctive therapy was not obvious over the cited references.  ***The advantages obtained using the claimed adjunctive therapy are NOT obtained with other types of combination.***  (Id. at ABTKEN00007138 (emphasis added).)

224.     Kennedy's statement that the "advantages obtained using the claimed adjunctive therapy are NOT obtained with other types of combination" is inconsistent with prior statements Kennedy made during the prosecution of the '766 patent, where Kennedy asserted that the adjunctive therapy results in Examples 1, 2, and 3 of the specification were representative of broader co-administration of methotrexate and a TNFα antagonist to treat patients with rheumatoid arthritis (i.e., that the results of adjunctive treatment group were representative of what one would expect from co-administering methotrexate and anti-TNFα

58

**A61**

antibody generally). (Ex. 1419.1 at ABTKEN00001235–36; Tr. at 241:5–242:13; see supra ¶¶ 182, 183.)

225.　　In responding to the examiner's obviousness rejection, Kennedy also relied on the alleged unexpected results obtained by adjunctively administering anti-TNFα antibody to a patient population already receiving, but failing to respond to, methotrexate therapy. (Ex. 1420.1 at ABTKEN00007143–44; see id. at ABTKEN00001346–50.) In taking this position, Kennedy relied on the same data from the T-14 study as it had in the prosecution of the '766 patent. (Compare id. at ABTKEN00007143–44 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) and -00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), with Ex. 1419.1 at ABTKEN00001235–36 (citing, inter alia, same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) and -00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification); see Tr. at 155:10–20; see also supra ¶¶ 184, 185, 186.)

226.　　With regard to the examiner's obviousness-type double patenting rejection based on the '766 patent, Kennedy attempted to distinguish claims 1 through 14 of the '766 patent directed to co-administration from those in the pending application directed to adjunctive therapy. Specifically, Kennedy stated that

> Applicants note that, in contrast to claims 1-14 of the '766 Patent, the individuals are already receiving methotrexate therapy in all of the pending claims. Additionally, the individuals still have active disease in the pending claims, despite having undergone methotrexate therapy. Claims 1-14 of the '766 Patent are generic with respect to these claim elements. For instance, the '766 Patent claims include individuals who did and who did not receive methotrexate. Likewise, they include individuals who are and who are not receiving benefit from methotrexate.

Applicants also note that the pending claims also differ from the '766 Patent claims in that the pending claims are directed to adjunctive therapy, a particular type of combination therapy. In contrast, the '766 Patent claims include adjunctive, sequential and simultaneous therapy.

Applicants further note that, in further contrast to the '766 Patent claims, the pending claims are limited to administration of anti-TNFα antibody in a separate composition from methotrexate. The '766 Patent claims include administration of anti-TNFα antibody and methotrexate in the same or separate compositions. (Ex. 1420.1 at ABTKEN00007151.)

227.     Although Kennedy's September 15, 2009 filing stated that the pending claims covered only administration of the antibody and methotrexate in separate compositions while the '766 patent claims administration of the antibody and methotrexate in the same or separate compositions, it was well known by the August 1995 that methotrexate was more frequently administered in tablet form, while anti-TNFα antibody was administered via infusion (i.e., in separate compositions). (See Tr. at 150:8–12, 167:15–168:13; see also supra ¶ 14.)

228.     Kennedy also argued that the claimed invention was not obvious to try because "it is well known that methotrexate is toxic. . . . As the patients had already failed treatment with methotrexate, it would not be obvious to try to continue methotrexate therapy, given its known toxicity, while commencing anti-TNFα antibody therapy." (Ex. 1420.1 at ABTKEN00007151–52.) By August 1995, however, it was a well-established practice to continue treating with methotrexate rheumatoid arthritis patients who had not completely responded to such treatment (in order to prevent flares), while adding another therapeutic agent to the methotrexate treatment. (See, e.g., supra ¶¶ 16, 17, 18.)

229.     To buttress the argument that the claimed invention was not obvious, Kennedy claimed there was no reasonable probability of success because "in patients who are not responding to methotrexate, there is no basis to expect them to respond to treatment with an anti-TNFα antibody administered adjunctively with methotrexate as opposed to anti-TNFα

antibody monotherapy." (Ex. 1420.1 at ABTKEN00007153.) By August 1995, however, rheumatoid arthritis patients who had not responded completely to methotrexate alone were often treated with a second therapy in combination with continuing methotrexate treatment. (See, e.g., supra ¶¶ 16, 17, 18.)

230. Kennedy again claimed the unexpected results of "adjunctive" therapy over purported "sequential" therapy methods in arguing against the examiner's obviousness-type double patenting rejection. (Ex. 1420.1 at ABTKEN00007153–55.) As noted above (see supra ¶¶ 224, 225), however, the data Kennedy cited to support these alleged unexpected results were the same data it had previously cited in support of its argument that the results of adjunctive therapy were representative of the results of co-administration generally. (Compare Ex. 1420.1 at ABTKEN00007154 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) and -00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), with Ex. 1419.1 at ABTKEN00001235–36 (citing, inter alia, same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) and -00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification).) Furthermore, as Professor Maini testified at trial, these data did not support Kennedy's assertion of unexpected results because "sequential co-administration" was not a subject of the relevant research, which instead had focused on adjunctive therapy. (See, e.g., supra ¶ 186.)

231. In addition, Kennedy argued that the results from the claimed invention were unexpected because the "efficacy of the adjunctive therapy is clearly unrelated to any reduction in the development of an antiglobulin response to the anti-TNFα antibody in the patient, i.e. a HACA response, because the antibody is no longer present at therapeutic levels."

(Ex. 1420.1 at ABTKEN00007154.)   Kennedy stated that "it is again clear that a reduced HACA response cannot be the basis for the improvement in methotrexate therapy."   (Id. at ABTKEN00007154–55.)

232.    This assertion contradicts, inter alia, Kennedy's prior arguments to the PTO, Professor Maini and Feldmann's scientific articles, the '766 patent, and Professor Maini's testimony at trial, all of which identified reduction in immunogenicity (i.e., reduction in the HACA response) as one of the benefits of co-administration of anti-TNFα antibody and methotrexate.   (See, e.g., supra ¶¶ 84, 91, 92, 93, 116, 173 & n.10.)

233.    Furthermore, the studies and data that Kennedy cited as support for these alleged unexpected results (and which Kennedy cited in the prosecution of the '776 patent) did not compare adjunctive with co-administration therapy; these materials only included situations where patients received adjunctive anti-TNFα antibody therapy to continuing methotrexate treatment.  As such, these materials provide no basis to conclude that adjunctive administration of an anti-TNFα antibody to methotrexate therapy provides unexpectedly better results compared to other forms of co-administration of methotrexate and an anti-TNFα antibody.  (See, e.g., supra ¶¶ 146, 184, 186.)

234.    On December 24, 2009, the PTO mailed a third Office action, in which the examiner responded to Kennedy's September 15, 2009 filing by withdrawing the previous grounds for rejection of the claimed invention in the '631 application.  (Ex. 1420.1 at ABTKEN00008453, -00008456.)

235.    The examiner rejected, however, the asserted claims under, inter alia, 35 U.S.C. §§ 102 and 103.  (Id. at ABTKEN00008456–64.)

236.     The examiner also maintained the obviousness-type double patenting rejection of the claims over claims 1 through 14 of the '766 patent, stating:

> Although the conflicting claims are not identical, they are not patentably distinct from each other because the patented claims anticipate or render obvious the instant claimed methods, as the instant and patented claims are drawn to the same or nearly the same methods of treating arthritis with the anti-TNFα antibodies and methotrexate to meet the needs of the patient. (Id. at ABTKEN00008465.)

237.     The examiner also stated that

> it would have been obvious to optimize the dosing and dosing regimens of both the conventional methotrexate treatment in the treatment of arthritis as well as the anti-TNFα antibodies in the treatment of diseases/conditions associated with arthritis. (Id.[17])

238.     On May 7, 2010, Kennedy mailed a response amending certain claims, canceling certain claims, responding to the examiner's rejections, and summarizing a February 23, 2010 interview with the examiner. (Id. at ABTKEN00008474–8526, -00008761–64, -00008935–36.)

239.     In its summary of the February 23, 2010 interview, Kennedy stated that the claimed invention of adjunctive therapy was "an unobvious species of claims 1-14 of the '766 Patent." (Id. at ABTKEN00008483.)

240.     Kennedy's assertion contradicted its prior argument to the PTO, made during the prosecution of the '766 patent, that the adjunctive species was representative of the broader co-administration genus. (See, e.g., supra ¶¶ 182, 183.)

241.     In responding to the examiner's rejection under 35 U.S.C. § 103, Kennedy repeated the argument it made in its prior response to the PTO and stated that "the advantages obtained by adjunctively administering with methotrexate therapy anti-human tumor necrosis

---

[17] This language is almost identical to the examiner's reasons for the April 15, 2009 obviousness-type double patenting rejection. (See supra ¶ 219.)

factor-α antibodies are *not* obtained with other types of combination therapy." (Ex. 1420.1 at ABTKEN00008495.) This is also inconsistent with Kennedy's prior argument to the PTO during the prosecution of the '766 patent, when—in order to get the examiner to allow broader claims 1 through 14 of the '766 patent related to the genus of co-administration—Kennedy asserted that adjunctive therapy was representative of combination therapy. (See, e.g., supra ¶¶ 182, 183; see also Ex. 1419.1 at ABTKEN00001235–36.)

242.     Kennedy also stated that "Applicants discovered the unexpected result that patients who failed to respond to methotrexate therapy showed a remarkably high response rate when they were adjunctively administered methotrexate therapy with an anti-human tumor necrosis factor-α antibody therapy, even after disappearance of therapeutic levels of antibody." (Ex. 1420.1 at ABTKEN00008508 (emphasis omitted).) Once again, however, the studies and data on which Kennedy relied in making this assertion were the same as those Kennedy had cited in support of the asserted unexpected benefits of co-administration generally during the prosecution of the '766 patent. (Compare id. at ABTKEN00008508–09 (citing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification) and -00001346–50 (containing underlying data at page 35, lines 1 through 8, and Tables 3 and 4 of specification), with Ex. 1419.1 at ABTKEN00001235–36 (citing, inter alia, same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification) and -00000126–31 (containing same underlying data at page 48, lines 6 through 11, and Tables 3 and 4 of specification); see also supra ¶¶ 224, 225.)

243.     Additionally, the studies and data that Kennedy cited both in support of the unexpected benefits of broader co-administration during the prosecution of the '766 patent, and in support of the unexpected benefits of adjunctive therapy during the prosecution of the '631 application, did not compare adjunctive therapy to any other kind of combination therapy.

(See, e.g., supra ¶¶ 230, 233. Compare Ex. 1420.1 at ABTKEN00008508 ("As can be seen from the data shown in Tables 3 and 4, the response rates in patients receiving the adjunctive treatment of the invention compared to patients receiving methotrexate therapy, are significantly higher . . . .") with Ex. 1419.1 at ABTKEN00001235 ("Applicants further demonstrated the unexpected result that combination therapy with methotrexate and a TNFα antagonist produced high clinical response rates for significantly longer durations in comparison with that obtained with the treatment with each therapeutic modality separately." (citing Tables 3 and 4)).)

244.　　　In its May 7, 2010 filing, Kennedy also responded to the examiner's rejection of the pending claims for obviousness-type double patenting over claims 1 through 14 of the '766 patent. Kennedy repeated its position that "the presently claimed invention is an unobvious species of claims 1-14 of the '766 Patent." Kennedy also stated that

> [i]n contrast to claims 1-14 of the '766 Patent . . . the pending claims
> provide a method of treating patients who are already receiving
> methotrexate therapy. Additionally, the pending claims provide a method
> of treatment for patients who still have active disease despite having
> undergone methotrexate therapy. Claims 1-14 of the '766 Patent are
> generic with respect to these claim elements. For instance, the '766 Patent
> claims include individuals who did and who did not receive methotrexate.
> Likewise, they include individuals who are and who are not receiving
> benefit from methotrexate. (Ex. 1420.1 at ABTKEN00008516.)

245.　　　Kennedy further argued that

> [t]he pending claims also differ from the '766 Patent claims in that the
> pending claims are directed to adjunctive therapy, a particular type of
> combination therapy. In contrast, the '766 Patent claims include
> adjunctive, sequential and simultaneous therapy.

> In further contrast to the '766 Patent claims, the pending claims are
> limited to administration of anti-human tumor necrosis factor-α antibody
> in a separate composition from methotrexate. The '766 Patent claims
> include administration of anti-human tumor necrosis factor-α antibody and
> methotrexate in the same or separate compositions. (Id. at
> ABTKEN00008517.)

65

246.     Finally, in responding to the examiner's rejection of the claimed invention for obviousness-type double patenting, Kennedy again asserted that "the invention as claimed provides unexpected results that demonstrate that the claimed invention is not obvious over claims 1-14 of the '766 Patent."  (Id.)  Here too Kennedy's support for the alleged unexpected results for adjunctive therapy was the same data it cited during the prosecution of the '766 patent as supportive of the unexpected results of co-administration generally.  These data were drawn from trials that only studied adjunctive therapy and did not make a comparison to any other type of combination therapy.  (See id. at ABTKEN00008519–20; see also supra ¶¶ 225, 230, 233, 242, 243.)

247.     On July 29, 2010, the examiner held an interview with Kennedy's attorneys and "invited applicant to provide a supplemental amendment to amend the claims for clarity in order to place this application in condition for allowance."  (Ex. 1420.1 at ABTKEN00008962.)  Kennedy filed a supplemental amendment amending certain claims on July 29, 2010.  (Id. at ABTKEN00008947–53.)

248.     On August 23, 2010, the PTO mailed to Kennedy a Notice of Allowability and a Notice of Allowance and Fee(s) Due.  (Id. at ABTKEN00008956–64.)  The Reasons for Allowance stated that the claims were allowed, in part, because of the "unexpected results" of "the claimed methods of treating rheumatoid arthritis by adjunctively administering methotrexate with anti-TNFα antibody in this patient population," and thus the claimed methods were "deemed to be an unobvious species."  (Id. at ABTKEN00008963.)

249.     On December 7, 2010, the PTO mailed an Issue Notification and issued the '442 from the '631 application.  (Id. at ABTKEN00008980; see Ex. 2.)

H.    **The '442 Patent and Specification**

250.    The '442 patent, entitled "Methods of Treating Rheumatoid Arthritis With An [sic] Anti-TNF-Alpha Antibodies and Methotrexate," lists Professors Maini and Feldmann as the inventors and The Mathilda and Terence Kennedy Institute of Rheumatology Trust as assignee.  (Ex. 2.)

251.    The '442 patent expires on August 21, 2018, which is twenty years from the effective filing date of August 1, 1996, plus an additional 750 days the PTO added under 35 U.S.C. § 154(b).  (Id.)

252.    Because the '442 patent derived from the '004 continuation application, which itself was a continuation application of the '775 application that subsequently issued as the '766 patent, the specification of the '442 patent is the same as that of the '766 patent.  (Compare Ex. 1 with Ex. 2.)

I.    **The Claims of the '442 Patent**

253.    Each of the 22 claims of the '442 patent is directed to a method of treating rheumatoid arthritis with anti-TNFα and methotrexate.

254.    Claim 1, an independent claim, recites:

> 1. A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and (c) is administered at a dosage of 0.01-100 mg/kg, and wherein such administration reduces or eliminates signs and symptoms associated with rheumatoid arthritis.  (Ex. 2 at col. 35, lines 2–15.)

255.    Claim 2, a dependent claim on claim 1, recites:

67

**A70**

2. The method of claim 1, wherein (a) methotrexate is administered at an interval of a week or weeks, and (b) the anti-human tumor necrosis factor-α antibody or fragment thereof is administered multiple times, each such administration being separated by an interval of a week or weeks from the prior administration.  (Id. at col. 35, lines 16–21.)

256.    Claim 3, an independent claim, recites:

3. A method for adjunctive treatment of an individual suffering from rheumatoid arthritis who still has active disease despite prior therapy with methotrexate and who is already being treated with methotrexate comprising administering a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is administered to the individual multiple times, each such administration (i) being separated by an interval of a week or weeks from the prior administration, and (ii) delivering 0.01-100 mg/kg of the anti-human tumor necrosis factor-α antibody or fragment thereof and wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis. (Id. at col. 35, lines 22–36.)

257.    Claim 4, a dependent claim on claim 3, recites:

4. The method of Claim 3, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α and (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors.  (Id. at col. 35, lines 37–41.)

258.    Claims 5, 6, 7, and 13 are dependent claims on claims 1 and 3, and recite:

5. The method of claim 1 or 3, wherein each administration of methotrexate delivers from 0.01-100 mg/kg.

6. The method of claim 1 or 3, wherein each administration of the anti-human tumor necrosis factor-α antibody or fragment thereof is separated by an interval of one day to thirty weeks from the prior administration.

7. The method of claim 1 or 3, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is an antibody.[18]  (Id. at col. 35, lines 42–50.)

---

[18] Claim 20 of the '442 patent is a dependent claim on claim 7, and recites, "The method of claim 7, wherein the antibody is a monoclonal antibody."  (Ex. at col. 36, lines 49–50.)

[…]

13. The method of claim 1 or 3, wherein the anti-human tumor necrosis factor-α antibody or fragment is administered via infusion.  (Id. at col. 36, lines 7–9.)

259.      Claim 14, an independent claim, recites:

14.  A method of treating an individual suffering from rheumatoid arthritis and already receiving methotrexate whose active disease is incompletely controlled comprising administering to the individual with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α monoclonal antibody, wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis. (Id. at col. 36, lines 10–17.)

260.      Claims 17 and 18, dependent claims on claim 14, recite:

17. The method of claim 14, wherein the anti-human tumor necrosis factor antibody is administered as adjunctive and/or concomitant therapy to methotrexate therapy.

18. The method of claim 14, wherein methotrexate is administered at an interval of a week or weeks and the anti-human tumor necrosis factor antibody is administered as multiple infusions.  (Id. at col. 36, lines 31–37.)

261.      Claim 19 is another independent claim, but expressly requires that the

TNFα antibody be administered as adjunctive therapy to methotrexate:

19.  A method of treating an individual suffering from active rheumatoid arthritis despite already receiving methotrexate comprising administering an anti-human tumor necrosis factor-α antibody to the individual, wherein the anti-human tumor necrosis factor-α antibody binds specifically to human tumor necrosis factor-α, and is administered in a different composition, in single or multiple doses, as adjunctive therapy to methotrexate therapy, wherein the methotrexate is administered in multiple doses and wherein such administration reduces or eliminates signs and symptoms associated with the arthritis.  (Id. at col. 36, lines 38–48.)

## VII.      THE INSTANT DISPUTE

### A.      **Humira**

262.      Humira, which is marketed by Abbott for the treatment a number of conditions, was the first commercially available fully human anti-TNFα antibody.  (Tr. at 104:5–7, 148:10–16; Ex. 1546, Humira Prescribing Information (May 2012).)

263.      In 2002, the FDA approved Humira for the treatment of rheumatoid arthritis either alone or in combination with methotrexate.  (Ex. 1546 at 1, 4; Tr. at 107:11–13.)

264.      Humira is currently also approved for use in treating juvenile idiopathic arthritis, psoriatic arthritis, ankylosing spondylitis, Crohn's disease, and plaque psoriasis, and Abbott has been studying its potential use for the treatment of other conditions.  (Ex. 1546 at 4; Tr. at 104:14–106:7.)

265.      As of the date of the trial in this matter, well over 500,000 patients were receiving treatment with Humira, and for the year 2011, sales revenue totaled over $3 billion. (Tr. at 106:10–18.)

### B.      **Abbott's Sublicenses to Kennedy's Patents**

266.      In 2002, while preparing for the launch of Humira, Abbott sought a license to Kennedy's '766 patent.  (Tr. at 107:21–109:15.)

267.      Although Kennedy owned the '766 patent rights, it had previously granted Centocor the right to sublicense the '766 patent (and related patents) to others.  (See supra ¶ 34.) In 2002, Abbott and Centocor negotiated two separate license agreements, which provided Abbott a license for the '766 patent family and a license from Abbott to Centocor for certain Abbott patents related to human anti-TNFα antibodies.  (Tr. at  109:16–111:17; Ex. 20.)

268.     Under the terms of this sublicense, Abbott pays Kennedy royalties on sales of Humira for use as co-administration with methotrexate.  (Tr. at 112:9–113:11; Ex. 20.)

269.     Based on this 2002 sublicense, Abbott has paid over $100 million in royalties to Kennedy for sales of Humira in the United States.  (Tr. at 113:12–114:1.)

270.     Since the '442 patent was issued in 2010, Kennedy has also demanded royalties for sales of Humira under the '442 patent as covered by the license.  (Id. at 111:21–112:8, 115:8–13.)

271.     Pursuant to the license, Abbott as licensee only owes Kennedy royalties for sales of Humira covered by a valid patent claim.  (Id. at 115:16–116:1; Ex. 20.)

272.     On April 13, 2011, Abbott filed this action for a declaratory judgment that certain claims of the '442 patent are invalid for obviousness-type double patenting over the '766 patent, and thus Abbott does not owe royalties to Kennedy under the '442 patent.  (See Compl.)

## CONCLUSIONS OF LAW

**I.     JURISDICTION**

273.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.  An actual controversy pursuant to 28 U.S.C. § 2201 exists between Abbott and Kennedy concerning the validity of claims 1 through 7, 13, 14, and 17 through 20 of Kennedy's '442 patent.

**II.     OBVIOUSNESS-TYPE DOUBLE PATENTING**

**A.     The Doctrine of Obviousness-Type Double Patenting**

274.     Under 35 U.S.C. § 101, an inventor may obtain "a patent," but only one patent for a single invention.  See Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc., 592 F.3d

1340, 1346 (Fed. Cir. 2010) (citations omitted). The doctrine of non-statutory, or "obviousness-type," double patenting prevents the extension of the term of a patent via the patenting of an obvious variation of the original patent. Eli Lilly & Co. v. Teva Pharm. USA, Inc., 619 F.3d 1329, 1341–42 (Fed. Cir. 2010) (citations omitted).

275.     "Obviousness-type double patenting is a judicially-created doctrine designed to prevent claims in separate applications or patents that do not recite the same invention, but nonetheless claim inventions so alike that granting both exclusive rights would effectively extend the life of patent protection." In re Hubbell, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (quotations omitted). One of the aims of the doctrine is "'to prevent unjustified timewise extension of the right to exclude granted by a patent[.]'" Id. (quoting In re Van Ornum, 686 F.2d 937, 943–44 (C.C.P.A. 1982)).

276.     The doctrine of obviousness-type double patenting prohibits "claims in a second patent that are 'not patentably distinct from'" claims in an earlier patent. Id. (quoting In re Longi, 759 F.2d 887, 892 (Fed. Cir. 1985)). Two claims are not "patentably distinct" if the later claim would have been obvious to a person of ordinary skill in the art based on the earlier claim, in light of the prior art. Amgen Inc. v. F. Hoffman-LA Roche Ltd., 580 F.3d 1340, 1361–62 (Fed. Cir. 2009); see In re Hubbell, 709 F.3d at 1145 ("A later patent claim 'is not patentably distinct from an earlier claim if the later claim is obvious over, or anticipated by, the earlier claim.'" (quoting Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 968 (Fed. Cir. 2001)).

277.     Obviousness-type double patenting is a question of law premised on underlying findings of fact. Otsuka Pharm. Co., Ltd. v. Sandoz, Inc., 678 F.3d 1280, 1290 (Fed. Cir. 2012); see Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 689 F.3d 1368, 1376 (Fed. Cir. 2012).

278.     The obviousness-type double patenting analysis involves two steps.  First, the Court must construe the claims in the earlier patent and the claims in the later patent and determine the differences.  Second, the Court must determine whether those differences render the claims patentably distinct.  Sun Pharm. Indust. v. Eli Lilly & Co., 611 F.3d 1381, 1384–85 (Fed Cir. 2010) (citing Pfizer, Inc. v. Teva Pharm. USA, Inc., 518 F.3d 1353, 1363 (Fed Cir. 2008)); see Eli Lilly, 689 F.3d at 1377.

279.     In determining whether the claims at issue are patentably distinct, the Court does not consider the differences in the claims in isolation, but must consider the claims "as a whole."  Eli Lilly, 689 F.3d at 1377; see Eli Lilly, 251 F.3d at 972; Gen. Foods Corp. v. Studiengesellschaft Kohle mbH, 972 F.2d 1272, 1278 (Fed. Cir. 1992).

280.     The obviousness-type double patenting doctrine "is concerned with the improper extension of exclusive rights—rights conferred and defined by the *claims*."  Eli Lilly, 689 F.3d at 1379.  In undertaking the obviousness-type double patenting analysis, the Court must focus on what was claimed in the earlier patent, not what was disclosed.  Accordingly, the Court may consider the specification of the earlier patent, but only to the extent necessary to construe its claims.  Id. at 1378–79.

281.     To reach an obviousness determination, the Court must conclude that a person of ordinary skill in the art would have perceived a reasonable expectation of success in making the later invention in light of the prior art.  Amgen, 580 F.3d at 1362; see Eli Lilly, 689 F.3d at 1378; Otsuka, 678 F.3d at 1298.

282.     Articles and other references published more than one year before the effective filing date of a patent are considered prior art.  See 35 U.S.C. § 102(b); e.g., In re Crish, 393 F.3d 1253, 1256 n.6 (Fed. Cir. 2004).

283.     Patents are presumed valid and each patent claim is independently presumed valid. 35 U.S.C. § 282(a).  The party asserting invalidity of a patent or claim bears the burden.  Id.; see Microsoft Corp. v. i4i Ltd. P'ship., 131 S.Ct. 2238, 2242 (2011).

284.     A party seeking to invalidate a patent for obviousness-type double patenting must show facts supporting a conclusion of invalidity by clear and convincing evidence.  See Proctor & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 993–94, 999 (Fed Cir. 2009); Amgen, 580 F.3d at 1362.

B.     **Claim Construction**

285.     Claim construction is matter of law.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 390–91 (1996).

286.     "It is a bedrock principle of patent law that that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed Cir. 2005) (en banc) (quotations omitted); see Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1373 (Fed Cir. 2008) ("The words of the claims define the scope of the patented invention.").

287.     The words of a patent claim are generally given their ordinary and customary meaning, i.e., the meaning that the term would have to a person of ordinary skill in the art at the time of the invention.  See Phillips, 415 F.3d at 1312–13 (collecting cases).  The time of the invention is the effective filing date of the patent application.  Id. at 1313.

288.     In addition, claim construction involves the consideration of the patent specification and its prosecution history, particularly when "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent."  Id. at 1313–14 (collecting cases); see Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed Cir. 2005)

74

**A77**

("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." (quotations omitted)).

289. "The specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

290. However, "[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." Deere & Co v. Bush Hog, LLC, 703 F.3d 1349, 1354 (Fed Cir. 2012).

291. Claim language and the specification generally carry greater weight than the prosecution history. HTC Corp. v. IPCom GmbH & Co., 667 F.3d 1270, 1276 (Fed Cir. 2012). "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

292. Yet the prosecution history is entitled to consideration as it "may 'demonstrate how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution.'" AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011) (quoting Phillips, 415 F.3d at 1317)).

293. It is also well settled that "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." Powell v. Home Depot U.S.A., Inc., 663 F.3d 1221, 1231 (Fed Cir. 2011) (quotation omitted) (collecting cases).

294.     In addition to this intrinsic evidence, extrinsic evidence such as inventor and expert testimony "may aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." AIA Eng'g, 657 F.3d at 1273 (quotations omitted). Extrinsic evidence is generally considered "less reliable than the patent and its prosecution history in determining how to read claim terms." Phillips, 415 F.3d at 1318. The Court may rely, however, on such evidence "for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, [or] to ensure that the [C]ourt's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art." Id.; see Spansion, Inc. v. Int'l Trade Comm'n, 629 F.3d 1331, 1344 (Fed. Cir. 2010) ("While claim construction primarily relies on intrinsic evidence, extrinsic evidence, such as expert testimony, may also be used when given the appropriate weight by the trial court.").

## C.     **Patentably Distinct Claims**

295.     "[A] later claim that is not patentably distinct from, i.e., is obvious over or anticipated by, an earlier claim is invalid for obviousness-type double patenting." Sun Pharm., 611 F.3d at 1385 (quotations omitted).

296.     The obviousness analysis is generally the same under the double patenting doctrine and 35 U.S.C. § 103, with several distinctions. First, where statutory obviousness compares claimed subject matter to the prior art, obviousness-type double patenting compares claims in an earlier patent to claims in a later patent. In addition, obviousness-type double patenting does not require inquiry into objective criteria suggesting non-obviousness. Proctor &

Gamble Co., 566 F.3d at 999 (citations omitted).[19]  When it is offered, however, evidence of objective indicia of non-obviousness, such as commercial success, long-felt need, or failure of others, should be considered by the Court in the obviousness-type double patenting analysis.  Eli Lilly, 689 F.3d at 1381; see Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966).

297.    Under Federal Circuit precedent, "[i]t is well established that the disclosure of a genus in the prior art is not necessarily a disclosure of every species that is a member of that genus."  Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 999 (Fed. Cir. 2006).  Where a genus, however, "is so limited that a person of ordinary skill can 'at once envisage each member of this limited class,'" In re Gleave, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (quoting Eli Lilly, 471 F.3d at 1376), "[i]n that limited circumstance, a reference describing the genus anticipates every species within the genus."  Id. (citing Perricone v. Medicis Pharm. Corp., 432 F.3d 1368, 1377 (Fed. Cir. 2005)); see Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1380 (Fed. Cir. 2001) ("[T]he disclosure of a small genus may anticipate the species of that genus even if the species are not themselves recited.").

---

[19] In Proctor & Gamble, the Federal Circuit further stated that the obviousness-type double patenting analysis "does not require inquiry into a motivation to modify the prior art."  566 F.3d at 999 (citing Geneva Pharm., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1378 (Fed. Cir. 2003)).  However, in Otsuka, the Federal Circuit characterized this statement as "dictum," and held that "[i]n the context of claimed chemical compounds, an analysis of nonstatutory obviousness-type double patenting—like an analysis under § 103—entails determining, inter alia, whether one of ordinary skill in the art would have had reason or motivation to modify the earlier claimed compound to make the compound of the asserted claim with a reasonable expectation of success."  678 F.3d at 1297–98.  Whether the Federal Circuit's instruction to consider motivation to modify the prior art applies when the claimed inventions are methods of administrating two compounds—but not the compounds themselves—is ultimately immaterial because the Court finds such motivation existed here.  (See, e.g., infra ¶¶ 355, 358, 369, 380, 387, 395, 403).  Cf. Eli Lilly, 689 F.3d at 1378–81 (noting an exception to the general rule regarding the use of the specification in the obviousness-type double patenting analysis where an earlier patent claims a compound and discloses the utility of that compound in the specification, and a later patent claims a method of using that compound for particular use described in the earlier patent's specification) (citations omitted).

298.    "[A]nticipation does not require actual performance of suggestions in a disclosure.  Rather, anticipation only requires that those suggestions be enabling to one of skill in the art."  Bristol-Myers Squibb, 246 F.3d at 1379 (Fed. Cir. 2001); see Rasmusson v. SmithKline Beecham Corp., 413 F.3d 1318, 1326 (Fed. Cir. 2005) (agreeing with litigant that Bristol-Myers Squibb "stands for the broader proposition that proof of efficacy is not required in order for a reference to be enabled for purposes of anticipation" under 35 U.S.C. § 102).

299.    In addition, the prior art need only indicate to a person of ordinary skill in the art "a reasonable expectation of success, not absolute predictability," for a subsequent invention to be obvious.  In re Longi, 759 F.2d at 897; see Amgen, 580 F.3d at 1362.

## III.    THE PERSON OF ORDINARY SKILL IN THE ART

300.    The Court may consider several factors in determining the level of ordinary skill in the art at the time of the invention, including: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  Daiichi Sankyo Co. v. Apotex, Inc., 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quotations omitted); see Amgen, 580 F.3d at 1361–62 (noting that the determination of obviousness to a person of ordinary skill in the art is similar for obviousness-type double patenting and under 35 U.S.C. § 103).

301.    As of August 1, 1996 (the effective filing date of the '442 patent), Professor Maini, one of the two primary inventors of the '766 and the '442 patents, was a practicing physician with advanced training and expertise in internal medicine and rheumatology, who had a rheumatology practice, and was actively conducting scientific research and clinical trials and publishing advanced papers on autoimmune diseases including rheumatoid

arthritis.  (Tr. at 447:13–453:9; Ex. HA).  Professor Feldmann, the other primary inventor, was

also a qualified physician, but worked primarily as a leading immunological researcher.[20]  (Tr. at

453:10–25.)

302.    These inventions address rheumatoid arthritis—a highly complex disease

with severe health effects that can be life-threatening.  (Id. at 151:19–23; see supra ¶¶ 3, 4.)

303.    The existing medications and treatments for rheumatoid arthritis at the

time were also very powerful and complicated, and as noted above, often were accompanied by

serious side effects.  (Id. at 151:23–24; see supra ¶¶ 6, 7, 13.)

304.    Due to the complexity and severity of rheumatoid arthritis and its

treatment, physicians treating patients with the disease (who would be prescribing the subject

matter of the '766 and '442 patents to their patients) ideally should be rheumatologists, but must

at least be practicing physicians with M.D. or D.O. degrees, with training and expertise in

rheumatology, and experience diagnosing, evaluating, and treating rheumatoid arthritis.  (Tr. at

151:19–152:17, 589:3–590:11; see also id. at 379:1–24 (describing why primary care physicians

without experience in rheumatology should preferably not treat rheumatoid arthritis patients).)

305.     In light of these factors and the contemporary advances in the treatments

of rheumatoid arthritis, the person of ordinary skill in the art as of the effective filing date of the

'442 patent would be a practicing physician with an M.D. or D.O. degree and advanced training

and expertise in rheumatology, who had experience in the diagnosis, evaluation, and treatment of

---

[20] Professors Maini and Feldmann's expertise and achievements are properly acknowledged.  Their work
and significant contributions to the study of, inter alia, rheumatoid arthritis were recognized by the
Albert Lasker Award for Clinical Medical Research, the conferral of knighthood by Queen Elizabeth II,
and their election to membership in the National Academy of Sciences.  (Tr. at 448:23–449:16, 531:6–
19; Ex. HA.)  Cf. Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 454 (Fed. Cir. 1985)
("Inventors, as a class, . . . possess something—call it what you will—which sets them apart from the
workers of ordinary skill[.]").

rheumatoid arthritis, including an understanding of the mechanisms by which the various treatments at the time worked.[21]

## IV. THE SIMILARITIES AND DIFFERENCES BETWEEN THE CLAIMS OF THE '766 AND '442 PATENTS

### A. Construction of Claims 8 through 14 of the '766 Patent

#### 1) "Co-administering"

306. Claim 8 of the '766 patent is an independent claim on which claims 9 through 14 either directly or indirectly depend. Accordingly, each of these claims recites the method of treating rheumatoid arthritis set forth in claim 8 "comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof[.]" (Ex. 1 at col. 35, lines 59–62.)

307. "Co-administering" is not expressly defined in the '766 patent.

308. The '766 patent specification states that

> [a]s a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual, comprising co-administering methotrexate and a tumor necrosis factor antagonist to the individual in therapeutically effective amounts. The TNF antagonist and methotrexate can be administered simultaneously or sequentially. (Id. at col. 4, lines 42–48.)

309. In addition, under the heading "Administration," the '766 patent specification states that

> [t]he TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual. TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate.

---

[21] Although the Court finds that a person of ordinary skill in the art would have advanced training and expertise in the field of rheumatology, the Court agrees with Abbott's expert witness that even using Kennedy's proposed definition of a person of ordinary skill in the art, the Court's ultimate conclusion would be the same. (Tr. at 152:13–17; see also id. at 589:20–592:1 (noting that while board certification in rheumatology would be ideal, approximately half of the physicians treating rheumatoid arthritis patients at the time did not have such certification).)

> For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy. (Id. at col. 18, lines 56–62.)

310.    These references to the administration of the TNF antagonist and methotrexate "sequentially" describe how the TNF antagonist and methotrexate need not be administered at the same time to effectuate co-administration, so long as the antibody is administered along with the continued administration of methotrexate. (Tr. at 225:21–226:15.)

311.    Kennedy now argues that these references to "sequential" mean that the term "co-administration" as used in the '766 patent covers the situation where a patient taking a first drug switches to a different drug, while at the same time discontinuing the first drug, and argues that this was what occurred in the T-14 study/Example 1. (See, e.g., id. at 610:7–612:13; 724:3–731:8)  This position, however, is contradicted by the language of the '766 patent, Kennedy's statements during the prosecution of the '766 patent, the publications by Professors Feldmann and Maini, and the testimony of the inventors.

312.    The '766 patent specification describes the "present invention" as "based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the ***antagonist administered alone*** or that obtained with ***methotrexate administered alone***." (Ex. 1 at col. 2, lines 39–48 (emphasis added).)

313.    Furthermore, the '766 patent identifies the group of patients in the T-14 study/Example 1 who were receiving methotrexate prior to receiving anti-TNFα antibody, ceased receiving methotrexate once they began receiving antibody, and only received antibody

throughout the trial as having received anti-TNFα antibody "[w]ithout methotrexate." (Id. at col. 20, lines 40–42.)

314.    The '766 patent specification describes Example 1 as "[a] randomized, double-blind, placebo controlled study . . . conducted to evaluate the safety and efficacy of a chimeric monoclonal anti-TNF antibody (cA2) following multiple infusions of 1, 3 or 10 mg/kg cA2, *alone or in combination with methotrexate*, compared to multiple infusions of placebo in combination with methotrexate, in the treatment of rheumatoid arthritis (RA) in patients." (Id. at col. 20, lines 43–49 (emphasis added).)

315.    The treatment regimen referred to in the '766 patent as cA2 alone (or identified in the accompanying tables as "MTX-") was the treatment given to the patients who were taking methotrexate at entry to the T-14 trial, discontinued their methotrexate treatment prior to the initiation of the antibody treatment, and received only antibody treatment for the remainder of the trial. The '766 patent does not refer to this patient group as having received methotrexate and antibody "sequentially" or as "sequential co-administration." (Tr. at 228:18–231:2.)

316.    Throughout the prosecution history of the '766 patent, Kennedy argued to the PTO (citing, inter alia, Example 1) that the unexpected results of the proposed invention were that "combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results than the results obtained with *each agent alone*." (Ex. 1419.1 at ABTKEN00000644 (emphasis added); see supra ¶¶ 156, 157, 158, 166, 173.)

317.    In light of the language in the '766 patent itself and its prosecution history, a person of ordinary skill in the art would understand "co-administration" as used in claims 8 through 14 to encompass three possibilities for the order of administration of the methotrexate

and anti-TNFα antibody (or fragment): (1) treatment with methotrexate and antibody is started at approximately the same time ("concomitantly"); (2) treatment with methotrexate is begun first and treatment with antibody is then added ("adjunctively") to ongoing and continuing methotrexate treatment; or (3) treatment with antibody is begun first and treatment with methotrexate is then added ("adjunctively") to ongoing and continuing antibody treatment. (Tr. at 233:4–21, 237:17–243:12; see also id. at 522:20–523:8.)

318. A person of ordinary skill in the art would understand "co-administration" as used in the claims of the '766 patent did not encompass the discontinuing of methotrexate therapy and then initiating anti-TNFα antibody therapy alone. (Id. at 225:21–231:2)

319. This construction of "co-administration" is consistent with Professors Maini and Feldmann's description—in their published articles that appeared in peer-reviewed scientific journals—of the patients in the T-14 study (from which the data were drawn for Example 1 in the '766 patent) who had been receiving methotrexate, stopped receiving methotrexate, then received only antibody during the T-14 trial as having received antibody "monotherapy" (or antibody "alone" or antibody "without methotrexate"). (Ex. 1025 at 1553, 1560; see supra ¶¶ 94, 95, 96, 97; see also Ex. 1406, Raphaela Goldbach-Manky & Peter Lipsky, "New Concepts in the Treatment of Rheumatoid Arthritis," *Annu. Rev. Med.* 54:197, 208 (2003); Tr. at 733:6–734:10.)

320. This construction of "co-administration" is further corroborated by Professor Maini's testimony at trial, in which he testified that the study from which Kennedy drew the underlying data it relied upon in support of the '766 patent and its prosecution was not powered to study, and did not scientifically prove, the beneficial effects of "sequential" co-administration as that term is now used by Kennedy, but only studied and compared the

administration of methotrexate or anti-TNF antibody alone with the administration of antibody as

adjunctive therapy with ongoing methotrexate treatment.[22]  (See Tr. at 523:9–525:16, 564:14–

570:24; supra ¶¶ 185, 186.[23])

      321.      Finally, this construction of "co-administration" is also consistent with

Professors Maini and Feldmann's own personal descriptions of the T-14 study.  (E.g., supra ¶¶

98, 99, 100, 101, 102.)  See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367,

1375–76 (Fed. Cir. 2004) (holding, in context of indefiniteness, that evidence of defendants' use

of a term, although not publicly available at the time, may nonetheless be probative in claim

construction to show a term's meaning).

---

[22] This is why, Professor Maini testified, he never referred to this group as having received "sequential" treatment.  Professor Maini also testified that while the '766 patent referred to the patient group in Example 1 who entered the T-14 trial on methotrexate, stopped receiving methotrexate, then received only antibody throughout the trial as having received antibody monotherapy or antibody alone because "operationally, that's absolutely what we would do," one "could" refer to this group as receiving "sequential" treatment of methotrexate and antibody for the first few weeks of the antibody treatment because the carryover effect of the prior methotrexate treatment would still be present in the patients at this time.  (Tr. at 518:8–521:15.)  As noted above, however, Kennedy and the inventors never used this terminology in the materials upon which a person of ordinary skill in the art could rely in construing the terms of the '766 patent.  (See also id. at 702:9–704:18.)

[23] On cross-examination, Dr. Weinblatt testified that he considered the group of patients who were receiving methotrexate at entry to the trial, continued receiving methotrexate, and received antibody treatment in addition to their ongoing methotrexate treatment to be receiving "adjunctive" therapy even after the last infusion of antibody in the T-14 trial/Example 1 because, due to the long half-life of antibody, the clinical effects it produced extended beyond its final administration.  Dr. Weinblatt (like Professor Maini and Dr. Lipsky) also testified that methotrexate can produce extended clinical effects after its final administration due to the cellular response to methotrexate treatment.  Kennedy questioned Dr. Weinblatt's definitions because while he considered the patients experiencing extended clinical effects of antibody to be receiving adjunctive therapy after the administration of antibody ceased, he did not consider the patients who stopped receiving methotrexate and received antibody treatment throughout the study to be receiving "sequential" therapy at the beginning of the T-14 trial despite the extended clinical effects of methotrexate.  (Tr. at 290:8–301:4.)

Regardless of whether the group who ceased receiving methotrexate at the beginning of the antibody treatment and received only antibody throughout the study experienced extended clinical effects of methotrexate after its administration ceased, for the reasons stated above a person of ordinary skill in the art would not understand—contrary to the evidence that was available—this group to have received "sequential co-administration" as that term is used by Kennedy in this litigation.

     *2)*      *"Individual in need thereof"*

322.      Claims 8 through 14 of the '766 patent (either independently or as a dependent claim) each recite a method of treating rheumatoid arthritis "in an individual in need thereof." (Ex. 1 at col. 35, line 59–col. 36, line 51.)

323.      "An individual in need thereof" is not expressly defined in the '766 patent or otherwise expanded on within the patent.

324.      The language in the '766 patent does not address whether the individuals in the patient population covered by claim 8 have mild or severe arthritis, or whether they had or had not previously been treated with methotrexate. (Tr. at 153:14–154:6.)

325.      In light of the claim term's broad coverage, the Court will not import a limitation from the patent specification into the claim. See Deere, 703 F.3d at 1354; Phillips, 415 F.3d at 1323.

326.      In light of the language in the '766 patent claims, a person of ordinary skill in the art would understand "an individual in need thereof" as used in claims 8 through 14 to mean a patient with rheumatoid arthritis who requires treatment. (Tr. at 244:25–245:5.)

     *3)*      *"Therapeutically effective amounts"*

327.      Claims 8 through 14 of the '766 patent (either independently or as a dependent claim) each recite a method of "co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof . . . in therapeutically effective amounts." (Ex. 1 at col. 35, line 59–col. 36, line 51.)

328.      The specification of the '766 patent states that

> TNF antagonists and methotrexate are administered in therapeutically effective amounts; the compositions of the present invention are administered in a therapeutically effective amount. As used herein, a "therapeutically effective amount" is such that administration of TNF

> antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered. *A therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease.*
> (Id. at col. 19, lines 15–30 (emphasis added).)

329.    This portion of the specification clarifies that a therapeutically effective amount is administered when the level of TNF activity in the body is reduced, even if there is not necessarily a reduction in the signs and symptoms of the TNF-mediated disease. (Tr. at 258:19–259:8.)

330.    In light of the language of the '766 patent, and particularly in light of the explanation included in the patent specification, a person of ordinary skill in the art would understand the term "therapeutically effective amount" to encompass (but not be limited to) an amount necessary to reduce or eliminate signs and symptoms of rheumatoid arthritis. (Id. at 259:9–24.)

B.    **Construction of Claims 1 through 7, 13, 14, and 17 through 20 of the '442 Patent**

1)    *"Adjunctive administration"*

331.    Each of the independent claims 1, 3, 14, and 19 of the '442 patent are directed to a method of treating an individual suffering from rheumatoid arthritis. Claims 2, 4, 5, 6, 7, 13, 17, 18, and 20 are each dependent on at least one of the independent claims. (Ex. 2 at col. 35–36.)

332.    Although each of these claims in the '442 patent uses slightly different wording, all are directed to "adjunctive" methods of treating rheumatoid arthritis in patients

already receiving methotrexate therapy. (Id.)

333.    For example, claim 1 recites, in relevant part:

A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising ***adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof*** . . . . (Id. at col. 35, lines 2–8 (emphasis added); see supra ¶¶ 256, 259, 261 (claims 3, 14, and 19).)

334.    The term "adjunctive" is not expressly defined in the Kennedy patents, but the claims and specification of the '442 patent make clear that adjunctive administration is one method of co-administration. (Tr. at 252:15–253:12.)

335.    For example, the specification of the '442 patent notes that

[t]he present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, [s]uch as ***an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy*** produces a rapid and sustained reduction in the clinical signs and symptoms of the disease. The present invention is also based on the unexpected and dramatic discovery that ***a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate*** to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration ***compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone.*** (Ex 2. at col. 2, lines 28–43 (emphasis added).)

336.    The specification further explains the invention summarized above by stating:

As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual, comprising ***co-administering methotrexate and a tumor necrosis factor antagonist*** to the individual in therapeutically effective amounts. ***The TNF antagonist and methotrexate can be administered simultaneously or sequentially***. (Id. at col. 4, lines 31–37 (emphasis added).)

87

337.    In addition, the patent specification notes that

[t]he TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual.  ***TNF antagonists can be administered prior to, simultaneously with*** (in the same or different compositions) ***or sequentially with the administration of methotrexate***. ***For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy.***  (Id. at col. 18, lines 40–46 (emphasis added).)

338.    In light of the language of the '442 patent, and particularly the explanations included in the patent specification, a person of ordinary skill in the art would understand the term "adjunctive" therapy or treatment, as used in the '442 patent, to mean a method of administration of methotrexate and an anti-TNFα antibody in which therapy with an anti-TNFα antibody (of fragment thereof) is added to ongoing methotrexate treatment.

*2)    "Signs and symptoms" and "active disease"*

339.    Each of claims 1 through 7, 13, 14, and 17 through 20 of the '442 patent (either independently or as a dependent claim) recites that the method described above "reduces or eliminates signs and symptoms associated with rheumatoid arthritis."  (See id. at col. 35–36.)

340.    Each of these claims of the '442 patent (either independently or as a dependent claim) also identifies the patient population to be treated by the methods disclosed in the '442 patent as those with "active disease" or "active rheumatoid arthritis," despite having received methotrexate treatment.  (Id.)

341.    For example, claim 1 recites:

A method of treating an ***individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate*** comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof . . . . (Id. at col. 35, lines 2–8 (emphasis added); see supra ¶¶ 256, 259, 261 (claims 3, 14, and 19).)

88

**A91**

342. The specification of the '442 patent, in describing the studies that were recounted as Examples 1 and 2 in the patents, states that for each trial, "[a]ctive disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria." (Ex. 2 at col. 20, lines 34–39; id. at col. 31, lines 7–11.)

343. This definition of "active disease" is appropriate when used in the context of entry to clinical trials, but would not be used by a person of ordinary skill in the art in clinical practice treating patients with rheumatoid arthritis. Such person would, for example, consider a patient to have "active" rheumatoid arthritis if the patient experienced fatigue and joint pain, but not joint swelling. (Tr. at 245:19–249:12; cf. id. at 716:5–717:20 (noting that the only way the term "active disease" is used in the '442 patent is in the context of entry to clinical trials).)

344. As such, a person of ordinary skill in the art would not be limited to the definition of "active disease" used in the criteria for entry into the clinical trials recounted in Examples 1 and 2, but would understand patients with "active disease" (or "active rheumatoid arthritis") to mean those patients with ongoing signs and symptoms of rheumatoid arthritis such as, inter alia, joint swelling and discomfort. (Id. at 245:7–18, 248:8–11.)

345. In light of the language of the '442 patent, a person of ordinary skill in the art would understand that patients with "active disease" or "active rheumatoid arthritis"—as those terms are used in the claims of the '442 patent—would be patients with continuing signs and symptoms of rheumatoid arthritis despite their ongoing methotrexate treatment.

346. This construction is consistent with the prior art and prevailing practices in the field at the time of the invention relating to the practice of continuing methotrexate treatment even if it did not completely eliminate a patient's rheumatoid arthritis. (Id. at 250:11–252:14, 253:13–255:6; Exs. FD, DB, FA, 78, 80, 1412, 73, 1408.1, 1575.)

C.     **The Differences Between Claims 8 through 14 of the '766 Patent and Claims 1 and 2 of the '442 Patent**

*1)     Methods of treatment and patient population*

347.     As noted above, claims 8 through 14 of the '766 patent broadly recite that methotrexate and an anti-TNFα antibody be co-administered, and there are only three ways of co-administering these two treatments: (1) beginning both treatments at the same time; (2) beginning methotrexate treatment first and adding anti-TNFα antibody as adjunctive treatment; or (3) beginning anti-TNFα treatment first and adding methotrexate as adjunctive treatment. (See supra ¶¶ 111, 112, 113, 306, 317, 318.)  Claims 1 and 2 of the '442 patent (independently and as a dependent claim, respectively) disclose the second of these three methods.  (See supra ¶¶ 254, 255, 332, 334, 338; Tr. at 253:2–12.)

348.     A person of ordinary skill in the art would not find there to be a substantial difference between co-administration as used in claims 8 through 14 of the '766 patent and adjunctive administration as used in claims 1 and 2 of the '442 patent.  (Tr. at 252:15–253:12.)

349.     In light of the limited universe of treatment methods within the genus of co-administration defined by claims 8 through 14 of the '766 patent, a person of ordinary skill in the art would have envisaged the species of adjunctive administration defined by claims 1 and 2 of the '442 patent.  See Gleave, 560 F.3d at 1338; Eli Lilly, 471 F.3d at 1376.

350.     In addition, of the three species within the genus of co-administration claimed in the '766 patent, the prior art as of August 1, 1995, would have "funneled" a person of ordinary skill in the art to the adjunctive treatment method claimed in the '442 patent.  Bayer Schering Pharma AG v. Barr Labs., Inc., 575 F.3d 1341, 1350 (Fed Cir. 2009).

90

**A93**

351.  For example, the July 1995 Higgins article teaches administering an anti-TNFα antibody adjunctively with methotrexate in patients with rheumatoid arthritis who did not respond to prior methotrexate treatment alone.[24]  (Ex. 1575; see supra ¶¶ 79, 82.)

352.  Furthermore, as of August 1, 1995, the patient population identified in claims 1 and 2 of the '442 patent would have been the most likely to receive adjunctive anti-TNFα antibody therapy with their ongoing methotrexate therapy.  While claims 8 through 14 of the '766 patent do not require previous methotrexate treatment in the patient to be treated (see supra ¶ 324), claims 1 and 2 of the '442 patent require that the patient to be treated with adjunctive anti-TNFα treatment still be experiencing signs and symptoms of rheumatoid arthritis despite ongoing methotrexate treatment (see supra ¶¶ 342, 345).

353.  As of August 1995, methotrexate was considered the "gold standard" of treatments for rheumatoid arthritis (see supra ¶ 12); it was an established practice for rheumatologists to treat patients who did not respond completely to methotrexate treatment alone by adding another drug to the underlying methotrexate the patient was already receiving (see supra ¶¶ 16, 17); rheumatologists frequently continued such patients' methotrexate treatment and added another treatment to it, rather than stop methotrexate treatment, in order to prevent flares of symptoms (see supra ¶ 18); and FDA officials had publicly discussed clinical trials of adding new treatments (such as anti-TNFα antibodies) to ongoing methotrexate treatment in patients

---

[24] That the planned study referenced in the Higgins article never took place is of no moment. (See Tr. at 344:9–11.)

with continuing signs and symptoms of rheumatoid arthritis despite their methotrexate treatment (see supra ¶¶ 66, 67, 68, 69, 71, 72, 73).[25]

354.    Also, a person of ordinary skill in the art would not consider there to be a substantial difference between the patient populations identified by claim 8 of the '766 patent and claim 1 of the '442 patent because patients whose active rheumatoid arthritis is incompletely controlled despite already receiving methotrexate would be included within the population of patients with rheumatoid arthritis "in need of treatment thereof."  (Tr. at 249:13–250:20; see supra ¶¶ 326, 345.)

355.    Accordingly, a person of ordinary skill in the art would have been motivated to try the adjunctive methods of treatment in claims 1 and 2 of the '442 patent with a reasonable expectation of success.

2)    *Different compositions*

356.    Claims 1 and 2 of the '442 patent (independently and as a dependent claim, respectively) recite that the methotrexate and anti-TNFα antibody be administered in different compositions.  (See supra ¶¶ 254, 255.)  Yet, a person of ordinary skill in the art would have known that, within the scope of claim 8 of the '766 patent, this was by far the most likely way to administer these two drugs in the treatment of rheumatoid arthritis.

357.    Although as of August 1, 1995, methotrexate could be administered either as a tablet or an injection, at this time it was more commonly administered orally in tablet form,

---

[25] Kennedy's suggestion that the "placebo" patient group in Table 4 of the '442 patent, who only received 7.5 mg of methotrexate weekly throughout the T-14 trial, were non-responders to methotrexate, and that it would have been contrary to clinical practice at the time to continue them on methotrexate and add another treatment, ignores the fact that the dosage level of methotrexate for these patients throughout the study was at the low end of what would have been prescribed at the time (see supra ¶ 14), and a person of ordinary skill in the art would not expect any patients who had active rheumatoid arthritis despite prior methotrexate treatment to respond to such a low level of treatment.  In addition, clinical practice at the time would be to continue any partial responders to methotrexate on such treatment and to add another therapy as well (see supra ¶¶ 16, 18).  (Tr. at 318:4–320:6.)

while the prior art on the use of anti-TNFα antibodies or fragments in the treatment of rheumatoid arthritis discussed the administration of antibody only via infusion, not in tablet form.  (See supra ¶¶ 14, 43, 49, 58, 76, 84.)

358.     As such, the specified use of different compositions in the methods of claims 1 and 2 of the '442 patent is not a meaningful distinction from the methods in claims 8 through 14 of the '766 patent, and a person of ordinary skill in the art would have been motivated to try the use of different compounds, as in claims 1 and 2 of the '442 patent, with a reasonable expectation of success.  (Tr. at 255:7–19.)

> *3)     Characteristics of the tumor necrosis factor alpha mechanism*

359.     Claim 1 of the '442 patent provides that the antibody or fragment must bind to an epitope on human TNFα.[26]  (Ex. 2 at col. 35, lines 8–10.)

360.     Claim 1 also provides that the antibody or fragment must inhibit binding of human TNFα to human TNFα cell surface receptors.  (Id. at col. 35, lines 11–12.)

361.     A person of ordinary skill in the art would expect these mechanisms of action by the antibody as they had been known in the prior art by August 1, 1995.  (Tr. at 255:20–256:20; e.g., Ex. 78; see supra ¶ 26.)

> *4)     Doses of antibody or fragment*

362.     Claim 1 of the '442 patent also requires that the antibody (or fragment) be administered at a dose of 0.01–100 mg/kg.  (Ex. 2 at col. 35, lines 12–15.)  There is no specific dose recited in claim 8 of the '766 patent.  (Tr. at 256:21–22.)

---

[26] The specification of the '442 patent defines epitope as "that portion of the antigen capable of being recognized by and bound by an antibody at one or more of the antibody's antigen binding region[s]," or, in other words, the portion of TNFα to which the antibody binds.  (Ex. 2 at col. 10, lines 30–33; see Tr. at 255:24–256:3.)

363.     The 10,000-fold range of possible doses recited in claim 1 of the '442 patent is extremely broad and encompasses the dose for each biologic agent that was studied and in the prior art as of August 1, 1995, all of which were between 0.1 mg/kg and 20 mg/kg.  (Id. at 256:22–257:24; see id. at 745:22–746:15; Exs. 78, 79, 80, 1412; supra ¶¶ 43, 49, 58, 76.)

364.     The Federal Circuit has recognized that when a patent claim includes ranges of elements, a prior art reference that falls within a claimed range may, like here, anticipate the claim.  See Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir. 1999) (citations omitted).[27]

### 5)     Efficacy

365.     Claim 8 of the '766 patent requires co-administering methotrexate and anti-TNFα antibody "in therapeutically effective amounts" (Ex. 1 at col. 35, lines 63–64), while claim 1 of the '442 patent recites that "administration [of the methotrexate and antibody] reduces or eliminates signs and symptoms associated with rheumatoid arthritis" (Ex. 2 at col. 35, lines 13–15).

366.     A person of ordinary skill in the art would not consider this to be a meaningful distinction because the term "therapeutically effective amount" clearly encompasses an amount that "reduces or eliminates signs or symptoms associated with rheumatoid arthritis." (See supra ¶ 330.)

### 6)     Dosing intervals

367.     Claim 9 of the '766 patent defines a method of claim 8 wherein the anti-TNFα antibody or fragment is administered in dosages separated by days or weeks; it does not address the dosing interval for methotrexate.  (See supra ¶ 113.)  Claim 2 of the '442 patent

---

[27] See also Otsuka, 678 F.3d at 1297 ("For anticipation, of course, motivation in the prior art is unimportant.").

provides that the methotrexate is administered at intervals of a week or weeks, and that the anti-TNFα antibody or fragment is administered multiple times separated by a week or weeks. (See supra ¶ 255.)

368.     With regards to the dosing intervals for methotrexate, a person of ordinary skill in the art would not have considered the difference between these claims substantial because as of August 1, 1995, it was an established practice in the art that methotrexate should be given no more than once a week when treating a patient with rheumatoid arthritis. (Tr. at 260:10–25; see supra ¶ 14.) Knowing of this accepted dosing regimen for treating rheumatoid arthritis patients with methotrexate, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claim 2 of the '442 patent with a reasonable expectation of success.

369.     With regards to the dosing intervals for the anti-TNFα antibody or fragment, a person of ordinary skill in the art would not have considered the difference between these claims substantial because, as of August 1, 1995, it was known in the art that anti-TNFα antibody had been administered to rheumatoid arthritis patients (who had not completely responded to prior therapy with methotrexate) multiple times at intervals of a week or weeks to successfully reduce signs and symptoms associated with rheumatoid arthritis. (Tr. at 261:1–262:9; see supra ¶¶ 50, 51, 78.) Knowing of this successful dosing regimen for treating rheumatoid arthritis patients with anti-TNFα antibody, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claim 2 of the '442 patent with a reasonable expectation of success.

7)     *"Unexpected Results" and Kennedy's Prior Statements to the Patent and Trademark Office*

370.     Abbott argues that because during the successful prosecution of the '766 patent Kennedy argued to the PTO that the unexpected results shown in its trial data of adjunctive administration were representative of the results obtained by co-administration generally, Kennedy should now be estopped from arguing (as it did during the prosecution of the '442 patent, relying on the same underlying data) that the results of adjunctive administration were unexpected when compared to co-administration.  See Yeda Research and Dev. Co. v. Imclone Sys. Inc., 443 F. Supp. 2d 570, 623–24 (S.D.N.Y. 2006).[28]

371.     While there is substantial evidence to support this position (see, e.g., supra ¶¶ 175–186, 223–225, 230–233, 239–243, 246), the Court need not decide this issue because, even considering Kennedy's arguments, the Court arrives at the same ultimate conclusions.

372.     This is particularly so because Kennedy's arguments of unexpected results are contradicted by the data relied upon, the inventors' own words in their published articles and studies, the scientific record, and the inventors' own testimony.  (Id.)

373.     Furthermore, the additional unexpected results Kennedy alleges are not supported by the data.  Kennedy argued that it was unexpected that patients who failed to respond to methotrexate therapy would show a remarkably high response rate when given adjunctive therapy (compared to those who received methotrexate monotherapy or sequential therapy), even after the disappearance of therapeutic levels of antibody in their bodies.  (Ex. 1420.1 at ABTKEN00007153–54.)  But this comparison is flawed, first and foremost, because the "sequential therapy" mentioned was—in the study from which these data were drawn—

---

[28] In considering this argument, the Court applies Second Circuit law, as the issue of judicial estoppel is not unique to patent cases.  See U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 596 n.3 (Fed. Cir. 1995) (collecting cases).

merely the administration of antibody alone after the patients ceased receiving methotrexate. As discussed, the underlying studies and data evaluated this group as antibody "monotherapy" and did not compare different methods of co-administration.[29] (Tr. at 278:1–280:16; see, e.g., supra ¶¶ 186, 230.) Second, even assuming arguendo that the data supported a comparison of adjunctive administration to "sequential co-administration," the results would not have been unexpected because the adjunctive administration group was receiving two therapies that had been shown to reduce the signs and symptoms of rheumatoid arthritis, instead of just one. (Tr. at 280:17–25.) Third, the fact that patients who received adjunctive therapy showed positive residual effects of the treatment even after the level of antibody subsided would not be unexpected (particularly where the antibody treatment had an extended half-life). (Id. at 281:1–10.)

374.    In addition, Kennedy's arguments rest on data that are selectively chosen and limited in scope because the studies and trials these data are drawn from were not powered to evaluate the results Kennedy claims (see id. at 281:11–282:24), and on positions that are directly contradicted by the inventors' own published works and statements regarding the data (see id. at 282:25–285:7; supra ¶¶ 231, 232).

    8)    Conclusions

375.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 of the '766 patent and claim 1 of the '442 patent, there is clear and convincing evidence that the invention of claim 1 of the '442 patent as a whole would have been obvious to a person of ordinary skill in

---

[29] Indeed, the unexpected results Professor Maini and Dr. Lipsky testified to at trial were, at most, in comparison to methotrexate or antibody treatment alone, not adjunctive administration versus another method of co-administration. (See Tr. at 525:18–529:13, 771:22–774:12)

the art in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (See Tr. at 259:25–260:9.)

376.     In addition, given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claims 8 and 9 of the '766 patent and claim 2 of the '442 patent, there is clear and convincing evidence that the invention of claim 2 of the '442 patent as a whole would have been obvious to a person of ordinary skill in the art in view of claim 8 or 9 or any of claims 10 through 14 of the '766 patent.  (See id. at 262:10–263:21.)

### D.     The Differences Between Claims 8 through 14 of the '766 Patent and Claims 3 through 7, and 13 of the '442 Patent

#### 1)     Dosing intervals

377.     Claim 3 of the '442 patent provides for the same method of administration, patient population, form of administration, dose of anti-TNFα antibody, and efficacy of treatment as claim 1 of the '442 patent.  (See supra ¶¶ 254, 256.)  Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 3 of the '442 patent to claims 8 through 14 of the '766 patent.  (Tr. at 263:22–265:13.)

378.     Claim 3 of the '442 patent also requires that the anti-TNFα antibody or fragment be administered multiple times separated by an interval of a weeks or weeks from the prior administration.  (See supra ¶ 256.)  In addition, claim 6 of the '442 patent, which depends on either claim 1 or 3, provides that the anti-TNFα antibody or fragment be administered in intervals of one day to thirty weeks.  (See supra ¶ 258.)

98

**A101**

379.     Again, claim 9 of the '766 patent required that the anti-TNFα antibody or fragment be administered in dosages separated by intervals of days or weeks.  (See supra ¶ 113.)

380.     As of August 1, 1995, a person of ordinary skill in the art would have known that anti-TNFα antibody had been administered to rheumatoid arthritis patients (who had not completely responded to prior therapy with methotrexate) multiple times at intervals of a week or weeks to successfully reduce signs and symptoms associated with rheumatoid arthritis. (See supra ¶ 369.)  Knowing of this successful dosing interval for treating rheumatoid arthritis patients with anti-TNFα antibody, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claims 3 and 6 of the '442 patent with a reasonable expectation of success.

381.     Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claims 8 or 9 and 10 through 14 of the '766 patent and claims 3 and 6 of the '442 patent, there is clear and convincing evidence that the inventions of claims 3 and 6 of the '442 patent as a whole would each have been obvious in view of claim 8 or 9 or any of claims 10 through 14 of the '766 patent.[30]  (See Tr. at 265:14–266:3, 268:7–269:17.)

          2)     *Characteristics of the tumor necrosis factor alpha mechanism*

382.     Claim 4 of the '442 patent is dependent on claim 3.  Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally

---

[30] Because claim 6 of the '442 patent depends on claim 1 or 3, the Court's reasons for finding that claims 1 through 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 6 of the '442 patent to claims 8 through 14 of the '766 patent.

to the comparison of claim 4 of the '442 patent to claims 8 through 14 of the '766 patent.  (Tr. at 266:4–15.)

383.  The additional limitations in claim 4 regarding the characteristics of the anti-TNFα antibody or fragment (i.e., that it bind to an epitope on human TNFα and that it inhibit binding of human TNFα to human TNFα cell surface receptors (see supra ¶ 257)) also appear in claim 1 of the '442 patent (see supra ¶¶ 359, 360).

384.  As such, for the reasons stated above with respect to claim 1, given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 4 of the '442 patent, there is clear and convincing evidence that the invention of claim 4 of the '442 patent as a whole would have been obvious to a person of ordinary skill in the art in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (See Tr. at 266:16–267:3.)

### 3) Doses of methotrexate

385.  Claim 5 of the '442 patent depends on claim 1 or 3.  Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 5 of the '442 patent to claims 8 through 14 of the '766 patent.

386.  The additional limitation of claim 1 or 3 recited in claim 5 is that each administration of methotrexate deliver from 0.01 to 100 mg/kg of the drug.  (See supra ¶ 258.)

387.  This broad range of methotrexate dosing does not distinguish claim 5 from the prior art.  As of August 1, 1995, one of ordinary skill in the art would have known that methotrexate was successfully administered to rheumatoid arthritis patients at weekly doses

ranging from 7.5 to 25 mg per week, well within the range recited in claim 5. (Tr. at 267:4–21; see supra ¶ 14.) Knowing of this successful dosing range for treating rheumatoid arthritis patients with methotrexate, a person of ordinary skill in the art would have been motivated to use it in a method of treatment as recited in claim 5 of the '442 patent with a reasonable expectation of success.

388.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 5 of the '442 patent, there is clear and convincing evidence that claim 5 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 267:22–268:6.)

*4)    Use of antibody and not fragment*

389.    Claim 7 of the '442 patent depends on either claim 1 or 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 7 of the '442 patent to claims 8 through 14 of the '766 patent.

390.    In contrast to claims 1 and 3 of the '442 patent, claim 7 does not include a fragment of an antibody that binds to TNFα; it only refers to the use of an antibody. (See supra ¶ 258.)

391.    Since claim 8 of the '766 patent refers to both alternatives—the use of antibody or a fragment (see supra ¶ 111)—the use of only one of these choices in claim 7 of the '442 patent would have been obvious.

392.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of

101

**A104**

claims 9 through 14 of the '766 patent and claim 7 of the '442 patent, there is clear and convincing evidence that '442 patent claim 7 would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 269:18–271:7.)

5) *Administration of tumor necrosis factor-α antibody*

393.    Claim 13 depends on claim 1 or 3. Accordingly, the Court's reasons for finding that claims 1 and 3 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 13 of the '442 patent to claims 8 through 14 of the '766 patent.

394.    The only additional limitation of claim 13 is that the anti-TNFα antibody be administered via infusion. (See supra ¶ 258.)

395.    Infusion as a method for administering biologics, including anti-TNFα antibody, was known in the art as of August 1, 1995, and had been used successfully to treat rheumatoid arthritis patients. (See, e.g., supra ¶¶ 43, 49, 58, 76, 78, 84.) Because infusion was used to administer antibody cA2 to individuals to treat rheumatoid arthritis as of August 1, 1995, a person of ordinary skill in the art would have been motivated to administer an anti-TNFα antibody by infusion as recited in claim 13 of the '442 patent with a reasonable expectation of success.

396.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 13 of the '442 patent, there is clear and convincing evidence that claim 13 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent. (Tr. at 271:8–272:5.)

E.     **The Differences Between Claims 8 through 14 of the '766 Patent and Claims 14 and 17 through 20 of the '442 Patent**

1)     *Methods of treatment and patient population*

397.     Claim 14 of the '442 patent is an independent claim that, while not using the word "adjunctive," provides for the same method of administration (adding anti-TNFα antibody to ongoing methotrexate treatment), patient population, form of administration, and efficacy of treatment as claim 1 of the '442 patent.  (See supra ¶ 259.)  Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 14 of the '442 patent to claims 8 through 14 of the '766 patent.  (Tr. at 272:6–13.)

398.     Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 14 of the '442 patent, there is clear and convincing evidence that claim 14 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (Id. at 272:15–273:2.)

399.     Claim 17 of the '442 patent is dependent on claim 14.  (See supra ¶ 260.) Accordingly, the Court's reasons for finding that claims 1 and 14 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 17 of the '442 patent to claims 8 through 14 of the '766 patent.  (Tr. at 273:3–10.)

400.     The additional limitation that claim 17 recites—administering anti-TNFα antibody either adjunctively and/or concomitantly—does not distinguish claim 17 of the '442 from claims 8 through 14 of the '766 patent, which require "co-administration" because, as noted

above, co-administration includes adjunctive and/or concomitant therapy with methotrexate. (See supra ¶ 317.)

401.     Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 17 of the '442 patent, there is clear and convincing evidence that claim 17 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (Tr. at 273:11–24.)

>               2)     *Dosing intervals*

402.     Claim 18 of the '442 patent is dependent on claim 14.  (See supra ¶ 260.) Accordingly, the Court's reasons for finding that claims 1 and 14 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 18 of the '442 patent to claims 8 through 14 of the '766 patent.

403.     The additional limitations that claim 18 recites—that the methotrexate be administered at an interval of a week or weeks and the anti-TNFα antibody be administered as multiple infusions—do not distinguish claim 18 of the '442 patent from claims 8 through 14 of the '766 patent, because as of August 1, 1995, it was established in the art that the dosing regimen of methotrexate for rheumatoid arthritis patients was no more than once a week (see supra ¶ 14); it was known in the art that infusion was a method for administering therapeutic agents, including anti-TNFα antibody, to rheumatoid arthritis patients (see supra ¶¶ 43, 49, 58, 76, 84); and it was known in the art that multiple infusions of antibody had been used successfully to treat rheumatoid arthritis (see supra ¶¶ 50, 51, 78).  (Tr. at 274:2–23.)  Knowing of the accepted dosing regimen for treating rheumatoid arthritis patients with methotrexate, and

of the successful administration of anti-TNFa antibody as multiple infusions, a person of

ordinary skill in the art would have been motivated to use these techniques in a method of

treatment as recited in claim 18 of the '442 patent with a reasonable expectation of success.

404.    Given the level of ordinary skill in the art as of August 1, 1995, the scope

and content of the prior art, and the similarities and differences between claim 8 and any of

claims 9 through 14 of the '766 patent and claim 18 of the '442 patent, there is clear and

convincing evidence that claim 18 of the '442 patent would have been obvious in view of claim

8 or any of claims 9 through 14 of the '766 patent.  (Tr. at 274:24–275:11.)

> 3)    *Characteristics of the antibody*

405.    As with claim 14, claim 19 of the '442 patent is an independent claim that

provides for the same method of adjunctive administration, patient population, form of

administration, and efficacy of treatment as claim 1 of the '442 patent.  (See supra ¶¶ 254, 261.)

Accordingly, the Court's reasons for finding that these features of claim 1 of the '442 patent

would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of

the '766 patent apply equally to the comparison of claim 19 of the '442 patent to claims 8

through 14 of the '766 patent.  (Tr. at 275:12–276:1.)

406.    The additional limitations that claim 19 recite do not distinguish claim 19

of the '442 from claims 8 through 14 of the '766 patent.  First, the requirements for the

mechanism by which the antibody would work were known in the art as of August 1, 1995.  (See

supra ¶ 361.)  Claim 19 also requires that the antibody be administered in single or multiple

doses while the methotrexate is administered in multiple doses.  This does not distinguish claim

19 from claims 8 through 14 of the '766 patent because, again, as of August 1, 1995, it was

known in the art that multiple administrations of antibody had been used to successfully treat

rheumatoid arthritis (see supra ¶¶ 50, 51, 78), and it was an established practice in the art to administer methotrexate for several weeks when treating a rheumatoid arthritis patient with signs and symptoms of the disease (see supra ¶¶ 12, 14).

407.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 19 of the '442 patent, there is clear and convincing evidence that claim 19 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (Tr. at 276:3–16.)

408.    Claim 20 of the '442 patent depends on claim 7, which itself depends on claims 1 or 3.  Accordingly, the Court's reasons for finding that claims 1, 3, and 7 of the '442 patent would have been obvious to a person of ordinary skill in the art in light of claims 8 through 14 of the '766 patent apply equally to the comparison of claim 20 of the '442 patent to claims 8 through 14 of the '766 patent.

409.    The additional limitation that claim 20 recites—that the antibody is a monoclonal antibody—does not distinguish claim 20 of the '442 patent from claims 8 through 14 of the '766 patent because as of August 1, 1995, it was known in the art that cA2, a monoclonal antibody to TNFα, had been successfully used to treat rheumatoid arthritis patients.  (Id. at 276:17–277:11; see supra ¶¶ 26, 44, 51, 61, 75, 77, 78.)

410.    Given the level of ordinary skill in the art as of August 1, 1995, the scope and content of the prior art, and the similarities and differences between claim 8 and any of claims 9 through 14 of the '766 patent and claim 20 of the '442 patent, there is clear and convincing evidence that claim 20 of the '442 patent would have been obvious in view of claim 8 or any of claims 9 through 14 of the '766 patent.  (Tr. at 277:12–24.)

## CONCLUSION

For the foregoing reasons, the Court concludes that Abbott has proven by clear and convincing evidence that claims 1 through 7, 13, 14, and 17 through 20 of U.S. Patent No. 7,846,442 are invalid for obviousness-type double patenting over claims 8 through 14 of U.S. Patent No. 6,270,766, and that Kennedy has failed to prove its counterclaim for a declaratory judgment that these claims of the '442 patent are not invalid.[31] Abbott is directed to submit a proposed judgment in accordance with the above Findings of Fact and Conclusions of Law within ten (10) days.

Dated: New York, New York
      June 20, 2013

SO ORDERED

_____

PAUL A. CROTTY
United States District Judge

---

[31] In its pretrial memorandum of law, Kennedy renews its motion that the obviousness-type double patenting doctrine does not apply here as a matter of law. (ECF No. 98.) This motion is denied for the reasons set forth in the Court's August 29, 2012 order. (ECF No. 80.) To the extent Kennedy renews its equitable argument, the Court denies this application as well. The evidence produced at trial and recounted above establishes—clearly and convincingly—that the claims at issue in the '442 patent would have been obvious to a person of ordinary skill in the art in light of the claims at issue in the '766 patent. The evidence also shows that Kennedy sought a 1992 priority date in order to avoid certain prior art and receive the protection of the '766 patent, then, after securing the '766 patent, sought to extend this protection beyond the expiration of the '766 patent by way of the indistinct '442 patent and its later expiration tied to an August 1, 1996 effective filing date. (See, e.g., supra nn.14, 15, 16, and accompanying text; see also Tr. at 434:1–439:12; Ex. 1005 at 9; Ex. 1006 at 9; Ex. 1007 at 8.) The equities do not favor such an "unjustified timewise extension of the right to exclude granted by a patent." In re Hubell, 709 F.3d at 1145 (quotations omitted).

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 29, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ABBOTT LABROTORIES and                              :
ABBOTT BIOTECHNOLOGY LIMITED,                        :
                                                    :
                      Plaintiffs,                   :
                                                    :
            - against -                             :              11 Civ. 2541 (PAC)
                                                    :
THE MATHILDA AND TERENCE KENNEDY                     :              ORDER
INSTITUTE OF RHEUMATOLOGY TRUST,                     :
                                                    :
                      Defendant.                    :
-----------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

On April 13, 2011, Plaintiffs Abbott Laboratories and Abbott Biotechnology Ltd.

("Abbott") commenced this declaratory judgment action, seeking a declaration that the claims of

U.S. Patent No. 7,846,442 (the "'442 patent") issued to Defendant The Mathilda and Terence

Kennedy Institute of Rheumatology Trust ("Kennedy") are invalid under the doctrine of

obviousness-type double patenting ("OTDP"). On July 6, 2012, Kennedy moved for judgment on

the pleadings, arguing that, in this "case of first impression," the Court should find Kennedy's

'442 patent is immune from the OTDP doctrine because: (1) Kennedy is entitled to an enforceable

17-year patent term; (2) statutory amendments to the Patent Act undermine the need for the

OTDP doctrine; and (3) it would be "unjust" to apply the OTDP doctrine here. Kennedy's motion

is DENIED.

The Patent Act precludes more than one patent on the same invention. 35 U.S.C. § 101

(2000). "Accordingly, an applicant may obtain 'a patent' for an invention." Geneva

Pharmaceuticals, Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1377-1378 (Fed. Cir. 2003).

"Section 101, however, only prohibits a second patent on subject matter identical to an earlier

**A111**

patent," and thus applicants can avoid this statutory requirement by drafting claims that vary slightly from the earlier patent. Id. To account for this problem, the United States Court of Customs and Patent Appeals, developed the OTDP doctrine "to prevent issuance a patent on claims that are nearly identical to claims in an earlier patent," and "prevent[] an applicant from extending patent protection for an invention beyond the statutory term by claiming a slight variant." Id.

Before 1995, a patent had a 17-year enforceable term measured from the date it issued. In 1994, Congress adopted the Uruguay Round Agreements Act ("URAA"), and amended the Patent Act to set a 20-year patent term measured from either (a) the application's filing date with the U.S. Patent and Trademark Office ("PTO"), or, where applicable, (b) an earlier filing or priority date claimed in the patent application. 35 U.S.C. § 154(a)(2). This method of calculation created a problem: "[u]nder the previous seventeen-year regime, PTO-caused delays could not affect patent terms because the term commenced upon issuance after any delays during patent acquisition. Under the twenty-year term, however, those delays consumed the effective term of a patent." Wyeth v. Kappos, 591 F.3d 1364, 1366 (Fed. Cir. 2010). In 1999, Congress addressed this problem by adopting the American Inventors Protection Act ("AIPA"), which provided, in essence, a guaranteed 17-year patent term where the "original patent is delayed due to the failure of the Patent and Trademark Office." 35 U.S.C. § 154(b).

The pertinent history of the patents at issue is as follows: On August 1, 1996, Kennedy filed its '766 patent application, which claimed methods for treating rheumatoid arthritis and other diseases by "co-administering" two drugs, anti-tumor necrosis factor-alpha antibodies along with methotrexate. Kennedy's '766 patent was filed as a "continuation-in-part" of a prior U.S. patent, which was filed on October 8, 1992. As a result of this earlier priority date, the '766's 20-

2

**A112**

year patent is set to expire on October 8, 2012. Since the '766 patent issued on August 7, 2001, it would have an enforceable term of 11 years, 2 months, and 1 day.

On September 12, 2005, Kennedy filed its '442 patent application, which claims to treat arthritis and other diseases through "adjunctive" therapy, by administering anti-tumor necrosis factor-alpha antibodies with methotrexate. Kennedy's '442 patent claims a priority date of August 1, 1996, the date the '766 patent application was filed. The PTO initially rejected Kennedy's '442 patent claims on the grounds of OTDP over the '766 patent, but ultimately allowed these claims and accepted the 1996 priority date. To account for its delays, the PTO extended Kennedy's patent term was from August 1, 2016[1] through August 21, 2018, approximately six years after the '766 patent expires. The time between the issuance of the '766 patent (August 7, 2001) and the expiration of the '442 patent (August 21, 2018) is approximately 17 years. Kennedy, accepting for purposes of this motion that its '442 patent is an obvious double-type patent over the '766 patent, argues that it is entitled to, and equitably deserves the combined 17-year enforceable term on this patented methodology.

Kennedy's arguments that it is entitled to a 17-year patent term must be rejected. No court has ever held that the OTDP doctrine is eviscerated by the URAA or AIPA amendments to the Patent Act.[2] After the URAA amendments, the Federal Circuit expressly held that "[n]o patent issued on an application filed after June 8, 1995, has a guaranteed 17-year term." Merck & Co., Inc. v. Kessler, 80 F.3d 1543, 1552 -1553 (Fed. Cir. 1996). AIPA's 17-year guarantee applies

---

[1] This date reflects a 20-year patent term measured from the priority date of August 1, 1996.

[2] In In re Metoprolol Succinate Patent Litig., 494 F.3d 1011, 1018 (Fed. Cir. 2007), the Federal Circuit rejected plaintiff's "argument that there can never be 'double patenting simply because a later claimed element is set forth in an earlier claim to the combination,'" because so holding "would require that this court eviscerate obviousness-type double patenting, thereby reducing invalidity based on double patenting to the § 101 statutory prohibition against claims of the same invention," which the Circuit would not do. Nonetheless, In re Fallaux, 564 F.3d 1313, 1318 -1319 (Fed Cir. 2009) the Federal Circuit recognized that the OTDP justification of preventing unjustified patent term extension may have "limited force" in post-URAA patent cases.

3

**A113**

only when the PTO causes delays in issuing patents; it does not permit double patented inventions to achieve the 17-year period.

Furthermore, the URAA amendment changed a patent's term from 17 years from the date of issuance to 20 years from the effective filing date, which incorporates any asserted priority date. 35 U.S.C. § 154(a)(2). In obtaining its '766 patent, Kennedy chose to claim a 1992 priority date, and there is no argument that the '766 patent's term was wrongly or unjustly calculated. Kennedy nonetheless asks the Court to consider only the term of enforceability between the '766 and '442 patents, from the time the '766 patent *issued* through the time the '442 patent expires. Doing so, however, would require ignoring the language of the URAA amendment and Kennedy's claimed priority date for the '766 patent, which the Court will not do. The Court thus rejects Kennedy's argument that it is entitled to a 17-year term of enforcement between the '766 and '442 patents.

The Court recognizes that Kennedy raises an equitable argument - that it is unjust to apply the OTDP against its '442 patent—and asserts that this is a case of "first impression." That is no reason to grant the relief Kennedy seeks. It is better to develop a full record on the OTDP issue at trial. Accordingly, Kennedy's motion for judgment on the pleadings is DENIED WITHOUT PREJUDICE.

Dated: New York, New York
     August 29, 2012

SO ORDERED

PAUL A. CROTTY
United States District Judge

4

**A114**

US007846442B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,846,442 B2**

Feldmann et al.    (45) **Date of Patent:**    **Dec. 7, 2010**

(54) **METHODS OF TREATING RHEUMATOID ARTHRITIS WITH AN ANTI-TNF-ALPHA ANTIBODIES AND METHOTREXATE**

(75) Inventors: **Marc Feldmann**, London (GB);
**Ravinder N. Maini**, London (GB)

(73) Assignee: **The Mathilda and Terence Kennedy Institute of Rheumatology Trust**,
London (GB)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 750 days.

(21) Appl. No.: **11/225,631**

(22) Filed: **Sep. 12, 2005**

(65) **Prior Publication Data**

US 2006/0099212 A1    May 11, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 09/754,004, filed on Jan. 3, 2001, now abandoned, which is a continuation of application No. 08/960,775, filed on Aug. 1, 1996, now Pat. No. 6,270,766.

(51) **Int. Cl.**
*A61K 39/395*    (2006.01)
*C07K 16/24*    (2006.01)
*A01N 43/58*    (2006.01)

(52) **U.S. Cl.** ............. **424/145.1**; 424/130.1; 424/133.1; 424/152.1; 424/158.1; 424/172.1; 514/251; 530/387.1; 530/387.3; 530/388.1; 530/388.2; 530/388.23

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,695,459 | A | 9/1987 | Steinman et al. |
| 5,096,906 | A | 3/1992 | Mandell et al. |
| 5,204,329 | A | 4/1993 | Ackerman et al. |
| 5,260,422 | A | 11/1993 | Clark et al. |
| 5,298,396 | A | 3/1994 | Kotzin et al. |
| 5,317,019 | A | 5/1994 | Bender et al. |
| 5,468,481 | A | 11/1995 | Sharma et al. |
| 5,502,066 | A | 3/1996 | Heinemann et al. |
| 5,580,873 | A | 12/1996 | Bianco et al. |
| 5,656,272 | A | 8/1997 | Le et al. |
| 5,658,570 | A | 8/1997 | Newman et al. |
| 5,672,347 | A | 9/1997 | Aggarwal et al. |
| 5,698,195 | A | 12/1997 | Le et al. |
| 5,741,488 | A | 4/1998 | Feldman et al. |
| 5,795,967 | A | 8/1998 | Aggarwal et al. |
| 5,919,452 | A | 7/1999 | Le et al. |
| 5,958,413 | A | 9/1999 | Anagnostopulos et al. |
| 5,994,510 | A | 11/1999 | Adair et al. |
| 6,015,557 | A | 1/2000 | Tobinick et al. |
| 6,177,077 | B1 | 1/2001 | Tobinick |
| 6,190,691 | B1 | 2/2001 | Mak |
| 6,270,766 | B1 | 8/2001 | Feldmann et al. |
| 6,770,279 | B1 | 8/2004 | Feldmann et al. |

| | | | |
|---|---|---|---|
| 7,138,118 | B2 * | 11/2006 | Le et al. ................. 424/145.1 |
| 2002/0010180 | A1 | 1/2002 | Feldmann et al. |
| 2002/0068057 | A1 | 6/2002 | Feldmann et al. |
| 2002/0136723 | A1 | 9/2002 | Feldmann et al. |
| 2004/0228863 | A1 | 11/2004 | Feldmann et al. |
| 2006/0099212 | A1 | 5/2006 | Feldmann et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | A-58976/90 | 2/1991 |
| AU | 92/17649 | 3/1992 |
| AU | 93/51522 | 10/1993 |
| AU | 1997/021229 | 2/1997 |
| AU | 2003/264629 | 12/2003 |
| CA | 2021369 A1 | 1/1991 |
| DE | 40 06 269 A1 | 8/1991 |
| EP | 0 240 344 A2 | 10/1987 |
| EP | 0 288 088 A2 | 10/1988 |
| EP | 0 663 836 B1 | 7/1997 |
| EP | 0 914 157 B1 | 10/2005 |
| EP | 1 941 904 | 7/2008 |
| GB | 2246569 | 6/1990 |
| GB | 2 246 569 A | 2/1992 |
| WO | WO 89/08460 | 9/1989 |
| WO | WO 90/15152 | 12/1990 |
| WO | WO 90/15152 A1 | 12/1990 |
| WO | WO 91/00092 A1 | 1/1991 |
| WO | WO 91/02078 A | 2/1991 |
| WO | WO 91/10722 A2 | 7/1991 |
| WO | WO 92/07076 A1 | 4/1992 |
| WO | WO 92/07585 A1 | 5/1992 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 07/958,248, filed Oct. 8, 1992, Marc Feldmann et al.
U.S. Appl. No. 08/607,419, filed Feb. 28, 1996, Marc Feldmann et al.
Abbas, A.K., et al. (1997) "Cellular and Molecular Immunology", 3rd ed., p. 258 (W.B. Saunders Company, Philadelphia, PA).
Abbott Laboratories Ltd. "Abbott Laboratories Receives Positive Opinion for HUMIRA Rheumatoid Arthritis Extension From European Medicines Evaluation Agency," May 6, 2004 Press Release.

(Continued)

*Primary Examiner*—Phillip Gambel
(74) *Attorney, Agent, or Firm*—John P. White; Cooper & Dunham LLP

(57)    **ABSTRACT**

Methods for treating and/or preventing a TNF-mediated disease in an individual are disclosed. Also disclosed is a composition comprising methotrexate and an anti-tumor necrosis factor antibody. TNF-mediated diseases include rheumatoid arthritis, Crohn's disease, and acute and chronic immune diseases associated with transplantation.

**22 Claims, 8 Drawing Sheets**

## US 7,846,442 B2

Page 2

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 92/08474 A2 | 5/1992 |
| WO | WO 92/11383 | 7/1992 |
| WO | WO 92/16553 A1 | 9/1992 |
| WO | WO 93/07863 A | 4/1993 |
| WO | WO 94/06476 | 3/1994 |
| WO | WO 94/08619 A | 4/1994 |
| WO | WO 94/08619 A1 | 4/1994 |
| WO | WO 95/03827 A | 2/1995 |
| WO | WO 95/09652 A1 | 4/1995 |
| WO | WO 96/33204 A2 | 10/1996 |
| WO | WO 98/24463 A2 | 6/1998 |
| WO | WO 98/05357 A1 | 12/1998 |
| WO | WO 00/50079 | 8/2000 |

### OTHER PUBLICATIONS

Abstract of Berchtold, P., & Seitz, M., (1996) "Immunsuppression—gratwanderung zwischen iatrogenie und therapie [Immunosuppression—a tightrope walk between iatrogenic harm and therapy]," Schweizerische medizinische Wochenschrift, vol. 126, No. 38, pp. 1,603-1,609.

Abstract of Bouchart, F., et al., (1993) "Methotrexate as rescue/adjunctive immunotherapy in infant and adult heart transplantation," Journal of Heart and Lung Transplantation, vol. 12, No. 3, pp. 427-433 (May-Jun. 1993).

Abstract of Drachman, D.B., (1996) "Immunotherapy in neuromuscular disorders: current and future strategies," Muscle & Nerve, vol. 19, No. 10, pp. 1,239-1,251.

Abstract of Huang, D., et al., (1992) "Effects of anti-TNF monoclonal antibody infusion in patients with hairy cell leukaemia," British Journal of Haematology, vol. 81, No. 2, pp. 231-234.

Addendum dated Dec. 15, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Advisory Action issued Dec. 3, 2004 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Advisory Action issued Jan. 17, 2003 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Advisory Action issued Mar. 26, 2004 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Advisory Action issued Mar. 31, 2004 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Amended Statement of Grounds and Particulars submitted Nov. 14, 2001 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Amendment and arguments submitted Aug. 12, 2004 in connection with Japanese Patent Application No. 6-509733, filed Oct. 6, 1993.

Amendment and arguments submitted Aug. 8, 2005 in connection with Japanese Patent Application No. 5-106657, filed Mar. 10, 1994.

Amendment and arguments submitted Jan. 4, 2008 in connection with Japanese Patent Application No. 5-106657, filed Mar. 10, 1994.

Amendment submitted Apr. 19, 2005 in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Amendment submitted Apr. 2, 2002 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Amendment submitted Apr. 4, 1995 in connection with European Patent Application No. 93922574.4, filed Oct. 8, 1993.

Amendment submitted Aug. 25, 1993 in connection with U.S. Appl. No. 07/958,248, filed Oct. 8, 1992.

Amendment submitted Aug. 7, 2000 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Amendment submitted Feb. 10, 2001 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Amendment submitted Feb. 27, 2001 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Amendment submitted Feb. 4, 2004 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment submitted Feb. 2, 2000 in connection with Canadian Patent Application No. 2,261,630, filed Aug. 1, 1997.

Amendment submitted Jan. 20, 1999 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Amendment submitted Jan. 20, 2000 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Amendment submitted Jan. 29, 2002 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Amendment submitted Jan. 3, 2001 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment submitted Jan. 31, 2008 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Amendment submitted Jan. 7, 1999, in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Amendment submitted Jul. 26, 2004 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Amendment submitted Jul. 31, 2003 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Amendment submitted Jul. 7, 1997 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Amendment submitted Jul. 8, 2004 in connection with U.S. Appl. No. 10/762,096, filed Jan. 20, 2004.

Amendment submitted Jun. 17, 2003 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment submitted Jun. 26, 2000 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Amendment submitted Mar. 8, 1998 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Amendment submitted Mar. 23, 2007 in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Amendment submitted Aug. 6, 2004 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment submitted Mar. 8, 2001 in connection with Japanese Patent Application No. 5-106557, filed Mar. 10, 1994.

Amendment submitted May 8, 2000 in connection with Canadian Patent Application No. 2,261,630, filed Aug. 1, 1997.

Amendment submitted May 23, 2000 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Amendment submitted Nov. 28, 2006 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Amendment submitted Oct. 10, 1995 in connection with PCT International Application No. PCT/GB94/00462, filed Mar. 10, 1994.

Amendment submitted Oct. 2, 1996 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Amendment submitted Oct. 24, 1997 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Amendment submitted Oct. 27, 2003 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Amendment submitted Oct. 4, 2000 in connection with Japanese Patent Application No. 6-509733, filed Oct. 6, 1993.

Amendment submitted Sep. 3, 1997 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Amendment submitted Sep. 4, 1997 in connection with U.S. Appl. No. 08/607,419, filed Feb. 28, 1996.

Amendment, including Exhibit A and B submitted Jan. 26, 2002 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Amendment, including Exhibits 1 and 2 submitted Aug. 6, 2004 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment, including Exhibits A to C submitted Jun. 17, 2003 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Amendment, including incorrect claims submitted Feb. 3, 2003 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Amendment, including correct claims submitted Feb. 3, 2003 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Annotated Statement of Grounds and Particulars submitted Nov. 14, 2001 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Applicants Submission in Support of Its Extension of Time Application dated Dec. 2, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Arend, W.P., and Dayer, J.M. (1990) "Cytokines and cytokine inhibitors or antagonists in rheumatoid arthritis" Arthritis Rheum. 33(3):305-315.

Bach, J.F. (1993) "Immunosuppressive therapy of autoimmune diseases" Trends Pharmacol. Sci. 14:213-216.

Barrera, P., et al. (1991) "Effects of a weekly Dosis of Methotrexate on IL-1, TNF and IL-6 in patients with rheumatoid arthritis," Cytokine 3(5):504 (Abstract 330).

Barrera, P., et al. (1995) "Effect of methotrexate alone or in combination with sulphasalazine on the production and circulating concentrations of cytokines and their antagonists. Longitudinal evaluation in patients with rheumatoid arthritis" Br. J. Rheumatol. 34:747-755.

Barrera, P., et al., (1996) "Effects of antirheumatic agents on cytokines," Seminars in Arthritis and Rheumatism, vol. 25, No. 4, pp. 234-253.

Barrera, P., et al., (1993) "Circulating soluable tumor necrosis factor receptors, interleukin-2 receptors, tumor necrosis factor α, and interleukin-6 levels in rheumatoid arthritis," Arthritis & Rheumatism 36:1070-1079.

Barrera, P., et al. (1994) "Circulating concentrations and production of cytokines and soluble receptors in rheumatoid arthritis patients: effectsa of a single dose methotrexate," British Journal of heumatology 33: 1017-1024.

Barrera, P., et al., (1996) "Effects of antirheumatic agents on cytokines," Seminars in Arthritis and Rheumatism 25: 234-253.

Berchtold, et al., (1996) "Immunsuppression-gratwanderung zwischen iatrogenie and therapie (Immunosuppression-a tightrope walk between iatrogenic harm and therpy)," Schweizerische medizinische Wochenschrift 126:1603-1609 (abstract only).

Blackburn, W.D., Jr., (1996) "Management of ostearthritis and rheumatoid arthritis: prospects and possibilities," The American Journal of Medicine 100: 2A-24S-2A-30S.

Boers, M., et al., (1997) "Randomised comparison of combined step-down prednisolone, methotrexate and sulphasalazine with sulphasalazine alone in early rheumatoid arthritis," Lancet, vol. 350, No. 9074, pp. 309-318.

Bolling, S.F., et al. (1992) "Prolongation of cardiac allograft survival in rats by anti-TNF and cyclosporine combination therapy", Transplantation 53(2):283-286.

Bologna, C., & Sany, J., (1996) "Association des traîtements de fond dans la polyarthrite rhumatoïde," La Presse Médicale, vol. 25, No. 19, pp. 876-878 (original).

Bologna, C., & Sany, J., (1996) "Association des traîtements de fond dans la polyarthrite rhumatoïde," La Presse Médicale, vol. 25, No. 19, pp. 876-878 (translation).

Borigini, M.J., and Paulus, H.E. (1995) "Combination therapy," Baillière's Clinical Rheumatology, 9(4):689-710.

Bouchart, F., et al., (1993) "Methotrexate as rescue/adjunctive immunotherapy in infant and adult heart transplant," Journal of Heart and Lung Transplantation 12: 427-433 (abstract only).

Brahn, E., et al. (1989) "Effects of Tumor Necrosis Factor and Combination Cyclosporin A/Methotrexate Therapy on Collagen Arthritis" Arthritis Rheum. 32(4 Suppl.):S133, abstract D42.

Breedveld, F.C., and deVries, R.R.P. (1992) "Anti-CD4 antibodies in rheumatoid arthritis," Clin. Exp. Rheumatol. 10:325-326.

Brennan, F.M. (1994) "Role of cytokines in experimental arthritis" Clin. Exp. Immunol. 97:1-3.

Brennan, F.M., et al. (1989) "Inhibitory Effect of TNFα Antibodies on Synovial Cell Interleukin-1 Production in Rheumatoid Arthritis," Lancet 2(8657):244-247.

Brennan, F.M., et al. (1992) "TNFα—a Pivotal Role in Rheumatoid Arthritis?" Br. J. Rheumatol. 31(5):293-298.

Brief on Appeal submitted Sep. 3, 1999, including Appendix in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Brief on Appeal, including Appendix submitted Apr. 11, 2001 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Brief on Appeal, including Appendix submitted Mar. 29, 2000 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Butler, D.M., et al., (1995) "Modulation of proinflammatory cytokine release in rheumatoid synovial membrane cell cultures. Comparison of monoclonal anti-TNFα antibody with the interleukin-1 receptor antagonist," Eur. Cytokine Netw., 6(4):225-230.

Chikanza, I.C., and Fernandes, L. (1996) "The current status and future prospects for biological targeted therapies for rheumatoid arthritis" Exp. Opin. Invest. Drugs 5(7):819-828.

Choy, E.H.S., et al., (1995) "Therapeutic monoclonal antibodies" Br. J. Rheumatol. 34:707-715.

Claims and abstract submitted Dec. 1, 2003 in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Claims and abstract submitted Jul. 24, 2007 in connection with Australian Patent Application No. 200720367, filed Jul. 29, 2007.

Claims submitted Aug. 4, 2000 in connection with Australian Patent Application No. 51825/00, filed Aug. 4, 2000.

Cobbold, S.P., et al. (1984) "Therapy with monoclonal antibodies by elimination of T-cell subsets in vivo", Nature 312:548-551.

Cohen, S., et al. (1993) "Comparison of the safety and efficacy of cyclosporine-A and metotrexate in refractory rheumatoid arthritis: a randomized, multi-centered, placebo-controlled trial," Rev. Esp. Reumatol. 20(1):148 (Abstract 318).

Communication issued Aug. 13, 2002 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Communication issued Aug. 27, 2003 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication issued Jan. 27, 2000 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication issued Jul. 17, 2001 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication issued Jul. 19, 2001 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication issued May 16, 2003 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication issued Nov. 15, 2007 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication Noting of loss of rights (R.69(1)EPC) (EPO Form 2021A) issued Dec. 3, 2002 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication submitted Dec. 26, 2002 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Communication submitted Feb. 8, 2000 in connection with Australian Patent Application No. 37035/97 (now 719015), filed Feb. 25, 1999.

Communication submitted Jan. 20, 2004 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Communication submitted Jul. 18, 2000 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Communication submitted Jul. 7, 2004 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Communication submitted May 10, 2002 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Communication submitted May 18, 2007, including List of documents cited by all parties in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1995.

Communication submitted Aug. 13, 2002 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Communication, including amended claims submitted Apr. 29, 2005 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication, including amended claims, French translation of claims and German translation of claims submitted Aug. 2, 2005 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1995.

Communication, including amended German translation of claims submitted Aug. 4, 2005 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1995.

Communication, including amended list of references submitted Jan. 29, 2008 in connection with European Patent No. EP 0 914 157 B1.

Communication, including annex issued Jun. 12, 2004 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication, including Main Request, First Auxiliary Request, Second Auxiliary Request, submitted Apr. 29, 2005 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication, including Minutes of the oral proceedings before the Examining Division, Statement of Requests, Minutes of the oral proceedings before the Examining Division, New Main Request and 2nd New Main Request submitted May 13, 2005 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1995.

Communication, issued Apr. 19, 2002 in connection with European Patent Applicaiton No. 97933799.5, filed Aug. 1, 1997.

Communication, including Statement of Proposed Amendments and Notice of Entitlement submitted Apr. 16, 1999 in connection with Australian Patent Application No. 37035/97 (now 719015), filed Feb. 25, 1999.

Cooper, K.D. (1993) "New therapeutic approaches in atopic dermatitis" Clin. Rev. Allergy 11:543-559.

The International Preliminary Examination Report for PCT International Application No. PCT/GB97/02058, filed Aug. 1, 1997 on behalf of The Kennedy Institute of Rheumatology in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Cronstein, B.N. (2004) "Therapeutic Cocktails for Rheumatoid Arthritis: The Mixmaster's Guide," Arthritis & Rheumatism 50(7): 2041-2043.

Curriculum Vitae of Andrew Cope submitted May 18, 2007 in connection with European Patent No. EP 0 914 157 B1 granted Oct. 5, 2005.

Debets, R., and Savelkoul, H.F.J. (1994) "Cytokine antagonists and their potential therapeutic use" Immunol. Today 15(10):455-458.

Decision of a Delegate of the Commissioner of Patents dated Dec. 15, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Decision on Appeal issued Mar. 21, 2003 in connection with U.S. Appl. No. 09/093,458 filed Jun. 8, 1998.

Decision on Petition issued Jul. 13, 1995 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Decision to refuse a European Patent Application issued Aug. 27, 2003 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Declaration by Andrew Cope, submitted May 18, 2007 in connection with European Patent No. 0 914 157 B1, granted Oct. 5, 2005.

Declaration by Denis Wakefield submitted Jul. 5, 2006 in connection with European Patent No. 0 914 157 B1, granted Oct. 5, 2005.

Declaration by Elliott Chartash submitted Jul. 5, 2006 in connection with European Patent No. 0 914 157 B1, granted Oct. 5, 2005.

Declaration by Ian Portek submitted Jul. 5, 2006 in connection with European Patent No. 0 914 157 B1, granted Oct. 5, 2005.

Declaration by Oliver Sander submitted Jan. 28, 2008 in connection with European Patent No. 0 914 157 B1, granted Oct. 5, 2005.

Declaration of Marc Feldmann, Ph.D. Under 37 C.F.R. § 1.132 submitted Mar. 15, 2000 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Declaration of Sander J.H. van Deventer, M.D., Ph.D. and Daan W. Hommes, M.D. Under 37 C.F.R. § 1.132 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Drachman, D.B., (1996) "Immunotherapy in neuromuscular disorders: current and future strategies," Muscle & Nerve 19: 1239-1251 (abstract only).

Eason, J.D., et al., (1995) "Inhibition of the effects of TNF in renal allograft recipients using recombinant human dimeric tumor necrosis factor receptors," Transplantation 59: 300-305.

Elliott, M.J., and Maini, R.N. (1993) "New directions for biological therapy in rheumatoid arthritis" Int. Arch. Allergy Immunol. 104:112-125.

Elliott, M.J., et al. (1993) "Treatment of Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to TNFα" Rev. Esp. Reumatol. 20(Suppl. 1):148, abstract 320.

Elliott, M.J., et al. (1993) "Treatment of Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to TNFα: Safety, Clinical Efficacy and Control of the Acute-Phase Response" J. Cell. Biochem., vol. 0, Suppl. 17B:145, abstract EZ 405.

Elliott, M.J., et al. (1994) "Randomised double-blind comparison of chimeric monoclonal antibody to tumour necrosis factor α (cA2) versus placebo in rheumatoid arthritis" Lancet 344:1105-1110.

Elliott, M.J., et al., (1993) "Treatment of rheumatoid arthritis with chimeric monoclonal antibodies to tumor necrosis factor α" Arth. Rheum. 36(12): 1681-1690.

Elliott, M.J., et al., (1994) "Repeated therapy with monoclonal antibody to tumour necrosis factor α (cA2) in patients with rheumatoid arthritis" Lancet 344:1125-1127.

Elliott, M.J., et al., (1995) "TNFα blockade in rheumatoid arthritis: rationale, clinical outcomes and mechanisms of action," International Journal of Immunopharmacology 17: 141-145.

Remicade : Product Information available on the Internet (www. centerwatch.com).

Enbrel: product Information available on Internet (www. medicalnewstoday.com).

Examiner's Answer issued Jul. 2, 2001 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Examiner's Report issued Jun. 28, 2005 in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Examiner's report issued Mar. 1, 2002 in connection with Australian Patent Application No. 51825/00, filed Aug. 4, 2000.

Examiner's Report issued Sep. 2, 1999 in connection with Australian Patent Application No. 37035/97 (now 719015), filed Feb. 25, 1999.

Facsimile submitted Oct. 23, 1997 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Farmer, K.F., et al. (2001) "Interleukin-17 rheumatoid arthritis (RA): production by RA synovial membrane cultures and IL-17 receptor IgG1 fusion protein treatment in rat adjuvant arthritis (AA)" Poster Session: Cytokines and Chemokines, board No. 74.

Feldmann, M., et al. (1996) "Role of cytokines in rheumatoid arthritis," Annual Review of Immunology 14:397-440.

Felson, D.T., et al., (1994) "The efficacy and toxicity of combination therapy in rheumatoid arthritis. A meta-analysis," Arthritis & Rheumatism, vol. 37, No. 10, pp. 1487-1491.

Fendly, B.M., et al. (1987) "Murine monoclonal antibodies defining neutralizing epitopes on tumor necrosis factor," Hybridoma 6: 359-369.

Fenner, H., et al., (1995) "Suppression of tumor necrosis factor (TNF) and TNF-mediated effector mechanisms by methotrexate (MTX) in patients with rheumatoid arthritis," Arthritis & Rheumatism, vol. 38, No. 9 (Suppl.), p. S266, Abstract 679.

Ferran, C., et al. (1991) "Cascade modulation by anti-tumor necrosis factor monoclonal antibody of interferon-γ, interleukin 3 and interleukin 6 release after triggering of the CD3/T cell receptor activation pathway", Eur. J. Immunol. 21:2349-2353.

Ferraz, M.B., et al. (1994) "Combination Therapy with Methotrexate and Chloroquine in Rheumatoid Arthritis. A Multicenter Randomized Placebo-controlled Trial," Scandinavian Journal of Rheumatology, vol. 12, No. 5, pp. 231-236.

Fox, D.A., (1995) "Biological therapies: a novel approach to the treatment of autoimmune disease," Am. J. Med. 99:82-88.

Fries, J.F., et al., (1990) "Reevaluating the Therapeutic Approach to Rheumatoid Arthritis: the "Sawtooth" Strategy" J. Rheumatol. 17(Suppl. 22): 12-15.

GenBank Accession AAA61200 for TNF (Jan. 14, 1995).

Genovese, M.C., et al. (2004) "Combination Therapy with Etanercept and Anakinra in the Treatment of Patients with Rheumatoid Arthritis Who Have Been Treated Unsuccessfully With Methotrexate", Arthritis & Rheumatism 50(5): 1412-1419.

Genzyme Catalog (1991) pp. 79-80.

Gorman, S.D., et al. (1991) "Reshaping a therapeutic CD4 antibody," Proc. Natl. Acad. Sci. USA 88:4181-4185.

Haagsma, C.J., et al., (1994) "Combination of methotrexate and sulphasalazine vs methotrexate alone: a randomized open clinical trial in rheumatoid arthritis patients resistant tosulphasalazine therapy," British Journal of Rheumatology 33: 1049-1055.

Haraoui, B., (2005) "The anti-tumor necrosis factor agents are a major advance in the treatment of rheumatoid arthritis," The Journal of Rheumatology. Supplement, vol. 32, Suppl. 72, pp. 46-47.

Harris, W.J., and Emery, S. (1993) "Therapeutic antibodies—the coming of age," Trends Biotechnol. 11:42-45.

Hearing Submissions dated Dec. 1, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Hervé, J.C. et al. (1992) "Phase I-II Trial of a Monoclonal Anti-Tumor Necrosis Factor α Antibody for the Treatment of Refractory Severe Acute Graft-Versus-Host Disease" Blood 79(12):3362-3368.

Herzog, C., et al. (1987) "Monoclonal Anti-CD4 in Arthritis," Lancet 2(8573):1461-1462.

Higgins, G., (1995) "Cytokine antagonism: still a main attraction in rheumatology R&D," Inpharma, vol. 994, pp. 9-10.

Hochberg, M.C., et al. (2003) "Comparison of the efficacy of the tumour necrosis factor α blocking agents adalimumab, etanercept, and infliximab when added to methotrexate in patients with active rheumatoid arthritis," Annals of the Rheumatic Diseases, vol. 62, Suppl. II, pp. ii13-ii16.

Horneff, G., et al. (1991) "Elevated Levels of Circulating Tumor Necrosis Factor-α, Interferon-γ, and Interleukin-2 in Systematic Reactions Induced by Anti-CD4 Therapy in Patients with Rheumatoid Arthritis" Cytokine 3(3):266-267.

Horneff, G., et al. (1991) "Treatment of Rheumatoid Arthritis with an Anti-CD4 Monoclonal Antibody" Arthritis Rheum. 34(2):129-140.

http://www.phoenix5.org/glossary/adjunctive_therapy.html.

Huang, D., et al., (1992) "Effects of anti-TNF monoclonal antibody infusion in patient with hairy cell leukemia," British Journal of Hematology 81: 231-234 (abstract only).

Humira: Abbott Press Release May 6, 2004.

Imagawa, D.K., et al. (1991) "The Role of Tumor Necrosis Factor in Allograft Rejection. III. Evidence that Anti-TNF Antibody Therapy Prolongs Allograft Survival in Rats with Acute Rejection", Transplantation, 51(1):57-62.

International Preliminary Examination Report mailed Nov. 2, 1994 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

International Search Report for PCT International Application PCT/GB97/02058, filed Aug. 1, 1997.

International Search Report mailed Dec. 12, 1995 in connection with PCT International Application No. PCT/GB94/00462, filed Mar. 10, 1994.

International Search Report mailed Feb. 22, 1994 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

International Search Report mailed Jun. 14, 1994 in connection with PCT International Application No. PCT/GB94/00462, filed Mar. 10, 1994.

Interview Summary issued Jun. 13, 2000 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Johnson, K., (1996) "Efficacy assessment in trials of combination therapy for rheumatoid arthritis," The Journal of Rheumatology 23(Suppl. 44):107-109.

Kahan, B.D. (1992) "Immunosuppressive therapy" Curr. Opin. Immunol. 4(5):553-560.

Kalden, J.R., and Manger, B. (1995) "Biologic agents in the treatment of inflammatory rheumatic diseases" Curr. Opin. Rheum. 7:191-97.

Kalden, J.R., and Manger, B. (1995) "Biologic agents in the treatment of inflammatory rheumatic diseases" Curr. Opin. Rheumatol. 9: 206-212.

Kavanaugh, A.F, et al., (1996) "Anti-TNF-α monoclonal antibody (mAb) treatment of rheumatoid arthritis (RA) patients with active disease on methotrexate (MTX): results of a double-blind placebo controlled multicenter trial," Arthritis & Rheumatism, vol. 39, No. 9 (Suppl.), p. S123, abstract 575.

Klareskog, L., et al., (2004) "Therapeutic effect of the combination of etanercept and methotrexate compared with each treatment alone in patients with rheumatoid arthritis: double-blind randomized controlled trial," Lancet 363:675-681.

Knight, D.M., et al., (1993) "Construction and initial characterization of a mouse-human chimeric anti-TNF antibody," Molecular Immunology 30: 1443-1453.

Kozarek, R.A., et al. (1989) "Methotrexate induces clinical and histologic remission in patients with refractory inflammatory bowel disease" Ann. Int. Med. 110:353-356.

Krause, D., et al., (2000) "Response to methotrexate treatment is associated with reduced mortality in patients with severe rheumatoid arthritis," Arthritis & Rheumatism vol. 43, No. 1, pp. 14-21.

Kremer, J.M. (1996) "Historical Overview of the Treatment of Rheumatoid Arthritis with an Emphasis on Methotrexate," J. Rheum. 23:Suppl. 44, pp. 34-37.

Kremer, J.M., (1995) "The changing face of therapy for rheumatoid arthritis," Rheumatic Disease Clinics of America 21: 845-852.

Kung, A.H.C., et al., (1993) (eds.) "Therapeutic Proteins, Pharmacokinetics and Pharmacodynamics," W.H. Freeman & Co., New York, USA, pub.

Lesslauer, W., et al., (1991) "Recombinant solualble tumor necrosis factor receptor proteins protect mice from lipopolysaccharide-induced lethality," European Journal of Immunology 21: 2883-2886.

Letter Accompanying Subsequently Filed Items (EPO Form 1038.1), including Opposition Brief submitted Jul. 5, 2006 in connection with European Patent No. EP 0 914 157 B1.

Letter from the United Kingdom Patent Office dated Nov. 11, 1993 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

Letter from the United Kingdom Patent Office dated Oct. 12, 1993 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

Letter to the United Kingdom Patent Office dated Nov. 11, 1993 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

Liang, C.M., et al., (1986) Production and characterization of monoclonal antibodies against recombinant human tumor necrosisi factor/cahectin, Biochemical and Biophysical Research Communications, 137: 847-854.

Littman, B.H., et al., (1995) "Rheumatoid arthritis treated with tenidap and piroxicam. Clinical associations with cytokine modulation by tenidap" Arthritis Rheum. 38:29-37.

Lorenz, H.M., and Kalden, J.R. (2002) "Perspectives for TNF-α-targeting therapies," Arthritis Res. 4 (Suppl. 3):S17-24.

Maini, R.N. (1995) "A Perspective on Anti-cytokine and Anti-T cell-directed therapies in Rheumatoid Arthritis," Clinical and Experimental Rheumatology, vol. 13 (Suppl. 12), pp. S35-S40.

Maini, R.N., (1995) "The role of cytokines in rheumatoid arthritis. The Croonian Lecture 1995" Journal of the Royal College of Physicians of London 30(4):344-351.

Maini, R.N., et al. (1995) "Clinical response of rheumatoid arthritis (RA) to anti-TNFα (cA2) monoclonal antibody (mab) is related to administered dose and persistence of circulating antibody" Arth. Rheum. Suppl. 38(9):S186 (Abstract 200).

Maini, R.N., et al. (1995) "Clinical response of rheumatoid arthritis (RA) to anti-TNFα (cA2) monoclonal antibody (mab) is related to administered dose and persistence of circulating antibody," Arthritis & Rheumatism, vol. 38, Suppl. 9, Abstract 200.

Maini, R.N., et al. (1995) "Infliximab (chimeric anti-tumour necrosis factor α monoclonal antibody) versus placebo in rheumatoid arthritis patients receiving concomitant methotrexate: a randomised phase III trial," Lancet, vol. 354, No. 9194, pp. 1932-1939.

Maini, R.N., et al., (1998) "Therapeutic efficacy of multiple intravenous infusion and anti-tumor necrosis factor α monoclonal antibody combined with low-dose weekly methotrexate in rheumatoid arthritis," Arthritis & Rheumatism 41: 1552-1563.

Markowitz, J., et al. (1991) "Immunology of inflammatory bowel disease: summary of the proceedings of the Subcommittee on Immunosuppresive Use in IBD" J. Pediatr. Gastroenterol. Nutr. 12(4):411-423.

Mathilda and Terence Kennedy Institute of Rheumatology Annual Scientific Report 1995, The, published Feb.-Mar. 1996, including Declaration of W. Paul Norton.

Matsumiya, G., et al., (1996) "Successful long-term concordant xenografts in primates: alteration of the immune response with methotrexate" Transplant. Proceed. 28(2):751-753.

Merck Manual of Diagnosis and Therapy, The (1992) 16th Ed., Berkow, R. (ed.) Merck Research Laboratories, Rahway, NJ (pub.), pp. 1304-1313.

Miller, V.E. (1993) "Detection of tumour necrosis factor alpha and interleukin-1 beta in the rheumatoid osteoarthritic cartilage-pannus junction by immunohistochemical methods" Rheumatology Int. 13:77-82.

Moreland, L.W. (1996) "Initial experience combining methotrexate with biologic agents for treating rheumatoid arthritis," The Journal of Rheumatology 23(Suppl. 44):78-83.

Moreland, L.W., (1993) "Use of a chimeric monoclonal anti-CD4 antibody in patients with refractory rheumatoid arthritis," Arthritis & Rheumatism, vol. 36, No. 3, pp. 307-318.

Moreland, L.W., et al., (1994) "Soluble tumor necrosis factor receptor (sTNFR): results of a phase I dose-escalation study in patients with rheumatoid arthritis," Clinical Research 42: 312A.

US 7,846,442 B2

Page 6

Moreland, L.W., et al., (1993) "Use of a chimeric monoclonal anti-CD4 anitbody in patients with refractory rheumatoid arthritis," Arthritis Rheum. 36: 307-318.

Moreland, L.W., et al., (1995) "Double-blind, placebo-controlled multicenter trial using chimeric monoclonal anti-CD4 antibody, cM-T412, in rheumatoid arthritis patients receiving concomitant methotrexate" Arthritis Rheum. 38:1581-1588.

Natanson, C., et al. (1994) "Selected Treatment Strategies for Septic Shock Based on Proposed Mechanisms of Pathogenesis" Ann. Int. Med. 120(9):771-783.

No author given (1996) "The American Heritage Dictionary of the English Language", 3rd ed. (Editors of the American Heritage Dictionaries, eds.), p. 80 (Houghton Mifflin Company, Boston, MA, publishers).

Notice of Allowance, including Notice of Allowability, Examiner's Amendment, Examiner's Statement of Reasons for Allowance and Interview Summary issued Oct. 28, 1997 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Notice of Allowance, including Notice of Allowability, Examiner's Amendment, Examiner's Statement of Reasons for Allowance and Interview Summary issued Oct. 25, 2000 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Notice of Allowance, including Notice of Allowability, Examiner's Amendment, Examiner's Statement of Reasons for Allowance, Interview Summary and Examiner Interview Summary Record issued Aug. 12, 2003 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Notice of Informal Application issued Jun. 1, 1995 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Notice of Opposition to a European Patent, including Additional Sheet for Publications and Notice of Opposition submitted Jun. 30, 2006 in connection with European Patent No. EP 0 914 157 B1.

Notice of Opposition to a European Patent, including Facts and Arguments Presented in Support of the Opposition, Additional Sheet, Annex A (List of References) and Annex B (Table of Contents) submitted Jul. 5, 2006 in connection with European Patent No. EP 0 914 157 B1.

Notice of Opposition to a European Patent, including list of Additional Representatives and Opposition submitted Jul. 5, 2006 in connection with European Patent No. EP 0 914 157 B1.

Notice of Opposition, including Statement of Grounds of Opposition submitted Jul. 5, 2006 in connection with European Patent No. EP 0 914 157 B1.

Notification of Transmittal of the International Preliminary Examination Report, including the International Preliminary Examination Report mailed Aug. 21, 1998 in connection with PCT International Application No. PCT/GB97/02058, filed Aug. 1, 1997.

Notification of Transmittal of the International Search Report or the Declaration, including the International Search Report mailed Dec. 17, 1997 in connection with PCT International Application No. PCT/GB97/02058, filed Aug. 1, 1997.

Observations of a Third Party under Art. 115 EPC submitted May 28, 2003 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

O'Dell, J., et al., (1996) "Pneumococcal vaccine in rheumatoid arthritis. Decreased response while taking methotrexate," Journal of Clinical Rheumatology 2: 59-63.

O'Dell, J., et al., (1995) "The treatment of rheumatoid arthritis in 1995: results of a survey," Arthritis & Rheumatism 38: p. S366 abs. 1277.

Office Action issued Apr. 10, 2000 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Office Action issued Aug. 13, 2002 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Office Action issued Aug. 26, 2003 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Office Action issued Dec. 9, 1997 in connection with U.S. Appl. No. 08/607,419, filed Feb. 28, 1996.

Office Action issued Dec. 9, 1997 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Office Action issued Feb. 19, 1998 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Feb. 25, 2004 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Office Action issued Feb. 25, 2005 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Feb. 8, 2005 in connection with Japanese Patent Application No. 5-106657, filed Mar. 10, 1994.

Office Action issued Jan. 17, 2003 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Office Action issued Jan. 7, 1997 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Office Action issued Jul. 20, 1999 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Office Action issued Jul. 22, 1997 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Jul. 3, 2007 in connection with Japanese Patent Application No. 5-106657, filed Mar. 10, 1994.

Office Action issued Jul. 31, 2007 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Office Action issued Jul. 7, 1998 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Jun. 21, 2000 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Jun. 25, 2002 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Mar. 11, 2005 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Office Action issued Mar. 12, 2002 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Office Action issued Mar. 2, 2004 in connection with Japanese Patent Application No. 6-509733, filed Oct. 6, 1993.

Office Action issued Mar. 25, 1993 in connection with U.S. Appl. No. 07/958,248, filed Oct. 8, 1992.

Office Action issued Mar. 29, 1999 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Mar. 3, 1997 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Office Action issued Mar. 4, 1997 in connection with U.S. Appl. No. 08/607,419, filed Feb. 28, 1996.

Office Action issued Apr. 5, 1999 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Office Action issued May 31, 2006 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Office Action issued Nov. 15, 2004 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Office Action issued Nov. 2, 2001 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Nov. 23, 1999 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Office Action issued Nov. 3, 1993 in connection with U.S. Appl. No. 07/958,248, filed Oct. 8, 1992.

Office Action issued Nov. 4, 2003 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Office Action issued Sep. 1, 1998 in connection with U.S. Appl. No. 08/690,775, filed Aug. 1, 1996.

Office Action issued Sep. 17, 2003 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Office Action issued Sep. 21, 2006 in connection with U.S. Appl. No. 10/762,096, filed Jan. 20, 2004.

Pascalis, L., et al. (1993) "Longterm efficacy and toxicity of combined cyclosporine A-steroid-methotrexate treatment in rheumatoid arthritis" Rev. Esp. Reumatol. 20(Suppl. 1):148 (abstract 319).

Paul, W.E. (1993) "Fundamental Immunology," 3rd Ed. (Raven Press, NY, publ.), p. 242.

Paul, W.E. (1993) "Fundamental Immunology," 3rd Ed. (Raven Press, NY, publ.), pp. 807-812.

PCT Written Opinion mailed Apr. 28, 1998 in connection with PCT International Application No. PCT/GB97/02058, filed Aug. 1, 1997.

Piguet, P.F., et al. (1992) "Evolution of collagen arthritis in mice is arrested by treatment with anti-tumor necrosis factor (TNF) antibody or a recombinant soluble TNF Receptor" Immunology 77:510-514.

Preliminary Amendment submitted Aug. 20, 2001 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

US 7,846,442 B2

Page 7

Preliminary Amendment submitted Aug. 3, 2001 in connection with U.S. Appl. No. 09/921,937, filed Aug. 3, 2001.

Preliminary Amendment submitted Jan. 20, 2004 in connection with U.S. Appl. No. 10/762,096, filed Jan. 20, 2004.

Preliminary Amendment submitted Jul. 8, 1997 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Preliminary Amendment submitted Jun. 8, 1998 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Preliminary Amendment submitted Mar. 16, 1995 in connection with U.S. Appl. No. 08/403,785, filed Jun. 8, 1998.

Preliminary Amendment submitted May 21, 2003 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Product description for adalimumab (sold as HUMIRA®).

Product description for etanercept (sold as ENBREL®).

Product description for infliximab (sold as REMICADE®).

Qin, S., et al. (1987) "CD4 monoclonal antibody pairs for immunosuppression and tolerance induction" Eur. J. Immunol. 17:1159-1165.

Racadot, E., et al. (1992) "Immunological follow-up of 17 patients with rheumatoid arthritis treated in vivo with an anti-T CD4+ Monoclonal Antibody (B-F5)" Clin. Exp. Rheumatol. 10:365-374.

Ralph, P. (1993) "Clinical and Preclinical Studies Presented at the Keystone Symposium on Arthritis, Related Diseases, and Cytokines" Lymphokine Cytokine Res. 12(4):261-263.

Rankin, E.C.C., et al. (1995) "The therapeutic effects of an engineered human anti-tumour necrosis factor alpha antibody (CDP571) in rheumatoid arthritis" Br. J. Rheumatol. 34: 334-342.

Remarks submitted Jan. 3, 2001 in connection with U.S. Appl. No. 09/754,004, filed Jan. 3, 2001.

Remicade: Product Information available on Internet (www.centerwatch.com).

Reply filed Jan. 29, 2002 to Communication pursuant to Article 96(2) EPC issued Jul. 7, 2001 by the European Patent Office in connection with European Patent Application No. 94 908 462.8, filed Mar. 10, 1994.

Reply to Restriction Requirement submitted Apr. 16, 1998 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Reply to Restriction Requirement submitted May 5, 1999 in connection with U.S. Appl. No. 09/093,450, filed Jun. 8, 1998.

Reply to Written Opinion submitted Oct. 7, 1994 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

Request to Amend a Patent or Any Other Filed Documents submitted Nov. 14, 2001 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Response to Restriction Requirement submitted Nov. 20, 1997 in connection with U.S. Appl. No. 08/617,737, filed May 10, 1996.

Response, Or in the Alternative, A Petition Under 37 C.F.R. 1.181 to the Notice of Informal Application submitted Jun. 15, 1995 in connection with U.S. Appl. No. 08/403,785, filed May 3, 1995.

Rezaian, M.M., (1999) "Do infliximab and methotrexate act synergisitically in the treatment of rheumatoid arthritis? Comment on the article by Maini et al.," Arthritis & Rheumatism 42: 1779.

Richardson, C., & Emery, P. (1995) "New therapies for rheumatoid arthritis" Br. J. Clin. Prac. 49(3):135-139.

Ruperto, N., et al., (2007) "A Randomized, Placebo-Controlled Trial of Infliximab Plus Methotrexate for the Treatment of Polyarticular-Course Juvenile Rheumatoid Arthritis," Arthritis & Rheumatism, vol. 56, No. 9, pp. 3096-3106.

Sander, O., et al., (1995) "Flair after discontinuation of 'ineffective' disease modifying anti rheumatic drug (DMARD) treatment in active rheumatoid arthritis (RA)," Rheumatology in Europe, vol. 24, Suppl. 3, p. 226, abstract D40.

Sander, O., et al., (1999) "Prospective six year follow up of patients withdrawn from a randomized study comparing parenteral gold salt and methotrexate," Annals of the Rheumatic Diseases, vol. 58, pp. 281-287.

Sander, O., et al. (1995) "Tumornecrosisfactor [sic] alpha (TNF) blockade enhances Methotrexate (MTX) response in patients with rheumatoid arthritis (RA)," Arthritis & Rheumatism, vol. 38, No. 9 (Suppl.), p. S266, abstract 678.

Schact, E. (1993) "Gegenwärtige und zukünftige Therapiestrategien Der rheumatoiden Arthritis (RA) ["The current and future therapy strategies of rheumatoid arthritis"]" Z. Rheumatol. 52(6):365-382 (with English abstract).

Seitz, M., et al., (1995) "Methotrexate action in rheumatoid arthritis: stimulation of cytokine inhibitor and inhibition of chemokine production by peripheral blood mononuclear cells," British Journal of Rheumatology, vol. 34, pp. 602-609.

Seu, P., et al. (1991) "Monoclonal Anti-Tumor Necrosis Factor-α Antibody Treatment of Rat Cardiac Allografts: Synergism with Low-Dose Cyclosporine and Immunohistological Studies", J. Surg. Res. 50(5):520-528.

Shanahan, F., et al., (1990) "Sulfasalazine inhibits the binding of TNFα to its receptor," Immunopharmacology 20: 217-224.

Sheehan, K.C.F., et al. (1989) "Generation and characterization of hamster monoclonal antibodies that neutralize murine tumor necrosis factors", J. Immunol. 142(11):3884-3893.

Sigidin, Y.A., & Zhukovskaya, G.N. (1995) "Treatment of rheumatoid arthritis with the combination of auranofin and Methotrexate," Rheumatology in Europe, vol. 24, Suppl. 3, abstract D50.

Sosman, J.A., and Sondel, P.M. (1993) "The graft-vs.-leukemia effect. Implications for post-marrow transplant antileukemia treatment" Am. J. Pediatric Hematol. Oncol. 15(2):185-195.

St.Clair, E. W., et al., (2004) "Combination of Infliximab and Methotrexate Therapy for Early Rheumatoid Arthritis," Arthritis & Rheumatism 50(11): 3432-3443.

Statement of Abbott submitted Oct. 5, 2007 by Biotechnology, Inc. in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Statement of Grounds and Particulars dated Nov. 16, 2004 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statement of Grounds and Particulars submitted Oct. 5, 2007 by Amgen Inc. in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Statement of Grounds submitted Jan. 6, 2004 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Statement of Grounds and Particulars in Support of Opposition submitted Oct. 5, 2007 by Wyeth in connection with Australian Patent Application No. 2003264629, filed Dec. 1, 2003.

Statutory Declaration of Denis Wakefield, including Annexure DW-1 dated Apr. 15, 2002 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Denis Wakefield, including Exhibit DW-2 dated Oct. 10, 2005 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Eric Morand, including Exhibits EM-1 to EM-11 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Ian Portek, including Annexure IP-1 dated Apr. 6, 2002 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Ian Portek, including Exhibits IP-1 to IP-4 dated Oct. 20, 2005 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Jack Edelman, including Annexures JE-1 and JE-2 dated Oct. 5, 2005.

Statutory Declaration of Kenneth Muirden, including Exhibits KDM-1 and KDM-2 dated Nov. 28, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Paul Anthony Power dated Dec. 1, 2003 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Statutory Declaration of Peter Michael Brooks, including Exhibit PB-1 dated Jan. 9, 2004 in connection with Australian Patent Application No. 719015 (previously 37035/97), filed Feb. 25, 1999.

Stedman, T.L. (1995) "Stedman's Medical Dictionary", 26th ed. (Spraycar, M., ed.), pp. 105 and 108 (Williams & Wilkins, Baltimore, MD, publishers).

US 7,846,442 B2

Page 8

Stein, C.M. et al., (1994) "Combination therapy with cyclosporine and methotrexate: results of a 24 week extension study subsequent to a 24 week double blind study," Arthritis & Rheumatism, vol. 37, No. 9 (Suppl.), p. S252, abstract 552.

Steinbrüchel, D.A., et al. (1991) "Monoclonal Antibody Treatment (Anti-CD4 and Anti-Interleukin-2 Receptor) combined with Cyclosporin A has a Positive but not Simple Dose-Dependent Effect on Rat Renal Allograft Survival," Scand. J. Immunol. 34:627-633.

Strand, V., et al. (1993) "Effects of administration of an anti-CD5 plus immunoconjugate in rheumatoid arthritis. Results of two phase II studies," Arthritis & Rheumatism, vol. 36, No. 5, pp. 620-630.

Strober, S., and Holoshitz, J. (1990) "Mechanisms of Immune Injury in Rheumatoid Arthritis: Evidence for the Involvement of T Cells and Heat-Shock Protein," Immunol. Rev. 118:233-255.

Stuart, J.M., and Kang, A.H. (1986) "Monkeying Around with Collagen Autoimmunity and Arthritis" Lab. Invest. 54(1):1-3.

Sugihara, M., et al., (2007) "Effects of Infliximab Therapy on Gene Expression Levels of Tumor Necrosis Factor α Tristetraprolin, T cell Intracellular Antigen 1, and Hu Antigen R in Patients With Rheumatoid Arthritis," Arthritis & Rheumatism, vol. 56, No. 7, pp. 2160-2169.

Summons to attend oral proceedings pursuant to Rule 71(1) EPC, including Annex to the communication issued Apr. 26, 2004 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Summons to Attend Oral Proceedings Pursuant to Rule 71(1) EPC, including Communication of the Technical Board of Appeal issued Feb. 23, 2005 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

The Mathilda and Terence Kennedy Institute of Rheumatology Annual Scientific Report 1995 including Declaration of W. Paul Norton.

Third Party Observations, including Exhibit 1 (PCT International Publication Nos. WO 95/09652 A, published Apr. 13, 1995, and WO 94/08619 A, published Apr. 28, 1994) submitted Feb. 28, 2002 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Third Party Observations, including signed Declaration of W. Paul Norton, dated Jun. 24, 2003 submitted Jul. 9, 2003 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Third Party Observations, including the Mathilda and Terence Kennedy Institute of Rheumatology Annual Scientific Report 1995 and unsigned Declaration of W. Paul Norton, dated Jun. 2003 submitted Jun. 12, 2003 in connection with European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Thorbecke, G.J., et al. (1992) "Involvement of endogenous tumor necrosis factor α and transforming growth factor α during induction of collagen type II arthritis in mice" Proc. Natl. Acad. Sci. USA 89:7375-7379.

Tisch, R., and McDevitt, H.O. (1994) "Antigen-specific immunotherapy: Is it a real possibility to combat T-cell-mediated autoimmunity?" Proc. Natl. Acad. Sci. USA 91:437-438.

Tugwell, P., et al., (1995) "Combination therapy with cyclosporine and methotrexate in severe rheumatoid arthritis. The methotrexate-cyclosporine combination study group," New England Journal of Medicine 333: 137-141.

van de Lubbe, P.A., et al. (1994) "Lack of clinical effect of CD4 monoclonal antibody therapy in early rheumatoid arthritis; a placebo controlled trial," Arthritis & Rheumatism, vol. 37 (Suppl.), p. S294, abstract 807.

Van Der Lubbe, P.A., et al., (1994) "Treatment of rheumatoid arthritis with a chimeric CD4 monoclonal antibody (cm-t412): immunopharmacological aspects and methods of action," Scandinavian Journal of Immunology 39: 286-294.

Van Der Lubbe, P.A., et al., (1995) "A randomized, double-blind, placebo-controlled study of CD4 monoclonal antibody therapy in early rheumatoid arthritis." Arth. Rheum. 38(8): 1097-1106.

Van Dullemen, H.M., et al., (1995) "Treatment of Crohn's disease with anti-tumor necrosis factor chimeric monoclonal antibody (cA2)." Gastroenterology 109: 129-135.

van Oosten, B.W., et al., (1996) "Increased MRI activity and immune activation in two multiple sclerosis patients treated with the monoclonal anti-tumor necrosis factor antibody cA2," Neurology, vol. 47, pp. 1531-1534.

Van Ostade, X., et al., (1994) "Structure-activity studies of human tumour necrosis factors," Protein Engineering, vol. 7, No. 1, pp. 5-22.

Verhoeven, A.C., et al. (1998) "Combination therapy in rheumatoid arthritis: updated systematic review" Br. J. Rheumatol. 37:612-619.

Voluntary Amendment submitted Apr. 7, 1995 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Voluntary Amendment submitted Jan. 29, 2001 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Voluntary Amendment submitted Oct. 12, 2000 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Waldmann, T.A. (1991) "Monoclonal Antibodies in Diagnosis and Therapy," Science 252:1657-1662.

Watts, R.A., and Isaacs, J.D. (1992) "Immunotherapy of rheumatoid arthritis" Ann. Rheum. Dis. 51:577-579.

Webster's 3rd International Dictionary: "adjunct" and "adjunctive".

Weinblatt, M.E. (1995) "Methotrexate for Chronic Diseases in Adults." New Engl. J. Med. 332:141-145.

Weinblatt, M.E., (1995) "Methotrexate for chronic diseases in adults," New England Journal of Medicine, vol. 332, No. 5, pp. 330-331.

Weinblatt, M.E., et al. (1999) "A trial of etanercept, a recombinant tumor necrosis factor receptor:Fc fusion protein, in patients with rheumatoid arthritis receiving methotrexate," New England Journal of Medicine, vol. 340, No. 4, pp. 253-259.

Weinblatt, M.E., et al. (2003) "Adalimumab, a Fully Human Anti-Tumor Necrosis Factor α Monoclonal Antibody, for the Treatment of Rheumatoid Arthritis in Patients Taking Concomitant Methotrexate: the ARMADA trial," Arthritis & Rheumatism, vol. 48, No. 1, pp. 35-45.

Weinblatt, M.E., et al., (1994) "Methotrexate in rheumatoid arthritis. A five-year prospective multicenter study" Arthritis Rheum. 37(10):1492-1498.

Weinblatt, M.E., (1995) "Efficacy of methotrexate in rheumatoid arthritis," British Journal of Rheumatology, vol. 34 (Suppl. 2), pp. 43-48.

Wilkens, R.F., et al. (1995) "Comparison of azathioprine, methotrexate, and the combination of the two in the treatment of rheumatoid arthritis. A forty-eight-week controlled clinical trial with radiologic outcome assessment." Arthritis Rheum. 38:1799-1806.

Williams, H.J., et al. (1992) "Comparison of auranofin, methotrexate, and the combination of both in the treatment of rheumatoid arthritis. A controlled clinical trial," Arthritis & Rheumatism, vol. 35, No. 3, pp. 259-269.

Williams, R.O., et al. (1992) "Anti-tumor necrosis factor ameliorates joint disease in murine collagen-induced arthritis," Proc. Natl. Acad. Sci. USA 89(20):9784-9788.

Williams, R.O., et al. (1994) "Synergy between anti-CD4 and anti-tumor necrosis factor in the amelioration of established collagen-induced arthritis" Proc. Natl. Acad. Sci. USA 91(7):2762-2766.

Williams, R.O., et al. (1995) "Successful therapy of collagen-induced arthritis with TNF receptor-IgG fusion protein and combination with anti-CD4" Immunology 84:433-439.

Wilske, K.R. & Yocum, D.E., (1996) "Consensus statement. Rheumatoid arthritis: the status and future of combination therapy," p. 110.

Winter, G., & Harris, W.J. (1993) "Humanized antibodies," Immunology Today, vol. 14, No. 6, pp. 243-246.

Wooley, P.H., (1993) "Influence of a recombinant human soluble tumor necrosis factor receptor FC fusion protein on type II collagen-induced arthritis in mice," The Journal of Immunology 151:6602-6607.

Wooley, P.H., et al., (1993) "Influence of a recombinant human soluble tumor necrosis factor receptor FC fusion protein on type II collagen-induced arthritis in mice," The Journal of Immunology, vol. 151, No. 11, pp. 6,602-6,607.

Written Opinion mailed Jul. 13, 1994 in connection with PCT International Application No. PCT/GB93/02070, filed Oct. 6, 1993.

Written Opinion mailed Jul. 14, 1995 in connection with PCT International Application No. PCT/GB94/00462, filed Mar. 10, 1994.

Yocum, D.E., (1991) "Combined DMARDS un rheumatoid arthritis: past, present and future," Progress in Inflammation Research and Therapy 117-121.

Office Action issued Mar. 26, 2008 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Amendment submitted Apr. 21, 2008 in connection with Canadian Patent Application No. 2,146,647, filed Oct. 6, 1993.

Office Action issued Dec. 21, 2007 in connection with U.S. Appl. No. 11/255,631, filed Sep. 12, 2005.

Preliminary Amendment submitted Jan. 12, 2006 in connection with U.S. Appl. No. 11/255,631, filed Sep. 12, 2005.

Preliminary Amendment submitted Jan. 18, 2007 in connection with U.S. Appl. No. 11/255,631, filed Sep. 12, 2005.

Preliminary Amendment submitted Sep. 12, 2005 in connection with U.S. Appl. No. 11/255,631, filed Sep. 12, 2005.

Preliminary Amendment, including Exhibits A to C submitted Jan. 11, 2006 in connection with U.S. Appl. No. 11/255,631, filed Sep. 12, 2005.

International Preliminary Examination Report mailed Dec. 18, 1995 in connection with PCT International Application No. PCT/GB94/00462, filed Mar. 10, 1994.

Summons to Attend Oral Proceedings Pursuant to Rule 71(1) EPC, including Communication issued Mar. 11, 2003 in connection with European Patent Application No. 94908462.8, filed Mar. 10, 1994.

Decision of Rejection issued Mar. 4, 2008 in connection with Japanese Patent Application No. 5-106657, filed Mar. 10, 1994.

Verhoeven, A.C., et al. (1998) "Combination therapy in rheumatoid arthritis: updated systematic review," Br. J. Rheumatol. 37(6):612-619.

http://www.arthritis.org/conditions/DiseaseCenter/default.asp, retrieved Mar. 31, 2002.

http:www.arthritis.org/research/research_program/RA/challenge, retrieved Jun. 23, 2002.

Manual of Medical Therapeutics, 25th Edition, Orian et al (editors) Dept of Medicine, Washington University, St. Louis, MO, pp. 308-309 (1986).

Bologna, C. et al., "Association of Methotrexate (MTX) and Steroids in the Treatment of Rheumatoid Arthritis (RA) Patients," Arthritis & Rheumatism, 1995, 38, S366, Abstract #1280.

Statutory Declaration of Leslie Schrieber including a Curriculum Vitae served Nov. 5, 2008 by Opponent, Abbott Bioresearch Center, in connection with Oppositions to counterpart Australian Patent Application No. 2003/264629, filed Dec. 1, 2003.

Kingsley, G. and Panayi, G., "The immunopathogenesis of rheumatoid arthritis," British Journal of Rheumatology, 1991, 30, Suppl. 2, 3-4.

Feldmann, M. et al., "Cytokine production in the rheumatoid joint: implications for treatment," Annals of Rheumatic Diseases, 1990, 49, 480-486.

Kremer, J.M. et al., "The Mechanism of Action of Methotrexate in Rheumatoid Arthritis: The Search Continues," J. Rheumatol., 1994, 21, 1-5.

O'Dell, J.R. et al., "Methotrexate Use in Rheumatoid Arthritis," Rheumatic Disease Clinics of North America, Edited by Cash, J.M., 23, 1997, 779-796, W.B. Sounders, Philadelphia.

O'Dell, J. et al., (1996) "Treatment of rheumatoid arthritis with methotrexate alone, sulfasalazine and hydroxycholoroquine, or a combination of all three medications," New England Journal of Medicine, 334(20): 1287-1291.

Statutory Declaration of Leslie Glen Cleland including Guidelines for Expert Witnesses in Proceedings in the Federal Court of Australia and a Curriculum Vitae served Nov. 5, 2008 by Opponent, Wyeth, in connection with Oppositions to counterpart Australian Patent Application No. 2003/264629, filed Dec. 1, 2003.

Diagrammatic representation of the cells and mediators involved in the inflammation of the joints seen in rheumatoid arthritis.

Conaghan, P.G., et al., "Anti-Rheumatic Drug-Prescribing Behavior of Australasian Rheumatologists 1984-1994," British Journal of Rheumatology, 1997, 36, 487-490.

Moreland, L.W. et al., "Soluble tumor necrosis factor receptor (sTNFR): results of a phase I dose-escalation study in patients with rheumatoid arthritis," Arthritis & Rheumatism, 1994, 37(9), Suppl., S295, Abstract #813.

Csuka, M. et al., "Treatment of Intractable Rheumatoid Arthritis With Combined Cyclophosphamide, Azathioprine, and Hydroxychloroquine," Rheumatoid Arthritis, 1986, 255(17), 2315-2319.

Statutory Declaration of Milton Laurence Cohen including a Curriculum Vitae served Jan. 13, 2009 by Opponent, Abbott Bioresearch Center, in connection with Oppositions to counterpart Australian Patent Application No. 2003/264629, filed Dec. 1, 2003.

Sandborn, W.J. et al., "Etanercept for Active Crohn's Disease: A Randomised, Doouble-Blind, Placebo Controlled Trial," Gastroenterology, 2001, 121, 1088-1094.

Office Action issued Apr. 20, 2009 in connection with Australian Patent Application No. 2007/203067, filed Jul. 29, 2007.

Office Action issued Jun. 24, 2009 in connection with U.S. Appl. No. 12/287,340, filed Oct. 7, 2008.

Office Action issued Aug. 20, 2009 in connection with U.S. Appl. No. 12/287,340, filed Oct. 7, 2008, including a Jul. 15, 2009 Interview Summary.

Preliminary Opinion issued Jul. 13, 2009 by the Opposition Division of the European Patent Office in connection with Oppositions filed against counterpart European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Response to Patentee's May 18, 2007 submission including an Amendment to the Consolidated List of References Submitted by the Patentee with Letter of May 18, 2007, submitted Jan. 28, 2008 by Opponent, Amgen, in connection with the Oppositions against counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005.

Response to Opponent Amgen's Jan. 28, 2008 submission submitted Sep. 29, 2008 in connection with the Oppositions against counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005.

Response to Patentee's Sep. 29, 2008 submission submitted Jan. 26, 2009 by Opponent, Amgen, in connection with the Oppositions against counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005.

Breedveld, F.C. et al., "New Perspectives on Treating Rheumatoid Arthritis," New England Journal of Medicine, 1995, 333(3), 183-184.

Declaration of W. Paul Norton submitted Jul. 9, 2003 by a Third Party under Article 115 EPC in connection with counterpart European Patent Application No. 97933799.5, filed Aug. 1, 1997.

Communication pursuant to Article 94(3) EPC issued Oct. 30, 2008 by the European Patent Office in connection with counterpart European Patent Application No. 05076131.1, filed Aug. 1, 1997.

Result of Consultation issued Nov. 27, 2008 by the European Patent Office in connection with counterpart European Patent Application No. 05076131.1, filed Aug. 1, 1997.

Response to an Oct. 30, 2008 Communication of the European Patent Office submitted Mar. 9, 2009 in connection with counterpart European Patent Application No. 05076131.1, filed Aug. 1, 1997.

European Examination Report issued Jul. 24, 2009 by the European Patent Office in connection with counterpart European Patent Application No. 05076131.1, filed Aug. 1, 1997.

Result of Consultation issued Aug. 11, 2009 by the European Patent Office in connection with counterpart European Patent Application No. 05076131.1, filed Aug. 1, 1997.

Communication forwarding European Search Report and European Search Opinion issued Aug. 7, 2009 in connection with the counterpart European Patent Application No. 08005013.1, filed Mar. 18, 2008, including the European Search Report.

European Search Opinion issued Aug. 7, 2009 in connection with the counterpart European Patent Application No. 08005013.1, filed Mar. 18, 2008.

Huizinga, T.W.J. and Breedveld, F.C., "Cytokine-suppressive anti-inflammatory drugs—Status of development in rheumatoid arthritis," Clinical Immunotherapeutics, 1996, 6(5), 395-404.

Phillips, G.L. et al., "Prophylaxis for acute graft-versus host disease following unrelated donor bone marrow transplantation," Bone Marrow Transplantation, 1995, 15(2), 213-219.

Nevill et al., Journal of Cellular Biochemistry, 1992, Suppl. 16A, 209.

van Vollenhoven RF et al., Lancet, Aug. 8;374(9688):459-66 (2009).

Elliott, M.J. et al., "Treatment of Rheumatoid Arthritis With Chimeric Monoclonal Antibodies to Tumor Necrosis Factor α," Arthritis & Rheumatism, vol. 36, No. 12, Dec. 1993, pp. 1681-1690.

**US 7,846,442 B2**

Page 10

Elliott, M.J. et al., "Randomised Double-Blind Comparison of Chimeric Monoclonal Antibody to Tumour Necrosis Factor α (cA2) Versus Placebo in Rheumatoid Arthritis," *The Lancet*, vol. 344, Oct. 22, 1994, pp. 1105-1109.

Felson, D.T. et al., "The Efficacy and Toxicity of Combination Therapy in Rheumatoid Arthritis," *Arthritis & Rheumatism*, vol. 37, No. 10, Oct. 1994, pp. 1487-1492.

*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 82 U.S.P.Q. 2d 1385 (2007).

Weinblatt, M. et al., "Selective Costimulation Modulation Using Abatacept in Patients With Active Rheumatoid Arthritis While Receiving Etanercept: a Randomised Clinical Trial," *Ann Rheum Dis.* 2007; 66:228-234.

Genovese, M.C. et al., "Combination Therapy With Etanercept and Anakinra in the Treatment of Patients With Rheumatoid Arthritis Who Have Been Treated Unsuccessfully With Methotrexate," *Arthritis & Rheumatism*, vol. 50, No. 5, May 2004, pp. 1412-1419.

Lipsky, P.E. et al., "Infliximab and Methotrexate in the Treatment of Rheumatoid Arthritis," *New England Journal of Medicine*, vol. 343, No. 22, Nov. 30, 2000, pp. 1594-1602.

Maini, R.N. et al., "Sustained Improvement Over Two Years in Physical Function, Structural Damage, and Signs and Symptoms Among Patients With Rheumatoid Arthritis Treated With Infliximab and Methotrexate," *Arthritis & Rheumatism*, vol. 50, No. 4, Apr. 2004, pp. 1051-1065.

Smolen, J.S. et al., "Evidence of Radiographic Benefit of Treatment With Infliximab Plus Methotrexate in Rheumatoid Arthritis Patients Who Had No Clinical Improvement," *Arthritis & Rheumatism*, vol. 52, No. 4, Apr. 2005, pp. 1020-1030.

FDA Approved Labeling for Remicade®, Apr. 14, 2009.

Lasker Foundation press release dated Sep. 14, 2003 announcing Marc Feldmann and Sir Ravinder N. Maini as recipients of Lasker Award.

European Patent Office press release naming Marc Feldmann as European Inventor of the Year 2007.

Letter from Harlan Weisman and Paul Stoffels, Johnson & Johnson, to Dr. Marc Feldmann announcing Drs. Feldmann and Maini as 2008 recipients of Dr. Paul Janssen Award for Biomedical Research.

Crawford Prize press release dated Jan. 13, 2000 announcing Professors Ravinder Maini and Marc Feldmann as recipients of the 2000 Crawford Prize.

Humira® advertisement, excerpted from *Arthritis & Rheumatism*, vol. 60, No. 1, Jan. 2009.

Van Der Heijde, D. et al., "Comparison of Etanercept and Methotrexate, Alone and Combined, in the Treatment of Rheumatoid Arthritis," *Arthritis & Rheumatism*, vol. 54, No. 4, Apr. 2006, pp. 1063-1074.

Diller, W., "Anti-TNFs Continue to Shine in a Pharmaceutical Market Beset by Problems," The Pink Sheet®, vol. 70, No. 49, Dec. 8, 2008, pp. 18-20.

Canadian Office Action, issued Nov. 3, 2009, in connection with counterpart Canadian Patent Application No. 2,261,630, filed Aug. 1, 1997.

Dec. 3, 2009 Response to the Jul. 24, 2009 Official Communication issued by the European Patent Office in connection with counterpart European Divisional Patent Application No. 5 076 131, filed Aug. 1, 1997, including a Main Request and Auxiliary Request.

Schröder, O. et al., (2004) "Infliximab and Methotrexate in fistulising Crohn's disease resistant or intolerant to azathioprine, " *Aliment Pharmacol. Ther.*, 19: 295-301.

European Medicines Agency (EMEA): Remicade, European Public Assessment Report (EPAR) Scientific Discussion, Jun. 1, 2006.

Katsicas M., & Russo R., (2009) "Use of adalimumab in patients with juvenile idiopathic arthritis refractory to etanercept and/or infliximab," *Clin. Rheumatology*, 28: 985-988.

European Medicines Agency (EMEA): Post-Authorisation Summary of Positive Opinion for Humira, Jul. 24, 2008.

Perez-Guijo, V. et al., (2007) "Increased efficacy of infliximab associated with methotrexate in ankylosing spondylitis," *Revue du Rhumatisme*, 74: 470-474.

Communication forwarding Nov. 23, 2009 Observations by Opponent, Abbott Laboratories, issued Dec. 4, 2009 in connection with the Oppositions against counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005, including the Nov. 23, 2009 Observations.

Office Action issued Dec. 29, 2009 in connection with U.S. Appl. No. 12/287,340, filed Oct. 7, 2008.

Jan. 22, 2010 Response to Jul. 13, 2009 Communication by Opposition Division in connection with the Oppositions to counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005.

Harrison's Principles of Internal Medicine, Fourteenth Edition, 1998, Ed: Fauci, A.S. et al., McGraw-Hill, pp. 1753 and 1760.

Scheidereit et al., In "Protein Phosphorylation in Cell Growth Regulation" Ed Michael J. Clemens, 1996, Harwood Academic Publishers GmbH, Netherlands., pp. 184-186.

Communication forwarding Jan. 25, 2010 Observations by Opponent, Wyeth, issued Feb. 4, 2010, in connection with the Oppositions against counterpart European Patent No. EP 0 914 157, granted Oct. 5, 2005, including the Jan. 25, 2010 Observations.

Lara-Ochoa, F., et al. (1996) "Antibody-Antigen Recognition: A Canonical Structure Paradigm" *J. Mol Evol.* 43:678-684.

Fundamental Immunology, Sixth Edition, 2005, Paul, W., et al., Lippincott Williams & Wilkins and Wolters Kluwer, p. 136.

Immuno Biology, The Immune System in Health and Disease, 2001, Janeway, C., et al., Garland Publishing.

Communication pursuant to Article 94(3) EPC issued Apr. 6, 2010 by the European Patent Office in connection with counterpart European Divisional Patent Application No. 08 005 013, filed Aug. 1, 1997.

Office Action issued Nov. 3, 2009 by the Canadian Intellectual Property Office in connection with counterpart Canadian Patent Application No. 2,261,630.

May 3, 2010 Response to the Nov. 3, 2009 Office Action issued by the Canadian Intellectual Property Office in connection with counterpart Canadian Patent Application No. 2,261,630.

Moreland, et al., *Arthritis & Rheumatism*, vol. 38, No. 11, Nov. 1995, Abstract.

Ernst Schering Prize Press Release dated Mar. 24, 2010 announcing Professors Ravinder Maini and Marc Feldmann as recipients of the 2010 Ernst Schering Prize.

* cited by examiner

**A124**



FIGURE 1A



FIGURE 1B



FIGURE 1C



FIGURE 2A



FIGURE 2B



FIGURE 2C

A126



FIGURE 3A



FIGURE 3B



FIGURE 3C



FIGURE 4A



FIGURE 4B



FIGURE 4C



FIGURE 5A



FIGURE 5B



FIGURE 5C



FIGURE 6A



FIGURE 6B



FIGURE 6C



FIGURE 7A

FIGURE 7B

FIGURE 7C

FIGURE 7D

FIGURE 7E

FIGURE 7F



FIGURE 8A



FIGURE 8B

US 7,846,442 B2

1

# METHODS OF TREATING RHEUMATOID ARTHRITIS WITH AN ANTI-TNF-ALPHA ANTIBODIES AND METHOTREXATE

## RELATED APPLICATIONS

This application is a continuation of U.S. Ser. No. 09/754,004, filed Jan. 3, 2001, now abandoned, which is a continuation of U.S. Ser. No. 08/690,775, filed Aug. 1, 1996, now U.S. Patent No. 6,270,766B1, issued Aug. 7, 2001.

## BACKGROUND OF THE INVENTION

Monocytes and macrophages secrete cytokines known as tumor necrosis factor alpha (TNFα) and tumor necrosis factor beta (TNFβ) in response to endotoxin or other stimuli. TNFα is a soluble homotrimer of 17 kD protein subunits (Smith et al., *J. Biol. Chem.* 262:6951-6954 (1987)). A membrane-bound 26 kD precursor form of TNF also exists (Kriegler et al., *Cell* 53:45-53 (1988)). For reviews of TNF, see Beutler et al., *Nature* 320:584 (1986); Old, *Science* 230:630 (1986); and Le et al., *Lab. Invest.* 56:234 (1987).

Cells other than monocytes or macrophages also produce TNFα. For example, human non-monocytic tumor cell lines produce tumor necrosis factor (TNF) (Rubin et al., *J. Exp. Med.* 164:1350 (1986); Spriggs et al., *Proc. Natl. Acad. Sci. USA* 84:6563 (1987)). CD4+ and CD8+ peripheral blood T lymphocytes and some cultured T and B cell lines (Cuturi et al., *J. Exp. Med.* 165:1581 (1987); Sunig et al., *J. Exp. Med.* 168:1539 (1988); Turner et al., *Eur. J. Immunol.* 17:1807-1814 (1987)) also produce TNFα.

TNF causes pro-inflammatory actions which result in tissue injury, such as degradation of cartilage and bone, induction of adhesion molecules, inducing procoagulant activity on vascular endothelial cells (Pober et al., *J. Immunol.* 136:1680 (1986)), increasing the adherence of neutrophils and lymphocytes (Pober et al., *J. Immunol.* 138:3319 (1987)), and stimulating the release of platelet activating factor from macrophages, neutrophils and vascular endothelial cells (Camussi et al., *J. Exp. Med.* 166: 1390 (1987)).

Recent evidence associates TNF with infections (Cerami et al., *Immunol. Today* 9:28 (1988)), immune disorders, neoplastic pathologies (Oliff et al., *Cell* 50:555 (1987)), autoimmune pathologies and graft-versus-host pathologies (Piguet et al., *J. Exp. Med.* 166:1280 (1987)). The association of TNF with cancer and infectious pathologies is often related to the host's catabolic state. Cancer patients suffer from weight loss, usually associated with anorexia.

The extensive wasting which is associated with cancer, and other diseases, is known as "cachexia" (Kern et al., *J. Parent. Enter. Nutr.* 12:286-298 (1988)). Cachexia includes progressive weight loss, anorexia, and persistent erosion of body mass in response to a malignant growth. The fundamental physiological derangement can relate to a decline in food intake relative to energy expenditure. The cachectic state causes most cancer morbidity and mortality. TNF can mediate cachexia in cancer, infectious pathology, and other catabolic states.

TNF also plays a central role in gram-negative sepsis and endotoxic shock (Michie et al., *Br. J. Surg.* 76:670-671 (1989); Debets et al., *Second Vienna Shock Forum*, p. 463-466 (1989); Simpson et al., *Crit. Care Clin.* 5:27-47 (1989)), including fever, malaise, anorexia, and cachexia. Endotoxin strongly activates monocyte/macrophage production and secretion of TNF and other cytokines (Kombluth et al., *J. Immunol.* 137:2585-2591 (1986)). TNF and other monocyte-derived cytokines mediate the metabolic and neurohormonal

2

responses to endotoxin (Michie et al., *New Engl. J. Med.* 318:1481-1486 (1988)). Endotoxin administration to human volunteers produces acute illness with flu-like symptoms including fever, tachycardia, increased metabolic rate and stress hormone release (Revhaug et al., *Arch. Surg.* 123:162-170 (1988)). Circulating TNF increases in patients suffering from Gram-negative sepsis (Waage et al., *Lancet* 1:355-357 (1987); Hammerle et al., *Second Vienna Shock Forum p.* 715-718 (1989); Debets et al., *Crit. Care Med.* 17:489-497 (1989); Calandra et al., *J. Infect. Dis.* 161:982-987 (1990)).

Thus, TNFα has been implicated in inflammatory diseases, autoimmune diseases, viral, bacterial and parasitic infections, malignancies, and/or neurogenerative diseases and is a useful target for specific biological therapy in diseases, such as rheumatoid arthritis and Crohl-'s disease. Beneficial effects in open-label trials with a chimeric monoclonal antibody to TNFα (cA2) have been reported with suppression of inflammation (Elliott et al., *Arthritis Rheum.* 36:1681-1690 (1993); Elliott et al., *Lancet* 344:1125-1127 (1994)). See also, Van Dullemeen et al., *Gastroenterology* 109:129-135 (1995). Beneficial results in a randomized, double-blind, placebo-controlled trial with cA2 have also been reported with suppression of inflammation (Elliott et al., *Lancet* 344:1105-1110 (1994)).

## SUMMARY OF THE INVENTION

The present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, Such as an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy produces a rapid and sustained reduction in the clinical signs and symptoms of the disease. The present invention is also based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone. As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. In a particular embodiment, methotrexate is administered in the form of a series of low doses separated by intervals of days or weeks.

A method is also provided herein for treating and/or preventing recurrence of a TNF-mediated disease in an individual comprising co-administering an anti-TNT antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. TNF-mediated diseases include rheumatoid arthritis, Crolh's disease, and acute and chronic immune diseases associated with an allogenic transplantation (e.g., renal, cardiac, bone marrow, liver, pancreatic, small intestine, skin or lung transplantation).

Therefore, in one embodiment, the invention relates to a method of treating and/or preventing rheumatoid arthritis in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. In a second embodiment, the invention relates to a method of treating and/or preventing Croli's disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof

US 7,846,442 B2

3

and methotrexate to the individual in therapeutically effective amounts. In a third embodiment, the invention relates to a method of treating and/or preventing other autoimmune diseases and/or acute or chronic immune disease associated with a transplantation in an individual, comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts.

A further embodiment of the invention relates to compositions comprising an anti-TNF antibody or a fragment thereof and methotrexate.

In addition to anti-TNF antibodies, TNF antagonists include anti-TNF antibodies and receptor molecules which bind specifically to TNF; compounds which prevent and/or inhibit TNF synthesis, TNF release or its action on target cells, such as thalidomide, tenidap, phosphodiesterase inhibitors (e.g, pentoxifylline and rolipram), A2b adenosine receptor agonists and A2b adenosine receptor enhancers; and compounds which prevent and/or inhibit TNF receptor signalling.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A-**1**C are a set of three graphs showing the results over time for swollen joint count in rheumatoid arthritis (RA) patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate (MTX−); black circle=+methotrexate (MTX+); square=placebo.

FIGS. **2**A-**2**C are a set of three graphs showing the results over time for tender joint count in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. **3**A-**3**C are a set of three graphs showing the results over time for the Physician's Global Disease Assessment in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. **4**A-**4**C are a set of three graphs showing the results over time for the Patient, Disease Assessment in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. **5**A-**5**C are a set of three graphs showing the results over time for C-reactive protein (CRP) concentration in RA patients receiving cA2 treatment (1 mg/cg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. **6**A-**6**C are a set of three graphs showing the results over time for the Health Assessment Questionnaire (HAQ) in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg

4

group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. **7**A-**7**F are a set of six graphs showing the serum cA2 concentration in each RA patient receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate, plotted over time. Data plotted are the serum cA2 concentrations obtained just before the administration of cA2 at weeks 2, 6, 10 and 14 and then at weeks 18 and 26. The scales for the serum cA2 concentration are condensed with higher doses of cA2.

FIGS. **8**A and **8**B are a set of two graphs showing the median serum cA2 concentration over time in RA patients receiving 3 mg/kg cA2 (top panel) or 10 mg/kg cA2 (bottom panel) with or without methotrexate. Square=+methotrexate; circle or triangle=−methotrexate.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from a TNF-mediated disease as adjunctive and/or concomitant therapy to methotrexate therapy, with good to excellent alleviation of the signs and symptoms of the disease. The present invention also relates to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from a TNF-mediated disease in multiple doses and as adjunctive and/or concomitant therapy to methotrexate therapy, with a significant improvement in duration of clinical response.

As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual, comprising co-administering methotrexate and a tumor necrosis factor antagonist to the individual in therapeutically effective amounts. The TNF antagonist and methotrexate can be administered simultaneously or sequentially. The TNF antagonist and methotrexate can each be administered in single or multiple doses. Multiple TNF antagonists can be co-administered with methotrexate. Other therapeutic regimens and agents can be used in combination with the therapeutic co-administration of TNF antagonists and methotrexate or other drugs that suppress the immune system.

A method is also provided herein for treating and/or preventing recurrence of a TNF-mediated disease in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

As used herein, a "TNF-mediated disease" refers to a TNF related pathology or disease. TNF related pathologies or diseases include, but are not limited to, the following:

(A) acute and chronic immune and autoimmune pathologies, such as, but not limited to, rheumatoid arthritis (RA), juvenile chronic arthritis (JCA), thyroiditis, graft versus host disease (GVHD), scleroderma, diabetes mellitus, Graves' disease, allergy acute or chronic immune disease associated with an allogenic transplantation, such as, but not limited to, renal transplantation, cardiac transplantation, bone marrow transplantation, liver transplantation, pancreatic transplantation, small intestine transplantation, lung transplantation and skin transplantation;

(B) infections, including, but not limited to, sepsis syndrome, cachexia, circulatory collapse and shock resulting from acute or chronic bacterial infection, acute and chronic parasitic and/or infectious diseases, bacterial, viral or fungal, such as a human immunodeficiency virus (HIV), acquired

US 7,846,442 B2

5

immunodeficiency syndrome (AIDS) (including symptoms of cachexia, autoimmune disorders, AIDS dementia complex and infections);

(C) inflammatory diseases, such as chronic inflammatory pathologies, including chronic inflammatory pathologies such as, but not limited to, sarcoidosis, chronic inflammatory bowel disease, ulcerative colitis, and Crohn's pathology or disease; vascular inflammatory pathologies, such as, but not limited to, disseminated intravascular coagulation, atherosclerosis, Kawasaki's pathology and vasculitis syndromes, such as, but not limited to, polyarteritis nodosa, Wegener's granulomatosis, Henoch-Schönlein purpura, giant cell arteritis and microscopic vasculitis of the kidneys; chronic active hepatitis; Sjögren's syndrome; spondyloarthropathies, such as ankylosing spondylitis, psoriatic arthritis and spondilytis, enteropathic arthritis and spondylitis, reactive arthritis and arthritis associated with inflammatory bowel disease; and uveitis;

(D) neurodegenerative diseases, including, but not limited to, demyelinating diseases, such as multiple sclerosis and acute transverse myelitis; myasthenia gravis; extrapyramidal and cerebellar disorders, such as lesions of the corticospinal system; disorders of the basal ganglia or cerebellar disorders; hyperkinetic movement disorders, such as Huntington's chorea and senile chorea; drug-induced movement disorders, such as those induced by drugs which block central nervous system (CNS) dopamine receptors; hypokinetic movement disorders, such as Parkinson's disease; progressive supranuclear palsy; cerebellar and spinocerebellar disorders, such as astructural lesions of the cerebellum; spinocerebellar degenerations (spinal ataxia, Friedreich's ataxia, cerebellar cortical degenerations, multiple systems degenerations (Mencel, Dejerine-Thomas, Shi-Drager, and MachadoJoseph)); and systemic disorders (Refsurn's disease, abetalipoproteinemia, ataxia, telangiectasia, and mitochondrial multisystem disorder); disorders of the motor unit, such as neurogenic muscular atrophies (anterior horn cell degeneration, such as amyotrophic lateral sclerosis, infantile spinal muscular atrophy and juvenile spinal muscular atrophy); Alzheimer's disease; Down's syndrome in middle age; diffuse Lewy body disease; senile dementia of Lewy body type; Wernicke-Korsakoff syndrome; chronic alcoholism; primary biliary cirrhosis; cryptogenic fibrosing alveolitis and other fibrotic lung diseases; hemolytic anemia; Creutzfeldt-Jakob disease; sub acute sclerosing panencephalitis, Hallervorden-Spatz disease; and dementia pugilistica, or any subset thereof;

(E) malignant pathologies involving TNF-secreting tumors or other malignancies involving TNF, such as, but not limited to, leukemias (acute, chronic myelocytic, chronic lymphocytic and/or myelodyspastic syndrome); lymphomas (Hodgkin's and non-Hodgkin's lymphomas, such as malignant lymphomas (Burkitt's lymphoma or Mycosis fungoides));

(F) cachectic syndromes and other pathologies and diseases involving excess TNF, such as, but not limited to, cachexia of cancer, parasitic disease and heart failure; and

(G) alcohol-induced hepatitis and other forms of chronic hepatitis.

See, e.g., Berkow et al., Eds., *The Merck Manual*, 16th edition, chapter 11, pp. 1380-1529, Merck and Co., Rahway, N.J., 1992, incorporated herein by reference.

The terms "recurrence", "flare-up" or "relapse" are defined to encompass the reappearance of one or more symptoms of the disease state. For example, in the case of rheumatoid arthritis, a reoccurrence can include the experience of one or more of swollen joints, morning stiffness or joint tenderness.

6

In one embodiment, the invention relates to a method of treating and/or preventing rheumatoid arthritis in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

In a second embodiment, the invention relates to a method for treating and/or preventing Crohn's disease in an individual comprising co-administering a methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

In a third embodiment, the invention relates to a method for treating and/or preventing an acute or chronic immune disease associated with an allogenic transplantation in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts. As used herein, a "transplantation" includes organ, tissue or cell transplantation, such as renal transplantation, cardiac transplantation, bone marrow transplantation, liver transplantation, pancreatic transplantation, small intestine transplantation, skin transplantation and lung transplantation.

The benefits of combination therapy with methotrexate and TNF antagonists include high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately. In addition, methotrexate significantly reduces immunogenicity of anti-TNF antibodies, thus permitting administration of multiple dosages of anti-TNF antibodies with enhanced safety. The results described herein suggest that methotrexate can be used to reduce immunogenicity of other antibodies or proteins. Based on the results described herein, methotrexate can be used in other forms of antibody therapy, such as anti-IL-2 antibody therapy. This method is particularly pertinent in therapies other than anti-CD4 antibody therapy.

In a further embodiment, the invention relates to compositions comprising methotrexate and a TNF antagonist. The compositions of the present invention are useful for treating a subject having a pathology or condition associated with abnormal levels of a substance reactive with a TNF antagonist, in particular TNF in excess of, or less than, levels present in a normal healthy subject, where such excess or diminished levels occur in a systemic, localized or particular tissue type or location in the body. Such tissue types can include, but are not limited to, blood, lymph, central nervous system (CNS), liver, kidney, spleen, heart muscle or blood vessels, brain or spinal cord white matter or grey matter, cartilage, ligaments, tendons, lung, pancreas, ovary, testes, prostate. Increased or decreased TNF concentrations relative to normal levels can also be localized to specific regions or cells in the body, such as joints, nerve blood vessel junctions, bones, specific tendons or ligaments, or sites of infection, such as bacterial or viral infections.

Tumor Necrosis Factor Antagonists

As used herein, a "tumor necrosis factor antagonist" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo. For example, a suitable TNF antagonist can bind TNF and includes anti-TNF antibodies and receptor molecules which bind specifically to TNF. A suitable TNF antagonist can also prevent or inhibit TNF synthesis and/or TNF release and includes compounds such as thalidomide, tenidap, and phosphodiesterase inhibitors, such as, but not limited to, pentoxifylline and rolipram. A suitable TNT antagonist that can prevent or inhibit TNF synthesis and/or TNF release also includes A2b adenosine receptor enhancers and A2b adenosine receptor agonists (e.g., 5'-(N-cyclopropyl)-carboxamidoadenosine, 5'-N-ethylcarboxamidoadenosine, cyclohexyladenosine and R-N[6]-phenyl-2-propyladenos-

**A135**

7

ine). See, for example, Jacobson (GB 2 289 218 A), the teachings of which are entirely incorporated herein by reference. A suitable TNF antagonist can also prevent or inhibit TNF receptor signalling.

Anti-TNF Antibodies

As used herein, an "anti-tumor necrosis factor antibody" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo. Anti-TNF antibodies useful in the methods and compositions of the present invention include mono-clonal, chimeric, humanized, resurfaced and recombinant antibodies and fragments thereof which are characterized by high affinity binding to TNF and low toxicity (including human anti-murine antibody (HAMA) and/or human anti-chimeric antibody (HACA) response). In particular, an anti-body where the individual components, such as the variable region, constant region and framework, individually and/or collectively possess low immunogenicity is useful in the present invention. The antibodies which can be used in the invention are characterized by their ability to treat patients for extended periods with good to excellent alleviation of symp-toms and low toxicity. Low immunogenicity and/or high affinity, as well as other undefined properties, may contribute to the therapeutic results achieved.

An example of a high affinity monoclonal antibody useful in the methods and compositions of the present invention is murine monoclonal antibody (mAb) A2 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine mAb A2 or an antibody having substan-tially the same specific binding characteristics, as well as fragments and regions thereof. Murine monoclonal antibody A2 and chimeric derivatives thereof, such as cA2, are described in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994; now U.S. Pat. No. 5,656,272), U.S. application Ser. No. 08/192,861 (filed Feb. 4, 1994; now U.S. Pat. No. 5,919,452), U.S. application Ser. No. 08/324,799 (filed Oct. 18, 1994; now U.S. Pat. No. 5,698,195), and Le, J. et al., International Publication No. WO 92/16553 (published Oct. 1, 1992), which references are entirely incorporated herein by refer-ence. A second example of a high affinity monoclonal anti-body useful in the methods and compositions of the present invention is murine mAb 195 and antibodies which will com-petitively inhibit in vivo the binding to human TNFα of anti-TNTα murine 195 or an antibody having substantially the same specific binding characteristics, as well as fragments and regions thereof. Other high affinity monoclonal antibod-ies useful in the methods and compositions of the present invention include murine mAb 114 and murine mAb 199 and antibodies which will competitively inhibit in vivo the bind-ing to human TNFα of anti-TNFα murine mAb 114 or mAb 199 or an antibody having substantially the same specific binding characteristics of mAb 114 or mAb 199, as well as fragments and regions thereof. Murine monoclonal antibod-ies 114, 195 and 199 and the method for producing them are described by Möller, A. et al. (Cytokine 2(3):162-169 (1990)), the teachings of which are entirely incorporated herein by reference. Preferred methods for determining mAb specific-ity and affinity by competitive inhibition can be found in Harlow, et al., Antibodies: A Laboratory Manual, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y. (1988); Colligan et al., eds., Current Protocols in Immunol-ogy, Greene Publishing Assoc. and Wiley Interscience, New York (1992, 1993); Kozbor et al., Immunol. Today 4:72-79 (1983); Ausubel et al., eds., Current Protocols in Molecular Biology, Wiley Interscience, New York (1987, 1992, 1993);

8

and Muller, Meth. Enzymol. 92:589-601 (1983), which refer-ences are entirely incorporated herein by reference.

Additional examples of monoclonal anti-TNF antibodies that can be used in the present invention are described in the art (see, e.g., U.S. application Ser. No. 07/943,852 (filed Sep. 11, 1992); Rathjen et al., International Publication No. WO 91/02078 (published Feb. 21, 1991); Rubin et al., EPO Patent Publication 0218868 (published Apr. 22, 1987); Yone et al., EPO Patent Publication No. 0288088 (Oct. 26, 1988); Liang, et al., Biochem. Biophys. Res. Comm. 137:847-854 (1986); Meager, et al., Hybridoma 6:305-311 (1987); Fendly et al., Hybridoma 6:359-369 (1987); Bringman, et al., Hybridoma 6:489-507 (1987); Hirai, et al., J. Immuno. Meth. 96:57-62 (1987); Moller, et al., Cytokine 2:162-169 (1990), which ref-erences are entirely incorporated herein by reference).

Chimeric antibodies are immunoglobulin molecules char-acterized by two or more segments or portions derived from different animal species. Generally, the variable region of the chimeric antibody is derived from a non-human mammalian antibody, such as a murine mAb, and the immunoglobulin constant region is derived from a human immunoglobulin molecule. Preferably, a variable region with low immunoge-nicity is selected and combined with a human constant region which also has low immunogenicity, the combination also preferably having low immunogenicity. "Low" immunoge-nicity is defined herein as raising significant HACA or HAMA responses in less than about 75%, or preferably less than about 50% of the patients treated and/or raising low titres in the patient treated (less than about 300, preferably less than about 100 measured with a double antigen enzyme immu-noassay) (Elliott et al., Lancet 344:1125-1127 (1994), incor-porated herein by reference).

As used herein, the term "chimeric antibody" includes monovalent, divalent or polyvalent immunoglobulins. A monovalent chimeric antibody is a dimer (HL) formed by a chimeric H chain associated through disulfide bridges with a chimeric L chain. A divalent chimeric antibody is a tetramer (H2L2) formed by two HL dimers associated through at least one disulfide bridge. A polyvalent chimeric antibody can also be produced, for example, by employing a CH region that aggregates (e.g., from an IgM H chain, or μ chain).

Antibodies comprise individual heavy (H) and/or light (L) immunoglobulin chains. A chimeric H chain comprises an antigen binding region derived from the H chain of a non-human antibody specific for TNF, which is linked to at least a portion of a human H chain C region (CH), such as CH1 or CH2. A chimeric L chain comprises an antigen binding region derived from the L chain of a non-human antibody specific for TNF, linked to at least a portion of a human L chain C region (CL).

Chimeric antibodies and methods for their production have been described in the art (Morrison et al., Proc. Natl. Acad. Sci. USA 81:6851-6855 (1984); Boulianne et al., Nature 312:643-646 (1984); Neuberger et al., Nature 314:268-270 (1985); Taniguchi et al., European Patent Application No. 171496 (published Feb. 19, 1985); Morrison et al., European Patent Application No. 173494 (published Mar. 5, 1986); Neuberger et al., PCT Application No. WO 86/01533, (pub-lished Mar. 13, 1986); Kudo et al., European Patent Applica-tion No. 184187 (published Jun. 11, 1986); Morrison et al., European Patent Application No. 173494 (published Mar. 5, 1986); Sahagan et al., J. Immunol. 137:1066-1074 (1986); Robinson et al., International Publication No. PCT/US86/02269 (published May 7, 1987); Liu et al., Proc. Natl. Acad. Sci. USA 84:3439-3443 (1987); Sun et al., Proc. Natl. Acad. Sci. USA 84:214-218 (1987); Better et al., Science 240:1041-1043 (1988); and Harlow and Lane, Antibodies: A Laboratory

US 7,846,442 B2

9

Manual, Cold Spring Harbor Laboratory, New York, 1988). These references are entirely incorporated herein by reference.

The anti-TNF chimeric antibody can comprise, for example, two light chains and two heavy chains, each of the chains comprising at least part of a human constant region and at least part of a variable (V) region of non-human origin having specificity to human TNF, said antibody binding with high affinity to an inhibiting and/or neutralizing epitope of human TNF, such as the antibody cA2. The antibody also includes a fragment or a derivative of such an antibody, such as one or more portions of the antibody chain, such as the heavy chain constant or variable regions, or the light chain constant or variable regions.

Humanizing and resurfacing the antibody can further reduce the immunogenicity of the antibody. See, for example, Winter (U.S. Pat. No. 5,225,539 and EP 239,400 B1), Padlan et al. (EP 519,596 A1) and Pedersen et al. (EP 592,106 A1). These references are incorporated herein by reference.

Preferred antibodies useful in the methods and compositions of the present invention are high affinity human-murine chimeric anti-TNF antibodies, and fragments or regions thereof, that have potent inhibiting and/or neutralizing activity in vivo against human TNFα. Such antibodies and chimeric antibodies can include those generated by immunization using purified recombinant TNFα or peptide fragments thereof comprising one or more epitopes.

An example of such a chimeric antibody is cA2 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine mAb A2, chimeric mAb cA2, or an antibody having substantially the same specific binding characteristics, as well as fragments and regions thereof. Chimeric mAb cA2 has been described, for example, in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994; now U.S. Pat. No. 5,656,272), U.S. application Ser. No. 08/192, 861 (filed Feb. 4, 1994; now U.S. Pat. No. 5,919,452), and U.S. application Ser. No. 08/324,799 (filed Oct. 18, 1994; now U.S. Pat. No. 5,698,195), and by Le, J. et al. (International Publication No. WO 92/16553 (published Oct. 1, 1992)); Knight, D. M. et al. (Mol. Immunol. 30:1443-1453 (1993)); and Siegel, S. A. et al. (Cytokine 7(1):15-25 (1995)). These references are entirely incorporated herein by reference.

Chimeric A2 anti-TNF consists of the antigen binding variable region of the high-affinity neutralizing mouse anti-human TNF IgG1 antibody, designated A2, and the constant regions of a human IgG1, kappa immunoglobulin. The human IgG1 Fc region improves allogeneic antibody effector function, increases the circulating serum half-life and decreases the immunogenicity of the antibody. The avidity and epitope specificity of the chimeric A2 is derived from the variable region of the murine A2. Chimeric A2 neutralizes the cytotoxic effect of both natural and recombinant human TNF in a dose dependent manner. From binding assays of cA2 and recombinant human TNF, the affinity constant of cA2 was calculated to be $1.8 \times 10^9 M^{-1}$. Preferred methods for deter-

10

mining mAb specificity and affinity by competitive inhibition can be found in Harlow, et al., Antibodies: A Laboratory Manual, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1988; Colligan et al., eds., Current Protocols in Immunology, Greene Publishing Assoc. and Wiley Interscience, New York, (1992, 1993); Kozbor et al., Immunol. Today 4:72-79 (1983); Ausubel et al., eds. Current Protocols in Molecular Biology, Wiley Interscience, New York (1987, 1992, 1993); and Muller, Meth. Enzymol. 92:589-601 (1983), which references are entirely incorporated herein by reference.

As used herein, the term "antigen binding region" refers to that portion of an antibody molecule which contains the amino acid residues that interact with an antigen and confer on the antibody its specificity and affinity for the antigen. The antibody region includes the "framework" amino acid residues necessary to maintain the proper conformation of the antigen-binding residues. Generally, the antigen binding region will be of murine origin. In other embodiments, the antigen binding region can be derived from other animal species, such as sheep, rabbit, rat or hamster. Preferred sources for the DNA encoding such a non-human antibody include cell lines which produce antibody, preferably hybrid cell lines commonly known as hybridomas. In one embodiment, a preferred hybridoma is the A2 hybridoma cell line.

An "antigen" is a molecule or a portion of a molecule capable of being bound by an antibody which is additionally capable of inducing an animal to produce antibody capable of selectively binding to an epitope of that antigen. An antigen can have one or more than one epitope.

The term "epitope" is meant to refer to that portion of the antigen capable of being recognized by and bound by an antibody at one or more of the antibody's antigen binding region. Epitopes usually consist of chemically active surface groupings of molecules such as amino acids or sugar side chains and have specific three dimensional structural characteristics as well as specific charge characteristics. By "inhibiting and/or neutralizing epitope" is intended an epitope, which, when bound by an antibody, results in loss of biological activity of the molecule containing the epitope, in vivo or in vitro, more preferably in vivo, including binding of TNF to a TNF receptor. Epitopes of TNF have been identified within amino acids 1 to about 20, about 56 to about 77, about 108 to about 127 and about 138 to about 149. Preferably, the antibody binds to an epitope comprising at least about 5 amino acids of TNF within TNF residues from about 87 to about 107, about 59 to about 80 or a combination thereof. Generally, epitopes include at least about 5 amino acids and less than about 22 amino acids embracing or overlapping one or more of these regions.

For example, epitopes of TNF which are recognized by, and/or binds with anti-TNF activity, an antibody, and fragments, and valuable regions thereof, include:

```
59-80:   Tyr-Ser-Gln-Val-Leu-Phe-Lys-Gly-Gln-Gly-    (SEQ ID NO:
         Cys-Pro-Ser-Thr-His-Val-Leu-Leu-Thr-His-     1)
         Thr-Ile;
and/or

87-108:  Tyr-Gln-Thr-Lys-Val-Asn-Leu-Leu-Ser-Ala-    (SEQ ID NO:
         Ile-Lys-Ser-Pro-Cys-Gln-Arg-Glu-Thr-Pro-     2)
         Glu-Gly.
```

The anti-TNF antibodies, and fragments, and variable regions thereof, that are recognized by, and/or binds with

US 7,846,442 B2

11

anti-TNF activity, these epitopes block the action of TNFα without binding to the putative receptor binding locus as presented by Eck and Sprang (*J. Biol. Chem.* 264(29): 17595-17605 (1989) (amino acids 11-13, 37-42, 49-57 and 155-157 of hTNFα). Rathjen et al., International Publication No. WO 91/02078 (published Feb. 21, 1991), incorporated herein by reference, discloses TNF ligands which can bind additional epitopes of TNF.

Antibody Production Using Hybridomas

The techniques to raise antibodies to small peptide sequences that recognize and bind to those sequences in the free or conjugated form or when presented as a native sequence in the context of a large protein are well known in the art. Such antibodies can be produced by hybridoma or recombinant techniques known in the art.

Murine antibodies which can be used in the preparation of the antibodies useful in the methods and compositions of the present invention have also been described in Rubin et al., EP 0218868 (published Apr. 22, 1987); Yone et al., EP 0288088 (published Oct. 26, 1988); Liang, et al., *Biochem. Biophys. Res. Comm.* 137:847-854 (1986); Meager, et al., *Hybridoma* 6:305-311 (1987); Fendly et al., *Hybridoma* 6:359-369 (1987); Bringman, et al., *Hybridoma* 6:489-507 (1987); Hirai, et al., *J. Immunol. Meth.* 96:57-62 (1987); Möller, et al., *Cytokine* 2:162-169 (1990).

The cell fusions are accomplished by standard procedures well known to those skilled in the field of immunology. Fusion partner cell lines and methods for fusing and selecting hybridomas and screening for mAbs are well known in the art. See, e.g, Ausubel infra, Harlow infra, and Colligan infra, the contents of which references are incorporated entirely herein by reference.

The TNFα-specific murine mAb useful in the methods and compositions of the present invention can be produced in large quantities by injecting hybridoma or transfectoma cells secreting the antibody into the peritoneal cavity of mice and, after appropriate time, harvesting the ascites fluid which contains a high titer of the mAb, and isolating the mAb therefrom. For such in vivo production of the mAb with a hybridoma (e.g., rat or human), hybridoma cells are preferably grown in irradiated or athymic nude mice. Alternatively, the antibodies can be produced by culturing hybridoma or transfectoma cells in vitro and isolating secreted mAb from the cell culture medium or recombinantly, in eukaryotic or prokaryotic cells.

In one embodiment, the antibody used in the methods and compositions of the present invention is a mAb which binds amino acids of an epitope of TNF recognized by A2, rA2 or cA2, produced by a hybridoma or by a recombinant host. In another embodiment, the antibody is a chimeric antibody which recognizes an epitope recognized by A2. In still another embodiment, the antibody is a chimeric antibody designated as chimeric A2 (cA2).

As examples of antibodies useful in the methods and compositions of the present invention, murine mAb A2 is produced by a cell line designated c134A.

"Derivatives" of the antibodies including fragments, regions or proteins encoded by truncated or modified genes to yield molecular species functionally resembling the immunoglobulin fragments are also useful in the methods and compositions of the present invention. The modifications include, but are not limited to, addition of genetic sequences coding for cytotoxic proteins such as plant and bacterial toxins. The fragments and derivatives can be produced from appropriate cells, as is known in the art. Alternatively, anti-TNF antibodies, fragments and regions can be bound to cyto-

12

toxic proteins or compounds in vitro, to provide cytotoxic anti-TNF antibodies which would selectively kill cells having TNF on their surface.

"Fragments" of the antibodies include, for example, Fab, Fab', F(ab')₂ and Fv. These fragments lack the Fc fragment of intact antibody, clear more rapidly from the circulation, and can have less non-specific tissue binding than an intact antibody (Wahl et al., *J. Nucl. Med.* 24:316-325 (1983)). These fragments are produced from intact antibodies using methods well known in the art, for example by proteolytic cleavage with enzymes such as papain (to produce Fab fragments) or pepsin (to produce F(ab')₂ fragments).

Recombinant Expression of Anti-TNF Antibodies

Recombinant and/or chimeric murine-human or human-human antibodies that inhibit TNF can be produced using known techniques based on the teachings provided in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994; now U.S. Pat. No. 5,656,272), U.S. application Ser. No. 08/192,861 (filed Feb. 4, 1994; now U.S. Pat. No. 5,919,452), U.S. application Ser. No. 08/324,799 (filed on Oct. 18, 1994; now U.S. Pat. No. 5,698,195) and Le, J. et al., International Publication No. WO 92/16553 (published Oct. 1, 1992), which references are entirely incorporated her-ein by reference. See, e.g., Ausubel et al., eds. *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987, 1992, 1993); and Sambrook et al. *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, New York (1989), the contents of which are entirely incorporated herein by reference. See also, e.g., Knight, D. M., et al., *Mol. Immunol* 30:1443-1453 (1993); and Siegel, S. A., et al., *Cytokine* 7(1):15-25 (1995), the contents of which are entirely incorporated herein by reference.

The DNA encoding an anti-TNF antibody can be genomic DNA or cDNA which encodes at least one of the heavy chain constant region (Hc), the heavy chain variable region (Hc), the light chain variable region (Lv) and the light chain constant regions (Lc). A convenient alternative to the use of chromosomal gene fragments as the source of DNA encoding the murine V region antigen-binding segment is the use of cDNA for the construction of chimeric immunoglobulin genes, e.g., as reported by Liu et al. (*Proc. Natl. Acad. Sci., USA* 84:3439 (1987) and *J. Immunology* 139:3521 (1987)), which references are entirely incorporated herein by reference. The use of cDNA requires that gene expression elements appropriate for the host cell be combined with the gene in order to achieve synthesis of the desired protein. The use of cDNA sequences is advantageous over genomic sequences (which contain introns), in that cDNA sequences can be expressed in bacteria or other hosts which lack appropriate RNA splicing systems. An example of such a preparation is set forth below.

Because the genetic code is degenerate, more than one codon can be used to encode a particular amino acid. Using the genetic code, one or more different oligonucleotides can be identified, each of which would be capable of encoding the amino acid. The probability that a particular oligonucleotide will, in fact, constitute the actual XXX-encoding sequence can be estimated by considering abnormal base pairing relationships and the frequency with which a particular codon is actually used (to encode a particular amino acid) in eukaryotic or prokaryotic cells expressing an anti-TNF antibody or fragment. Such "codon usage rules" are disclosed by Lathe, et al., *J. Mol. Biol.* 183:1-12 (1985). Using the "codon usage rules" of Lathe, a single oligonucleotide, or a set of oligonucleotides, that contains a theoretical "most probable"

A138

US 7,846,442 B2

13

nucleotide sequence capable of encoding anti-TNF variable or constant region sequences is identified.

Although occasionally an amino acid sequence can be encoded by only a single oligonucleotide, frequently the amino acid sequence can be encoded by any of a set of similar oligonucleotides. Importantly, whereas all of the members of this set contain oligonucleotides which are capable of encoding the peptide fragment and, thus, potentially contain the same oligonucleotide sequence as the gene which encodes the peptide fragment, only one member of the set contains the nucleotide sequence that is identical to the nucleotide sequence of the gene. Because this member is present within the set, and is capable of hybridizing to DNA even in the presence of the other members of the set, it is possible to employ the unfractionated set of oligonucleotides in the same manner in which one would employ a single oligonucleotide to clone the gene that encodes the protein.

The oligonucleotide, or set of oligonucleotides, containing the theoretical "most probable" sequence capable of encoding an anti-TNF antibody or fragment including a variable or constant region is used to identify the sequence of a complementary oligonucleotide or set of oligonucleotides which is capable of hybridizing to the "most probable" sequence, or set of sequences. An oligonucleotide containing such a complementary sequence can be employed as a probe to identify and isolate the variable or constant region anti-TNF gene (Sambrook et al., infra).

A suitable oligonucleotide, or set of oligonucleotides, which is capable of encoding a fragment of the variable or constant anti-TNF region (or which is complementary to such an oligonucleotide, or set of oligonucleotides) is identified (using the above-described procedure), synthesized, and hybridized by means well known in the art, against a DNA or, more preferably, a cDNA preparation derived from cells which are capable of expressing anti-TNF antibodies or variable or constant regions thereof. Single stranded oligonucleotide molecules complementary to the "most probable" variable or constant anti-TNF region peptide coding sequences can be synthesized using procedures which are well known to those of ordinary skill in the art (Belagaje, et al., *J. Biol. Chem.* 254:5765-5780 (1979); Maniatis, et al., *In: Molecular Mechanisms in the Control of Gene Expression*, Nierlich, et al., eds., Acad. Press, New York (1976); Wu, et al., *Prog. Nucl. Acid Res. Molec. Biol.* 21:101-141 (1978); Khorana, *Science* 203:614-625 (1979)). Additionally, DNA synthesis can be achieved through the use of automated synthesizers. Techniques of nucleic acid hybridization are disclosed by Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, New York (1989); and by Haynes, et al., in: *Nucleic Acid Hybridization, A Practical Approach*, IRL Press, Washington, D.C. (1985), which references are entirely incorporated herein by reference. Techniques such as, or similar to, those described above have successfully enabled the cloning of genes for human aldehyde dehydrogenases (Hsu, et al., *Proc. Natl. Acad. Sci. USA* 82:3771-3775 (1985)), fibronectin (Suzuki, et al., *Bur. Mol. Biol. Organ. J.* 4:2519-2524 (1985)), the human estrogen receptor gene (Walter, et al., *Proc. Natl. Acad. Sci. USA* 82:7889-7893 (1985)), tissue-type plasminogen activator (Pennica, et al., *Nature* 301:214-221 (1983)) and human placental alkaline phosphatase complementary DNA (Keun, et al., *Proc. Natl. Acad. Sci. USA* 82:8715-8719 (1985)).

In an alternative way of cloning a polynucleotide encoding an anti-TNF variable or constant region, a library of expression vectors is prepared by cloning DNA or, more preferably, cDNA (from a cell capable of expressing an anti-TNF antibody or variable or constant region) into an expression vector.

14

The library is then screened for members capable of expressing a protein which competitively inhibits the binding of an anti-TNF antibody, such as A2 or cA2, and which has a nucleotide sequence that is capable of encoding polypeptides that have the same amino acid sequence as anti-TNF antibodies or fragments thereof. In this embodiment, DNA, or more preferably cDNA, is extracted and purified from a cell which is capable of expressing an anti-TNF antibody or fragment. The purified cDNA is fragmentized (by shearing, endonuclease digestion, etc.) to produce a pool of DNA or cDNA fragments. DNA or cDNA fragments from this pool are then cloned into an expression vector in order to produce a genomic library of expression vectors whose members each contain a unique cloned DNA or cDNA fragment such as in a lambda phage library, expression in prokaryotic cell (e.g., bacteria) or eukaryotic cells, (e.g., mammalian, yeast, insect or, fungus). See, e.g., Ausubel, infra, Harlow, infra, Colligan, infra; Nyyssonen et al. *Bio/Technology* 11:591-595 (1993); Marks et al., *Bio/Technology* 11:1145-1149 (October 1993). Once nucleic acid encoding such variable or constant anti-TNF regions is isolated, the nucleic acid can be appropriately expressed in a host cell, along with other constant or variable heavy or light chain encoding nucleic acid, in order to provide recombinant monoclonal antibodies that bind TNF with inhibitory activity. Such antibodies preferably include a murine or human anti-TNF variable region which contains a framework residue having complementarity determining residues which are responsible for antigen binding.

Human genes which encode the constant (C) regions of the chimeric antibodies, fragments and regions of the present invention can be derived from a human fetal liver library, by known methods. Human C region genes can be derived from any human cell including those which express and produce human immunoglobulins. The human CH region can be derived from any of the known classes or isotypes of human H chains, including gamma, μ, α, δ or ε, and subtypes thereof, such as G1, G2, G3 and G4. Since the H chain isotype is responsible for the various effector functions of an antibody, the choice of CH region will be guided by the desired effector functions, such as complement fixation, or activity in antibody-dependent cellular cytotoxicity (ADCC). Preferably, the CH region is derived from gamma 1 (IgG1), gamma 3 (IgG3), gamma 4 (IgG4), or μ (IgM). The human CL region can be derived from either human L chain isotype, kappa or lambda.

Genes encoding human immunoglobulin C regions are obtained from human cells by standard cloning techniques (Sambrook, et al. (*Molecular Cloning. A Laboratory Manual,* 2nd Edition, Cold Spring Harbor Press, Cold Spring Harbor, N.Y. (1989) and Ausubel et al., eds., *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987-1993)). Human C region genes are readily available from known clones containing genes representing the two classes of L chains, the five classes of H chains and subclasses thereof. Chimeric antibody fragments, such as F(ab')₂ and Fab, can be prepared by designing a chimeric H chain gene which is appropriately truncated. For example, a chimeric gene encoding an H chain portion of an F(ab')₂ fragment would include DNA sequences encoding the CH1 domain and hinge region of the H chain, followed by a translational stop codon to yield the truncated molecule.

Generally, the murine, human and chimeric antibodies, fragments and regions are produced by cloning DNA segments encoding the H and L chain antigen-binding regions of a TNF-specific antibody, and joining these DNA segments to DNA segments encoding CH and CL regions, respectively, to produce murine, human or chimeric immunoglobulin-encod-

US 7,846,442 B2

15

ing genes. Thus, in a preferred embodiment, a fused chimeric gene is created which comprises a first DNA segment that encodes at least the antigen-binding region of non-human origin, such as a functionally rearranged V region with joining (J) segment, linked to a second DNA segment encoding at least a pall of a human C region.

Therefore, cDNA encoding the antibody J and C regions and the method of producing a chimeric antibody can involve several steps, outlined below:

1. Isolation of messenger RNA (mRNA) from the cell line producing an anti-TNF antibody and from optional additional antibodies supplying heavy and light constant regions; cloning and cDNA production therefrom;
2. Preparation of a full length cDNA library from purified mRNA from which the appropriate V and/or C region gene segments of the L and H chain genes can be: (i) identified with appropriate probes, (ii) sequenced, and (iii) made compatible with a C or V gene segment from another antibody for a chimeric antibody;
3. Construction of complete H or L chain coding sequences by linkage of the cloned specific V region gene segments to cloned C region gene, as described above;
4. Expression and production of L and H chains in selected hosts, including prokaryotic and eukaryotic cells to provide murine-murine, human-murine, human-human or human-murine antibodies.

One common feature of all immunoglobulin H and L chain genes and their encoded mRNTAs is the J region. H and L chain J regions have different sequences, but a high degree of sequence homology exists (greater than 80%) among each group, especially near the C region. This homology is exploited in this method and consensus sequences of H and L chain J regions can be used to design oligonucleotides for use as primers for introducing useful restriction sites into the J region for subsequent linkage of V region segments to human C region segments.

C region cDNA vectors prepared from human cells can be modified by site-directed mutagenesis to place a restriction site at the analogous position in the human sequence. For example, one can clone the complete human kappa chain C (Ck) region and the complete human gamma-1 C region (C gamma-1). In this case, the alternative method based upon genomic C region clones as the source for C region vectors would not allow these genes to be expressed in bacterial systems where enzymes needed to remove intervening sequences are absent. Cloned V region segments are excised and ligated to L or H chain C region vectors. Alternatively, the human C gamma-1 region can be modified by introducing a termination codon thereby generating a gene sequence which encodes the H chain portion of an Fab molecule. The coding sequences with linked V and C regions are then transferred into appropriate expression vehicles for expression in appropriate hosts, prokaryotic or eukaryotic.

Two coding DNA sequences are said to be "operably linked" if the linkage results in a continuously translatable sequence without alteration or interruption of the triplet reading frame. A DNA coding sequence is operably linked to a gene expression element if the linkage results in the proper function of that gene expression element to result in expression of the coding sequence.

Expression vehicles include plasmids or other vectors. Preferred among these are vehicles carrying a functionally complete human CH or CL chain sequence having appropriate restriction sites engineered so that any VH or VL chain sequence with appropriate cohesive ends can be easily inserted therein. Human CH or CL chain sequence-contain-

16

ing vehicles thus serve as intermediates for the expression of any desired complete H or L chain in any appropriate host.

A chimeric antibody, such as a mouse-human or human-human, will typically be synthesized from genes driven by the chromosomal gene promoters native to the mouse H and L chain V regions used in the constructs; splicing usually occurs between the splice donor site in the mouse J region and the splice acceptor site preceding the human C region and also at the splice regions that occur within the human C, region; polyadenylation and transcription termination occur at native chromosomal sites downstream of the human coding regions.

A nucleic acid sequence encoding at least one anti-TNF antibody fragment may be recombined with vector DNA in accordance with conventional techniques, including blunt-ended or staggered-ended termini for ligation, restriction enzyme digestion to provide appropriate termini, filling in of cohesive ends as appropriate, alkaline phosphatase treatment to avoid undesirable joining, and ligation with appropriate ligases. Techniques for such manipulations are disclosed, e.g., by Ausubel, supra, Sambrook, supra, entirely incorporated herein by reference, and are well known in the art.

A nucleic acid molecule, such as DNA, is "capable of expressing" a polypeptide if it contains nucleotide sequences which contain transcriptional and translational regulatory information and such sequences are "operably linked" to nucleotide sequences which encode the polypeptide. An operable linkage is a linkage in which the regulatory DNA sequences and the DNA sequence sought to be expressed are connected in such a way as to permit gene expression as anti-TNF peptides or antibody fragments in recoverable amounts. The precise nature of the regulatory regions needed for gene expression may vary from organism to organism and is well known in the analogous art. See, e.g., Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, New York (1989); and Ausubel, eds., *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987, 1993).

Many vector systems are available for the expression of cloned anti-TNF peptide H and L chain genes in mammalian cells (see Glover, ed., *DNA Cloning, Vol. II*, pp. 143-238, IRL Press, Washington, D.C., 1985). Different approaches can be followed to obtain complete H2L2 antibodies. It is possible to co-express H and L chains in the same cells to achieve intracellular association and linkage of H and L chains into complete tetrameric H2L2 antibodies. The co-expression can occur by using either the same or different plasmids in the same host. Genes for both H and L chains can be placed into the same plasmid, which is then transfected into cells, thereby selecting directly for cells that express both chains. Alternatively, cells can be transfected first with a plasmid encoding one chain, for example the L chain, followed by transfection of the resulting cell line with an H chain plasmid containing a second selectable marker. Cell lines producing H2L2 molecules via either route could be transfected with plasmids encoding additional copies of peptides, H, L, or H plus L chains in conjunction with additional selectable markers to generate cell lines with enhanced properties, such as higher production of assembled H2L2 antibody molecules or enhanced stability of the transfected cell lines.

Receptor Molecules

Receptor molecules (also referred to herein as soluble TNF receptors) useful in the methods and compositions of the present invention are those that bind TNF with high affinity (see, e.g., Feldman et al., International Publication No. WO 92/07076 (published Apr. 30, 1992), incorporated herein by reference) and possess low immunogenicity. In particular, the

**A140**

US 7,846,442 B2

17

55 kDa (p55 TNF-R) and the 75 kDa (p75 TNF-R) TNF cell surface receptors are useful in the present invention. Truncated forms of these receptors, comprising the extracellular domains (ECD) of the receptors or functional portions thereof, are also useful in the present invention. Truncated forms of the TNF receptors, comprising the ECD, have been detected in urine and serum as 30 kDa and 40 kDa TNF inhibitory binding proteins (Engelmann, H. et al., *J. Biol. Chem.* 265:1531-1536 (1990)). TNF receptor multimeric molecules and TNF immunoreceptor fusion molecules, and derivatives and fragments or portions thereof, are additional examples of receptor molecules which are useful in the methods and compositions of the present invention. The receptor molecules which can be used in the invention are characterized by their ability to treat patients for extended periods with good to excellent alleviation of symptoms and low toxicity. Low immunogenicity and/or high affinity, as well as other undefined properties, may contribute to the therapeutic results achieved.

TNF receptor multimeric molecules useful in the present invention comprise all or a functional portion of the ECD of two or more TNF receptors linked via one or more polypeptide linkers. The multimeric molecules can further comprise a signal peptide of a secreted protein to direct expression of the multimeric molecule. These multimeric molecules and methods for their production have been described in U.S. application Ser. No. 08/437,533 (filed May 9, 1995), the content of which is entirely incorporated herein by reference.

TNF immunoreceptor fusion molecules useful in the methods and compositions of the present invention comprise at least one portion of one or more immunoglobulin molecules and all or a functional portion of one or more TNF receptors. These immunoreceptor fusion molecules can be assembled as monomers, or hetero- or homo-multimers. The immunoreceptor fusion molecules can also be monovalent or multivalent. An example of such a TNF immunoreceptor fusion molecule is TNF receptor/IgG fusion protein.

TNF immunoreceptor fusion molecules and methods for their production have been described in the art (Lesslauer et al., *Eur. J. Immunol.* 21:2883-2886 (1991); Ashkenazi et al., *Proc. Natl. Acad. Sci. USA* 88:10535-10539 (1991); Peppel et al., *J. Exp. Med.* 174:1483-1489 (1991); Kolls et al., *Proc. Natl. Acad. Sci. USA* 91:215-219 (1994); Butler et al., *Cytokine* 6(6):616-623 (1994); Baker et al., *Eur. J. Immunol.* 24:2040-2048 (1994); Beutler et al., U.S. Pat. No. 5,447,851; and U.S. application Ser. No. 08/442,133 (filed May 16, 1995)). These references are entirely incorporated herein by reference. Methods for producing immunoreceptor fusion molecules can also be found in Capon et al., U.S. Pat. No. 5,116,964; Capon et al., U.S. Pat. No. 5,225,538; and Capon et al., *Nature* 337:525-531 (1989), which references are entirely incorporated herein by reference.

Derivatives, fragments, regions and functional portions of the receptor molecules functionally resemble the receptor molecules that can be used in the present invention (i.e., they bind TNF with high affinity and possess low immunogenicity). A functional equivalent or derivative of the receptor molecule refers to the portion of the receptor molecule, or the portion of the receptor molecule sequence which encodes the receptor molecule, that is of sufficient size and sequences to functionally resemble the receptor molecules that can be used in the present invention (i.e., bind TNF with high affinity and possess low immunogenicity). A functional equivalent of the receptor molecule also includes modified receptor molecules that functionally resemble the receptor molecules that can be used in the present invention (i.e., bind TNF with high affinity and possess low immunogenicity). For example, a functional equivalent of the receptor molecule can contain a "SILENT" codon or one or more amino acid substitutions, deletions or additions (e.g., substitution of one acidic amino acid for another acidic amino acid; or substitution of one codon

18

encoding the same or different hydrophobic amino acid for another codon encoding a hydrophobic amino acid). See Ausubel et al., *Current Protocols in Molecular Biology*, Greene Publishing Assoc. and Wiley-Interscience, New York (1989).

Methotrexate

Presently available oral and intravenous formulations of methotrexate include RHEUMATREX® methotrexate dose pack (Lederle Laboratories, Wayne, N.J.); methotrexate tablets (Mylan Pharmaceuticals Inc., Morgantown, W. Va.; Roxane Laboratories, Inc., Columbus, Ohio); and methotrexate sodium tablets, for injection and injection (Immunex Corporation, Seattle, Wash.) and methotrexate LPF® sodium (methotrexate sodium injection) (Immunex Corporation, Seattle, Wash.). Methotrexate is also available from Pharmacochemie (Netherlands). Methotrexate prodrugs, homologs and/or analogs (e.g., folate antagonists) can also be used in the methods and compositions of the present invention. Alternatively, other immunosuppressive agents (or drugs that suppress the immune system) can be used in the methods and compositions of the present invention.

Administration

TNF antagonists, methotrexate and the compositions of the present invention can be administered to an individual in a variety of ways. The routes of administration include intradermal, transdermal (e.g., in slow release polymers), intramuscular, intraperitoneal, intravenous, subcutaneous, oral, topical, epidural, buccal, rectal, vaginal and intranasal routes. Any other therapeutically efficacious route of administration can be used, for example, infusion or bolus injection, absorption through epithelial or mucocutaneous linings, or by gene therapy wherein a DNA molecule encoding the therapeutic protein or peptide is administered to the patient, e.g., via a vector, which causes the protein or peptide to be expressed and secreted at therapeutic levels in vivo. In addition, the TNF antagonists, methotrexate and compositions of the present invention can be administered together with other components of biologically active agents, such as pharmaceutically acceptable surfactants (e.g., glycerides), excipients (e.g., lactose), carriers, diluents and vehicles. If desired, certain sweetening, flavoring and/or coloring agents can also be added.

The TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual. TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate. For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy.

For parenteral (e.g., intravenous, subcutaneous, intramuscular) administration, TNF antagonists, methotrexate and the compositions of the present invention can be formulated as a solution, suspension, emulsion or lyophilized powder in association with a pharmaceutically acceptable parenteral vehicle. Examples of such vehicles are water, saline, Ringer's solution, dextrose solution, and 5% human serum albumin. Liposomes and nonaqueous vehicles such as fixed oils can also be used. The vehicle or lyophilized powder can contain additives that maintain isotonicity (e.g., sodium chloride, mannitol) and chemical stability (e.g., buffers and preservatives). The formulation is sterilized by commonly used techniques.

Suitable pharmaceutical carriers are described in Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in this field of art.

For example, a parenteral composition suitable for administration by injection is prepared by dissolving 1.5% by weight of active ingredient in 0.9% sodium chloride solution.

TNF antagonists and methotrexate are administered in therapeutically effective amounts; the compositions of the present invention are administered in a therapeutically effective amount. As used herein, a "therapeutically effective

19

amount" is such that administration of TNF antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered. A therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease. As used herein, a therapeutically effective amount is not necessarily an amount such that administration of the TNF antagonist alone, or administration of methotrexate alone, must necessarily result in inhibition of the biological activity of TNF.

Once a therapeutically effective amount has been administered, a maintenance amount of TNF antagonist alone, of methotrexate alone, or of a combination of TNF antagonist and methotrexate can be administered to the individual. A maintenance amount is the amount of TNF antagonist, methotrexate, or combination of TNF antagonist and methotrexate necessary to maintain the reduction or elimination of the signs and symptoms associated with a particular TNF-mediated disease achieved by the therapeutically effective dose. The maintenance amount can be administered in the form of a single dose, or a series of doses separated by intervals of days or weeks.

The dosage administered to an individual will vary depending upon a variety of factors, including the pharmacodynamic characteristics of the particular antagonists, and its mode and route of administration; size, age, sex, health, body weight and diet of the recipient; nature and extent of symptoms of the disease being treated, kind of concurrent treatment, frequency of treatment, and the effect desired. In vitro and in vivo methods of determining the inhibition of TNF in an individual are well known to those of skill in the art. Such in vitro assays can include a TNF cytotoxicity assay (e.g., the WEHI assay or a radioimmunoassay, ELISA). In vivo methods can include rodent lethality assays and/or primate pathology model systems (Mathison et al., *J. Clin. Invest.,* 81:1925-1937 (1988); Beutler et al., *Science* 229:869-871 (1985); Tracey et al., *Nature* 330:662-664 (1987); Shimamoto et al., *Immunol. Lett.* 17:311-318 (1988); Silva et al., *J. Infect. Dis.* 162:421-427 (1990); Opal et al., *J. Infect. Dis.* 161:1148-1152 (1990); Hinshaw et al., *Circ. Shock* 30:279-292 (1990)).

TNF antagonist and methotrexate can each be administered in single or multiple doses depending upon factors such as nature and extent of symptoms, kind of concurrent treatment and the effect desired. Thus, other therapeutic regimens or agents (e.g., multiple drug regimens) can be used in combination with the therapeutic co-administration of TNF antagonists and methotrexate. In a particular embodiment, a TNF antagonist is administered in multiple doses. In another embodiment, methotrexate is administered in the form of a series of low doses separated by intervals of days or weeks. Adjustment and manipulation of established dosage ranges are well within the ability of those skilled in the art.

Usually a daily dosage of active ingredient can be about 0.01 to 100 milligrams per kilogram of body weight. Ordinarily 1 to 40 milligrams per kilogram per day given in divided doses 1 to 6 times a day or in sustained release form is effective to obtain desired results. Second or subsequent administrations can be administered at a dosage which is the same, less than or greater than the initial or previous dose administered to the individual.

A second or subsequent administration is preferably during or immediately prior to relapse or a flare-up of the disease or symptoms of the disease. For example, second and subsequent administrations can be given between about one day to

20

30 weeks from the previous administration. Two, three, four or more total administrations can be delivered to the individual, as needed.

Dosage forms (composition) suitable for internal administration generally contain from about 0.1 milligram to about 500 milligrams of active ingredient per unit. In these pharmaceutical compositions the active ingredient will ordinarily be present in an amount of about 0.5-95% by weight based on the total weight of the composition.

The present invention will now be illustrated by the following example, which is not intended to be limiting in any way.

EXAMPLES

Example 1

Clinical Treatment of Rheumatoid Arthritis by Multiple Infusions of an Anti-TNF Antibody with and without Methotrexate

A randomized, double-blind, placebo controlled study was conducted to evaluate the safety and efficacy of a chimeric monoclonal anti-TNF antibody (cA2) following multiple infusions of 1, 3 or 10 mg/kg cA2, alone or in combination with methotrexate, compared to multiple infusions of placebo in combination with methotrexate, in the treatment of rheumatoid arthritis (RA) in patients.

Patients

One hundred one (101) patients at six European centers who had been using methotrexate for at least 6 months, had been on a stable dose of 7.5 mg/wk for at least 4 weeks, and had active disease (according to the criteria of the American College of Rheumatology) with erosive changes on X-rays of hands and feet, were enrolled in the trial. Active disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria (duration of morning stiffness $\geq$45 minutes; $\geq$6 tender or painful joints; erythrocyte sedimentation rate (ESR) $\geq$28 mm/hour; C-reactive protein (CRP) $\geq$20 mg/l.

In patients using corticosteroids ($\leq$7.5 mg/day) or non-steroidal anti-inflammatory drugs (NSAIDs), the doses had been stable for 4 weeks prior to screening. The dose of corticosteroids remained stable throughout trial participation. The dose of NSAID typically also remained stable throughout trial participation.

Study Infusions

The chimeric monoclonal anti-TNF antibody (cA2) was supplied as a sterile solution containing 5 mg cA2 per ml of 0.01 M phosphate-buffered saline in 0.15 M sodium chloride with 0.01% polysorbate 80, pH 7.2. The placebo vials contained 0.1% human serum albumin in the same buffer. Before use, the appropriate amount of cA2 or placebo was diluted to 300 ml in sterile saline by the pharmacist, and administered intravenously via a 0.2 μm in-line filter over 2 hours. The characteristics of the placebo and cA2 infusion bags were identical, and the investigators and patients did not know which infusion was being administered.

Assessments

Patients were randomized to one of seven treatment groups. The number of patients in each dose (or treatment) group is indicated in Table 1. Each of the 101 patients received multiple infusions of either 0, 1, 3, or 1.0 mg/kg cA2. Infusions were to be administered at weeks 0, 2, 6, 10 and 14. Starting at week 0, the patients were receiving 7.5 mg/wk of methotrexate (Pharmacochemie, Netherlands) or 3 placebo tablets/week (Pharmacochemie, Netherlands). Patients were

US 7,846,442 B2

21

monitored for adverse events during infusions and regularly thereafter, by interviews, physical examination, and laboratory testing.

The six primary disease-activity assessments were chosen to allow analysis of the response in individual patients according to the Paulus index (Paulus, et al., *Arthritis Rheumatism* 33:477-484 (1990), the teachings of which are incorporated herein by reference). The assessments contributing to this index were the tender joint and swollen joint scores (60 and 58 joints, respectively, hips not assessed for swelling; graded 0-3), the duration of morning stiffness (minutes), the patient's and physician's assessment of disease severity (on a 5-point scale, ranging from 1 (symptom-free) to 5 (very severe), and erythrocyte sedimentation rate (ESR). Patients were considered to have responded if at least four of the six variables improved, defined as at least 20% improvement in the continuous variables, and at least two grades of improvement or improvement from grade 2 to 1 in the two disease-severity assessments (Paulus 20% response). Improvements of at least 50% in the continuous variables were also used (Paulus 50% response).

Other disease-activity assessments included the pain score (0-10 cm on a visual analogue scale (VAS)), an assessment of

22

fatigue (0-10 cm VAS), and grip strength (0-300 mm Hg, mean of three measurements per hand by sphygmomanometer cuff)).

The ESR was measured at each study site with a standard method (Westergen). C-reactive protein (CRP) was measured by rate nephelometry (Abbott fluorescent polarizing immunoassay). See also, Elliott et al., *Lancet* 344:1105-1110 (1994); Elliott et al., *Lancet* 344:1125-1127 (1994); and Elliott et al., *Arthritis Rheum.* 36(12): 1681-1690 (1993), which references are entirely incorporated herein by reference.

Evaluations were performed at weeks 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22 and 26.

Results

The 101 patients were randomized to one of seven treatment (or dose) groups. The patients enrolled in each dose group were well matched for baseline demographics. Disease duration and swollen and tender joint counts at baseline were also well-balanced across the groups (Table 1). Table 1 also shows the maximum methotrexate dose administered within 6 months prior to randomization. Median maximum doses for each group ranged between 10 and 15 mg/week; there were no significant differences amongst the treatment groups (p=0.404).

TABLE 1

Baseline Disease Characteristics Joint Counts

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | All | Treatment effect |
|---|---|---|---|---|---|---|---|---|---|
| | MTX+ | MTX+ | MTX− | MTX+ | MTX− | MTX+ | MTX− | patients | p-value |
| Disease dur. (yrs) | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 15 | 14 | 14 | 15 | 101 | 0.634 |
| Mean ± SD | 7.6 ± 4.0 | 14.3 ± 12.1 | 7.6 ± 6.0 | 12.1 ± 9.0 | 7.8 ± 4.3 | 11.1 ± 7.4 | 9.7 ± 7.4 | 10.0 ± 7.8 | |
| Median | 6.9 | 11.4 | 11.9 | 7.7 | 10.7 | 7.6 | 7.6 | | |
| IQ range | (4.3, 11.5) | (3.3, 24.7) | (3.4, 9.0) | (4.3, 16.4) | (4.6, 9.8) | (4.5, 15.5) | (4.9, 14.9) | (4.3, 14.4) | |
| Range | (1.8, 14.2) | (0.7, 37.3) | (2.5, 21.3) | (0.7, 30.5) | (1.4, 17.4) | (1.4, 24.1) | (1.1, 24.3) | (0.7, 37.3) | |
| Number of Swollen joints, Paulus joint set (0-58) | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 15 | 14 | 14 | 15 | 101 | 0.643 |
| Mean ± SD | 18.1 ± 8.6 | 16.9 ± 7.8 | 21.2 ± 11.2 | | 17.7 ± 5.9 | 19.7 ± 9.9 | 21.1 ± 8.2 | 17.8 ± 8.7 | 18.9 ± 8.7 |
| Median | 16.5 | 15.5 | 20.0 | 16.0 | 17.0 | 19.5 | 17.0 | 18.0 | |
| IQ range | (12.0, 25.0) | (10.0, 25.0) | (10.0, 33.0) | (13.0, 22.0) | (11.0, 32.0) | (15.0, 31.0) | (11.0, 21.0) | (12.0, 25.0) | |
| Range | (6.0, 38.0) | (6.0, 29.0) | (7.0, 40.0) | (10.0, 29.0) | (8.0, 34.0) | (10.0, 34.0) | (7.0, 41.0) | (6.0, 41.0) | |
| Number of tender joints, Paulus joint set (0-60) | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 15 | 14 | 14 | 15 | 101 | 0.135 |
| Mean ± SD | 31.5 ± 14.2 | 19.1 ± 10.7 | 29.9 ± 17.1 | 24.5 ± 14.4 | 31.2 ± 11.7 | 26.5 ± 12.0 | 26.2 ± 11.7 | 27.0 ± 13.5 | |
| Median | 27.0 | 16.0 | 30.0 | 21.0 | 31.0 | 25.5 | 23.0 | 25.0 | |
| IQ range | (22.0, 44.0) | (13.0, 30.0) | (14.0, 45.0) | (12.0, 32.0) | (23.0, 39.0) | (21.0, 38.0) | (17.0, 35.0) | (15.0, 38.0) | |
| Range | (8.0, 52.0) | (2.0, 39.0) | (6.0, 58.0) | (10.0, 52.0) | (9.0, 52.0) | (8.0, 44.0) | (11.0, 48.0) | (2.0, 58.0) | |
| Max dose MTX prev. 6 mo (mg/kg) | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 14 | 13 | 14 | 15 | 99 | 0.404 |
| Mean ± SD | 13.8 ± 3.9 | 11.6 ± 3.5 | 12.8 ± 5.6 | 11.6 ± 3.3 | 11.7 ± 4.8 | 12.7 ± 5.0 | 12.5 ± 3.0 | 12.4 ± 4.2 | |
| Median | 15.0 | 11.3 | 12.5 | 10.0 | 10.0 | 10.0 | 12.5 | 12.5 | |
| IQ range | (10.0, 15.0) | (10.0, 12.5) | (10.0, 15.0) | (10.0, 15.0) | (7.5, 12.5) | (10.0, 15.0) | (10.0, 15.0) | (10.0, 15.0) | |
| Range | (7.5, 20.0) | (7.5, 20.0) | (7.5, 30.0) | (7.5, 17.5) | (7.5, 25.0) | (7.5, 25.0) | (7.5, 20.0) | (7.5, 30.0) | |

MTX = Methotrexate

US 7,846,442 B2

23

The pre-specified primary analysis in this trial was the comparison of the total time of clinical response during the 26-week follow-up period. The results for the primary analysis are shown in Table 2. The duration of response of all

24

cA2-treated groups, with the exception of the 1 mg/kg group not receiving methotrexate, was significantly improved (p<0.001) compared to the placebo group receiving methotrexate alone.

TABLE 2

| Total Time of Response[a] Based On Paulus 20% Criteria | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Treatment Groups | | | | |
| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
| Total time of response in weeks | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
| Median | 0 | 16.6 | 2.6 | 16.5 | 172 | >23.1 | 10.4 | <0.001 |
| Minimum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 25th percentile | 0.0 | 6.2 | 2.0 | 7.0 | 4.0 | 2.6 | 6.9 | |
| 75th percentile | 0.0 | 22.5 | 8.0 | >20.1 | 20.7 | >24.6 | >23.1 | |
| Maximum | >15.1 | >26.9 | 15.1 | >24.9 | >25.9 | >25.6 | >26.4 | |
| p-value vs. MTX alone | | <0.001 | 0.119 | <0.001 | <0.001 | <0.001 | <0.001 | |

[a]Patients were followed through 26 weeks following the initial infusion of cA2

The response rates at Paulus 20% are shown in Table 3. Drop-outs were considered as non-responders subsequent to their dropping out from the study. With the exception of the 1 mg/kg group not receiving methotrexate, all of the cA2-treated groups demonstrated clinical benefit thorough 14 weeks when the last dose of cA2 was received. Sustained clinical benefit was observed through 26 weeks (the last follow-up visit) in patients who received 3 or 10 mg/kg cA2 with methotrexate. Approximately one-half of the patients who received 3 mg/kg cA2 with methotrexate demonstrated continued clinical benefit at 26 weeks.

TABLE 3

| Number of Patients Responding According To Paulus 20% Criteria At Each Evaluation Visit | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Treatment Groups | | | | |
| | Placebo | mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
| Pts with any response | 21% (3/14) | 93% 13/14 | 80% 12/15 | 80% 12/15 | 79% 11/14 | 85% 11/13 | 80% 12/15 | <0.001 |
| p-value vs MTX alone | | <0.001 | 0.006 | 0.002 | 0.002 | 0.001 | 0.004 | |
| Time post-infusion | | | | | | | | |
| 1 Week | 0% (0/14) | 31% (4/13) | 53% (8/15) | 27% (4/15) | 43% (6/14) | 31% (4/13) | 60% (9/15) | |
| 2 Weeks | 7% (1/14) | 64% (9/14) | 57% (8/14) | 27% (4/15) | 43% (6/14) | 62% (8/13) | 53% (8/15) | |
| 4 Weeks[a] | 0% (0/14) | 79% 11/14 | 33% (5/15) | 40% (6/15) | 64% (9/14) | 54% (7/13) | 53% (8/15) | 0.002 |
| 6 Weeks | 0% (0/14) | 71% 10/14 | 27% (4/15) | 47% (7/15) | 50% (7/14) | 54% (7/13) | 47% (7/15) | |
| 8 Weeks[a] | 14% (2/14) | 64% (9/14) | 20% (3/15) | 60% (9/15) | 71% 10/14 | 69% (9/13) | 40% (6/15) | 0.003 |
| 10 Weeks | 7% (1/14) | 71% 10/14 | 20% (3/15) | 67% 10/15 | 64% (9/14) | 69% (9/13) | 53% (8/15) | |
| 12 Weeks[a] | 7% (1/14) | 57% (8/14) | 13% (2/15) | 67% 10/15 | 64% (9/14) | 62% (8/13) | 60% (8/13) | <0.001 |
| 14 Weeks | 0% (0/14) | 71% 10/14 | 7% (1/15) | 60% (9/15) | 57% (8/14) | 77% 10/13 | 53% (8/15) | |
| 16 Weeks[a] | 14% (2/14) | 64% (9/14) | 7% (1/15) | 67% 10/15 | 64% (9/14) | 54% (7/13) | 67% 10/15 | <0.001 |

**A144**

US 7,846,442 B2

25      26

TABLE 3-continued

| | Placebo | mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX– (n = 15) | MTX+ (n = 15) | MTX– (n = 14) | MTX+ (n = 13) | MTX– (n = 15) | effect p-value |
| 18 Weeks | 21% (3/14) | 50% (7/14) | 13% (2/15) | 71% 10/14 | 69% (9/13) | 62% (8/13) | 57% (8/14) | |
| 20 Weeks | 7% (1/14) | 54% (7/13) | 13% (2/15) | 53% (8/15) | 43% (6/14) | 54% (7/13) | 53% (8/15) | |
| 22 Weeks | 7% (1/14) | 46% (6/13) | 0% (0/15) | 47% (7/15) | 36% (5/14) | 54% (7/13) | 33% (5/15) | |
| 26 Weeks[a] | 7% (1/14) | 21% (3/14) | 7% (1/15) | 47% (7/15) | 21% (3/14) | 54% (7/13) | 33% (5/15) | 0.013 |

*Number of Patients Responding According To Paulus 20% Criteria At Each Evaluation Visit; Treatment Groups*

[a]Evaluation visits pre-specified for analysis.

20

The response rate at Paulus 50% are shown in table 4. The magnitude of the clinical benefit of cA2 treatment was substantial. The majority of patients were responding to cA2 treatment according to the 50% Paulus criteria.

Commensurate with the clinical response rates shown in Tables 2-4, most of the patients in the treatment groups demonstrating effectiveness of cA2 treatment received all 5 infusions of cA2 (Table 5). The principle reason for patients not

TABLE 4

Number of Patients Responding According To Paulus 50% Criteria At Each Evaluation Visit

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX– (n = 15) | MTX+ (n = 15) | MTX– (n = 14) | MTX+ (n = 13) | MTX– (n = 15) | effect p-value |
| Pts with any response | 14.3% (2/14) | 85.7% (12/14) | 40.0% (6/15) | 73.3% (11/15) | 64.3% (9/14) | 76.9% (10/13) | 66.7% (10/15) | <0.001 |
| p-value vs MTX alone | | <0.001 | 0.079 | 0.001 | 0.008 | 0.002 | 0.009 | |
| Time post-infusion | | | | | | | | |
| 1 Week | 0.0% (0/14) | 7.7% (1/13) | 26.7% (4/15) | 0.0% (0/15) | 35.7% (5/14) | 7.7% (1/13) | 26.7% (4/15) | |
| 2 Weeks | 0.0% (0/14) | 21.4% (3/14) | 28.6% (4/14) | 6.7% (1/15) | 28.6% (4/14) | 15.4% (2/13) | 20.0% (3/15) | |
| 4 Weeks[a] | 0.0% (0/14) | 57.1% (8/14) | 13.3% (2/15) | 13.3% (2/15) | 28.6% (4/14) | 46.2% (6/13) | 40.0% (6/15) | 0.006 |
| 6 Weeks | 0.0% (0/14) | 57.1% (8/14) | 0.0% (0/15) | 26.7% (4/15) | 42.9% (6/14) | 38.5% (5/13) | 33.3% (5/15) | |
| 8 Weeks[a] | 7.1% (1/14) | 50.0% (7/14) | 0.0% (0/15) | 40.0% (6/15) | 50.0% (7/14) | 69.2% (9/13) | 33.3% (5/15) | 0.001 |
| 10 Weeks | 0.0% (0/14) | 57.1% (8/14) | 0.0% (0/15) | 40.0% (6/15) | 50.0% (7/14) | 69.2% (9/13) | 40.0% (6/15) | |
| 12 Weeks[a] | 7.1% (1/14) | 50.0% (7/14) | 6.7% (1/15) | 60.0% (9/15) | 35.7% (5/14) | 61.5% (8/13) | 40.0% (6/15) | <0.001 |
| 14 Weeks | 0.0% (0/14) | 57.1% (8/14) | 6.7% (1/15) | 40.0% (6/15) | 35.7% (5/14) | 61.5% (8/13) | 40.0% (6/15) | |
| 16 Weeks[a] | 0.0% (0/14) | 64.3% (9/14) | 6.7% (1/15) | 60.0% (9/15) | 50.0% (7/14) | 53.8% (7/13) | 40.0% (6/15) | <0.001 |
| 18 Weeks | 7.1% (1/14) | 50.0% (7/14) | 6.7% (1/15) | 71.4% (10/14) | 46.2% (6/13) | 61.5% (8/13) | 57.1% (8/14) | |
| 20 Weeks | 7.1% (1/14) | 53.8% (7/13) | 0.0% (0/15) | 53.3% (8/15) | 35.7% (5/14) | 46.2% (6/13) | 40.0% (6/15) | |
| 22 Weeks | 0.0% (0/14) | 38.5% (5/13) | 0.0% (0/15) | 46.7% (7/15) | 14.3% (2/14) | 53.8% (7/13) | 26.7% (4/15) | |
| 26 Weeks[a] | 0.0% (0/14) | 21.4% (3/14) | 6.7% (1/15) | 40.0% (6/15) | 14.3% (2/14) | 46.2% (6/13) | 20.0% (3/15) | 0.008 |

[a]Evaluation visits pre-specified for analysis.

US 7,846,442 B2

27

receiving the complete dose regimen was because of lack of efficacy in the placebo group (methotrexate alone) and in the 1 mg/kg group not receiving methotrexate. All 15 patients in the 3 mg/kg group that received methotrexate completed the 5-infusion dose regimen.

28

purposes of data presentation, the scales for cA2 concentration for each graph are condensed as the cA2 dose was increased.

Substantial differences were observed for the cA2 serum concentration over time in the 1 mg/kg dose groups according

TABLE 5

| Pts with complete[a] infusions | Number of Infusions Completed | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Treatment Groups | | | | | | | |
| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | effect p-value |
| 5 infusions | 6 (42.86%) | 12 (85.71%) | 8 (53.33%) | 15 (100.00%) | 12 (85.71%) | 12 (85.71%) | 12 (80.00%) | 0.003 |
| 4 infusions | 0 (0.00%) | 1 (7.14%) | 0 (0.00%) | 0 (0.00%) | 1 (7.14%) | 1 (7.14%) | 0 (0.00%) | |
| 3 infusions | 2 (14.29%) | 1 (7.14%) | 6 (40.00%) | 0 (0.00%) | 0 (0.00%) | 1 (7.14%) | 1 (6.67%) | |
| 2 infusions | 5 (35.71%) | 0 (0.00%) | 1 (6.67%) | 0 (0.00%) | 1 (7.14%) | 0 (0.00%) | 2 (13.33%) | |
| 1 infusion | 1 (7.14%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | |

[a]Patients are counted only once for the first group for which they qualify (5 infusions >4 infusions etc. . . ). Patients were only counted if they had completed the entire infusion.

Results for measures of swollen and tender joint counts and the physician and patient global assessments are shown in FIGS. 1-4. The median results in FIGS. 1-4 were reported for each evaluation visit based only on the patients with data collected. That is, a last observation carried forward approach was not used for patients who dropped out. Instead, the number of patients with data that comprise each point on the graph was reported at the bottom of the figures.

Despite the number of drop-outs in the placebo group and the 1 mg/kg group not receiving methotrexate, the results in FIGS. 1-4 demonstrate that cA2 treatment in combination with methotrexate profoundly reduces disease activity for all of the traditional measurements of disease activity, approaching near remission in many patients.

Results for a commonly used serum marker of inflammatory activity, C-reactive protein (CRP) are shown in FIG. 5. Treatment with cA2 produced a rapid decrease in CRP concentration which was sustained through 26 weeks in the patients who received 3 or 10 mg/kg cA2.

Results for the Health Assessment Questionnaire (HAQ) are shown in FIG. 6. This measurement of quality of life/disability demonstrated improvement over time corresponding with the clinical improvement observed in patients treated with cA2. In the patients treated with 3 mg/kg cA2 and methotrexate, the HAQ decreased from 2.0 at baseline to 1.1 at 22 weeks.

Pharmacokinetics of cA2

Serum concentrations of cA2 were obtained in all patients in this study. The serum concentration in each patient plotted over time according to the cA2 dose group is shown in FIG. 7. Data plotted are the serum cA2 concentrations obtained just before the administration of cA2 at weeks 2, 6, 10 and 14 and then at weeks 18 and 26. These sampling times were selected to best demonstrate the stability of the cA2 concentration during the multiple dose regimen and the decline in serum cA2 concentration after the last dose was administered. For

to whether patients received methotrexate. Most of the patients receiving 1 mg/kg cA2 with methotrexate demonstrated measurable cA2 concentrations through 18 weeks, although it appeared that there was a tendency for the concentration to decline over time. In sharp contrast, the majority of patients who received 1 mg/kg cA2 without methotrexate were not able to maintain measurable serum concentrations of cA2 over time. As discussed herein, the inability to maintain serum cA2 in these patients was associated with a high rate of neutralizing antibody formation.

In contrast to the 1 mg/kg groups, patients who received either 3 mg/kg cA2 or 10 mg/kg cA2 were able to maintain serum cA2 concentrations through the multiple dose regimen. However, even in those dose groups, there was evidence that concomitant treatment with methotrexate was associated with high cA2 serum concentrations. As shown in FIG. 8, the median serum cA2 concentration in both the 3 and 10 mg/kg dose groups receiving methotrexate was higher than in the corresponding groups not receiving methotrexate.

Immune Responses to cA2

Serum samples were collected through 26 weeks from all patients and analyzed for human anti-chimeric antibodies (HACA) to cA2. The results for HACA responses for each cA2 treatment group are shown in Table 6. It should be noted that in several patients in the 3 mg/kg group and in most patients in the 10 mg/1 g group, cA2 was still present in the 26-week sample and could potentially interfere with the detection of HACA in the assay. However, it could also be reasoned that if neutralizing antibodies were present at 26 weeks, then cA2 should not be present. Therefore, in presenting the data in Table 6, results for the immune response rate are shown not including patients with serum cA2 at 26 weeks and including patients with serum cA2 at 26 weeks, assuming that if cA2 was present at 26 weeks, the patient did not have a positive HACA response.

US 7,846,442 B2

29      30

TABLE 6

| | | | | | |
|---|---|---|---|---|---|
| HACA Responses | | | | | |
| | 1 mg/kg | | 3 mg/kg | | 10 mg/kg |
| | MTX+ | MTX– | MTX+ | MTX– | MTX+ | MTX– |
| HACA responses not including pts with 26-week serum cA2 | 2/13 (15.4%) | 8/15 (53.3%) | 0/10 (0%) | 3/12 (25.0%) | 0/2 (0%) | 1/10 (10%) |
| HACA responses including pts with 26-week serum cA2[1] | 2/13 (15.4%) | 8/15 (53.3%) | 0/15 (0%) | 3/14 (21.4%) | 0/14 (0%) | 1/15 (6.7%) |

[1]Patients with a measurable 26-week serum cA2 concentration were considered negative for a HACA response for this analysis.

The results in Table 6 demonstrate that concomitant methotrexate treatment suppresses the immune response to cA2, enabling stable pharmacokinetics to be achieved in a multiple dose regimen of cA2. This effect was also found after combined anti-CD4/anti-TNF antibody treatment in mice with collagen-induced arthritis and described in U.S. application Ser. No. 08/607,419, filed Feb. 28, 1996, the teachings of which are entirely incorporated herein by reference.

Clinical Safety

Two out of 86 patients (with most patients receiving 3 treatments) experienced multisystem infusion-related reactions with retreatment. Multisystem, infusion-related reactions include headache, fever, facial flushing, pruritus, myalgia, nausea, chest tightness, dyspnea, vomiting, erythema, abdominal discomfort, diaphoresis, shivers, hypertension, lightheadedness, hypotension, palpitations and somnolence.

Hypersensitivity reactions, as described herein, may occur whenever protein-containing materials, such as cA2, are administered. Thus, it is unclear whether these symptoms represent an immunologic event or physical factors such as infusion rate and immunoglobulin aggregation. Investigators have reported that symptoms resolve in some patients by decreasing the rate of the infusion. Previous literature reports indicate that vasomotor symptoms have been observed in patients receiving intravenous immunoglobulin therapy (Berkman et al., *Ann. Intern Med.* 112:278-292 (1990); Ochs et al., *Lancet* 2:1158-1159 (1980)).

One patient developed hypotension during all three infusions of 10 mg/kg cA2. The patient did not display clinical signs of hypotension and did not require medical treatment, but, in keeping with predefined safety criteria, the treatment schedule of this patient was discontinued.

One patient treated with 3 infusions of 10 mg/kg of cA2 and with 7.5 mg/week methotrexate developed symptoms of sepsis as a result of staphylococcal pneumonia 2 weeks after her last study visit and 14 weeks after her last infusion with cA2. Six days after developing symptoms she was admitted to the hospital and treated. She died one day later. (This patient had not proceeded with the fourth infusion for reasons unrelated to the sepsis.) Patients with RA who develop infections have a worse than expected outcome. Wolfe and coworkers have reported an observed:expected ratio for death due to pneumonia of 5.307 and an observed:expected ratio for death due to infections (excluding pneumonia) of 6.213 in RA patients from the ARAMIS database (Wolfe et al., *Arthritis Rheumatism* 4:481-494 (1994)).

One patient experienced a serious postoperative infection following cataract surgery 9 weeks after the fifth and last infusion of 3 mg/kg of cA2 (with 7.5 mg/week methotrexate), leading to removal of the eye. This patient was receiving prednisolone (7 mg/day). The incidence of endophthalmitis after cataract extraction has been reported to be between 0.072 and 0.093% (Kattan et al., *Ophthalmology* 98(9): 1147-1148 (1991)) and may be heightened in patients receiving corticosteroid therapy.

Eight (9%) of 87 patients developed double stranded (ds)-DNA antibodies following multiple infusions of cA2. Measurements were performed at baseline, week 8, 16 and 26 (12 weeks following the last infusion). In these patients with antibodies against ds-DNA, there was a trend toward a lower level in antibodies at the last evaluation, with two patients being negative.

One patient developed dyspnea, pleuritic chest pain and a rebound of arthritis activity at study week 14 (four weeks after the fourth infusion of 3 mg/kg of cA2). Symptoms resolved and she received her fifth dose of cA2. Symptoms recurred 3 weeks later. Examination of the serial blood samples revealed that the test for antinuclear antibodies and anti ds-DNA antibodies were negative prior to treatment, but became positive at week 6 of the study. The patient's symptoms responded to oral prednisolone 20-30 mg daily. The working diagnosis was systemic lupus erythematosus (SLE). The patient currently does not have symptoms of SLE but has active RA.

To date, although antibodies to ds-DNA have been detected in patients treated with cA2, they generally represent transient increases and only one patient has been symptomatic. In patients who have had sufficient follow-up, anti-ds-DNA antibodies have resolved with discontinuation of treatment.

In summary, treatment with cA2 is well tolerated. The reductions in disease activity produced by cA2 are significant as supported by the findings of a low placebo response rate. High clinical response rates are obtained with a multiple dose regimen of 3 mg/kg cA2 in combination with 7.5 mg/wk methotrexate and can be sustained through 26 weeks. This dose regimen is considered preferable to the 1 mg/kg plus methotrexate regimen because better pharmacokinetics are obtained, virtually no immune response was detected and the clinical response is better sustained following the last treatment with cA2. The clinical benefit obtained by increasing the dose regimen to 10 mg/kg cA2 plus methotrexate is similar to that observed with the 3 mg/kg cA2 plus methotrexate regimen.

Thus, the results of this study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in RA patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks. The benefit produced by cA2 generally exceeds 50% reductions in the traditional measurements of rheumatoid arthritis (swollen and tender joints, patient and physician global disease assessments) and achieves near clinical remission in many patients. Accordingly, the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

Example 2

Clinical Treatment of Rheumatoid Arthritis by Single Infusion of an Anti-TNF Antibody in Patients Receiving Methotrexate

A randomized, double-blind, placebo controlled study was conducted to evaluate the effects of a single infusion of placebo, 5, 10 or 20 mg/log cA2 in combination with methotrexate, administered at a dose of 10 mg/week, in the treatment of rheumatoid arthritis (RA) in patients.

US 7,846,442 B2

31

## Patients

Twenty-eight (28) RA patients at three centers in the United States who, despite receiving three months therapy with methotrexate administered at a stable dose of 10 mg/wk for at least 4 weeks prior to screening, still had active disease according to the criteria of the American College of Rheumatology, were enrolled in the study. Active disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria (duration of morning stiffness ≧45 minutes; ≧6 tender or painful joints; erythrocyte sedimentation rate (ESR) ≧28 mm/hour; C-reactive protein (CRP) ≧20 mg/l.

Patients taking NSAIDs and corticosteroids (prednisone) at screening were allowed to continue at stable doses (7.5 mg/day).

## Study Infusions

The chimeric monoclonal anti-TNF antibody (cA2) was supplied as a sterile solution containing 5 mg cA2 per ml of 0.01 M phosphate-buffered saline in 0.15 M sodium chloride with 0.01% polysorbate 80, pH 7.2. The placebo vials contained 0.1% human serum albumin in the same buffer. Before use, the appropriate amount of cA2 or placebo was diluted to 300 ml in sterile saline by the pharmacist, and administered intravenously via a 0.2 μm in-line filter over 2 hours. The characteristics of the placebo and cA2 infusion bags were identical, and the investigators and patients did not know which infusion was being administered.

## Assessments

Patients were randomized to one of four treatment groups (7 patients per group). Each of the 28 patients received a single dose of either 0, 5, 10 or 20 mg/kg cA2 and were followed for 12 weeks. Patients continued treatment with methotrexate (Pharmacochemie, Netherlands) administered at 10 mg/week throughout the study. Patients were monitored for adverse events during infusions and regularly thereafter, by interviews, physical examination, and laboratory testing.

The primary measurement of clinical response was defined by the ACR preliminary definition of response (Felson et al., *Arthritis Rheumatism* 38(6):727-735 (1995)). Patients were considered to have a response if they had a 20% reduction in swollen and tender joint count, and had experienced a 20% reduction in 3 of the 5 following assessments: patient's assessment of pain (VAS), patient's global assessment of disease activity (VAS), physician's global assessment of disease activity (VAS), patient's assessment of physical function (HAQ), and an acute phase reactant (ESR). The ESR was measured at each study site with a standard method (Westergen).

Evaluations were performed on day 3, and at weeks 1, 2, 4, 6, 8, 10, and 12.

## Results

The 28 patients were randomized to one of four treatment (or dose) groups.

The clinical response rates over time by ACR 20% criteria in each of the treatment groups is shown in Table 7.

TABLE 7

Clinical Response Rates (By ACR 20% Criteria) In Patients Receiving 10 mg/kg Methotrexate

| | | Dose of cA2 | | | cA2 Treated |
|---|---|---|---|---|---|
| Pts evaluated | Placebo 7 | 5 mg/kg 7 | 10 mg/kg 7 | 20 mg/kg 7 | Patients 21 |
| Pts with any response 1 Week | 1(14.3%) 0(0.0%) | 6(85.7%) 4(57.1%) | 5(71.4%) 2(28.6%) | 6(85.7%) 5(71.4%) | 17(81.0%) 11(52.4%) |

32

TABLE 7-continued

Clinical Response Rates (By ACR 20% Criteria) In Patients Receiving 10 mg/kg Methotrexate

| | | Dose of cA2 | | | cA2 Treated |
|---|---|---|---|---|---|
| Pts evaluated | Placebo 7 | 5 mg/kg 7 | 10 mg/kg 7 | 20 mg/kg 7 | Patients 21 |
| 2 Weeks | 0(0.0%) | 4(57.1%) | 5(71.4%) | 5(71.4%) | 14(66.7%) |
| 4 Weeks | 1(14.3%) | 3(42.9%) | 5(71.4%) | 5(71.4%) | 13(61.9%) |
| 6 Weeks | 0(0.0%) | 3(42.9%) | 5(71.4%) | 4(57.1%) | 12(57.1%) |
| 8 Weeks | 1(14.3%) | 3(42.9%) | 4(57.1%) | 4(57.1%) | 11(52.4%) |
| 10 Weeks | 1(14.3%) | 1(14.3%) | 4(57.1%) | 3(42.9%) | 8(38.1%) |
| 12 Weeks | 1(14.3%) | 2(28.6%) | 4(57.1%) | 3(42.9%) | 9(42.9%) |

Clinical benefit of cA2 treatment was evident at the first evaluation visit at one week. Although each of the 3 doses of cA2 produced clinical responses in the majority of patients treated, the duration of clinical response appeared to be better sustained through 12 weeks in the groups receiving 10 or 20 mg/kg cA2. Clinical response was achieved much more frequently among patients receiving cA2 as compared to placebo. That is, $^{17}/_{21}$ (81%) patients in the 3 cA2 groups achieved a response, compared with only $^{1}/_{7}$ (14%) placebo treated patients. The magnitude of clinical response was notable. The mean tender joint count among cA2 treated patients decreased from 30.1 at baseline to 13.3 at week 12, and mean CRP decreased from 3.0 at baseline to 1.1 at week 12.

The duration of clinical response appeared to be dose dependent. $^{2}/_{6}$ (33%) of the responding patients treated with 5 mg/kg cA2 sustained a response through 12 weeks of follow-up, compared to $^{7}/_{11}$ (64%) of the responding patients who received 10 or 20 mg/kg. Treatment in all groups was generally well tolerated.

In summary, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate. Moreover, the clinical response achieved by this approach can be sustained for more than 12 weeks after a single treatment. Accordingly, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

### Example 3

Clinical Treatment of Rheumatoid Arthritis by Repeated Dose Administration of an Anti-TNF Antibody in Patients Following a Single Dose, Double-Blind, Placebo-Controlled Trial

An open label study was conducted to evaluate the effects of repeated infusions of 10 mg/kg cA2 in combination with methotrexate, administered at a dose of 10 mg/week, in the treatment of rheumatoid arthritis in patients.

## Patients

As described in Example 2, a randomized, double-blind, placebo controlled, 12 week study of cA2 was conducted in RA patients who had active disease despite receiving three months therapy with methotrexate administered at a stable dose of 10 mg/wk for at least 4 weeks prior to screening.

US 7,846,442 B2

33

At week 12, patients who had completed the 12 week evaluation period and had not experienced adverse events prohibiting further infusions of cA2, were offered 3 subsequent open label infusions of cA2, administered at a dose of 10 mg/kg, at eight week intervals (weeks 12, 20, 28). Twenty-three (23) patients from the 12 week study were enrolled in this study.

Assessments

11/23 patients entering this open label study were evaluated at 1 of 3 centers in the United States and followed up to 40 weeks after initial entry. Patients continued treatment with methotrexate administered at 10 mg/week throughout the study. Repeated treatments with cA2 were generally well tolerated. Three patients had transient infusion related symptoms (urticaria, somnolence).

The primary measurement of clinical response was defined by the ACR preliminary definition of response (Felson et al., *Arthritis Rheumatism* 38(6):727-735 (1995)). Patients were considered to have a response if they had a 20% reduction in swollen and tender joint count, and had experienced a 20% reduction in 3 of the 5 following assessments: patient's assessment of pain (VAS), patient's global assessment of disease activity (VAS), physician's global assessment of disease activity (VAS), patient's assessment of physical function (HAQ), and an acute phase reactant (ESR). The ESR was measured at each study site with a standard method (Westergen).

Results

Of six patients who had all received cA2 during the double-blinded study described in Example 2 and responded through the 12 weeks of that study, four patients sustained a response throughout the 40 week followup. Of the remaining two patients, one patient is still responding through week 28, and one patient recently entered this open label trial. For all 4

34

patients completing 40 weeks of followup and the patient at week 28, final tender joint counts were 2 and swollen joint counts 1, compared to a mean of 23 and 29, respectively, at entry into the double-blinded study described in Example 2. For 4 of these 5 patients, ESR were 18 mm/hr and CRP 0.7, compared to a mean of 27 and 3.9, respectively, at entry into the double-blind study described in Example 2.

Of two patients who had both received cA2 during the double-blinded study described in Example 2 and responded only through week 10 of that study, one patient responded through 36 weeks and one patient is still responding through week 20.

Of three patients who did not respond during the double-blinded study described in Example 2 (2 received placebos, 1 received 5 mg/kg cA2), two of these patients experienced a transient clinical response, and one patient is still responding through week 20.

In summary, the preliminary results of this study suggest that repeated adjunctive and/or concomitant therapy with cA2, in RA patients whose disease is incompletely controlled by methotrexate, can result in substantial clinical improvement for a majority of the patients. Moreover, the clinical response achieved by this approach can be sustained for up to 40 weeks of followup. Accordingly, the results of this study indicate that repeated treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

EQUIVALENTS

Those skilled in the art will know, or be able to ascertain, using no more than routine experimentation, many equivalents to the specific embodiments of the invention described herein. These and all other equivalents are intended to be encompassed by the following claims.

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 2

<210> SEQ ID NO 1
<211> LENGTH: 22
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 1

Tyr Ser Gln Val Leu Phe Lys Gly Gln Gly Cys Pro Ser Thr His Val
1               5                   10                  15

Leu Leu Thr His Thr Ile
            20


<210> SEQ ID NO 2
<211> LENGTH: 22
<212> TYPE: PRT
<213> ORGANISM: Homo sapiens

<400> SEQUENCE: 2

Tyr Gln Thr Lys Val Asn Leu Leu Ser Ala Ile Lys Ser Pro Cys Gln
1               5                   10                  15

Arg Glu Thr Pro Glu Gly
            20
```

US 7,846,442 B2

35

What is claimed:

**1**. A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled despite already receiving methotrexate comprising adjunctively administering with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α, (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors and (c) is administered at a dosage of 0.01-100 mg/kg, and wherein such administration reduces or eliminates signs and symptoms associated with rheumatoid arthritis.

**2**. The method of claim **1**, wherein (a) methotrexate is administered at an interval of a week or weeks, and (b) the anti-human tumor necrosis factor-α antibody or fragment thereof is administered multiple times, each such administration being separated by an interval of a week or weeks from the prior administration.

**3**. A method for adjunctive treatment of an individual suffering from rheumatoid arthritis who still has active disease despite prior therapy with methotrexate and who is already being treated with methotrexate comprising administering a different composition comprising an anti-human tumor necrosis factor-α antibody or a human tumor necrosis factor-α binding fragment thereof to the individual, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is administered to the individual multiple times, each such administration (i) being separated by an interval of a week or weeks from the prior administration, and (ii) delivering 0.01-100 mg/kg of the anti-human tumor necrosis factor-α antibody or fragment thereof and wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis.

**4**. The method of claim **3**, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof (a) binds to an epitope on human tumor necrosis factor-α and (b) inhibits binding of human tumor necrosis factor-α to human tumor necrosis factor-α cell surface receptors.

**5**. The method of claim **1** or **3**, wherein each administration of methotrexate delivers from 0.01-100 mg/kg.

**6**. The method of claim **1** or **3**, wherein each administration of the anti-human tumor necrosis factor-α antibody or fragment thereof is separated by an interval of one day to thirty weeks from the prior administration.

**7**. The method of claim **1** or **3**, wherein the anti-human tumor necrosis factor-α antibody or fragment thereof is an antibody.

**8**. The method of claim **7**, wherein the anti-human tumor necrosis factor-α antibody a chimeric antibody.

**9**. The method of claim **8**, wherein the chimeric antibody binds to one or more amino acids of human tumor necrosis factor-α selected from the group of consecutive amino acids at positions 87-108 (SEQ ID NO:2) or at positions 59-80 (SEQ ID NO:1).

36

**10**. The method of claim **9**, wherein the chimeric antibody binds to the epitope recognized by cA2.

**11**. The method of claim **10**, wherein the chimeric antibody is cA2.

**12**. The method of claim **7**, wherein the antibody is a humanized antibody.

**13**. The method of claim **1** or **3**, wherein the anti-human tumor necrosis factor-α antibody or fragment is administered via infusion.

**14**. A method of treating an individual suffering from rheumatoid arthritis and already receiving methotrexate whose active disease is incompletely controlled comprising administering to the individual with methotrexate therapy a different composition comprising an anti-human tumor necrosis factor-α monoclonal antibody, wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis.

**15**. A method of treating an individual suffering from rheumatoid arthritis whose active disease is incompletely controlled by methotrexate comprising administering to the individual a different composition comprising an anti-human tumor necrosis factor antibody, wherein the anti-human tumor necrosis factor antibody is cA2 and is administered repeatedly as adjunctive therapy to methotrexate therapy and wherein such administration reduces or eliminates signs and symptoms associated with the rheumatoid arthritis.

**16**. The method of claim **15**, wherein the anti-human tumor necrosis factor antibody is cA2 and is administered as a repeated infusion of 10 mg/kg cA2, and the methotrexate is administered at a dose of 10 mg/week.

**17**. The method of claim **14**, wherein the anti-human tumor necrosis factor antibody is administered as adjunctive and/or concomitant therapy to methotrexate therapy.

**18**. The method of claim **14**, wherein methotrexate is administered at an interval of a week or weeks and the anti-human tumor necrosis factor antibody is administered as multiple infusions.

**19**. A method of treating an individual suffering from active rheumatoid arthritis despite already receiving methotrexate comprising administering an anti-human tumor necrosis factor-α antibody to the individual, wherein the anti-human tumor necrosis factor-α antibody binds specifically to human tumor necrosis factor-α, and is administered in a different composition, in single or multiple doses, as adjunctive therapy to methotrexate therapy, wherein the methotrexate is administered in multiple doses and wherein such administration reduces or eliminates signs and symptoms associated with the arthritis.

**20**. The method of claim **7**, wherein the antibody is a monoclonal antibody.

**21**. The method of claim **1**, **3** or **14**, wherein 7.5 mg of methotrexate is administered at an interval of a week or weeks, and the anti-human tumor necrosis factor-α antibody is cA2 and is administered by infusion at a dosage of one of 1, 3 or 10 mg/kg.

**22**. The method of claim **21**, wherein the dosage is 3 mg/kg.

\* \* \* \* \*

US006270766B1

(12) **United States Patent**          (10) **Patent No.:**     **US 6,270,766 B1**
Feldman et al.                         (45) **Date of Patent:**      **Aug. 7, 2001**

(54) **ANTI-TNF ANTIBODIES AND METHOTREXATE IN THE TREATMENT OF ARTHRITIS AND CROHN'S DISEASE**

(75) Inventors: **Marc Feldman**, Highgate; **Ravinder N. Maini**, London, both of (GB)

(73) Assignee: **The Kennedy Institute of Rheumatology**, London (GB)

( * ) Notice:      Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/690,775**

(22) Filed: **Aug. 1, 1996**

**Related U.S. Application Data**

(62) Continuation-in-part of application No. 08/607,419, filed on Feb. 28, 1996, now abandoned, which is a continuation-in-part of application No. PCT/GB94/00462, filed on Mar. 10, 1994, which is a continuation-in-part of application No. 08/403,785, filed as application No. PCT/GB93/02070 on Oct. 6, 1993, now Pat. No. 5,741,488, which is a continuation-in-part of application No. 07/958,248, filed on Oct. 8, 1992, now abandoned.

(51) **Int. Cl.**[7] ...................... **A61K 39/395**; A61K 38/19; A01N 43/58

(52) **U.S. Cl.** .................................... **424/145.1**; 424/130.1; 424/133.1; 424/152.1; 424/158.1; 424/172.1; 424/184.1; 424/192.1; 514/2; 514/8; 514/253; 514/885

(58) **Field of Search** ............................. 424/130.1, 133.1, 424/145.1, 152.1, 158.1, 172.1, 184.1, 192.1; 514/218, 885, 253; 530/387.1, 387.3, 388.1, 388.2, 388.23

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,317,019 | * | 5/1994 | Bender . |
| 5,656,272 | * | 8/1997 | Le et al. . |
| 5,672,347 | * | 9/1997 | Aggarwal et al. . |
| 5,698,195 | * | 12/1997 | Le et al. . |
| 5,741,488 | * | 4/1998 | Feldmann et al. . |
| 5,919,452 | * | 7/1999 | Le et al. . |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 89/08460 | 9/1989 | (WO) . |
| WO 92/07585 | 5/1992 | (WO) . |
| WO 92/08474 | 5/1992 | (WO) . |
| WO 92/16553 | 10/1992 | (WO) . |
| WO 95/09652 | 4/1995 | (WO) . |
| WO 96/33204 | 10/1996 | (WO) . |
| WO 98/24496 | 6/1998 | (WO) . |

OTHER PUBLICATIONS

Kaldan, J.R., and Manger, B., "Biologic Agents in the Treatment of Inflammatory Rheumatic Diseases," *Curr. Opin. Rheum.*, 7 :191–297 (2995).

Bologna, C., and Sany, J., "Association des Traitements de Fond dans la Polyarthrite Rhumatoide," *Presse Med.*, 25:876–878 (1996).

Borigini, M.J., and Paulus, H.E., "Combination Therapy," Baillière's *Clin. Rheum.* , 9(4):689–710 (1995).

Kalden, J.R., and Manger, B., "Biologic Agents in the Treatment of Inflammatory Rheumatic Diseases," *Curr. Opin. Rheum.*, 9:206–212 (1997).

Kavanaugh, A., et al., "Anti–TNF–α Monoclonal Antibody (mAB) Treatment of Rheumatoid Arthritis (RA) Patients With Active Disease On Methotrexate (MTX); Results of a Double–Blind, Placebo Controlled Multicenter Trial," *Arth. Rheum.*, 39(Suppl.9): 18–22 (Oct. 1996), Abstract 575.

Horneff, G., et al, "Elevated levels of circulating tumor necrosis factor–α, inteferon–γ, and interleukin–2 in systemic reactions induced by anti–CD4 therapy in patients with rheumatoid arthritis", *Cytokine*, 3(3):266–247 (1991).

Brennan, F., et al., "Inhibitory effect of TNFα antibodies on synovial cell interleukin–1 production in rheumatoid arthritis", *The Lancet*, 2(8657):244–247 (1989).

Steinbruchel, D., et al., "Monoclonal antibody treatment (anti–CD4 and anti–interleukin–2 receptor) combined with cyclosporin A has a positive but not simple dose–dependent effect on rat renal allograft survival", *Scandinavian J. Immunol.*, 34(5):627–633 (1991).

Breedveld, F., et al., "Anti–CD4 antibodies in rheumatoid arthritis", *Clinical and Experimental Rheumatology*, 10(4):325–326 (1992).

Brennan, F., et al., "TNFα–a pivotal role in rheumatoid arthritis?", *British J. Rheumatology*, 31(5):293–298 (1992).

Elliott, M.J., et al., "Treatment of rheumatoid arthritis with chimeric monoclonal antibodies to TNF–α: safety, clinical efficacy and control of the acute phase response", *Cell. Biochemistry, Supplement*, 0(17B):145 (1993); Abstract EZ405.

Williams, R.O., et al., "Synergy between anti–CD4 and anti–tumor necrosis factor in the amelioration of established collagen–induced arthritis", *Proc. Natl. Acad. Sci. USA*, 91:2762–2766 (1994).

Ralph, P., "Clinical and Preclinical Studies Presented at the Keystone Symposium on Arthritis, Related Diseases, and Cytokines," *Lymphokine and Cytokine Research.*, 12(4):261–263 (1993).

Racadot, E., "Immunological follow–up of 17 patients with rheumatoid arthritis treated in vivo with an anti–T CD4+ monoclonal antibody (B–F5)," *Clinical and Experimental Rheumatology*, 10:365–374 (1992).

Williams, R.O., et al., "Successful therapy of collagen–induced arthritis with TNF receptor–IgG fusion protein and combination with anti–CD4," *Immunology*, 84:433–439 (Mar. 1995).

(List continued on next page.)

*Primary Examiner*—Phillip Gambel
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57)          **ABSTRACT**

Methods for treating and/or preventing a TNF-mediated disease in an individual are disclosed. Also disclosed is a composition comprising methotrexate and an anti-tumor necrosis factor antibody. TNF-mediated diseases include rheumatoid arthritis, Crohn's disease, and acute and chronic immune diseases associated with transplantation.

**30 Claims, 8 Drawing Sheets**

## OTHER PUBLICATIONS

Van Der Lubbe, P.A., et al., "A Randomized, Double–Blind, Placebo–Controlled Study of CD4 Monoclonal Antibody Therapy In Early Rheumatoid Arthritis," *Arth. Rheum.*, 38(8):1097–1106 (1995).

Choy, E.H.S., et al., "Therapeutic Monoclonal Antibodies," *British J. Rheumatology*, 34:707–715 (1995).

Rankin, E.C.C., et al., "The Therapeutic Effects of an Engineered Human Anti–Tumour Necrosis Factor Alpha Antibody (CDP571) in Rheumatoid Arthritis," *British J. Rheumatology*, 34:334–342 (1995).

Butler, D.M., et al., "Modulation of proinflammatory cytokine release in rheumatoid synovial membrane cell cultures. Comparison of monoclonal anti TNF–α antibody with the interleukin–1 receptor antagonist," *Eur. Cytokine Netw.*, 6(4):225–230 (1995).

Horneff, G., et al., "Treatment of Rheumatoid Arthritis with an Anti–CD4 Monoclonal Antibody," *Arthritis & Rheumatism*, 34(2): 129–140 (1991).

Van Dulleman, H.M., et al., "Treatment of Crohn's Disease With Anti–Tumor Necrosis Factor Chimeric Monoclonal Antibody (cA2)," *Gastroenterology*, 109(1):129–135 (1995).

Watts, R.A., and Isaacs, J.D., "Immunotherapy of rheumatoid arthritis," *Annals Rheumatic Diseases*, 51:577–579 (1992).

Schacht, E., "Gegenwärtige und zukünftige Therapiestrategien der rheumatoiden Arthritis (RA)," ["The current and future therapy strategies of rheumatoid arthritis (RA)"], *Zeitschrift für Rheumatologie*, 52(6):365–382 (1993).

Elliott, M.J., et al., "Treatment of Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to TNFα", *Rev. Esp. Reumatol*, 20 Suppl. 1:148 (1993); Abstract 320.

Elliott, M.J., et al., "Treatment of Rheumatoid Arthritis with Chimeric Monoclonal Antibodies to Tumor Necrosis Factorα", *Arth. Rheum.*, 36(12):1681–1690 (1993).

Elliott, M.J., et al., "Randomised double–blind comparison of chimeric monoclonal antibody to tumour necrosis factorα (cA2) versus placebo in rheumatoid arthritis", *The Lancet* 344:1105–1110 (1994).

Elliott, M.J., et al., "Repeated therapy with monoclonal antibody to tumour necrosis factor α (cA2) in patients with rheumatoid arthritis", *The Lancet* 344:1125–1127 (1994).

Maini, R.N., et al., "Clinical response of rheumatoid arthritis (RA) to anti–TNFα (cA2) monoclonal antibody (mab) is related to administered dose and persistence of circulating antibody", *Arth. Rheum. Supplement*, 38(9):S186 (1995); Abstract 200.

Maini, R.N., "The role of cytokines in rheumatoid arthritis", *J. Royal College of Physicians of London*, 30(4):344–351 (1996).

Rebets et al. Immunology Today 15:455–458 (1994).*

Manual of Medical Therapeutics 25th Edition Orlan et al (Ed.) Dept of Medicine, Washington University St Louis MO 1986.*

Paul (Ed) Fundamental Immunology, Raven Press NY 1993; pp. 807–812.*

Natanson Ann Int Med 120:771–783, 1994.*

Paul (Ed) Fundamental Immunology Raven Press NY 1993 p. 242 Only.*

Flesch Blood 79: 3362–3368(1992).*

Barrera Cytokine 3(5):504(1991).*

Kozarek Ann Int. Med. 110:353–356(1989).*

Markowitz et al. J. Pediatric Gastroenterology and Nutrition 14:411–413 (1991).*

Not Provided Either Cited as Exhibit or IDS Cohen et al. Rev. Esp. Reumatol 20 Suppl 1: 148 (1993) #318.*

Not Provided Either Cited as Exhibit or IDS Pascaus et al. Rev. Esp. Reumatol 20 Suppl 1: 148 (1993) #319.*

* cited by examiner



FIGURE 1A

FIGURE 1B

FIGURE 1C

FIGURE 2A

FIGURE 2B

FIGURE 2C





FIGURE 3A

FIGURE 3B

FIGURE 3C





FIGURE 4A

FIGURE 4B

FIGURE 4C

FIGURE 5A

FIGURE 5B

FIGURE 5C



FIGURE 6A

FIGURE 6B

FIGURE 6C



FIGURE 7A — 1 mg/kg cA2 + methotrexate

FIGURE 7B — 1 mg/kg cA2, no methotrexate

FIGURE 7C — 3 mg/kg cA2 + methotrexate

FIGURE 7D — 3 mg/kg cA2, no methotrexate

FIGURE 7E — 10 mg/kg cA2 + methotrexate

FIGURE 7F — 10 mg/kg cA2, no methotrexate



FIGURE 8A

FIGURE 8B

US 6,270,766 B1

1

# ANTI-TNF ANTIBODIES AND METHODTREXATE IN THE TREATMENT OF ARTHRITIS AND CROHN'S DISEASE

## RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 08/607,419, filed Feb. 28, 1996, which is a continuation-in-part of International Application No. PCT/GB94/00462, filed Mar. 10, 1994, which is a continuation-in-part of U.S. application Ser. No. 08/403,785, which is the U.S. National Phase of International Application No. PCT/GB93/02070, filed Oct. 6, 1993, which is a continuation-in-part of U.S. application Ser. No. 07/958,248, filed Oct. 8, 1992, now abandoned, the teachings of all of which are entirely incorporated herein by reference.

## BACKGROUND OF THE INVENTION

Monocytes and macrophages secrete cytokines known as tumor necrosis factor alpha (TNFα) and tumor necrosis factor beta (TNFβ) in response to endotoxin or other stimuli. TNFα is a soluble homotrimer of 17 kD protein subunits (Smith et al., *J. Biol. Chem.* 262:6951–6954 (1987)). A membrane-bound 26 kD precursor form of TNF also exists (Kriegler et al., *Cell* 53:45–53 (1988)). For reviews of TNF, see Beutler et al., *Nature* 320:584 (1986); Old, *Science* 230:630 (1986); and Le et al., *Lab. Invest.* 56:234 (1987).

Cells other than monocytes or macrophages also produce TNFα. For example, human non-monocytic tumor cell lines produce tumor necrosis factor (TNF) (Rubin et al., *J. Exp. Med.* 164:1350 (1986); Spriggs et al., *Proc. Natl. Acad. Sci. USA* 84:6563 (1987)). CD4+ and CD8+ peripheral blood T lymphocytes and some cultured T and B cell lines (Cuturi et al., *J. Exp. Med.* 165:1581 (1987); Sung et al., *J. Exp. Med.* 168:1539 (1988); Turner et al., *Eur. J. Immunol.* 17:1807–1814 (1987)) also produce TNFα.

TNF causes pro-inflammatory actions which result in tissue injury, such as degradation of cartilage and bone, induction of adhesion molecules, inducing procoagulant activity on vascular endothelial cells (Pober et al., *J. Immunol.* 136:1680 (1986)), increasing the adherence of neutrophils and lymphocytes (Pober et al., *J. Immunol.* 138:3319 (1987)), and stimulating the release of platelet activating factor from macrophages, neutrophils and vascular endothelial cells (Camussi et al., *J. Exp. Med.* 166:1390 (1987)).

Recent evidence associates TNF with infections (Cerami et al., *Immunol. Today* 9:28 (1988)), immune disorders, neoplastic pathologies (Oliff et al., *Cell* 50:555 (1987)), autoimmune pathologies and graft-versus-host pathologies (Piguet et al., *J. Exp. Med.* 166:1280 (1987)). The association of TNF with cancer and infectious pathologies is often related to the host's catabolic state. Cancer patients suffer from weight loss, usually associated with anorexia.

The extensive wasting which is associated with cancer, and other diseases, is known as "cachexia" (Kern et al., *J. Parent. Enter. Nutr.* 12:286–298 (1988)). Cachexia includes progressive weight loss, anorexia, and persistent erosion of body mass in response to a malignant growth. The fundamental physiological derangement can relate to a decline in food intake relative to energy expenditure. The cachectic state causes most cancer morbidity and mortality. TNF can mediate cachexia in cancer, infectious pathology, and other catabolic states.

TNF also plays a central role in gram-negative sepsis and endotoxic shock (Michie et al., *Br. J. Surg.* 76:670–671 (1989); Debets et al., *Second Vienna Shock Forum,*

2

p.463–466 (1989); Simpson et al., *Crit. Care Clin.* 5:27–47 (1989)), including fever, malaise, anorexia, and cachexia. Endotoxin strongly activates monocyte/macrophage production and secretion of TNF and other cytokines (Kornbluth et al., *J. Immunol.* 137:2585–2591 (1986)). TNF and other monocyte-derived cytokines mediate the metabolic and neurohormonal responses to endotoxin (Michie et al., *New Engl. J. Med.* 318:1481–1486 (1988)). Endotoxin administration to human volunteers produces acute illness with flu-like symptoms including fever, tachycardia, increased metabolic rate and stress hormone release (Revhaug et al., *Arch. Surg.* 123:162–170 (1988)). Circulating TNF increases in patients suffering from Gram-negative sepsis (Waage et al., *Lancet* 1:355–357 (1987); Hammerle et al., *Second Vienna Shock Forum p.* 715–718 (1989); Debets et al., *Crit. Care Med.* 17:489–497 (1989); Calandra et al., *J. Infect. Dis.* 161:982–987 (1990)).

Thus, TNFα has been implicated in inflammatory diseases, autoimmune diseases, viral, bacterial and parasitic infections, malignancies, and/or neurogenerative diseases and is a useful target for specific biological therapy in diseases, such as rheumatoid arthritis and Crohn's disease. Beneficial effects in open-label trials with a chimeric monoclonal antibody to TNFα (cA2) have been reported with suppression of inflammation (Elliott et al., *Arthritis Rheum.* 36:1681–1690 (1993); Elliott et al., *Lancet* 344:1125–1127 (1994)). See also, Van Dullemen et al., *Gastroenterology* 109:129–135 (1995). Beneficial results in a randomized, double-blind, placebo-controlled trial with cA2 have also been reported with suppression of inflammation (Elliott et al., *Lancet* 344:1105–1110 (1994)).

## SUMMARY OF THE INVENTION

The present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy produces a rapid and sustained reduction in the clinical signs and symptoms of the disease. The present invention is also based on the unexpected and dramatic discovery that a multiple dose regimen of a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, when administered adjunctively with methotrexate to an individual suffering from a TNF-mediated disease produces a highly beneficial or synergistic clinical response for a significantly longer duration compared to that obtained with a single or multiple dose regimen of the antagonist administered alone or that obtained with methotrexate administered alone. As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. In a particular embodiment, methotrexate is administered in the form of a series of low doses separated by intervals of days or weeks.

A method is also provided herein for treating and/or preventing recurrence of a TNF-mediated disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. TNF-mediated diseases include rheumatoid arthritis, Crohn's disease, and acute and chronic immune diseases associated with an allogenic transplantation (e.g., renal, cardiac, bone marrow, liver, pancreatic, small intestine, skin or lung transplantation).

Therefore, in one embodiment, the invention relates to a method of treating and/or preventing rheumatoid arthritis in

3

an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. In a second embodiment, the invention relates to a method of treating and/or preventing Crohn's disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts. In a third embodiment, the invention relates to a method of treating and/or preventing other autoimmune diseases and/or acute or chronic immune disease associated with a transplantation in an individual, comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts.

A further embodiment of the invention relates to compositions comprising an anti-TNF antibody or a fragment thereof and methotrexate.

In addition to anti-TNF antibodies, TNF antagonists include anti-TNF antibodies and receptor molecules which bind specifically to TNF; compounds which prevent and/or inhibit TNF synthesis, TNF release or its action on target cells, such as thalidomide, tenidap, phosphodiesterase inhibitors (e.g, pentoxifylline and rolipram), A2b adenosine receptor agonists and A2b adenosine receptor enhancers; and compounds which prevent and/or inhibit TNF receptor signalling.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A–1C are a set of three graphs showing the results over time for swollen joint count in rheumatoid arthritis (RA) patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with-or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate (MTX−); black circle=+methotrexate (MTX+); square=placebo.

FIGS. 2A–2C are a set of three graphs showing the results over time for tender joint count in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. 3A–3C are a set of three graphs showing the results over time for the Physician's Global Disease Assessment in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. 4A–4C are a set of three graphs showing the results over time for the Patient Disease Assessment in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. 5A–5C are a set of three graphs showing the results over time for C-reactive protein (CRP) concentration in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the pla-

4

cebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. 6A–6C are a set of three graphs showing the results over time for the Health Assessment Questionnaire (HAQ) in RA patients receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate. Results for the placebo group (methotrexate alone) are shown with the 1 mg/kg group. The number of patients with data at each evaluation visit is shown at the bottom of each graph. White circle=−methotrexate; black circle=+methotrexate; square=placebo.

FIGS. 7A–7F are a set of six graphs showing the serum cA2 concentration in each RA patient receiving cA2 treatment (1 mg/kg, 3 mg/kg or 10 mg/kg) with or without methotrexate, plotted over time. Data plotted are the serum cA2 concentrations obtained just before the administration of cA2 at weeks 2, 6, 10 and 14 and then at weeks 18 and 26. The scales for the serum cA2 concentration are condensed with higher doses of cA2.

FIGS. 8A and 8B are a set of two graphs showing the median serum cA2 concentration over time in RA patients receiving 3 mg/kg cA2 (top panel) or 10 mg/kg cA2 (bottom panel) with or without methotrexate. Square=+methotrexate; circle or triangle=−methotrexate.

DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from a TNF-mediated disease as adjunctive and/or concomitant therapy to methotrexate therapy, with good to excellent alleviation of the signs and symptoms of the disease. The present invention also relates to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from a TNF-mediated disease in multiple doses and as adjunctive and/or concomitant therapy to methotrexate therapy, with a significant improvement in duration of clinical response.

As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual, comprising co-administering methotrexate and a tumor necrosis factor antagonist to the individual in therapeutically effective amounts. The TNF antagonist and methotrexate can be administered simultaneously or sequentially. The TNF antagonist and methotrexate can each be administered in single or multiple doses. Multiple TNF antagonists can be co-administered with methotrexate. Other therapeutic regimens and agents can be used in combination with the therapeutic co-administration of TNF antagonists and methotrexate or other drugs that suppress the immune system.

A method is also provided herein for treating and/or preventing recurrence of a TNF-mediated disease in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

As used herein, a "TNF-mediated disease" refers to a TNF related pathology or disease. TNF related pathologies or diseases include, but are not limited to, the following:

(A) acute and chronic immune and autoimmune pathologies, such as, but not limited to, rheumatoid arthritis (RA), juvenile chronic arthritis (JCA), thyroiditis, graft versus host disease (GVHD), scleroderma, diabetes mellitus, Graves' disease,

US 6,270,766 B1

5

allergy, acute or chronic immune disease associated with an allogenic transplantation, such as, but not limited to, renal transplantation, cardiac transplantation, bone marrow transplantation, liver transplantation, pancreatic transplantation, small intestine transplantation, lung transplantation and skin transplantation;

(B) infections, including, but not limited to, sepsis syndrome, cachexia, circulatory collapse and shock resulting from acute or chronic bacterial infection, acute and chronic parasitic and/or infectious diseases, bacterial, viral or fungal, such as a human immunodeficiency virus (HIV), acquired immunodeficiency syndrome (AIDS) (including symptoms of cachexia, autoimmune disorders, AIDS dementia complex and infections);

(C) inflammatory diseases, such as chronic inflammatory pathologies, including chronic inflammatory pathologies such as, but not limited to, sarcoidosis, chronic inflammatory bowel disease, ulcerative colitis, and Crohn's pathology or disease; vascular inflammatory pathologies, such as, but not limited to, disseminated intravascular coagulation, atherosclerosis, Kawasaki's pathology and vasculitis syndromes, such as, but not limited to, polyarteritis nodosa, Wegener's granulomatosis, Henoch-Schönlein purpura, giant cell arthritis and microscopic vasculitis of the kidneys; chronic active hepatitis; Sjögren's syndrome; spondyloarthropathies, such as ankylosing spondylitis, psoriatic arthritis and spondylitis, enteropathic arthritis and spondylitis, reactive arthritis and arthritis associated with inflammatory bowel disease; and uveitis;

(D) neurodegenerative diseases, including, but not limited to, demyelinating diseases, such as multiple sclerosis and acute transverse myelitis; myasthenia gravis; extrapyramidal and cerebellar disorders, such as lesions of the corticospinal system; disorders of the basal ganglia or cerebellar disorders; hyperkinetic movement disorders, such as Huntington's chorea and senile chorea; drug-induced movement disorders, such as those induced by drugs which block central nervous system (CNS) dopamine receptors; hypokinetic movement disorders, such as Parkinson's disease; progressive supranuclear palsy; cerebellar and spinocerebellar disorders, such as astructural lesions of the cerebellum; spinocerebellar degenerations (spinal ataxia, Friedreich's ataxia, cerebellar cortical degenerations, multiple systems degenerations (Mencel, Dejerine-Thomas, Shi-Drager, and MachadoJoseph)); and systemic disorders (Refsum's disease, abetalipoprotienemia, ataxia, telangiectasia, and mitochondrial multisystem disorder); disorders of the motor unit, such as neurogenic muscular atrophies (anterior horn cell degeneration, such as amyotrophic lateral sclerosis, infantile spinal muscular atrophy and juvenile spinal muscular atrophy); Alzheimer's disease; Down's syndrome in middle age; diffuse Lewy body disease; senile dementia of Lewy body type; Wernicke-Korsakoff syndrome; chronic alcoholism; primary biliary cirrhosis; cryptogenic fibrosing alveolitis and other fibrotic lung diseases; hemolytic anemia; Creutzfeldt-Jakob disease; subacute sclerosing panencephalitis, Hallervorden-Spatz disease; and dementia pugilistica, or any subset thereof;

(E) malignant pathologies involving TNF-secreting tumors or other malignancies involving TNF, such as, but not limited to, leukemias (acute, chronic

6

myelocytic, chronic lymphocytic and/or myelodyspastic syndrome); lymphomas (Hodgkin's and non-Hodgkin's lymphomas, such as malignant lymphomas (Burkitt's lymphoma or Mycosis fungoides));

(F) cachectic syndromes and other pathologies and diseases involving excess TNF, such as, but not limited to, cachexia of cancer, parasitic disease and heart failure; and

(G) alcohol-induced hepatitis and other forms of chronic hepatitis.

See, e.g., Berkow et al., Eds., *The Merck Manual,* 16th edition, chapter 11, pp. 1380–1529, Merck and Co., Rahway, N.J., 1992, incorporated herein by reference.

The terms "recurrence", "flare-up" or "relapse" are defined to encompass the reappearance of one or more symptoms of the disease state. For example, in the case of rheumatoid arthritis, a reoccurrence can include the experience of one or more of swollen joints, morning stiffness or joint tenderness.

In one embodiment, the invention relates to a method of treating and/or preventing rheumatoid arthritis in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

In a second embodiment, the invention relates to a method for treating and/or preventing Crohn's disease in an individual comprising co-administering a methotrexate and a TNF antagonist to the individual in therapeutically effective amounts.

In a third embodiment, the invention relates to a method for treating and/or preventing an acute or chronic immune disease associated with an allogenic transplantation in an individual comprising co-administering methotrexate and a TNF antagonist to the individual in therapeutically effective amounts. As used herein, a "transplantation" includes organ, tissue or cell transplantation, such as renal transplantation, cardiac transplantation, bone marrow transplantation, liver transplantation, pancreatic transplantation, small intestine transplantation, skin transplantation and lung transplantation.

The benefits of combination therapy with methotrexate and TNF antagonists include high clinical response rates for significantly longer durations in comparison with that obtained with treatment with each therapeutic modality separately. In addition, methotrexate significantly reduces immunogenicity of anti-TNF antibodies, thus permitting administration of multiple dosages of anti-TNF antibodies with enhanced safety. The results described herein suggest that methotrexate can be used to reduce immunogenicity of other antibodies or proteins. Based on the results described herein, methotrexate can be used in other forms of antibody therapy, such as anti-IL-2 antibody therapy. This method is particularly pertinent in therapies other than anti-CD4 antibody therapy.

In a further embodiment, the invention relates to compositions comprising methotrexate and a TNF antagonist. The compositions of the present invention are useful for treating a subject having a pathology or condition associated with abnormal levels of a substance reactive with a TNF antagonist, in particular TNF in excess of, or less than, levels present in a normal healthy subject, where such excess or diminished levels occur in a systemic, localized or particular tissue type or location in the body. Such tissue types can include, but are not limited to, blood, lymph, central nervous system (CNS), liver, kidney, spleen, heart muscle or blood vessels, brain or spinal cord white matter or grey matter, cartilage, ligaments, tendons, lung, pancreas, ovary, testes,

A163

US 6,270,766 B1

7

prostate. Increased or decreased TNF concentrations relative to normal levels can also be localized to specific regions or cells in the body, such as joints, nerve blood vessel junctions, bones, specific tendons or ligaments, or sites of infection, such as bacterial or viral infections.

Tumor Necrosis Factor Antagonists

As used herein, a "tumor necrosis factor antagonist" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo. For example, a suitable TNF antagonist can bind TNF and includes anti-TNF antibodies and receptor molecules which bind specifically to TNF. A suitable TNF antagonist can also prevent or inhibit TNF synthesis and/or TNF release and includes compounds such as thalidomide, tenidap, and phosphodiesterase inhibitors, such as, but not limited to, pentoxifylline and rolipram. A suitable TNF antagonist that can prevent or inhibit TNF synthesis and/or TNF release also includes A2b adenosine receptor enhancers and A2b adenosine receptor agonists (e.g., 5'-(N-cyclopropyl)-carboxamidoadenosine, 5'-N-ethylcarboxamidoadenosine, cyclohexyladenosine and R-N$^6$-phenyl-2-propyladenosine). See, for example, Jacobson (GB 2 289 218 A), the teachings of which are entirely incorporated herein by reference. A suitable TNF antagonist can also prevent or inhibit TNF receptor signalling.

Anti-TNF Antibodies

As used herein, an "anti-tumor necrosis factor antibody" decreases, blocks, inhibits, abrogates or interferes with TNF activity in vivo. Anti-TNF antibodies useful in the methods and compositions of the present invention include monoclonal, chimeric, humanized, resurfaced and recombinant antibodies and fragments thereof which are characterized by high affinity binding to TNF and low toxicity (including human anti-murine antibody (HAMA) and/or human anti-chimeric antibody (HACA) response). In particular, an antibody where the individual components, such as the variable region, constant region and framework, individually and/or collectively possess low immunogenicity is useful in the present invention. The antibodies which can be used in the invention are characterized by their ability to treat patients for extended periods with good to excellent alleviation of symptoms and low toxicity. Low immunogenicity and/or high affinity, as well as other undefined properties, may contribute to the therapeutic results achieved.

An example of a high affinity monoclonal antibody useful in the methods and compositions of the present invention is murine monoclonal antibody (mAb) A2 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine mAb A2 or an antibody having substantially the same specific binding characteristics, as well as fragments and regions thereof. Murine monoclonal antibody A2 and chimeric derivatives thereof, such as cA2, are described in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994, now U.S. Pat. No. 5,656,272), U.S. application Ser. No. 08/192,861 (filed Feb. 4, 1994), U.S. application Ser. No. 08/324,799 (filed Oct. 18, 1994), and Le, J. et al., International Publication No. WO 92/16553 (published Oct. 1, 1992), which references are entirely incorporated herein by reference. A second example of a high affinity monoclonal antibody useful in the methods and compositions of the present invention is murine mAb 195 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine 195 or an antibody having substantially the same specific binding characteristics, as well as fragments and regions thereof. Other high affinity monoclonal antibodies useful in the

8

methods and compositions of the present invention include murine mAb 114 and murine mAb 199 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine mAb 114 or mAb 199 or an antibody having substantially the same specific binding characteristics of mAb 114 or mAb 199, as well as fragments and regions thereof. Murine monoclonal antibodies 114, 195 and 199 and the method for producing them are described by Möller, A. et al. (Cytokine 2(3):162–169 (1990)), the teachings of which are entirely incorporated herein by reference. Preferred methods for determining mAb specificity and affinity by competitive inhibition can be found in Harlow, et al., Antibodies: A Laboratory Manual, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y. (1988); Colligan et al., eds., Current Protocols in Immunology, Greene Publishing Assoc. and Wiley Interscience, New York (1992, 1993); Kozbor et al., Immunol. Today 4:72–79 (1983); Ausubel et al., eds., Current Protocols in Molecular Biology, Wiley Interscience, New York (1987, 1992, 1993); and Muller, Meth. Enzymol. 92:589–601 (1983), which references are entirely incorporated herein by reference.

Additional examples of monoclonal anti-TNF antibodies that can be used in the present invention are described in the art (see, e.g., U.S. application No. 07/943,852 (filed Sep. 11, 1992); Rathjen et al., International Publication No. WO 91/02078 (published Feb. 21, 1991); Rubin et al., EPO Patent Publication 0218868 (published April 22, 1987); Yone et al., EPO Patent Publication No. 0288088 (Oct. 26, 1988); Liang, et al., Biochem. Biophys. Res. Comm. 137:847–854 (1986); Meager, et al., Hybridoma 6:305–311 (1987); Fendly et al., Hybridoma 6:359–369 (1987); Bringman, et al., Hybridoma 6:489–507 (1987); Hirai, et al., J. Immunol. Meth. 96:57–62 (1987); Moller, et al., Cytokine 2:162–169 (1990), which references are entirely incorporated herein by reference).

Chimeric antibodies are immunoglobulin molecules characterized by two or more segments or portions derived from different animal species. Generally, the variable region of the chimeric antibody is derived from a non-human mammalian antibody, such as a murine mAb, and the immunoglobulin constant region is derived from a human immunoglobulin molecule. Preferably, a variable region with low immunogenicity is selected and combined with a human constant region which also has low immunogenicity, the combination also preferably having low immunogenicity. "Low" immunogenicity is defined herein as raising significant HACA or HAMA responses in less than about 75%, or preferably less than about 50% of the patients treated and/or raising low titres in the patient treated (less than about 300, preferably less than about 100 measured with a double antigen enzyme immunoassay) (Elliott et al., Lancet 344:1125–1127 (1994), incorporated herein by reference).

As used herein, the term "chimeric antibody" includes monovalent, divalent or polyvalent immunoglobulins. A monovalent chimeric antibody is a dimer (HL)) formed by a chimeric H chain associated through disulfide bridges with a chimeric L chain. A divalent chimeric antibody is a tetramer (H2L2) formed by two HL dimers associated through at least one disulfide bridge. A polyvalent chimeric antibody can also be produced, for example, by employing a CH region that aggregates (e.g., from an IgM H chain, or μ chain).

Antibodies comprise individual heavy (H) and/or light (L) immunoglobulin chains. A chimeric H chain comprises an antigen binding region derived from the H chain of a non-human antibody specific for TNF, which is linked to at least a portion of a human H chain C region (CH), such as

US 6,270,766 B1

9

CH1 or CH2. A chimeric L chain comprises an antigen binding region derived from the L chain of a non-human antibody specific for TNF, linked to at least a portion of a human L chain C region (CL).

Chimeric antibodies and methods for their production have been described in the art (Morrison et al., *Proc. Natl. Acad. Sci. USA* 81:6851–6855 (1984); Boulianne et al., *Nature* 312:643–646 (1984); Neuberger et al., *Nature* 314:268–270 (1985); Taniguchi et al., European Patent Application No. 171496 (published Feb. 19, 1985); Morrison et al., European Patent Application No. 173494 (published Mar. 5, 1986); Neuberger et al., PCT Application No. WO 86/01533, (published Mar. 13, 1986); Kudo et al., European Patent Application No. 184187 (published Jun. 11, 1986); Morrison et al., European Patent Application No. 173494 (published Mar. 5, 1986); Sahagan et al., *J. Immunol.* 137:1066–1074 (1986); Robinson et al., International Publication no. PCT/US86/02269 (published May 7, 1987); Liu et al., *Proc. Natl. Acad. Sci. USA* 84:3439–3443 (1987); Sun et al., *Proc. Natl. Acad. Sci. USA* 84:214–218 (1987); Better et al., *Science* 240:1041–1043 (1988); and Harlow and Lane, *Antibodies: A Laboratory Manual*, Cold Spring Harbor Laboratory, New York, 1988). These references are entirely incorporated herein by reference.

The anti-TNF chimeric antibody can comprise, for example, two light chains and two heavy chains, each of the chains comprising at least part of a human constant region and at least part of a variable (V) region of non-human origin having specificity to human TNF, said antibody binding with high affinity to an inhibiting and/or neutralizing epitope of human TNF, such as the antibody cA2. The antibody also includes a fragment or a derivative of such an antibody, such as one or more portions of the antibody chain, such as the heavy chain constant or variable regions, or the light chain constant or variable regions.

Humanizing and resurfacing the antibody can further reduce the immunogenicity of the antibody. See, for example, Winter (U.S. Pat. No. 5,225,539 and EP 239,400 B1), Padlan et al. (EP 519,596 A1) and Pedersen et al. (EP 592,106 A1). These references are incorporated herein by reference.

Preferred antibodies useful in the methods and compositions of the present invention are high affinity human-murine chimeric anti-TNF antibodies, and fragments or regions thereof, that have potent inhibiting and/or neutralizing activity in vivo against human TNFα. Such antibodies and chimeric antibodies can include those generated by immunization using purified recombinant TNFα or peptide fragments thereof comprising one or more epitopes.

An example of such a chimeric antibody is cA2 and antibodies which will competitively inhibit in vivo the binding to human TNFα of anti-TNFα murine mAb A2, chimeric mAb cA2, or an antibody having substantially the same specific binding characteristics, as well as fragments and regions thereof. Chimeric mAb cA2 has been described, for example, in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,861 (filed Feb. 4, 1994), and U.S. application Ser. No. 08/324,799 (filed Oct. 18, 1994), and by Le, J. et al. (International Publication No. WO 92/16553 (published Oct. 1, 1992)); Knight, D. M. et al. (*Mol. Immunol.* 30:1443–1453 (1993)); and Siegel, S. A. et al. (*Cytokine* 7(1):15–25 (1995)). These references are entirely incorporated herein by reference.

Chimeric A2 anti-TNF consists of the antigen binding variable region of the high-affinity neutralizing mouse anti-human TNF IgG1 antibody, designated A2, and the constant

10

regions of a human IgG1, kappa immunoglobulin. The human IgG1 Fc region improves allogeneic antibody effector function, increases the circulating serum half-life and decreases the immunogenicity of the antibody. The avidity and epitope specificity of the chimeric A2 is derived from the variable region of the murine A2. Chimeric A2 neutralizes the cytotoxic effect of both natural and recombinant human TNF in a dose dependent manner. From binding assays of cA2 and recombinant human TNF, the affinity constant of cA2 was calculated to be $1.8 \times 10^9 \, M^{-1}$. Preferred methods for determining mAb specificity and affinity by competitive inhibition can be found in Harlow, et al., *Antibodies: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1988; Colligan et al., eds., *Current Protocols in Immunology*, Greene Publishing Assoc. and Wiley Interscience, New York, (1992, 1993); Kozbor et al., *Immunol. Today* 4:72–79 (1983); Ausubel et al., eds. *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987, 1992, 1993); and Muller, *Meth. Enzymol.* 92:589–601 (1983), which references are entirely incorporated herein by reference.

As used herein, the term "antigen binding region" refers to that portion of an antibody molecule which contains the amino acid residues that interact with an antigen and confer on the antibody its specificity and affinity for the antigen. The antibody region includes the "framework" amino acid residues necessary to maintain the proper conformation of the antigen-binding residues. Generally, the antigen binding region will be of murine origin. In other embodiments, the antigen binding region can be derived from other animal species, such as sheep, rabbit, rat or hamster. Preferred sources for the DNA encoding such a non-human antibody include cell lines which produce antibody, preferably hybrid cell lines commonly known as hybridomas. In one embodiment, a preferred hybridoma is the A2 hybridoma cell line.

An "antigen" is a molecule or a portion of a molecule capable of being bound by an antibody which is additionally capable of inducing an animal to produce antibody capable of selectively binding to an epitope of that antigen. An antigen can have one or more than one epitope.

The term "epitope" is meant to refer to that portion of the antigen capable of being recognized by and bound by an antibody at one or more of the antibody's antigen binding region. Epitopes usually consist of chemically active surface groupings of molecules such as amino acids or sugar side chains and have specific three dimensional structural characteristics as well as specific charge characteristics. By "inhibiting and/or neutralizing epitope" is intended an epitope, which, when bound by an antibody, results in loss of biological activity of the molecule containing the epitope, in vivo or in vitro, more preferably in vivo, including binding of TNF to a TNF receptor. Epitopes of TNF have been identified within amino acids 1 to about 20, about 56 to about 77, about 108 to about 127 and about 138 to about 149. Preferably, the antibody binds to an epitope comprising at least about 5 amino acids of TNF within TNF residues from about 87 to about 107, about 59 to about 80 or a combination thereof. Generally, epitopes include at least about 5 amino acids and less than about 22 amino acids embracing or overlapping one or more of these regions.

For example, epitopes of TNF which are recognized by, and/or binds with anti-TNF activity, an antibody, and fragments, and variable regions thereof, include:

59–80: Tyr-Ser-Gln-Val-Leu-Phe-Lys-Gly-Gln-Gly-Cys-Pro-Ser-Thr-His-Val-Leu-Leu-Thr-His-Thr-Ile (SEQ ID NO:1); and/or

**A165**

US 6,270,766 B1

11

87–108: Tyr-Gln-Thr-Lys-Val-Asn-Leu-Leu-Ser-Ala-Ile-Lys-Ser-Pro-Cys-Gln-Arg-Glu-Thr-Pro-Glu-Gly (SEQ ID NO:2).

The anti-TNF antibodies, and fragments, and variable regions thereof, that are recognized by, and/or binds with anti-TNF activity, these epitopes block the action of TNFα without binding to the putative receptor binding sites as presented by Eck and Sprang (J. Biol. Chem. 264(29): 17595–17605 (1989) (amino acids 11–13, 37–42, 49–57 and 155–157 of hTNFα). Rathjen et al., International Publication No. WO 91/02078 (published Feb. 21, 1991), incorporated herein by reference, discloses TNF ligands which can bind additional epitopes of TNF.

Antibody Production Using Hybridomas

The techniques to raise antibodies to small peptide sequences that recognize and bind to those sequences in the free or conjugated form or when presented as a native sequence in the context of a large protein are well known in the art. Such antibodies can be produced by hybridoma or recombinant techniques known in the art.

Murine antibodies which can be used in the preparation of the antibodies useful in the methods and compositions of the present invention have also been described in Rubin et al., EP 0218868 (published Apr. 22, 1987); Yone et al., EP 0288088 (published Oct. 26, 1988); Liang, et al., Biochem. Biophys. Res. Comm. 137:847–854 (1986); Meager, et al., Hybridoma 6:305–311 (1987); Fendly et al., Hybridoma 6:359–369 (1987); Bringman, et al., Hybridoma 6:489–507 (1987); Hirai, et al., J. Immunol. Meth. 96:57–62 (1987); M öller, et al., Cytokine 2:162–169 (1990).

The cell fusions are accomplished by standard procedures well known to those skilled in the field of immunology. Fusion partner cell lines and methods for fusing and selecting hybridomas and screening for mAbs are well known in the art. See, e.g, Ausubel infra, Harlow infra, and Colligan infra, the contents of which references are incorporated entirely herein by reference.

The TNFα-specific murine mAb useful in the methods and compositions of the present invention can be produced in large quantities by injecting hybridoma or transfectoma cells secreting the antibody into the peritoneal cavity of mice and, after appropriate time, harvesting the ascites fluid which contains a high titer of the mAb, and isolating the mAb therefrom. For such in vivo production of the mAb with a hybridoma (e.g., rat or human), hybridoma cells are preferably grown in irradiated or athymic nude mice. alternatively, the antibodies can be produced by culturing hybridoma or transfectoma cells in vitro and isolating secreted mAb from the cell culture medium or recombinantly, in eukaryotic or prokaryotic cells.

In one embodiment, the antibody used in the methods and compositions of the present invention is a mAb which binds amino acids of an epitope of TNF recognized by A2, rA2 or cA2, produced by a hybridoma or by a recombinant host. In another embodiment, the antibody is a chimeric antibody which recognizes an epitope recognized by A2. In still another embodiment, the antibody is a chimeric antibody designated as chimeric A2 (cA2).

As examples of antibodies useful in the methods and compositions of the present invention, murine mAb A2 is produced by a cell line designated c134A.

"Derivatives" of the antibodies including fragments, regions or proteins encoded by truncated or modified genes to yield molecular species functionally resembling the immunoglobulin fragments are also useful in the methods and compositions of the present invention. The modifications include, but are not limited to, addition of genetic

12

sequences coding for cytotoxic proteins such as plant and bacterial toxins. The fragments and derivatives can be produced from appropriate cells, as is known in the art. Alternatively, anti-TNF antibodies, fragments and regions can be bound to cytotoxic proteins or compounds in vitro, to provide cytotoxic anti-TNF antibodies which would selectively kill cells having TNF on their surface.

"Fragments" of the antibodies include, for example, Fab, Fab', F(ab')₂ and Fv. These fragments lack the Fc fragment of intact antibody, clear more rapidly from the circulation, and can have less non-specific tissue binding than an intact antibody (Wahl et al., J. Nucl. Med. 24:316–325 (1983)). These fragments are produced from intact antibodies using methods well known in the art, for example by proteolytic cleavage with enzymes such as papain (to produce Fab fragments) or pepsin (to produce F(ab')₂ fragments).

Recombinant Expression of Anti-TNF Antibodies

Recombinant and/or chimeric murine-human or human-human antibodies that inhibit TNF can be produced using known techniques based on the teachings provided in U.S. application Ser. No. 08/192,093 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,102 (filed Feb. 4, 1994), U.S. application Ser. No. 08/192,861 (filed Feb. 4, 1994), U.S. application Ser. No. 08/324,799 (filed on Oct. 18, 1994) and Le, J. et al., International Publication No. WO 92/16553 (published Oct. 1, 1992), which references are entirely incorporated herein by reference. See, e.g., Ausubel et al., eds. Current Protocols in Molecular Biology, Wiley Interscience, New York (1987, 1992, 1993); and Sambrook et al. Molecular Cloning: A Laboratory Manual, Cold Spring Harbor Laboratory Press, New York (1989), the contents of which are entirely incorporated herein by reference. See also, e.g., Knight, D. M., et al., Mol. Immunol 30:1443–1453 (1993); and Siegel, S. A., et al., Cytokine 7(1):15–25 (1995), the contents of which are entirely incorporated herein by reference.

The DNA encoding an anti-TNF antibody can be genomic DNA or cDNA which encodes at least one of the heavy chain constant region (Hc), the heavy chain variable region (Hc), the light chain variable region (Lv) and the light chain constant regions (Lc). A convenient alternative to the use of chromosomal gene fragments as the source of DNA encoding the murine V region antigen-binding segment is the use of CDNA for the construction of chimeric immunoglobulin genes, e.g., as reported by Liu et al. (Proc. Natl. Acad. Sci., USA 84:3439 (1987) and J. Immunology 139:3521 (1987)), which references are entirely incorporated herein by reference. The use of cDNA requires that gene expression elements appropriate for the host cell be combined with the gene in order to achieve synthesis of the desired protein. The use of CDNA sequences is advantageous over genomic sequences (which contain introns), in that cDNA sequences can be expressed in bacteria or other hosts which lack appropriate RNA splicing systems. An example of such a preparation is set forth below.

Because the genetic code is degenerate, more than one codon can be used to encode a particular amino acid. Using the genetic code, one or more different oligonucleotides can be identified, each of which would be capable of encoding the amino acid. The probability that a particular oligonucleotide will, in fact, constitute the actual XXX-encoding sequence can be estimated by considering abnormal base pairing relationships and the frequency with which a particular codon is actually used (to encode a particular amino acid) in eukaryotic or prokaryotic cells expressing an anti-TNF antibody or fragment. Such "codon usage rules" are disclosed by Lathe, et al., J. Mol. Biol. 183:1–12 (1985).

US 6,270,766 B1

13

Using the "codon usage rules" of Lathe, a single oligonucleotide, or a set of oligonucleotides, that contains a theoretical "most probable" nucleotide sequence capable of encoding anti-TNF variable or constant region sequences is identified.

Although occasionally an amino acid sequence can be encoded by only a single oligonucleotide, frequently the amino acid sequence can be encoded by any of a set of similar oligonucleotides. Importantly, whereas all of the members of this set contain oligonucleotides which are capable of encoding the peptide fragment and, thus, potentially contain the same oligonucleotide sequence as the gene which encodes the peptide fragment, only one member of the set contains the nucleotide sequence that is identical to the nucleotide sequence of the gene. Because this member is present within the set, and is capable of hybridizing to DNA even in the presence of the other members of the set, it is possible to employ the unfractionated set of oligonucleotides in the same manner in which one would employ a single oligonucleotide to clone the gene that encodes the protein.

The oligonucleotide, or set of oligonucleotides, containing the theoretical "most probable" sequence capable of encoding an anti-TNF antibody or fragment including a variable or constant region is used to identify the sequence of a complementary oligonucleotide or set of oligonucleotides which is capable of hybridizing to the "most probable" sequence, or set of sequences. An oligonucleotide containing such a complementary sequence can be employed as a probe to identify and isolate the variable or constant region anti-TNF gene (Sambrook et al., infra).

A suitable oligonucleotide, or set of oligonucleotides, which is capable of encoding a fragment of the variable or constant anti-TNF region (or which is complementary to such an oligonucleotide, or set of oligonucleotides) is identified (using the above-described procedure), synthesized, and hybridized by means well known in the art, against a DNA or, more preferably, a cDNA preparation derived from cells which are capable of expressing anti-TNF antibodies or variable or constant regions thereof. Single stranded oligonucleotide molecules complementary to the "most probable" variable or constant anti-TNF region peptide coding sequences can be synthesized using procedures which are well known to those of ordinary skill in the art (Belagaje, et al., *J. Biol. Chem.* 254:5765–5780 (1979); Maniatis, et al., In: *Molecular Mechanisms in the Control of Gene Expression*, Nierlich, et al., eds., Acad. Press, New York (1976); Wu, et al., *Prog. Nucl. Acid Res. Molec. Biol.* 21:101–141 (1978); Khorana, *Science* 203:614–625 (1979)). Additionally, DNA synthesis can be achieved through the use of automated synthesizers. Techniques of nucleic acid hybridization are disclosed by Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, New York (1989); and by Haynes, et al., in: *Nucleic Acid Hybridization, A Practical Approach*, IRL Press, Washington, DC (1985), which references are entirely incorporated herein by reference. Techniques such as, or similar to, those described above have successfully enabled the cloning of genes for human aldehyde dehydrogenases (Hsu, et al., *Proc. Natl. Acad. Sci. USA* 82:3771–3775 (1985)), fibronectin (Suzuki, et al., *Bur. Mol. Biol. Organ. J.* 4:2519–2524 (1985)), the human estrogen receptor gene (Walter, et al., *Proc. Natl. Acad. Sci. USA* 82:7889–7893 (1985)), tissue-type plasminogen activator (Pennica, et al., *Nature* 301:214–221 (1983)) and human placental alkaline phosphatase complementary DNA (Keun, et al., *Proc. Natl. Acad. Sci. USA* 82:8715–8719 (1985)).

In an alternative way of cloning a polynucleotide encoding an anti-TNF variable or constant region, a library of

14

expression vectors is prepared by cloning DNA or, more preferably, cDNA (from a cell capable of expressing an anti-TNF antibody or variable or constant region) into an expression vector. The library is then screened for members capable of expressing a protein which competitively inhibits the binding of an anti-TNF antibody, such as A2 or cA2, and which has a nucleotide sequence that is capable of encoding polypeptides that have the same amino acid sequence as anti-TNF antibodies or fragments thereof. In this embodiment, DNA, or more preferably CDNA, is extracted and purified from a cell which is capable of expressing an anti-TNF antibody or fragment. The purified cDNA is fragmentized (by shearing, endonuclease digestion, etc.) to produce a pool of DNA or cDNA fragments. DNA or cDNA fragments from this pool are then cloned into an expression vector in order to produce a genomic library of expression vectors whose members each contain a unique cloned DNA or cDNA fragment such as in a lambda phage library, expression in prokaryotic cell (e.g., bacteria) or eukaryotic cells, (e.g., mammalian, yeast, insect or, fungus). See, e.g., Ausubel, infra, Harlow, infra, Colligan, infra; Nyyssonen et al. *Bio/Technology* 11:591–595 (1993); Marks et al., *Bio/Technology* 11:1145–1149 (October 1993). Once nucleic acid encoding such variable or constant anti-TNF regions is isolated, the nucleic acid can be appropriately expressed in a host cell, along with other constant or variable heavy or light chain encoding nucleic acid, in order to provide recombinant monoclonal antibodies that bind TNF with inhibitory activity. Such antibodies preferably include a murine or human anti-TNF variable region which contains a framework residue having complementarity determining residues which are responsible for antigen binding.

Human genes which encode the constant (C) regions of the chimeric antibodies, fragments and regions of the present invention can be derived from a human fetal liver library, by known methods. Human C region genes can be derived from any human cell including those which express and produce human immunoglobulins. The human CH region can be derived from any of the known classes or isotypes of human H chains, including gamma, $\mu$, $\alpha$, $\delta$ or $\epsilon$, and subtypes thereof, such as G1, G2, G3 and G4. Since the H chain isotype is responsible for the various effector functions of an antibody, the choice of CH region will be guided by the desired effector functions, such as complement fixation, or activity in antibody-dependent cellular cytotoxicity (ADCC). Preferably, the CH region is derived from gamma 1 (IgG1), gamma 3 (IgG3), gamma 4 (IgG4), or $\mu$ (IgM). The human CL region can be derived from either human L chain isotype, kappa or lambda.

Genes encoding human immunoglobulin C regions are obtained from human cells by standard cloning techniques (Sambrook, et al. (*Molecular Cloning: A Laboratory Manual*, 2nd Edition, Cold Spring Harbor Press, Cold Spring Harbor, N.Y. (1989) and Ausubel et al., eds., *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987–1993). Human C region genes are readily available from known clones containing genes representing the two classes of L chains, the five classes of H chains and subclasses thereof. Chimeric antibody fragments, such as F(ab')₂ and Fab, can be prepared by designing a chimeric H chain gene which is appropriately truncated. For example, a chimeric-gene encoding an H chain portion of an F(ab')₂ fragment would include DNA sequences encoding the CH1 domain and hinge region of the H chain, followed by a translational stop codon to yield the truncated molecule.

Generally, the murine, human and chimeric antibodies, fragments and regions are produced by cloning DNA seg-

**A167**

US 6,270,766 B1

15

ments encoding the H and L chain antigen-binding regions of a TNF-specific antibody, and joining these DNA segments to DNA segments encoding CH and CL regions, respectively, to produce murine, human or chimeric immunoglobulin-encoding genes. Thus, in a preferred embodiment, a fused chimeric gene is created which comprises a first DNA segment that encodes at least the antigen-binding region of non-human origin, such as a functionally rearranged V region with joining (J) segment, linked to a second DNA segment encoding at least a part of a human C region.

Therefore, cDNA encoding the antibody V and C regions and the method of producing a chimeric antibody can involve several steps, outlined below:

1. isolation of messenger RNA (mRNA) from the cell line producing an anti-TNF antibody and from optional additional antibodies supplying heavy and light constant regions; cloning and cDNA production therefrom;

2. preparation of a full length cDNA library from purified mRNA from which the appropriate V and/or C region gene segments of the L and H chain genes can be: (i) identified with appropriate probes, (ii) sequenced, and (iii) made compatible with a C or V gene segment from another antibody for a chimeric antibody;

3. Construction of complete H or L chain coding sequences by linkage of the cloned specific V region gene segments to cloned C region gene, as described above;

4. Expression and production of L and H chains in selected hosts, including prokaryotic and eukaryotic cells to provide murine-murine, human-murine, human-human or human-murine antibodies.

One common feature of all immunoglobulin H and L chain genes and their encoded mRNAs is the J region. H and L chain J regions have different sequences, but a high degree of sequence homology exists (greater than 80%) among each group, especially near the C region. This homology is exploited in this method and consensus sequences of H and L chain J regions can be used to design oligonucleotides for use as primers for introducing useful restriction sites into the J region for subsequent linkage of V region segments to human C region segments.

C region cDNA vectors prepared from human cells can be modified by site-directed mutagenesis to place a restriction site at the analogous position in the human sequence. For example, one can clone the complete human kappa chain C (Ck) region and the complete human gamma-1 C region (C gamma-1). In this case, the alternative method based upon genomic C region clones as the source for C region vectors would not allow these genes to be expressed in bacterial systems where enzymes needed to remove intervening sequences are absent. Cloned V region segments are excised and ligated to L or H chain C region vectors. Alternatively, the human C gamma-1 region can be modified by introducing a termination codon thereby generating a gene sequence which encodes the H chain portion of an Fab molecule. The coding sequences with linked V and C regions are then transferred into appropriate expression vehicles for expression in appropriate hosts, prokaryotic or eukaryotic.

Two coding DNA sequences are said to be "operably linked" if the linkage results in a continuously translatable sequence without alteration or interruption of the triplet reading frame. A DNA coding sequence is operably linked to a gene expression element if the linkage results in the proper function of that gene expression element to result in expression of the coding sequence.

Expression vehicles include plasmids or other vectors. Preferred among these are vehicles carrying a functionally

16

complete human CH or CL chain sequence having appropriate restriction sites engineered so that any VH or VL chain sequence with appropriate cohesive ends can be easily inserted therein. Human CH or CL chain sequence-containing vehicles thus serve as intermediates for the expression of any desired complete H or L chain in any appropriate host.

A chimeric antibody, such as a mouse-human or human-human, will typically be synthesized from genes driven by the chromosomal gene promoters native to the mouse H and L chain V regions used in the constructs; splicing usually occurs between the splice donor site in the mouse J region and the splice acceptor site preceding the human C region and also at the splice regions that occur within the human C, region; polyadenylation and transcription termination occur at naive chromosomal sites downstream of the human coding regions.

A nucleic acid sequence encoding at least one anti-TNF antibody fragment may be recombined with vector DNA in accordance with conventional techniques, including blunt-ended or staggered-ended termini for ligation, restriction enzyme digestion to provide appropriate termini, filling in of cohesive ends as appropriate, alkaline phosphatase treatment to avoid undesirable joining, and ligation with appropriate ligases. Techniques for such manipulations are disclosed, e.g., by Ausubel, supra, Sambrook, supra, entirely incorporated herein by reference, and are well known in the art.

A nucleic acid sequence, such as DNA, is "capable of expressing" a polypeptide if it contains nucleotide sequences which contain transcriptional and translational regulatory information and such sequences are "operably linked" to nucleotide sequences which encode the polypeptide. An operable linkage is a linkage in which the regulatory DNA sequences and the DNA sequence sought to be expressed are connected in such a way as to permit gene expression as anti-TNF peptides or antibody fragments in recoverable amounts. The precise nature of the regulatory regions needed for gene expression may vary from organism to organism and is well known in the analogous art. See, e.g., Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, New York (1989); and Ausubel, eds., *Current Protocols in Molecular Biology*, Wiley Interscience, New York (1987, 1993).

Many vector systems are available for the expression of cloned anti-TNF peptide H and L chain genes in mammalian cells (see Glover, ed., *DNA Cloning, Vol. II*, pp. 143–238, IRL Press, Washington, DC, 1985). Different approaches can be followed to obtain complete H2L2 antibodies. It is possible to co-express H and L chains in the same cells to achieve intracellular association and linkage of H and L chains into complete tetrameric H2L2 antibodies. The co-expression can occur by using either the same or different plasmids in the same host. Genes for both H and L chains can be placed into the same plasmid, which is then transfected into cells, thereby selecting directly for cells that express both chains. Alternatively, cells can be transfected first with a plasmid encoding one chain, for example the L chain, followed by transfection of the resulting cell line with an H chain plasmid containing a second selectable marker. Cell lines producing H2L2 molecules via either route could be transfected with plasmids encoding additional copies of peptides, H, L, or H plus L chains in conjunction with additional selectable markers to generate cell lines with enhanced properties, such as higher production of assembled H2L2 antibody molecules or enhanced stability of the transfected cell lines.

**A168**

US 6,270,766 B1

17

Receptor Molecules

Receptor molecules (also referred to herein as soluble TNF receptors) useful in the methods and compositions of the present invention are those that bind TNF with high affinity (see, e.g., Feldmann et al., International Publication No. WO 92/07076 (published Apr. 30, 1992), incorporated herein by reference) and possess low immunogenicity. In particular, the 55 kDa (p55 TNF-R) and the 75 kDa (p75 TNF-R) TNF cell surface receptors are useful in the present invention. Truncated forms of these receptors, comprising the extracellular domains (ECD) of the receptors or functional portions thereof, are also useful in the present invention. Truncated forms of the TNF receptors, comprising the ECD, have been detected in urine and serum as 30 kDa and 40 kDa TNF inhibitory binding proteins (Engelmann, H. et al., *J. Biol. Chem.* 265:1531–1536 (1990)). TNF receptor multimeric molecules and TNF immunoreceptor fusion molecules, and derivatives and fragments or portions thereof, are additional examples of receptor molecules which are useful in the methods and compositions of the present invention. The receptor molecules which can be used in the invention are characterized by their ability to treat patients for extended periods with good to excellent alleviation of symptoms and low toxicity. Low immunogenicity and/or high affinity, as well as other undefined properties, may contribute to the therapeutic results achieved.

TNF receptor multimeric molecules useful in the present invention comprise all or a functional portion of the ECD of two or more TNF receptors linked via one or more polypeptide linkers. The multimeric molecules can further comprise a signal peptide of a secreted protein to direct expression of the multimeric molecule. These multimeric molecules and methods for their production have been described in U.S. application Ser. No. 08/437,533 (filed May 9, 1995), the content of which is entirely incorporated herein by reference.

TNF immunoreceptor fusion molecules useful in the methods and compositions of the present invention comprise at least one portion of one or more immunoglobulin molecules and all or a functional portion of one or more TNF receptors. These immunoreceptor fusion molecules can be assembled as monomers, or hetero- or homo-multimers. The immunoreceptor fusion molecules can also be monovalent or multivalent. An example of such a TNF immunoreceptor fusion molecule is TNF receptor/IgG fusion protein.

TNF immunoreceptor fusion molecules and methods for their production have been described in the art (Lesslauer et al., *Eur. J. Immunol.* 21:2883–2886 (1991); Ashkenazi et al., *Proc. Natl. Acad. Sci. USA* 88:10535–10539 (1991); Peppel et al., *J. Exp. Med.* 174:1483–1489 (1991); Kolls et al., *Proc. Natl. Acad. Sci. USA* 91:215–219 (1994); Butler et al., *Cytokine* 6(6):616–623 (1994); Baker et al., *Eur. J. Immunol.* 24:2040–2048 (1994); Beutler et al., U.S. Pat. No. 5,447,851; and U.S. application Ser. No. 08/442,133 (filed May 16, 1995)). These references are entirely incorporated herein by reference. Methods for producing immunoreceptor fusion molecules can also be found in Capon et al., U.S. Pat. No. 5,116,964; Capon et al., U.S. Pat. No. 5,225,538; and Capon et al., *Nature* 337:525–531 (1989), which references are entirely incorporated herein by reference.

Derivatives, fragments, regions and functional portions of the receptor molecules functionally resemble the receptor molecules that can be used in the present invention (i.e., they bind TNF with high affinity and possess low immunogenicity). A functional equivalent or derivative of the receptor molecule refers to the portion of the receptor molecule, or the portion of the receptor molecule sequence

18

which encodes the receptor molecule, that is of sufficient size and sequences to functionally resemble the receptor molecules that can be used in the present invention (i.e., bind TNF with high affinity and possess low immunogenicity). A functional equivalent of the receptor molecule also includes modified receptor molecules that functionally resemble the receptor molecules that can be used in the present invention (i.e., bind TNF with high affinity and possess low immunogenicity). For example, a functional equivalent of the receptor molecule can contain a "SILENT" codon or one or more amino acid substitutions, deletions or additions (e.g., substitution of one acidic amino acid for another acidic amino acid; or substitution of one codon encoding the same or different hydrophobic amino acid for another codon encoding a hydrophobic amino acid). See Ausubel et al., *Current Protocols in Molecular Biology*, Greene Publishing Assoc. and Wiley-Interscience, New York (1989).

Methotrexate

Presently available oral and intravenous formulations of methotrexate include Heumatrex® methotrexate dose pack (Lederle Laboratories, Wayne, N.J.); methotrexate tablets (Mylan Pharmaceuticals Inc., Morgantown, W.Va.; Roxane Laboratories, Inc., Columbus, Ohio); and methotrexate sodium tablets, for injection and injection (Immunex Corporation, Seattle, Wash.) and methotrexate LPF® sodium (methotrexate sodium injection) (Immunex Corporation, Seattle, Wash.). Methotrexate is also available from Pharmacochemie (Netherlands). Methotrexate prodrugs, homologs and/or analogs (e.g., folate antagonists) can also be used in the methods and compositions of the present invention. Alternatively, other immunosuppressive agents (or drugs that suppress the immune system) can be used in the methods and compositions of the present invention.

Administration

TNF antagonists, methotrexate and the compositions of the present invention can be administered to an individual in a variety of ways. The routes of administration include intradermal, transdermal (e.g., in slow release polymers), intramuscular, intraperitoneal, intravenous, subcutaneous, oral, topical, epidural, buccal, rectal, vaginal and intranasal routes. Any other therapeutically efficacious route of administration can be used, for example, infusion or bolus injection, absorption through epithelial or mucocutaneous linings, or by gene therapy wherein a DNA molecule encoding the therapeutic protein or peptide is administered to the patient, e.g., via a vector, which causes the protein or peptide to be expressed and secreted at therapeutic levels in vivo. In addition, the TNF antagonists, methotrexate and compositions of the present invention can be administered together with other components of biologically active agents, such as pharmaceutically acceptable surfactants (e.g., glycerides), excipients (e.g., lactose), carriers, diluents and vehicles. If desired, certain sweetening, flavoring and/or coloring agents can also be added.

The TNF antagonists and methotrexate can be administered prophylactically or therapeutically to an individual. TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate. For example, TNF antagonists can be administered as adjunctive and/or concomitant therapy to methotrexate therapy.

For parenteral (e.g., intravenous, subcutaneous, intramuscular) administration, TNF antagonists, methotrexate and the compositions of the present invention can be formulated as a solution, suspension, emulsion or lyophilized powder in association with a pharmaceutically

**A169**

US 6,270,766 B1

19                                                                           20

acceptable parenteral vehicle. Examples of such vehicles are water, saline, Ringer's solution, dextrose solution, and 5% human serum albumin. Liposomes and nonaqueous vehicles such as fixed oils can also be used. The vehicle or lyophilized powder can contain additives that maintain isotonicity (e.g., sodium chloride, mannitol) and chemical stability (e.g., buffers and preservatives). The formulation is sterilized by commonly used techniques.

Suitable pharmaceutical carriers are described in Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in this field of art.

For example, a parenteral composition suitable for administration by injection is prepared by dissolving 1.5% by weight of active ingredient in 0.9% sodium chloride solution.

TNF antagonists and methotrexate are administered in therapeutically effective amounts; the compositions of the present invention are administered in a therapeutically effective amount. As used herein, a "therapeutically effective amount" is such that administration of TNF antagonist and methotrexate, or administration of a composition of the present invention, results in inhibition of the biological activity of TNF relative to the biological activity of TNF when therapeutically effective amounts of antagonist and methotrexate are not administered, or relative to the biological activity of TNF when a therapeutically effective amount of the composition is not administered. A therapeutically effective amount is preferably an amount of TNF antagonist and methotrexate necessary to significantly reduce or eliminate signs and symptoms associated with a particular TNF-mediated disease. As used herein, a therapeutically effective amount is not necessarily an amount such that administration of the TNF antagonist alone, or administration of methotrexate alone, must necessarily result in inhibition of the biological activity of TNF.

Once a therapeutically effective amount has been administered, a maintenance amount of TNF antagonist alone, of methotrexate alone, or of a combination of TNF antagonist and methotrexate can be administered to the individual. A maintenance amount is the amount of TNF antagonist, methotrexate, or combination of TNF antagonist and methotrexate necessary to maintain the reduction or elimination of the signs and symptoms associated with a particular TNF-mediated disease achieved by the therapeutically effective dose. The maintenance amount can be administered in the form of a single dose, or a series or doses separated by intervals of days or weeks.

The dosage administered to an individual will vary depending upon a variety of factors, including the pharmacodynamic characteristics of the particular antagonists, and its mode and route of administration; size, age, sex, health, body weight and diet of the recipient; nature and extent of symptoms of the disease being treated, kind of concurrent treatment, frequency of treatment, and the effect desired. In vitro and in vivo methods of determining the inhibition of TNF in an individual are well known to those of skill in the art. Such in vitro assays can include a TNF cytotoxicity assay (e.g., the WEHI assay or a radioimmunoassay, ELISA). In vivo methods can include rodent lethality assays and/or primate pathology model systems (Mathison et al., *J. Clin. Invest.*, 81:1925–1937 (1988); Beutler et al., *Science* 229:869–871 (1985); Tracey et al., *Nature* 330:662–664 (1987); Shimamoto et al., *Imunol. Lett.* 17:311–318 (1988); Silva et al., *J. Infect. Dis.* 162:421–427 (1990); Opal et al., *J. Infect. Dis.* 161:1148–1152 (1990) ; Hinshaw et al., *Circ. Shock* 30:279–292 (1990)).

TNF antagonist and methotrexate can each be administered in single or multiple doses depending upon factors such as nature and extent of symptoms, kind of concurrent treatment and the effect desired. Thus, other therapeutic regimens or agents (e.g., multiple drug regimens) can be used in combination with the therapeutic co-administration of TNF antagonists and methotrexate. In a particular embodiment, a TNF antagonist is administered in multiple doses. In another embodiment, methotrexate is administered in the form of a series of low doses separated by intervals of days or weeks. Adjustment and manipulation of established dosage ranges are well within the ability of those skilled in the art.

Usually a daily dosage of active ingredient can be about 0.01 to 100 milligrams per kilogram of body weight. Ordinarily 1 to 40 milligrams per kilogram per day given in divided doses 1 to 6 times a day or in sustained release form is effective to obtain desired results. Second or subsequent administrations can be administered at a dosage which is the same, less than or greater than the initial or previous dose administered to the individual.

A second or subsequent administration is preferably during or immediately prior to relapse or a flare-up of the disease or symptoms of the disease. For example, second and subsequent administrations can be given between about one day to 30 weeks from the previous administration. Two, three, four or more total administrations can be delivered to the individual, as needed.

Dosage forms (composition) suitable for internal administration generally contain from about 0.1 milligram to about 500 milligrams of active ingredient per unit. In these pharmaceutical compositions the active ingredient will ordinarily be present in an amount of about 0.5–95% by weight based on the total weight of the composition.

The present invention will now be illustrated by the following example, which is not intended to be limiting in any way.

## EXAMPLES

### Example 1

Clinical Treatment of Rheumatoid Arthritis By Multiple Infusions of an Anti-TNF Antibody With and Without Methotrexate

A randomized, double-blind, placebo controlled study was conducted to evaluate the safety and efficacy of a chimeric monoclonal anti-TNF antibody (cA2) following multiple infusions of 1, 3 or 10 mg/kg cA2, alone or in combination with methotrexate, compared to multiple infusions of placebo in combination with methotrexate, in the treatment of rheumatoid arthritis (RA) in patients.

Patients

One hundred one (101) patients at six European centers who had been using methotrexate for at least 6 months, had been on a stable dose of 7.5 mg/wk for at least 4 weeks, and had active disease (according to the criteria of the American College of Rheumatology) with erosive changes on X-rays of hands and feet, were enrolled in the trial. Active disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria (duration of morning stiffness $\geq 45$ minutes; $\geq 45$ tender or painful joints; erythrocyte sedimentation rate (ESR) $\geq 28$ mm/hour; C-reactive protein (CRP) $\geq 220$ mg/l.

In patients using corticosteroids ($\leq 7.5$ mg/day) or non-steroidal anti-inflammatory drugs (NSAIDs), the doses had been stable for 4 weeks prior to screening. The dose of corticosteroids remained stable throughout trial participation. The dose of NSAID typically also remained stable throughout trial participation.

US 6,270,766 B1

21

Study Infusions

The chimeric monoclonal anti-TNF antibody (cA2) was supplied as a sterile solution containing 5 mg cA2 per ml of 0.01 M phosphate-buffered saline in 0.15 M sodium chloride with 0.01% polysorbate 80, pH 7.2. The placebo vials contained 0.1% human serum albumin in the same buffer. Before use, the appropriate amount of cA2 or placebo was diluted to 300 ml in sterile saline by the pharmacist, and administered intravenously via a 0.2 $\mu$m in-line filter over 2 hours. The characteristics of the placebo and cA2 infusion bags were identical, and the investigators and patients did not know which infusion was being administered.

Assessments

Patients were randomized to one of seven treatment groups. The number of patients in each dose (or treatment) group is indicated in Table 1. Each of the 101 patients received multiple infusions of either 0, 1, 3 or 10 mg/kg cA2. Infusions were to be administered at weeks 0, 2, 6, 10 and 14. Starting at week 0, the patients were receiving 7.5 mg/wk of methotrexate (Pharmachemie, Netherlands) or 3 placebo tablets/week (Pharmacochemie, Netherlands). Patients were monitored for adverse events during infusions and regularly thereafter, by interviews, physical examination, and laboratory testing.

The six primary disease-activity assessments were chosen to allow analysis of the response in individual patients according to the Paulus index (Paulus, et al., *Arthritis Rheumatism* 33:477–484 (1990), the teachings of which are incorporated herein by reference). The assessments contributing to this index were the tender joint and swollen joint scores (60 and 58 joints, respectively, hips not assessed for swelling; graded 0–3), the duration of morning stiffness (minutes), the patient's and physician's assessment of disease severity (on a 5-point scale, ranging from 1 (symptom-free) to 5 (very severe), and erythrocyte sedimentation rate

22

(ESR). Patients were considered to have responded if at least four of the six variables improved, defined as at least 20% improvement in the continuous variables, and at least two grades of improvement or improvement from grade 2 to 1 in the two disease-severity assessments (Paulus 20% response). Improvements of at least 50% in the continuous variables were also used (Paulus 50% response).

Other disease-activity assessments included the pain score (0–10 cm on a visual analogue scale (VAS)), an assessment of fatigue (0–10 cm VAS), and grip strength (0–300 mm Hg, mean of three measurements per hand by sphygmomanometer cuff).

The ESR was measured at each study site with a standard method (Westergen). C-reactive protein (CRP) was measured by rate nephelometry (Abbott fluorescent polarizing immunoassay). See also, Elliott et al., *Lancet* 344:1105–1110 (1994); Elliott et al., *Lancet* 344:1125–1127 (1994); and Elliott et al., *Arthritis Rheum.* 36(12) :1681–1690 (1993), which references are entirely incorporated herein by reference.

Evaluations were performed at weeks 1, 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22 and 26.

Results

The 101 patients were randomized to one of seven treatment (or dose) groups. The patients enrolled in each dose group were well matched for baseline demographics. Disease duration and swollen and tender joint counts at baseline were also well-balanced across the groups (Table 1). Table 1 also shows the maximum methotrexate dose administered within 6 months prior to randomization. Median maximum doses for each group ranged between 10 and 15 mg/week; there were no significant differences amongst the treatment groups (p=0.404).

TABLE 1

Baseline Disease Characteristics Joint Counts

| | | Treatment Groups | | | | | | | |
| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | All | Treatment effect |
| | MTX+ | MTX+ | MTX− | MTX+ | MTX− | MTX+ | MTX− | Patients | p-value |
|---|---|---|---|---|---|---|---|---|---|
| **Disease dur. (yrs)** | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 14 | 14 | 14 | 15 | 101 | |
| Mean ± SD | 7.6 ± 4.0 | 14.3 ± 12.1 | 7.6 ± 6.0 | 12.1 ± 9.0 | 7.8 ± 4.3 | 11.1 ± 7.4 | 9.7 ± 7.4 | 10.0 ± 7.8 | 0.634 |
| Median | 6.9 | 11.4 | 5.2 | 11.9 | 7.7 | 10.7 | 7.6 | 7.6 | |
| IQ range | (4.3, 11.5) | (3.3, 24.7) | (3.4, 9.0) | (4.3, 16.4) | (4.6, 9.8) | (4.5, 15.5) | (4.9, 14.9) | (4.3, 14.4) | |
| Range | (1.6, 14.2) | (0.7, 37.3) | (2.5, 21.3) | (0.7, 30.5) | (1.4, 17.4) | (1.4, 24.1) | (1.1, 24.3) | (0.7, 37.3) | |
| **Number of Swollen joints, Paulus joint set (0–58)** | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 15 | 14 | 14 | 15 | 101 | |
| Mean ± SD | 18.1 ± 8.6 | 16.9 ± 7.8 | 21.2 ± 11.2 | 17.7 ± 5.9 | 19.7 ± 9.9 | 21.1 ± 8.2 | 17.8 ± 8.7 | 18.9 ± 8.7 | 0.643 |
| Median | 16.5 | 15.5 | 20.0 | 16.0 | 17.0 | 19.5 | 17.0 | 18.0 | |
| IQ range | (12.0, 25.0) | (10.0, 25.0) | (10.0, 33.0) | (13.0, 22.0) | (11.0, 32.0) | (15.0, 31.0) | (11.0, 21.0) | (12.0, 25.0) | |
| Range | (6.0, 38.0) | (6.0, 29.0) | (7.0, 40.0) | (10.0, 29.0) | (8.0, 34.0) | (10.0, 34.0) | (7.0, 41.0) | (6.0, 41.0) | |
| **Number of tender joints, Paulus joint set (0–60)** | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 15 | 14 | 14 | 15 | 101 | |
| Mean ± SD | 31.5 ± 14.2 | 19.1 ± 10.7 | 29.9 ± 17.1 | 24.5 ± 14.4 | 31.2 ± 11.7 | 26.5 ± 12.0 | 26.2 ± 11.7 | 27.0 ± 13.5 | 0.135 |
| Median | 27.0 | 16.0 | 30.0 | 21.0 | 31.0 | 25.5 | 23.0 | 25.0 | |
| IQ range | (22.0, 44.0) | (13.0, 30.0) | (14.0, 45.0) | (12.0, 32.0) | (23.0, 39.0) | (21.0, 38.0) | (17.0, 35.0) | (15.0, 38.0) | |
| Range | (8.0, 52.0) | (2.0, 39.0) | (6.0, 58.0) | (10.0, 52.0) | (9.0, 52.0) | (8.0, 44.0) | (11.0, 48.0) | (2.0, 58.0) | |
| **Max dose MTX prev. 6 mo (mg/kg)** | | | | | | | | | |
| Pts evaluated | 14 | 14 | 15 | 14 | 13 | 14 | 15 | 99 | |

US 6,270,766 B1

23                                                                    24

TABLE 1-continued

Baseline Disease Characteristics Joint Counts

Treatment Groups

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | All | Treatment effect |
|---|---|---|---|---|---|---|---|---|---|
| | MTX+ | MTX+ | MTX− | MTX+ | MTX− | MTX+ | MTX− | Patients | p-value |
| Mean ± SD | 13.8 ± 3.9 | 11.6 ± 3.5 | 12.8 ± 5.6 | 11.6 ± 3.3 | 11.7 ± 4.8 | 12.7 ± 5.0 | 12.5 ± 3.0 | 12.4 ± 4.2 | 0.404 |
| Median | 15.0 | 11.3 | 12.5 | 10.0 | 10.0 | 10.0 | 12.5 | 12.5 | |
| IQ range | (10.0, 15.0) | (10.0, 12.5) | (10.0, 15.0) | (10.0, 15.0) | (7.5, 12.5) | (10.0, 15.0) | (10.0, 15.0) | (10.0, 15.0) | |
| Range | (7.5, 20.0) | (7.5, 20.0) | (7.5, 30.0) | (7.5, 17.5) | (7.5, 25.0) | (7.5, 25.0) | (7.5, 20.0) | (7.5, 30.0) | |

MTX = Methotrexate

The pre-specified primary analysis in this trial was the comparison of the total time of clinical response during the 26-week follow-up period. The results for the primary analysis are shown in Table 2. The duration of response of all cA2-treated groups, with the exception of the 1 mg/kg group not receiving methotrexate, was significantly improved (p<0.001) compared to the placebo group receiving methotrexate alone.

their dropping out from the study. With the exception of the 1 mg/kg group not receiving methotrexate, all of the cA2-treated groups demonstrated clinical benefit through 14 weeks when the last dose of cA2 was received. Sustained clinical benefit was observed through 26 weeks (the last follow-up visit) in patients who received 3 or 10 mg/kg cA2 with methotrexate. Approximately one-half of the patients

TABLE 2

Total Time of Response[a] Based On Paulus 20% Criteria

Treatment Groups

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
| Total time of response in weeks | | | | | | | | |
| Median | 0 | 16.6 | 2.6 | 16.5 | 17.2 | >23.1 | 10.4 | <0.001 |
| Minimum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 25th percentile | 0.0 | 6.2 | 2.0 | 7.0 | 4.0 | 2.6 | 6.9 | |
| 75th percentile | 0.0 | 22.5 | 8.0 | >20.1 | 20.7 | >24.6 | >23.1 | |
| Maximum | >15.1 | >26.9 | 15.1 | >24.9 | >25.9 | >25.6 | >26.4 | |
| p-val:vs. MTX alone | | <0.001 | 0.119 | <0.001 | <0.001 | <0.001 | <0.001 | |

[a]Patients were followed through 26 weeks following the initial infusion of cA2

The response rates at Paulus 20% are shown in Table 3. Drop-outs were considered as non-responders subsequent to

who received 3 mg/kg cA2 with methotrexate demonstrated continued clinical benefit at 26 weeks.

TABLE 3

Number of Patients Responding According To Paulus 20% Criteria At Each Evaluation Visit

Treatment Groups

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
| Pts with any response | 21% (3/14) | 93% 13/14 | 80% 12/15 | 80% 12/15 | 79% 11/14 | 85% 11/13 | 80% 12/15 | <0.001 |
| p-value vs MTX alone | | <0.001 | 0.006 | 0.002 | 0.002 | 0.001 | 0.004 | |
| Time post-infusion | | | | | | | | |
| 1 Week | 0% (0/14) | 31% (4/13) | 53% (6/15) | 27% (4/15) | 43% (6/14) | 31% (4/13) | 60% (9/15) | |
| 2 Weeks | 7% (1/14) | 64% (9/14) | 57% (6/14) | 27% (4/15) | 43% (6/14) | 62% (8/13) | 53% (8/15) | |

US 6,270,766 B1

25     26

TABLE 3-continued

Number of Patients Responding According To Paulus
20% Criteria At Each Evaluation Visit

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
|---|---|---|---|---|---|---|---|---|
| 4 Weeks[a] | 0% (0/14) | 79% (11/14) | 33% (5/15) | 40% (6/15) | 64% (9/14) | 54% (7/13) | 53% (8/15) | 0.002 |
| 6 Weeks | 0% (0/14) | 71% (10/14) | 27% (4/15) | 47% (7/15) | 50% (7/14) | 54% (7/13) | 47% (7/15) | |
| 8 Weeks[a] | 14% (2/14) | 64% (9/14) | 20% (3/15) | 60% (9/15) | 71% (10/14) | 69% (9/13) | 40% (6/15) | 0.003 |
| 10 Weeks | 7% (1/14) | 71% (10/14) | 20% (3/15) | 67% (10/15) | 64% (9/14) | 69% (9/13) | 53% (8/15) | |
| 12 Weeks | 7% (1/14) | 57% (8/14) | 13% (2/15) | 67% (10/15) | 64% (9/14) | 62% (8/13) | 60% (8/13) | <0.001 |
| 14 Weeks | 0% (0/14) | 71% (10/14) | 7% (1/15) | 60% (9/15) | 57% (8/14) | 77% (10/13) | 53% (8/15) | |
| 16 Weeks[a] | 14% (2/14) | 64% (9/14) | 7% (1/15) | 67% (10/15) | 64% (9/14) | 54% (7/13) | 67% (10/15) | <0.001 |
| 18 Weeks | 21% (3/14) | 50% (7/14) | 13% (2/15) | 71% (10/14) | 69% (9/13) | 62% (8/13) | 57% (8/14) | |
| 20 Weeks | 7% (1/14) | 54% (7/13) | 13% (2/15) | 53% (5/15) | 43% (6/14) | 54% (7/13) | 53% (8/15) | |
| 22 Weeks | 7% (1/14) | 46% (6/13) | 0% (0/15) | 47% (7/15) | 36% (5/14) | 54% (7/13) | 33% (5/15) | |
| 26 Weeks[a] | 7% (1/14) | 21% (3/14) | 7% (1/15) | 47% (7/15) | 21% (3/14) | 54% (7/13) | 33% (5/15) | 0.013 |

[a]Evaluation visits pre-specified for analysis.

The response rates at Paulus 50% are shown in Table 4. The magnitude of the clinical benefit of cA2 treatment was substantial. The majority of patients were responding to cA2 treatment according to the 50% Paulus criteria.

TABLE 4

Number of Patients Responding According To Paulus
50% Criteria At Each Evaluation Visit

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
|---|---|---|---|---|---|---|---|---|
| Pts with any response | 14.3% (2/14) | 85.7% (12/14) | 40.0% (6/15) | 73.3% (11/15) | 64.3% (9/14) | 76.9% (10/13) | 66.7% (10/15) | <0.001 |
| p-value vs MTX alone | | <0.001 | 0.079 | 0.001 | 0.008 | 0.002 | 0.009 | |
| Time post-infusion | | | | | | | | |
| 1 Week | 0.0% (0/14) | 7.7% (1/13) | 26.7% (4/15) | 0.0% (0/15) | 35.7% (5/14) | 7.7% (1/13) | 26.7% (4/15) | |
| 2 Weeks | 0.0% (0/14) | 21.4% (3/14) | 28.6% (4/14) | 6.7% (1/15) | 28.6% (4/14) | 15.4% (2/13) | 20.0% (3/15) | |
| 4 Weeks[a] | 0.0% (0/14) | 57.1% (8/14) | 13.3% (2/15) | 13.3% (2/15) | 28.6% (4/14) | 46.2% (6/13) | 40.0% (6/15) | 0.006 |
| 6 Weeks | 0.0% (0/14) | 57.1% (8/14) | 0.0% (0/15) | 26.7% (4/15) | 42.9% (6/14) | 38.5% (5/13) | 33.3% (5/15) | |
| 8 Weeks[a] | 7.1% (1/14) | 50.0% (7/14) | 0.0% (0/15) | 40.0% (6/15) | 50.0% (7/14) | 69.2% (9/13) | 33.3% (5/15) | <0.001 |
| 10 Weeks | 0.0% (0/14) | 57.1% (8/14) | 0.0% (0/15) | 40.0% (6/15) | 50.0% (7/14) | 69.2% (9/13) | 40.0% (6/15) | |
| 12 Weeks[a] | 7.1% (1/14) | 50.0% (7/14) | 6.7% (1/15) | 60.0% (9/15) | 35.7% (5/14) | 61.5% (8/13) | 40.0% (6/15) | <0.001 |
| 14 Weeks | 0.0% (0/14) | 57.1% (8/14) | 6.7% (1/15) | 40.0% (6/15) | 35.7% (5/14) | 61.5% (8/13) | 40.0% (6/15) | |
| 16 Weeks[a] | 0.0% (0/14) | 64.3% (9/14) | 6.7% (1/15) | 60.0% (9/15) | 50.0% (7/14) | 53.9% (7/13) | 40.0% (6/15) | <0.001 |
| 18 Weeks | 7.1% (1/14) | 50.0% (7/14) | 6.7% (1/15) | 71.4% (10/14) | 46.2% (6/13) | 61.5% (8/13) | 57.1% (8/14) | |

#### TABLE 4-continued

Number of Patients Responding According To Paulus
50% Criteria At Each Evaluation Visit

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 15) | MTX− (n = 15) | MTX+ (n = 15) | MTX− (n = 14) | MTX+ (n = 13) | MTX− (n = 15) | effect p-value |
| 20 Weeks | 7.1% (1/14) | 53.8% (7/13) | 0.0% (0/15) | 53.3% (8/15) | 35.7% (5/14) | 46.2% (6/13) | 40.0% (6/15) | |
| 22 Weeks | 0.0% (0/14) | 38.5% (5/13) | 0.0% (0/15) | 46.7% (7/15) | 14.3% (2/14) | 53.8% (7/13) | 26.7% (4/15) | |
| 26 Weeks[a] | 0.0% (0/14) | 21.4% (3/14) | 6.7% (1/15) | 40.0% (6/15) | 14.3% (2/14) | 46.2% (6/13) | 20.0% (3/15) | 0.008 |

[a]Evaluation visits pre-specified for analysis.

Commensurate with the clinical response rates shown in Tables 2–4, most of the patients in the treatment groups demonstrating effectiveness of cA2 treatment received all 5 infusions of cA2 (Table 5). The principle reason for patients not receiving the complete dose regimen was because of lack of efficacy in the placebo group (methotrexate alone) and in the 1 mg/kg group not receiving methotrexate. All 15 patients in the 3 mg/kg group that received methotrexate completed the 5-infusion dose regimen.

Treatment with cA2 produced a rapid decrease in CRP concentration which was sustained through 26 weeks in the patients who received 3 or 10 mg/kg cA2.

Results for the Health Assessment Questionnaire (HAQ) are shown in FIG. **6**. This measurement of quality of life/disability demonstrated improvement over time corresponding with the clinical improvement observed in patients treated with cA2. In the patients treated with 3 mg/kg cA2

#### TABLE 5

Number of Infusions Completed

| | Placebo | 1 mg/kg cA2 | | 3 mg/kg cA2 | | 10 mg/kg cA2 | | Treatment |
|---|---|---|---|---|---|---|---|---|
| | MTX+ (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | MTX+ (N = 15) | MTX− (n = 14) | MTX+ (n = 14) | MTX− (n = 15) | effect p-value |
| Pts with complete[a] infusions | | | | | | | | |
| 5 infusions | 6 (42.86%) | 12 (85.71%) | 8 (53.33%) | 15 (100.00%) | 12 (85.71%) | 12 (85.71%) | 12 (80.00%) | 0.003 |
| 4 infusions | 0 (0.00%) | 1 (7.14%) | 0 (0.00%) | 0 (0.00%) | 1 (7.14%) | 1 (7.14%) | 0 (0.00%) | |
| 3 infusions | 2 (14.29%) | 1 (7.14%) | 6 (40.00%) | 0 (0.00%) | 0 (0.00%) | 1 (7.14%) | 1 (6.67%) | |
| 2 infusions | 5 (35.71%) | 0 (0.00%) | 1 (6.67%) | 0 (0.00%) | 1 (7.14%) | 0 (0.00%) | 2 (13.33%) | |
| 1 infusion | 1 (7.14%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | 0 (0.00%) | |

[a]Patients are counted only once for the first group for which they qualify (5 infusions> 4 infusions etc . . .). Patients were only counted if they had completed the entire infusion.

Results for measures of swollen and tender joint counts and the physician and patient global assessments are shown in FIGS. **1–4**. The median results in FIGS. **1–4** were reported for each evaluation visit based only on the patients with data collected. That is, a last observation carried forward approach was not used for patients who dropped out. Instead, the number of patients with data that comprise each point on the graph was reported at the bottom of the figures.

Despite the number of drop-outs in the placebo group and the 1 mg/kg group not receiving methotrexate, the results in FIGS. **1–4** demonstrate that cA2 treatment in combination with methotrexate profoundly reduces disease activity for all of the traditional measurements of disease activity, approaching near remission in many patients.

Results for a commonly used serum marker of inflammatory activity, C-reactive protein (CRP) are shown in FIG. **5**.

and methotrexate, the HAQ decreased from 2.0 at baseline to 1.1 at 22 weeks.

Pharmacokinetics of cA2

Serum concentrations of cA2 were obtained in all patients in this study. The serum concentration in each patient plotted over time according to the cA2 dose group is shown in FIG. **7**. Data plotted are the serum cA2 concentrations obtained just before the administration of cA2 at weeks 2, 6, 10 and 14 and then at weeks 18 and 26. These sampling times were selected to best demonstrate the stability of the cA2 concentration during the multiple dose regimen and the decline in serum cA2 concentration after the last dose was administered. For purposes of data presentation, the scales for cA2 concentration for each graph are condensed as the cA2 dose was increased.

US 6,270,766 B1

29

Substantial differences were observed for the cA2 serum concentration over time in the 1 mg/kg dose groups according to whether patients received methotrexate. Most of the patients receiving 1 mg/kg cA2 with methotrexate demonstrated measurable cA2 concentrations through 18 weeks, although it appeared that there was a tendency for the concentration to decline over time. In sharp contrast, the majority of patients who received 1 mg/kg cA2 without methotrexate were not able to maintain measurable serum concentrations of cA2 over time. As discussed herein, the inability to maintain serum cA2 in these patients was associated with a high rate of neutralizing antibody formation.

In contrast to the 1 mg/kg groups, patients who received either 3 mg/kg cA2 or 10 mg/kg cA2 were able to maintain serum cA2 concentrations through the multiple dose regimen. However, even in those dose groups, there was evidence that concomitant treatment with methotrexate was associated with high cA2 serum concentrations. As shown in FIG. **8**, the median serum cA2 concentration in both the 3 and 10 mg/kg dose groups receiving methotrexate was higher than in the corresponding groups not receiving methotrexate.

Immune Responses to cA2

Serum samples were collected through 26 weeks from all patients and analyzed for human anti-chimeric antibodies (HACA) to cA2. The results for HACA responses for each cA2 treatment group are shown in Table 6. It should be noted that in several patients in the 3 mg/kg group and in most patients in the 10 mg/kg group, cA2 was still present in the 26-week sample and could potentially interfere with the detection of HACA in the assay. However, it could also be reasoned that if neutralizing antibodies were present -at 26 weeks, then cA2 should not be present. Therefore, in presenting the data in Table 6, results for the immune response rate are shown not including patients with serum cA2 at 26 weeks and including patients with serum cA2 at 26 weeks, assuming that if cA2 was present at 26 weeks, the patient did not have a positive HACA response.

30

tions include headache, fever, facial flushing, pruritus, myalgia, nausea, chest tightness, dyspnea, vomiting, erythema, abdominal discomfort, diaphoresis, shivers, hypertension, lightheadedness, hypotension, palpitations and somnolence.

Hypersensitivity reactions, as described herein, may occur whenever protein-containing materials, such as cA2, are administered. Thus, it is unclear whether these symptoms represent an immunologic event or physical factors such as infusion rate and immunoglobulin aggregation. Investigators have reported that symptoms resolve in some patients by decreasing the rate of the infusion. Previous literature reports indicate that vasomotor symptoms have been observed in patients receiving intravenous immunoglobulin therapy (Berkman et al., *Ann. Intern Med.* 112:278–292 (1990); Ochs et al., *Lancet* 2:1158–1159 (1980)).

One patient developed hypotension during all three infusions of 10 mg/kg cA2. The patient did not display clinical signs of hypotension and did not require medical treatment, but, in keeping with predefined safety criteria, the treatment schedule of this patient was discontinued.

One patient treated with 3 infusions of 10 mg/kg of cA2 and with 7.5 mg/week methotrexate developed symptoms of sepsis as a result of staphylococcal pneumonia 2 weeks after her last study visit and 14 weeks after her last infusion with cA2. Six days after developing symptoms she was admitted to the hospital and treated. She died one day later. (This patient had not proceeded with the fourth infusion for reasons unrelated to the sepsis.) Patients with RA who develop infections have a worse than expected outcome. Wolfe and coworkers have reported an observed:expected ratio for death due to pneumonia of 5.307 and an observed:expected ratio for death due to infections (excluding pneumonia) of 6.213 in RA patients from the ARAMIS database (Wolfe et al., Arthritis Rheumatism 4:481–494 (1994)).

One patient experienced a serious postoperative infection following cataract surgery 9 weeks after the fifth and last

TABLE 6

| | HACA Responses | | | | | |
| | 1 mg/kg | | 3 mg/kg | | 10 mg/kg | |
| | MTX+ | MTX– | MTX+ | MTX– | MTX+ | MTX– |
|---|---|---|---|---|---|---|
| HACA responses not including pts with 26-week serum cA2 | 2/13 (15.4%) | 8/15 (53.3%) | 0/10 (0%) | 3/12 (25.0%) | 0/2 (0%) | 1/10 (10%) |
| HACA responses including pts with 26-week serum cA2[1] | 2/13 (15.4%) | 8/15 (53.3%) | 0/15 (0%) | 3/14 (21.4%) | 0/14 (0%) | 1/15 (6.7%) |

[1]Patients with a measurable 26-week serum cA2 concentration were considered negative for a HACA response for this analysis.

Results in Table 6 demonstrate that concomitant methotrexate treatment suppresses the immune response to cA2, enabling stable pharmacokinetics to be achieved in a multiple dose regimen of cA2. This effect was also found after combined anti-CD4/anti-TNF antibody treatment in mice with collagen-induced arthritis and described in U.S. application Ser. No. 08/607,419, filed Feb. 28, 1996, the teachings of which are entirely incorporated herein by reference.

Clinical Safety

Two out of 86 patients (with most patients receiving 5 treatments) experienced multisystem infusion-related reactions with retreatment. Multisystem, infusion-related reac-

infusion of 3 mg/kg of cA2 (with 7.5 mg/week methotrexate), leading to removal of the eye. This patient was receiving prednisolone (7 mg/day). The incidence of endophthalmitis after cataract extraction has been reported to be between 0.072 and 0.093% (Kattan et al., *Ophthalmology* 98(9):1147–1148 (1991)) and may be heightened in patients receiving corticosteroid therapy.

Eight (9%) of 87 patients developed double stranded (ds)-DNA antibodies following multiple infusions of cA2. Measurements were performed at baseline, week 8, 16 and 26 (12 weeks following the last infusion). In these patients with antibodies against ds-DNA, there was a trend toward a

US 6,270,766 B1

31

lower level in antibodies at the last evaluation, with two patients being negative.

One patient developed dyspnea, pleuritic chest pain and a rebound of arthritis activity at study week 14 (four weeks after the fourth infusion of 3 mg/kg of cA2). Symptoms resolved and she received her fifth dose of cA2. Symptoms recurred 3 weeks later. Examination of the serial blood samples revealed that the test for antinuclear antibodies and anti-ds-DNA antibodies were negative prior to treatment, but became positive at week 6 of the study. The patient's symptoms responded to oral prednisolone 20–30 mg daily. The working diagnosis was systemic lupus erythematosus (SLE). The patient currently does not have symptoms of SLE but has active RA.

To date, although antibodies to ds-DNA have been detected in patients treated with cA2, they generally represent transient increases and only one patient has been symptomatic. In patients who have had sufficient follow-up, anti-ds-DNA antibodies have resolved with discontinuation of treatment.

In summary, treatment with cA2 is well tolerated. The reductions in disease activity produced by cA2 are significant as supported by the findings of a low placebo response rate. High clinical response rates are obtained with a multiple dose regimen of 3 mg/kg cA2 in combination with 7.5 mg/wk methotrexate and can be sustained through 26 weeks. This dose regimen is considered preferable to the 1 mg/kg plus methotrexate regimen because better pharmacokinetics are obtained, virtually no immune response was detected and the clinical response is better sustained following the last treatment with cA2. The clinical benefit obtained by increasing the dose regimen to 10 mg/kg cA2 plus methotrexate is similar to that observed with the 3 mg/kg cA2 plus methotrexate regimen.

Thus, the results of this study indicate that treatment with a multiple dose regimen of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy, in RA patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks. The benefit produced by cA2 generally exceeds 50% reductions in the traditional measurements of rheumatoid arthritis (swollen and tender joints, patient and physician global disease assessments) and achieves near clinical remission in many patients. Accordingly, the results of this study indicate that treatment with multiple infusions of cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

Example 2

Clinical Treatment of Rheumatoid Arthritis By Single Infusion of an Anti-TNF Antibody In Patients Receiving Methotrexate

A randomized, double-blind, placebo controlled study was conducted to evaluate the effects of a single infusion of placebo, 5, 10 or 20 mg/kg cA2 in combination with methotrexate, administered at a dose of 10 mg/week, in the treatment of rheumatoid arthritis (RA) in patients.

Patients

Twenty-eight (28) RA patients at three centers in the United States who, despite receiving three months therapy with methotrexate administered at a stable dose of 10 mg/wk for at least 4 weeks prior to screening, still had active disease according to the criteria of the American College of Rheumatology, were enrolled in the study. Active disease was defined by the presence of six or more swollen joints plus at least three of four secondary criteria (duration of

32

morning stiffness ≧45 minutes; ≧6 tender or painful joints; erythrocyte sedimentation rate (ESR) ≧28 mm/hour; C-reactive protein (CRP) 20 mg/l.

Patients taking NSAIDs and corticosteroids (prednisone) at screening were allowed to continue at stable doses (7.5 mg/day).

Study Infusions

The chimeric monoclonal anti-TNF antibody (cA2) was supplied as a sterile solution containing 5 mg cA2 per ml of 0.01 M phosphate-buffered saline in 0.15 M sodium chloride with 0.01% polysorbate 80, pH 7.2. The placebo vials contained 0.1% human serum albumin in the same buffer. Before use, the appropriate amount of cA2 or placebo was diluted to 300 ml in sterile saline by the pharmacist, and administered intravenously via a 0.2 $\mu$m in-line filter over 2 hours. The characteristics of the placebo and cA2 infusion bags were identical, and the investigators and patients did not know which infusion was being administered.

Assessments

Patients were randomized to one of four treatment groups (7 patients per group). Each of the 28 patients received a single dose of either 0, 5, 10 or 20 mg/kg cA2 and were followed for 12 weeks. Patients continued treatment with methotrexate (Pharmachemie, Netherlands) administered at 10 mg/week throughout the study. Patients were monitored for adverse events during infusions and regularly thereafter, by interviews, physical examination, and laboratory testing.

The primary measurement of clinical response was defined by the ACR preliminary definition of response (Felson et al., *Arthritis Rheumatism* 38(6):727–735 (1995)). Patients were considered to have a response if they had a 20% reduction in swollen and tender joint count, and had experienced a 20% reduction in 3 of the 5 following assessments: patient's assessment of pain (VAS), patient's global assessment of disease activity (VAS), physician's global assessment of disease activity (VAS), patient's assessment of physical function (HAQ), and an acute phase reactant (ESR). The ESR was measured at each study site with a standard method (Westergen).

Evaluations were performed at day 3, and at weeks 1, 2, 4, 6, 8, 10, and 12.

Results

The 28 patients were randomized to one of four treatment (or dose) groups.

The clinical response rates over time by ACR 20% criteria in each of the treatment groups is shown in Table 7.

TABLE 7

| | | | | | cA2 Treated Patients |
|---|---|---|---|---|---|
| Clinical Response Rates (By ACR 20% Criteria) In Patients Receiving 10 mg/kg Methotrexate | | | | | |
| | | | Dose of cA2 | | |
| | Placebo | 5 mg/kg | 10 mg/kg | 20 mg/kg | |
| Pts evaluated | 7 | 7 | 7 | 7 | 21 |
| Pts with any response | 1(14.3%) | 6(85.7%) | 5(71.4%) | 6(85.7%) | 17(81.0%) |
| 1 Week | 0(0.0%) | 4(57.1%) | 2(28.6%) | 5(71.4%) | 11(52.4%) |
| 2 Weeks | 0(0.0%) | 4(57.1%) | 5(71.4%) | 5(71.4%) | 14(66.7%) |
| 4 Weeks | 1(14.3%) | 3(42.9%) | 5(71.4%) | 5(71.4%) | 13(61.9%) |
| 6 Weeks | 0(0.0%) | 3(42.9%) | 5(71.4%) | 4(57.1%) | 12(57.1%) |
| 8 Weeks | 1(14.3%) | 3(42.9%) | 4(57.1%) | 4(57.1%) | 11(52.4%) |
| 10 Weeks | 1(14.3%) | 1(14.3%) | 4(57.1%) | 3(42.9%) | 8(38.1%) |
| 12 Weeks | 1(14.3%) | 2(28.6%) | 4(57.1%) | 3(42.9%) | 9(42.9%) |

Clinical benefit of cA2 treatment was evident at the first evaluation visit at one week. Although each of the 3 doses

US 6,270,766 B1

33

of cA2 produced clinical responses in the majority of patients treated, the duration of clinical response appeared to be better sustained through 12 weeks in the groups receiving 10 or 20 mg/kg cA2. Clinical response was achieved much more frequently among patients receiving cA2 as compared to placebo. That is, 17/21 (81%) patients in the 3 cA2 groups achieved a response, compared with only 1/7 (14%) placebo treated patients. The magnitude of clinical response was notable. The mean tender joint count among cA2 treated patients decreased from 30.1 at baseline to 13.3 at week 12, and mean CRP decreased from 3.0 at baseline to 1.1 at week 12.

The duration of clinical response appeared to be dose dependent. 2/6 (33%) of the responding patients treated with 5 mg/kg cA2 sustained a response through 12 weeks of followup, compared to 7/11 (64%) of the responding patients who received 10 or 20 mg/kg. Treatment in all groups was generally well tolerated.

In summary, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is effective in the reduction of the signs and symptoms of rheumatoid arthritis in patients whose disease is incompletely controlled by methotrexate. Moreover, the clinical response achieved by this approach can be sustained for more than 12 weeks after a single treatment. Accordingly, the results of this study indicate that treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

Example 3

Clinical Treatment of Rheumatoid Arthritis By Repeated Dose Administration of an Anti-TNF Antibody In Patients Following A Single Dose, Double-Blind, Placebo-Controlled Trial

An open label study was conducted to evaluate the effects of repeated infusions of 10 mg/kg cA2 in combination with methotrexate, administered at a dose of 10 mg/week, in the treatment of rheumatoid arthritis in patients.

Patients

As described in Example 2, a randomized, double-blind, placebo controlled, 12 week study of cA2 was conducted in RA patients who had active disease despite receiving three months therapy with methotrexate administered at a stable dose of 10 mg/wk for at least 4 weeks prior to screening.

At week 12, patients who had completed the 12 week evaluation period and had not experienced adverse events prohibiting further infusions of cA2, were offered 3 subsequent open label infusions of cA2, administered at a dose of 10 mg/kg, at eight week intervals (weeks 12, 20, 28). Twenty-three (23) patients from the 12 week study were enrolled in this study.

Assessments

11/23 patients entering this open label study were evaluated at 1 of 3 centers in the United States and followed up to 40 weeks after initial entry. Patients continued treatment with methotrexate administered at 10 mg/week throughout

34

the study. Repeated treatments with cA2 were generally well tolerated. Three patients had transient infusion related symptoms (urticaria, somnolence).

The primary measurement of clinical response was defined by the ACR preliminary definition of response (Felson et al., *Arthritis Rheumatism* 38(6):727–735 (1995)). Patients were considered to have a response if they had a 20% reduction in swollen and tender joint count, and had experienced a 20% reduction in 3 of the 5 following assessments: patient's assessment of pain (VAS), patient's global assessment of disease activity (VAS), physician's global assessment of disease activity (VAS), patient's assessment of physical function (HAQ), and an acute phase reactant (ESR). The ESR was measured at each study site with a standard method (westergen).

Results

Of six patients who had all received cA2 during the double-blinded study described in Example 2 and responded through the 12 weeks of that study, four patients sustained a response throughout the 40 week followup. Of the remaining two patients, one patient is still responding through week 28, and one patient recently entered this open label trial. For all 4 patients completing 40 weeks of followup and the patient at week 28, final tender joint counts were 2 and swollen joint counts 1, compared to a mean of 23 and 29, respectively, at entry into the double-blinded study described in Example 2. For 4 of these 5 patients, ESR were 18 mm/hr and CRP 0.7, compared to a mean of 27 and 3.9, respectively, at entry into the double-blind study described in Example 2.

Of two patients who had both received cA2 during the double-blinded study described in Example 2 and responded only through week 10 of that study, one patient responded through 36 weeks and one patient is still responding through week 20.

Of three patients who did not respond during the double-blinded study described in Example 2 (2 received placebos, 1 received 5 mg/kg cA2), two of these patients experienced a transient clinical response, and one patient is still responding through week 20.

In summary, the preliminary results of this study suggest that repeated adjunctive and/or concomitant therapy with cA2, in RA patients whose disease is incompletely controlled by methotrexate, can result in substantial clinical improvement for a majority of the patients. Moreover, the clinical response achieved by this approach can be sustained for up to 40 weeks of followup. Accordingly, the results of this study indicate that repeated treatment with cA2 as adjunctive and/or concomitant therapy to methotrexate therapy is an important and efficacious therapeutic approach for treating RA in patients.

Equivalents

Those skilled in the art will know, or be able to ascertain, using no more than routine experimentation, many equivalents to the specific embodiments of the invention described herein. These and all other equivalents are intended to be encompassed by the following claims.

```
                      SEQUENCE LISTING


(1) GENERAL INFORMATION:

    (iii) NUMBER OF SEQUENCES: 2


(2) INFORMATION FOR SEQ ID NO:1:
```

US 6,270,766 B1

35                                                                              36

-continued

```
     (i) SEQUENCE CHARACTERISTICS:
         (A) LENGTH: 22 amino acids
         (B) TYPE: amino acid
         (C) STRANDEDNESS:
         (D) TOPOLOGY: linear

    (ii) MOLECULE TYPE: peptide

    (xi) SEQUENCE DESCRIPTION: SEQ ID NO:1:

Tyr Ser Gln Val Leu Phe Lys Gly Gln Gly Cys Pro Ser Thr His Val
1               5                   10                  15

Leu Leu Thr His Thr Ile
            20


(2) INFORMATION FOR SEQ ID NO:2:

     (i) SEQUENCE CHARACTERISTICS:
         (A) LENGTH: 22 amino acids
         (B) TYPE: amino acid
         (C) STRANDEDNESS:
         (D) TOPOLOGY: linear

    (ii) MOLECULE TYPE: peptide

    (xi) SEQUENCE DESCRIPTION: SEQ ID NO:2:

Tyr Gln Thr Lys Val Asn Leu Leu Ser Ala Ile Lys Ser Pro Cys Gln
1               5                   10                  15

Arg Glu Thr Pro Glu Gly
            20
```

What is claimed:

**1**. A method of treating arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts.

**2**. A method of claim **1** wherein the anti-tumor necrosis factor alpha antibody or antigen binding fragment is administered in a series of doses separated by intervals of days or weeks.

**3**. A method of claim **1** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

**4**. A method of claim **3** wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:2.

**5**. A method of claim **3** wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

**6**. A method of claim **5** wherein the chimeric antibody is monoclonal antibody cA2.

**7**. A method of claim **1** wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof.

**8**. A method of treating rheumatoid arthritis in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts.

**9**. A method of claim **8** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks.

**10**. A method of claim **8** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

**11**. A method of claim **10** wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:1 or SEQ ID NO:2..

**12**. A method of claim **10** wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

**13**. A method of claim **12** wherein the chimeric antibody is monoclonal antibody cA2.

**14**. A method of claim **8** wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof.

**15**. A method of treating Crohn's disease in an individual in need thereof comprising co-administering methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof to the individual, in therapeutically effective amounts.

**16**. A method of claim **15** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is administered in a series of doses separated by intervals of days or weeks.

**17**. A method of claim **15** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

US 6,270,766 B1

37

**18**. A method of claim **17** wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:1 or SEQ ID NO:2.

**19**. A method of claim **17** wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

**20**. A method of claim **17** wherein the chimeric antibody is monoclonal antibody cA2.

**21**. A method of claim **15** wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof.

**22**. A composition comprising methotrexate and an anti-tumor necrosis factor alpha antibody or an antigen-binding fragment thereof.

**23**. A composition of claim **22** wherein the anti-tumor necrosis factor alpha antibody or antigen-binding fragment is a chimeric antibody or chimeric fragment, wherein said chimeric antibody or chimeric fragment comprises a non-human variable region specific for tumor necrosis factor alpha or an antigen-binding portion thereof and a human constant region.

**24**. A composition of claim **23** wherein the chimeric antibody binds to one or more epitopes included in amino acid residues set forth in SEQ ID NO:1 or SEQ ID NO:2. .

38

**25**. A composition of claim **23** wherein the chimeric antibody competitively inhibits binding of TNFα to monoclonal antibody cA2.

**26**. A composition of claim **25** wherein the chimeric antibody is monoclonal antibody cA2.

**27**. A method of claim **22** wherein the anti-TNFα antibody or antigen-binding fragment is a humanized anti-TNFα antibody or antigen-binding fragment thereof.

**28**. A method of treating arthritis in an individual in need thereof comprising co-administering to the individual, in therapeutically effective amounts, methotrexate and a soluble TNFα receptor or functional portion thereof, wherein said soluble TNFα receptor is selected from the group consisting of p55 TNFα receptor and p75 TNFα receptor.

**29**. A method of claim **28** wherein the soluble TNFα receptor is a TNFα receptor multimeric molecule.

**30**. A method of claim **28** wherein the soluble TNFα receptor is a TNFα immunoreceptor fusion molecule.

* * * * *

A179

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on counsel of record on December 2, 2013, by CM/ECF.

By: /s/ Mark A. Perry

Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
T: (202) 955-8500
F: (202) 467-0539
mperry@gibsondunn.com

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,994 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated:  December 2, 2013

By:  /s/ Mark A. Perry

Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com