**2013-1545**

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

———————————

ABBVIE INC. and ABBVIE BIOTECHNOLOGY LIMITED,

*Plaintiffs-Appellees*,

v.

THE MATHILDA AND TERENCE KENNEDY INSTITUTE
OF RHEUMATOLOGY TRUST,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of New York
in case no. 11-CV-2541,
Judge Paul A. Crotty.

———————————

### BRIEF FOR PLAINTIFFS-APPELLEES

———————————

Michael A. Morin
David P. Frazier
Casey L. Dwyer
Cora R. Holt
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413

*Attorneys for Plaintiffs-Appellees*

February 18, 2014

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees AbbVie Inc. and AbbVie Biotechnology Limited certify the following:

1.  The full name of every party or amicus represented by me is:

> AbbVie Inc. (f/k/a Abbott Laboratories)
> AbbVie Biotechnology Limited (f/k/a Abbott Biotechnology Limited)

2.  The name of the real party in interest represented by me is:

> AbbVie Inc. (f/k/a Abbott Laboratories)
> AbbVie Biotechnology Limited (f/k/a Abbott Biotechnology Limited)

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

> AbbVie Inc.: No parent corporation and no publicly held corporation holds 10% or more of its stock.

> AbbVie Biotechnology Limited: AbbVie Bahamas Ltd., AbbVie Limited (Cyprus), AbbVie Overseas S.à.r.l., AbbVie International S.à.r.l., AbbVie (Gibraltar) Holdings Limited, AbbVie (Gibraltar) Limited, and AbbVie Inc.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

> FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
> Michael A. Morin, David P. Frazier, Robert E. Shaffer, Steven P. O'Connor, John T. Battaglia, Jennifer A. Johnson, Casey L. Dwyer, Cora R. Holt

> FLEMMING ZULACK WILLIAMS ZAUDERER, LLP
> Gerald G. Paul, Grant Shehigian

Dated: February 18, 2014　　　　　　　/s/ Michael A. Morin
　　　　　　　　　　　　　　　　　　　　　Michael A. Morin

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES .......................................................... iiv

STATEMENT OF RELATED CASES ............................................. viii

INTRODUCTION ......................................................................... 1

STATEMENT OF ISSUES .............................................................. 4

STATEMENT OF THE CASE ........................................................... 5

    I.     Historical Treatment of Rheumatoid Arthritis ..................... 5

    II.    Kennedy's '766 Patent ...................................................... 9

        A.    The T-14 Trial .......................................................... 10

        B.    Kennedy's Prosecution of the '766 Patent ................ 12

        C.    The Inventors' Publications ...................................... 13

    III.    Kennedy's '442 Patent ...................................................... 14

        A.    Kennedy's Contradictory Prosecution of the '442 Patent ..................................................................... 15

    IV.    The Proceedings Below ..................................................... 18

        A.    Kennedy's Failed Rule 12 Motion ............................ 18

        B.    Trial and the District Court's Decision ..................... 19

        C.    The District Court's Second Rejection of Kennedy's Rule 12 Motion ...................................................... 25

SUMMARY OF THE ARGUMENT .................................................. 26

STANDARD OF REVIEW ............................................................. 28

ARGUMENT .............................................................................. 29

I.    The Doctrine of Obviousness-Type Double Patenting
      Remains Robust and Applies Here .....................................29

      A.    Obviousness-Type Double Patenting Prevents
            Extension of Patent Protection Beyond the Statutory
            Term ..........................................................................29

      B.    The URAA Did Not Eviscerate Obviousness-Type
            Double Patenting.......................................................31

      C.    Kennedy's Equitable Arguments Are Unfounded ....................37

II.   The District Court Correctly Construed the Claims...........................39

      A.    Co-administering........................................................40

      B.    Active Disease............................................................46

III.  The District Court Correctly Found the '442 Claims
      Obvious Over the '766 Claims.......................................51

      A.    Adjunctive Therapy Was an Obvious Species of  Co-
            administering.............................................................51

      B.    The Recitation of a Specific Patient Population and
            Therapeutic Result in the '442 Claims Is Insufficient
            to Render Them Nonobvious ......................................55

      C.    There Are No Unexpected Results to Support
            Nonobviousness .......................................................58

CONCLUSION .........................................................................61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
  334 F.3d 1343 (Fed. Cir. 2003) ...........................................................49

*Allergan, Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013) ...........................................................60

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ...........................................................50

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ...........................................................55

*Ex Parte Annis*,
  No. 2011-9711, 2012 WL 3296313 (BPAI Aug. 8, 2012) ...................55

*In re Basell Poliolefine Italia S.P.A.*,
  547 F.3d 1371 (Fed. Cir. 2008) ...........................................................38

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
  575 F.3d 1341 (Fed. Cir. 2009) ....................................................52, 54

*In re Berg*,
  140 F.3d 1428 (Fed. Cir. 1998) ....................................................30, 31

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
  592 F.3d 1340 (Fed. Cir. 2010) ....................................................31, 35

*In re Bowers*,
  359 F.2d 886 (CCPA 1966) .................................................................37

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001) ...........................................................57

*Eli Lilly & Co. v. Barr Labs., Inc.*,
  251 F.3d 955 (Fed. Cir. 2001) ......................................................30, 33

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  689 F.3d 1368 (Fed. Cir. 2012) ...........................................................28

*In re Emert*,
 124 F.3d 1458 (Fed. Cir. 1997) ..........................................................30

*In re Fallaux*,
 564 F.3d 1313 (Fed. Cir. 2009) ...................................................34, 35

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
 349 F.3d 1373 (Fed. Cir. 2003) .........................................................29

*In re Gleave*,
 560 F.3d 1331 (Fed. Cir. 2009) ...................................................52, 54

*In re Goodman*,
 11 F.3d 1046 (Fed. Cir. 1993) ...........................................................30

*In re Hubbell*,
 709 F.3d 1140 (Fed. Cir. 2013) .........................................................34

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
 456 U.S. 844 (1982) ...................................................................28, 59

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
 175 F.3d 985 (Fed. Cir. 1999) ...........................................................49

*Kara Tech. Inc. v. Stamps.com Inc.*,
 582 F.3d 1341 (Fed. Cir. 2009) .........................................................47

*King Pharms., Inc. v. Eon Labs., Inc.*,
 616 F.3d 1267 (Fed. Cir. 2010) .........................................................57

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007) ..........................................................................52

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
 358 F.3d 898 (Fed. Cir. 2004) ...........................................................47

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
 500 F. App'x 951 (Fed. Cir. 2013) .....................................................39

*In re Lonardo*,
 119 F.3d 960 (Fed. Cir. 1997) ...........................................................29

*In re Longi,*
    759 F.2d 887 (Fed. Cir. 1985) ....................................................31, 33

*Mars, Inc. v. H.J. Heinz Co.,*
    377 F.3d 1369 (Fed. Cir. 2004) ........................................................47

*In re Mayne,*
    104 F.3d 1339 (Fed. Cir. 1997) ...................................................28, 59

*Merck & Co., Inc. v. Kessler,*
    80 F.3d 1543 (Fed. Cir. 1996) ..........................................................32

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011).................................................................28, 61

*Miller v. Eagle Mfg. Co.,*
    151 U.S. 186 (1894)..........................................................................29

*Perricone v. Medicis Pharm. Corp.,*
    432 F.3d 1368 (Fed. Cir. 2005) ........................................................36

*In re Petering,*
    301 F.2d 676 (CCPA 1962) ........................................................52, 54

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007) ..................................................52, 54

*In re Robeson,*
    331 F.2d 610 (CCPA 1964) ..............................................................37

*Southwall Techs., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) ..........................................................45

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.,*
    611 F.3d 1381 (Fed. Cir. 2010) ..................................................37, 38

*Thorner v. Sony Computer Entm't Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................47, 50

*In re Zickendraht,*
    319 F.2d 225 (CCPA 1963) ........................................................47, 50

## Federal Statutes

35 U.S.C. § 101 ..................................................................................29, 36

35 U.S.C. § 154 (1988) ..............................................................................32

35 U.S.C. § 154(a)(2)..........................................................................10, 15

35 U.S.C. § 154(b) ...............................................................................15, 37

American Inventors Protection Act,
    Pub. L. No. 106-113, 113 Stat. 1501, Title IV (1999).......................36

Uruguay Round Agreements Act,
    Pub. L. No. 103-465, 108 Stat. 4809 (1994) ......................................32

## Other Authorities

Manual of Patent Examining Procedure
    (9th ed. Rev. Aug. 2012).....................................................................34

Mark A. Lemley & Kimberly A. Moore,
    *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63 (2004) ............32, 33

Official Gazette of the United States Patent and Trademark Office
    1201 OG 112 (Sept. 30, 1997)............................................................34

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from the same proceeding in the lower court was previously before this or any other appellate court. Other than the case cited in Kennedy's statement of related cases, there is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## **INTRODUCTION**

In 2002, AbbVie took a license to Kennedy's '766 patent, which was directed to "co-administering" two drugs—an antibody and methotrexate—to treat patients suffering from rheumatoid arthritis. AbbVie paid more than $100 million under that agreement, expecting that its royalty obligations would cease in October 2012 with the expiration of the '766 patent. But Kennedy had a different plan. To keep its royalty stream coming, Kennedy came up with a scheme to, in its own words, "extend the expiry date" of the '766 patent.

Specifically, Kennedy filed an application for a new patent (the '442 patent) with the same specification as the '766 patent. But this time, Kennedy claimed a later priority date, so the '442 patent would not expire until several years after the '766 patent. And this time, Kennedy narrowed its claims slightly, to a specific type of co-administration, called "adjunctive" co-administration.

As established at trial, adjunctive co-administration was not only *an* obvious type of co-administration; it was *the* most obvious type. There are only three possible ways to co-administer the two drugs: (1) methotrexate can be given first, and then the antibody added to the regimen; (2) the antibody can be given first, and the methotrexate added to the regimen; or (3) the two drugs can be started at the same time. Given that there are only three choices, picking one can hardly be deemed a separately patentable invention. Moreover, as the district court found,

1

the first method—the "adjunctive" co-administration now being claimed by Kennedy—was by far the most likely of the three, since most patients who needed antibody treatment were already on methotrexate at the time, ruling out the second and third options. And indeed, by the priority date of the '442 patent, the prior art (including the "Schwieterman" and "Higgins" references) confirmed that adjunctive co-administration had "become standard."

Yet, Kennedy convinced the PTO to issue its claims. It did so by taking positions that were *diametrically opposed* to those it had taken to get the '766 patent allowed. For example, to obtain the '766 patent, Kennedy told the PTO that certain clinical trial results in the patent were *representative of* the entire category of co-administration. But to obtain the '442 patent, Kennedy pointed to the *same results* and asserted that they showed that one form of co-administration— adjunctive co-administration—was *better* than the others and therefore deserving of a separate patent. The examiner accepted this and other contradictory arguments, and allowed the '442 patent to issue.

New patent in hand, Kennedy insisted that AbbVie would continue to owe royalties on the '442 patent after the '766 patent expired, for the same activities AbbVie had been paying for all along. AbbVie disagreed and filed this suit, seeking a declaratory judgment that the '442 patent is invalid for obviousness-type

double patenting.  After fifteen months of litigation and a four-day trial, the district court issued a 107-page opinion finding the claims invalid.

In this appeal, Kennedy argues that the district court erred for three reasons.  *First*, Kennedy argues that the doctrine of obviousness-type double patenting no longer exists in view of the change to patent term passed by Congress nearly two decades ago.  But that argument has no legislative or judicial basis, was never raised by Kennedy at the PTO, and is inconsistent with this Court's decisions and the purpose of the doctrine.  *Second*, Kennedy asserts that the district court erred in its claim constructions.  But the court's constructions, arrived at after a careful study of the patents and file histories, and after hearing from both parties' experts at trial, are correct.  *Third*, Kennedy asserts that the claims of the '442 patent are patentably distinct from those of the '766 patent.  But the district court properly found, based on the evidence presented at trial, that adjunctive therapy was the most obvious way to co-administer the two drugs.  And even if Kennedy were correct that there is a fourth type of co-administration, the claims would still be an obvious species within a very small genus.  Kennedy was already granted one patent on co-administering antibodies with methotrexate; it is not now entitled to another patent on the most obvious way to do it.

For these and other reasons discussed below, the district court's decision should be affirmed.

## <u>STATEMENT OF ISSUES</u>

I.    Did the district court correctly hold that the obviousness-type double patenting doctrine was not abrogated, *sub silencio*, by the 1995 statutory change in patent term, or otherwise rendered inapplicable to the '442 patent?

II.    Did the district court correctly construe: (i) "co-administering" to exclude the administration of an antibody "alone," thus rejecting Kennedy's proposed construction as contrary to the specification, prosecution history, and the inventors' own statements; and (ii) "active disease" as not being limited to a narrow definition for clinical trial entry, thus rejecting Kennedy's proposed attempt to read an ambiguous definition from the examples into the claims?

III.    Did the district court correctly invalidate Kennedy's later '442 patent to "adjunctively" administering an antibody and methotrexate for obviousness-type double patenting over Kennedy's earlier, expired '766 patent on "co-administering" those same two drugs, where: (1) there were only three ways to "co-administer" the drugs, "adjunctive" being the most obvious; (2) Kennedy's alleged "differences" in claim language are not meaningful; and (3) Kennedy's "unexpected results" are irrelevant and unsupported?

## STATEMENT OF THE CASE

AbbVie is a branded pharmaceutical company formed as a spinoff of Abbott Laboratories, and the successor to Abbott's long history of pharmaceutical development. A6-7[¶1]. Beginning in the 1990s, AbbVie (through its predecessors) developed the first human therapeutic antibody that binds to tumor necrosis factor alpha (TNFα). A73[¶¶262-65]; A1103[104:3-7]; A1147[148:10-16]. Patients with too much TNFα suffer from a range of diseases, including rheumatoid arthritis, Crohn's disease, and psoriasis. A1103-04[104:14-105:7]; A1141-42[142:23-143:7]. AbbVie's antibody, Humira®, neutralizes TNFα and has been used successfully to treat hundreds of thousands of patients. A1103-06[104:14-107:13]; A1142-45[143:25-146:17].

## I. Historical Treatment of Rheumatoid Arthritis

Rheumatoid arthritis is an autoimmune disease characterized by inflammation of the joints that, left untreated, results in joint pain and swelling, cartilage and bone destruction, deformity, incapacity, and potentially life-threatening complications. A7[¶3]; A1135-37[136:21-138:17]; A10135-36.

By the mid-1990s, methotrexate had emerged as the gold standard for treating rheumatoid arthritis. A8-10[¶¶8-14]; A1165-72[166:5-173:19]; A4058-59; A10197. But despite its benefits, a significant percentage of patients taking methotrexate still experienced signs and symptoms of the disease. A11[¶15];

A1173[174:4-14]; A1591-92[592:17-593:19].  Thus, by 1995, it had become

established practice for rheumatologists to first prescribe methotrexate and, if

necessary, add a second drug to the regimen.  A11-12[¶¶16-17]; A1172-86[173:20-

187:8]; A10137; A10151; A10396-400; A10401-06; A10158-85.  Doctors avoided

discontinuing methotrexate because loss of even partial benefits of the drug could

cause a flare in patients' symptoms.  A12[¶18]; A1179[180:3-21]; A10151.

In the early 1990s, as AbbVie was developing Humira®, others were

developing antibodies of their own.  A15[¶32]; A1473-75[474:3-476:9].  For

example, Kennedy scientists, Professors Ravinder Maini and Marc Feldmann (the

inventors of Kennedy's patents), were studying the use of an antibody called

"cA2" for treating rheumatoid arthritis.  A14-16[¶¶29-36].  cA2 is "chimeric,"

meaning it contains both mouse and human portions.  A13[¶26]; A1146-

47[147:10-148:2].  One drawback of chimeric antibodies is that patients' immune

systems react to the mouse portion of the molecule, in what is called the Human

Anti-Chimeric Antibody ("HACA") response, potentially reducing their

effectiveness.  A14[¶27]; A1147[148:3-9].

Kennedy's initial trials studied cA2 as a monotherapy (i.e., in the absence of

other drugs), and demonstrated it was safe and effective for treating rheumatoid

arthritis.  A17-22[¶¶39-45, 48-61, 63]; A4030-48.  Professors Maini and Feldmann

observed, however, that patients experienced a diminishing response with each

6

successive dose.  A19[¶50]; A4041; A1484-88[485:21-489:22]; A1196-97[197:25-198:17].  They hypothesized that this was due to development of a HACA response, and suggested combining the antibody with traditional immunosuppressive drugs, such as methotrexate.  A19-20[¶¶52-54]; A4041; A1484-85[485:21-486:12]; A1490-93[491:4-494:4]; A1197-200[198:18-201:20]; A4058.  In other words, they suggested co-administering the two drugs.

By 1995, others in the field, including Schwieterman and Higgins, had recommended that the two drugs should be co-administered in a particular way, namely, "adjunctively."  A21-26[¶¶62-82].

**Schwieterman:**  In March 1995, leading rheumatologists and FDA representatives met to discuss current therapies and clinical trial designs for treating rheumatoid arthritis.  A21-24[¶¶62-73]; A1205-06[206:6-207:22].  Their discussions were reported in a noted publication ("Schwieterman").  A10000-08.

At the 1995 conference, Dr. Michael Weinblatt, a leading rheumatologist and AbbVie's expert below, explained that after a biologic (i.e., an antibody drug) was shown to be safe as a monotherapy, the next step should be testing it in a patient who was already receiving, and would continue to receive, methotrexate.  A1207-09[208:1-210:16].  Dr. Weinblatt explained that methotrexate should not be discontinued because patients would experience a flare in their disease activity.  A10004.  He further explained that "[b]ecause methotrexate is such a dominant

7

drug in the U.S., . . . a likely study population will be patients that are incomplete responders on methotrexate.  That is the population, from both a practical and commercial standpoint, that we would be interested in looking at: *not patients withdrawn from methotrexate, but rather, incomplete responders on it*."  *Id.* (emphasis added).

Dr. Schwieterman, an FDA representative, agreed, explaining that once a biologic was shown to be safe in monotherapy trials, it would be "perfectly appropriate to go into a methotrexate-treated patient population" and that the FDA had "recommended the design that [Dr. Weinblatt] mentioned to several sponsors, *and it has become standard to go first alone [with the biologic] and then go with methotrexate*."  A10005 (emphasis added).  Thus, the antibody would be added to the treatment regimen of patients already receiving methotrexate, such that patients would receive "adjunctive" co-administration.  A1209-12[210:17-213:1].

**Higgins:**  This approach was confirmed in "Higgins," a July 1995 medical news publication.  A25-26[¶¶79-82]; A10207-08.  Higgins reported, consistent with Schwieterman, that "[o]ne of the key studies to be conducted will look at the possibility of combining CDP-571 [another anti-TNFα antibody] with methotrexate in patients with rheumatoid arthritis who do not respond to methotrexate alone."  A10208; *see also* A1214[215:3-24].  Again, this corresponds to "adjunctive" co-administration.

## II.    Kennedy's '766 Patent

Kennedy's U.S. Patent No. 6,270,766 ("the '766 patent") issued on August 7, 2001, from an application filed on August 1, 1996.  A151.  It claims methods of treating rheumatoid arthritis by "co-administering" methotrexate and anti-TNFα antibodies to individuals "in need thereof" in a manner that is "therapeutically effective."  *E.g.*, A178[35:35-39].  The specification explains that the invention relates "to the discovery that tumor necrosis factor antagonists can be administered to patients suffering from a TNF-mediated disease as adjunctive and/or concomitant therapy to methotrexate therapy, with good to excellent alleviation of the signs and symptoms of the disease."  A162[4:31-36].

As discussed above, there are only three ways a patient can end up on "co-administration" therapy: (i) treatment with methotrexate can begin first, and antibody therapy can then be added "adjunctively" to the ongoing methotrexate therapy; (ii) treatment with the antibody can begin first, and methotrexate therapy can then be added "adjunctively" to the ongoing antibody therapy; or (iii) treatment with methotrexate and the antibody can be started at approximately the same time, or "concomitantly."  A41-42[¶145]; A1223[224:1-19].[1]  Of the three options, the first was the most likely because methotrexate was the accepted

---

[1] Kennedy does not challenge the district court's construction of "adjunctive" or "concomitant" co-administration, for which both parties offered parallel definitions.  A1223-24[224:1-225:11]; A5387; A5389; A1301[302:2-14].

standard of care, such that patients would have started on it before being put on a newer, more potent antibody treatment.  A42[¶146]; A1223-24[224:20-225:11]; A1209-10[210:7-211:12].

During prosecution, Kennedy sought and was granted priority to an October 8, 1992, application, such that the '766 patent expired twenty years later, on October 8, 2012.  35 U.S.C. § 154(a)(2); A46[¶163]; A48[¶172]; A51[¶179]; A53[¶187]; A5537-38; A5563-65; A5600-03; A5628-29.  Despite relying on the 1992 priority date to obtain issuance of the '766 patent, Professor Maini repudiated Kennedy's representations at trial, testifying that he and Dr. Feldmann had not even *conceived* of co-administration by the time they filed their 1992 priority application.  A46[n.14]; A1538-50[539:3-551:25].[2]

A.     **The T-14 Trial**

A significant focus of the '766 patent, and of the dispute below, is Example 1, which describes Kennedy's "T-14" clinical trial that studied co-administration of methotrexate and anti-TNFα antibodies.  A37[¶123]; A170-76[20:39-31:49].  The T-14 trial was a study of "adjunctive" co-administration, wherein patients whose disease was not controlled by methotrexate alone had anti-

---

[2] Professor Feldmann made a similar disavowal during his deposition.  A10252-53[46:10-47:4].

TNFα antibody therapy added to their continuing methotrexate regimen.

A37[¶124]; A41-42[¶¶144-46]; A1158[159:6-9].

In the specification, the T-14 study is described as comparing administration

of antibody "alone or in combination with methotrexate." A170[20:43-49]. The

Example describes three treatment groups:

(i) **MTX+ (adjunctive co-administration)**: patients received antibody in addition to continuing methotrexate (in one of three separate dosages);

(ii) **MTX- (antibody alone)**: patients discontinued their prior methotrexate, then received antibody alone (in one of three separate dosages); and

(iii) **Placebo (methotrexate alone)**: patients received continuing methotrexate, and did not receive antibody.

A171[21:13-23, Table 1]; A38[¶¶128-29]. The '766 patent repeatedly identifies

the patients in the MTX- group as having received antibody "alone" or "[w]ithout

methotrexate," and, importantly, *contrasts* them to those receiving combination

therapy (i.e., MTX+, or "with methotrexate"). A162[3:29-4:13] (identifying the

MTX- group as the group "without methotrexate"); A170[20:43-49] (identifying

the same group as the group receiving antibody "alone"); A170[20:43-49]

(describing the T-14 trial as comparing the administration of antibody "alone or in

combination with methotrexate"); A84-85[¶¶312-15].

The results of the T-14 trial showed that patients in the adjunctive co-

administration group experienced superior results—in both duration and magnitude

of response—compared to the "alone" groups. A39-40[¶¶130-35]; A172-

74[Tables 2-5]; A176[31:21-49]. The specification also states that adjunctive co-administration "suppresse[d] the immune response to cA2" and reduced the HACA response. A175[29:56-63, Table 6]. Thus, Example 1 concludes that "treatment with a multiple dose regimen of cA2 [antibody] as *adjunctive and/or concomitant* therapy to methotrexate therapy, in RA [rheumatoid arthritis] patients whose disease is incompletely controlled by methotrexate, produces a highly beneficial or synergistic clinical response that can be sustained through 26 weeks." A176[31:35-40] (emphasis added).

### B.   Kennedy's Prosecution of the '766 Patent

Whereas Kennedy now argues that the antibody "alone" (MTX-) group is a type of co-administration, K.Br. 36-43, it urged the exact *opposite* to get its '766 patent allowed. During prosecution, Kennedy *differentiated* the antibody "alone" group from the claimed co-administration, arguing that "combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results *than the results obtained with each agent alone*" or each agent used "separately." A5516 (emphasis added); *see also* A44-45[¶¶156-58]; A1233-34[234:5-235:1]; A5545-47; A5561; A5578; A5618; A46-49[¶¶166, 171, 173]; A51[¶¶180-81]; A1236-38[237:17-239:6]. In response to the examiner's rejection, Kennedy further argued that these superior results were representative of *all types* of co-administration and were not limited to certain patient populations:

12

> *There is no technical reason to believe that the synergistic effects exemplified in the specification by combination therapy with methotrexate and a TNFα antagonist is limited to a certain patient population.* That is, there is no technical reason to believe that treatment with a combination of methotrexate and a TNFα antagonist, in accordance with Applicants' teachings, would not yield the superior therapeutic effects described in the subject application. *The superior therapeutic effects are due to co-administration of methotrexate and a TNFα antagonist* functionally limited to therapeutically effective amounts, as described in the specification.

A5619 (emphasis added); *see also* A5583-98; A51-52[¶¶182-85]; A1238-42[239:7-243:12].[3]  Kennedy also repeated its observation that the unexpected results were due to "significantly reduced immunogenicity of anti-TNFα antibodies . . . obtained with combination therapy with methotrexate."  A5578; A48-49[¶173].

## C.     The Inventors' Publications

Other evidence confirmed that the antibody "alone" group was not considered a type of "co-administration," as Kennedy now claims.  The Kennedy inventors reported in their scientific articles and communications that the T-14 trial compared and contrasted adjunctive co-administration (the MTX+ group) to treatment with antibody "monotherapy," or antibody "alone" (the MTX- group). *See, e.g.*, A10116 (characterizing the trial as comparing antibody "monotherapy or combined with" methotrexate); A10117-18, A10125 (characterizing the trial as

---

[3] As seen in this passage, the applicants used the terms "combination" and "co-administration" interchangeably to refer a regimen of administering the two drugs together.

comparing antibody "alone or in combination with" methotrexate); A10132, A10393, A10392, A10130 (all characterizing the trial as comparing "antibody alone" and antibody "co-administered" or given "in combination with" methotrexate); A29-32[¶¶93-104]; A1231-32[232:4-233:3]; A1563-81[564:14-582:24]. The inventors also confirmed that the superior results of adjunctive co-administration were due to a decreased HACA response arising from synergy between methotrexate and anti-TNFα antibodies. A10117; A10126; A28-29[¶¶91-92]; A1526[527:16-19]; A1282-84[283:22-285:7].

## III.  Kennedy's '442 Patent

Multiple companies, including AbbVie, took licenses to the '766 patent, yielding hundreds of millions of dollars in payments to Kennedy. A73-74[¶¶267-69]; A1112-13[113:3-114:1]; A1406-08[407:23-409:22]. Indeed, AbbVie alone paid more than $100 million in royalties on the '766 patent. A74[¶269]; A1110-11[111:21-112:8]; A1112-13[113:12-114:1].

But Kennedy had a problem. It knew that the '766 patent—and its U.S. royalty stream—would expire in October 2012. So it came up with a plan to "extend the expiry date" of the '766 patent. A10200; A10017; A10055; A10092; A110[n.31]; A1433-42[434:1-443:14].

To accomplish this goal, Kennedy filed a new patent application, with the same specification, which ultimately issued on December 7, 2010, as U.S. Patent

14

No. 7,846,442 ("the '442 patent"). A115. But this time, instead of claiming the broader category of "co-administering" the two drugs to patients "in need thereof," Kennedy claimed the most obvious, and most commonly used, type of co-administration: "adjunctive" co-administration. *E.g.*, A150[35:1-15]. And instead of describing the patients being treated as those "in need thereof," Kennedy described them as having "active disease." *Id.* Instead of saying the treatment is "therapeutically effective," Kennedy said that it "reduces or eliminates signs and symptoms" of the disease. *Id.* And most significantly, instead of claiming priority back to 1992 as it had with the '766 patent, Kennedy claimed priority only back to August 1, 1996. A59[¶217].

With this later priority date, Kennedy hoped to get paid for many more years. Indeed, given the statutory 20-year term plus an additional 750 days of patent term adjustment, the '442 patent does not expire until August 21, 2018—nearly six years after the '766 patent. A70[¶251]; 35 U.S.C. § 154(a)(2), (b).

## A.  Kennedy's Contradictory Prosecution of the '442 Patent

During prosecution, the PTO rejected Kennedy's '442 claims for obviousness-type double patenting over the '766 patent. A59-60[¶¶218-19]; A66[¶¶236-37]; A5852-53; A5937. In response, Kennedy did *not* argue that the doctrine was extinct, or that its new application was somehow exempt. Instead,

Kennedy took positions that contradicted those it had taken a decade earlier to secure its '766 patent.

For example, when prosecuting the '766 patent, Kennedy argued that the results of the T-14 trial were representative of *all* types of co-administration. *See supra* at 12-13. But to get its '442 patent, Kennedy argued the *exact opposite*, claiming that the T-14 trial showed *one* type of co-administration—"adjunctive"—was superior to the others:

> As discussed above, combination therapy includes numerous different types of associations such as simultaneous, sequential, separate, parallel, or intermittent administration of two or more therapeutic agents. The choice of a TNF-antagonist in adjunctive therapy was not obvious over the cited references. The advantages obtained using the claimed adjunctive therapy are NOT obtained with other types of combination.

A5896; *see also* A5953; A5965; A61-62[¶¶223-24]; A66-67[¶¶239-41]; A1240-41[241:5-242:13].

Likewise, despite arguing before that the unexpected results of the T-14 trial were not "limited to a certain patient population," *see supra* at 13, Kennedy now told the PTO that its '442 claims were distinguishable *because* they were directed to the specific patient population already receiving methotrexate:

> Applicants note that, in contrast to claims 1-14 of the '766 Patent, the individuals are already receiving methotrexate therapy in all of the pending claims. Additionally, the individuals still have active disease in the pending claims, despite having undergone methotrexate therapy. Claims 1-14 of the '766 Patent are generic with respect to these claim elements. For instance, the '766 Patent claims include

individuals who did and who did not receive methotrexate. Likewise, they include individuals who are and who are not receiving benefit from methotrexate.

Applicants also note that the pending claims also differ from the '766 Patent claims in that the pending claims are directed to adjunctive therapy, a particular type of combination therapy. In contrast, the '766 Patent claims include adjunctive, sequential and simultaneous therapy.

A5909; *see also* A5868; A5878; A5986-87; A60-62[¶¶221-22, 226];

A68[¶¶244-45].

In arguing for unexpected results of "adjunctive" therapy, Kennedy pointed to the same data from Example 1 that it had relied on to secure allowance of its '766 claims. *Compare* A5901-02, A5911-12, A5978-79 (citing data at A5698-702) *with* A5618 (citing the same data at A5443-48); A62[¶225]; A64[¶230]; A67-68[¶¶242-43]. But this time, Kennedy recast Example 1 as comparing two *types* of co-administration therapy (adjunctive and sequential), as opposed to comparing co-administration to monotherapy. *E.g.*, A5911-13; A64[¶230].

Finally, despite previously arguing that the superior results were due to a decreased HACA response, Kennedy this time argued that they were "clearly unrelated to any reduction in the development of an antiglobulin response to the anti-TNFα antibody in the patient, i.e. a HACA response," stating that it was "clear that a reduced HACA response cannot be the basis for the improvement in methotrexate therapy." A5912-13; *see also* A64-65[¶¶231-32].

17

Kennedy's representations contradicted its prior statements to the PTO, its specification, and its inventors' peer-reviewed publications, as the district court correctly found.  A61-62[¶¶224-25]; A64-65[¶¶230, 232-33]; A66-69[¶¶240-43, 246]; A84[¶311].  Nevertheless, the examiner allowed the '442 claims to issue, citing in part the alleged "unexpected" results. A69[¶248]; A6007.

## IV.    The Proceedings Below

AbbVie expected that its U.S. royalty obligations would expire in October 2012, with the '766 patent.  A1107[108:8-13].  But when the '442 patent issued in late 2010, Kennedy demanded payment under that patent too, which would have extended AbbVie's payment obligations for nearly six more years.  A74[¶270]; A1114[115:8-13].  Believing that patent to be invalid, AbbVie filed this declaratory judgment action.

### A.    Kennedy's Failed Rule 12 Motion

The case proceeded through fact and expert discovery.  Then, on the eve of trial, Kennedy came up with a new theory that it had never raised in response to the PTO's rejections or earlier in the case.  Specifically, Kennedy filed a Rule 12(c) motion, arguing (as it does here) that the obviousness-type double patenting doctrine became extinct with the 1995 change in statutory patent term or,

alternatively, that it would be "unjust" to apply the doctrine to Kennedy's '442

patent.  A111.

The district court rejected Kennedy's arguments.  Reviewing the language of

the Patent Act and this Court's jurisprudence, the court held that

> Kennedy's arguments that it is entitled to a 17-year patent term must
> be rejected.  No court has ever held that the OTDP doctrine is
> eviscerated by the URAA or AIPA amendments to the Patent Act.
> After the URAA amendments, the Federal Circuit expressly held that
> "[n]o patent issued on an application filed after June 8, 1995, has a
> guaranteed 17-year term."  <u>Merck & Co., Inc. v. Kessler</u>, 80 F.3d
> 1543, 1552-1553 (Fed. Cir. 1996).  AIPA's 17-year guarantee applies
> only when the PTO causes delays in issuing patents; it does not permit
> double patented inventions to achieve the 17-year period.

A113-14 (alteration in original) (footnote omitted).  The court further noted that

Kennedy *chose* the 1992 priority date for the '766 patent, and found that

Kennedy's argument that it should nonetheless receive additional term "ignor[es]

the language of the URAA amendment and Kennedy's claimed priority date for the

'766 patent."  A114.  The district court therefore denied Kennedy's motion, but did

so without prejudice "to develop a full record on the OTDP issue at trial."  *Id.*

### B.  Trial and the District Court's Decision

The case proceeded to a four-day bench trial, in which the district court

considered both sides' pretrial briefs, testimony by multiple fact witnesses

(including Professor Maini, a Kennedy inventor) and expert rheumatologists for

19

both parties, and an extensive documentary record. Following trial, the district court issued a 107-page decision holding the '442 patent invalid. A4-110.

Sixty-five pages of the decision were devoted to detailed factual findings regarding the underlying technology and background art, Kennedy's early work and the T-14 trial, the inventors' statements about their discovery, and the prosecution histories of the '766 and '442 patents. A7-72[¶¶3-261]. Many of those findings required resolving differences in the expert testimony offered by both parties. In drawing its conclusions, the district court credited AbbVie's expert, Dr. Weinblatt, over Kennedy's expert, Dr. Lipsky, finding that Dr. Lipsky's testimony was "argumentative and non-responsive," whereas Dr. Weinblatt's testimony was "clearer, more consistent, more responsive, and more reflective of the other evidence in the record." A41[n.12].

Following its comprehensive factual analysis, the district court applied this Court's two-step test for obviousness-type double patenting, first construing the claims of the two patents and determining their differences, and then determining whether those differences render the claims patentably distinct. A74-109[¶¶274-410].

### 1.    Claim Construction

The district court construed two terms that Kennedy disputes on appeal: "co-administering" (from the '766 patent) and "active disease" (from the '442 patent).

**Co-administering:**  The court construed "co-administering" as encompassing "concomitant" co-administration (beginning treatment with the two drugs at approximately the same time) or "adjunctive" co-administration (starting with methotrexate and then adding the antibody, or vice versa).  A85-86[¶317].  In doing so, the court relied on the '766 patent specification and prosecution history, the view of a person of ordinary skill in the art, and the inventors' own descriptions and testimony.  A83-87[¶¶306-21].

The district court rejected Kennedy's argument that the MTX- group of the T-14 trial—those who discontinued methotrexate before receiving antibody "alone"—fell within the definition of "co-administration."  The court held that Kennedy's argument that this was a type of "sequential" co-administration was "contradicted by the language of the '766 patent, Kennedy's statements during the prosecution of the '766 patent, the publications by Professors Feldmann and Maini, and the testimony of the inventors."  A84[¶311].  The court observed that a "person of ordinary skill in the art would understand 'co-administration' as used in the claims of the '766 patent did not encompass the discontinuing of methotrexate therapy and then initiating anti-TNFα antibody therapy alone."  A86[¶318].

Witness testimony supported the court's refusal to define co-administration as including patients who discontinued methotrexate and then switched to an antibody alone.  Professor Maini testified that Kennedy's "sequential" co-

21

administration theory "wasn't the subject of what I believed that our study had proven conclusively, which was adjunctive therapy." A1569[570:12-17]. In response to a question asking whether he had ever referred to the MTX- group (those who discontinued methotrexate and received antibody "alone") as having received "sequential" co-administration, he replied that he had not, because he did not view the data underlying that characterization to be

> scientifically proven to be due to sequential co-administration … [and] because it was not scientifically proven, as a scientist, I did not think it was appropriate to draw attention to a phenomenon that I could not scientifically support ....

A1568-69[569:19-570:11]; *see also* A53[¶186]; A86-87[¶320].[4]

Professor Maini's testimony supported testimony by Dr. Weinblatt, who explained that a person skilled in the art would not have understood "co-administration" as used in the '766 claims to encompass stopping methotrexate and switching to antibody alone. A86[¶318]; A1224-30[225:21-231:2]. While Kennedy tried to make much of the use of the term "sequential" in the patent to describe a type of co-administration, Dr. Weinblatt explained that this term indicated nothing more than that the two drugs need not be taken precisely simultaneously (i.e., in one physical act); for example, methotrexate may be taken

---

[4] Upon further questioning, Professor Maini could not explain why the PTO was persuaded by such unsupported data, testifying only that he has "seen some surprising patents issued on very flimsy data." A1571[572:3-10].

daily, whereas an antibody may be taken weekly.  A84[¶310]; A1148[149:1-6];

A1167[168:2-13]; A1224-25[225:21-226:15].  As Dr. Weinblatt explained,

"sequential" was *not* used to describe patients who discontinued methotrexate and

received only antibody "alone," as that regimen was specifically distinguished

from co-administration throughout the intrinsic and extrinsic record.  A1226-

42[227:19-243:12].

**Active disease:**  Second, the district court construed "active disease" in the

'442 claims as referring to individuals with continuing signs and symptoms of

rheumatoid arthritis despite ongoing methotrexate treatment.  A92[¶345].  The

court rejected Kennedy's request to limit "active disease" to a narrow clinical trial

definition recited in the patent, concluding that a skilled artisan would have

considered a patient to have active disease even if they did not meet the strict

standard required for enrollment in those trials.  A92[¶¶343-46].  In doing so, the

court relied on the specification, as viewed from the standpoint of a person of

ordinary skill in the art, the prior art and prevailing practices in the field at the time

of the invention, and the testimony of Dr. Weinblatt.  *Id.*; *see also* A1244-

54[245:6-255:6]; A10000-08; A10135-57; A10186-94; A10207-08; A10396-406;

A4030-39; A4043-48; A10670-74.

## 2. Comparison of the Claims

The district court next compared the claims of the two patents to determine whether they are patentably distinct. In doing so, the court conducted a rigorous analysis, comparing the claimed methods of administration, patient populations, degrees of efficacy, and other alleged differences Kennedy identified below (but does not challenge on appeal).[5] A93-109[¶¶347-410].

The district court first held that, given that there were only three ways of co-administering the two drugs, the "adjunctive" methods claimed in the '442 patent were not patentably distinct from the "co-administration" methods of the '766 patent. A93[¶¶347-49]; A1244-52[245:14-253:12]. The court also found that a person of skill in the art would have been motivated to try those methods with a reasonable expectation of success. A95[¶355]. The court further noted that the patient population claimed in the '442 patent—those with active disease despite methotrexate therapy—was the *most likely* to receive co-administration. A93-95[¶¶350-55]; A1248-49[249:13-250:20]. In doing so, the court relied on the prior art teachings of methotrexate as the "gold standard" for treating rheumatoid arthritis, the frequent addition by rheumatologists of drugs to patients who did not respond completely to methotrexate, the disinclination of rheumatologists to

---

[5] While Kennedy mentions some of these other alleged differences in passing, K.Br. 8-9, it does not argue that they are relevant to patentability.

discontinue methotrexate in order to avoid disease flares, and the express teaching of adjunctive co-administration in the Schwieterman and Higgins references. A93-95[¶¶350-55].

The district court next held that the differing descriptions of efficacy in the '766 and '442 claims—treatment by a "therapeutically effective amount" versus treatment that "reduces or eliminates signs or symptoms associated with the rheumatoid arthritis"—did not give rise to patentable distinction. A97[¶¶365-66]; A1243-44[244:25-245:5]; A1257-58[258:19-259:24]. In doing so, the district court relied, *inter alia*, on the specification's description of a therapeutically effective amount as "preferably an amount … necessary to significantly reduce or eliminate signs and symptoms" of disease. A170[19:15-30]; A88-89[¶¶327-30].

Citing its extensive factual findings, the district court also held that Kennedy's arguments of unexpected results in support of its '442 claims were "contradicted by the data relied upon, the inventors' own words in their published articles and studies, the scientific record, and the inventors' own testimony." A99[¶372]; A99-100[¶¶370-74].

## C. The District Court's Second Rejection of Kennedy's Rule 12 Motion

Finally, the district court again denied Kennedy's (renewed) motion that obviousness-type double patenting did not apply as a matter of law. A110[n.31]. The court rejected Kennedy's argument that the equities weighed against applying

the doctrine, observing that Kennedy had purposely sought an early priority date to obtain the '766 patent but "then, after securing the '766 patent, sought to extend this protection beyond the expiration of the '766 patent by way of the indistinct '442 patent and its later expiration tied to an August 1, 1996 effective filing date." *Id.* Citing documents and testimony demonstrating Kennedy's strategy in extending the term of its '766 patent, the court concluded that "[t]he equities do not favor such an 'unjustified timewise extension of the right to exclude granted by a patent.'" *Id.* (citing A1433-42[434:1-443:15], A1538-550[539:3-551:25], A10017, A10092, A10055).

## SUMMARY OF THE ARGUMENT

I.    The doctrine of obviousness-type double patenting is alive and well. While Kennedy argues that the doctrine is extinct as a result of the 1995 change in patent term, that argument has no basis in statute, case law, or the rationale underlying the doctrine. Moreover, given that obviousness-type double patenting is the judicial counterpart to the statutory prohibition against double patenting of the same invention, Kennedy's argument is undercut by Congress's failure to modify that aspect of the statute. In addition, both this Court and the PTO have applied obviousness-type double patenting to invalidate and reject patents repeatedly since 1995. Kennedy's alternative argument that its '442 patent is

otherwise immune from the doctrine fares no better. Even if equities were taken into account as Kennedy has urged, they would favor *AbbVie*, not Kennedy.

II.     The district court correctly rejected Kennedy's claim constructions. Kennedy's assertion that "co-administration" includes treating patients by discontinuing methotrexate and then starting the antibody "alone" is contrary to the specification, prosecution history, and the inventors' own statements. Those statements consistently *distinguish* such patients from those receiving "co-administration." Kennedy's proposed construction of "active disease" is likewise flawed, for it is an improper attempt to import a narrow, clinical trial definition into the claims.

III.    The '442 patent is invalid, irrespective of which claim constructions are applied. Kennedy already has one patent on "co-administering" an antibody with methotrexate. It is not now entitled to another patent, and many more years of royalties, on the most obvious way of doing so. Moreover, Kennedy's convoluted arguments about the differences in patient populations and effectiveness are both legally irrelevant and contrary to the evidence presented at trial. Finally, Kennedy's purported evidence of "unexpected results" is contrary to the evidence presented at trial, belied by Kennedy's own statements during prosecution of the '766 patent, and inconsistent with the inventors' publications and testimony. The district court did not err, much less clearly err, in rejecting it.

## STANDARD OF REVIEW

AbbVie agrees with Kennedy's Standards of Review, K.Br. 16, and adopts them, with three additions.

*First*, while invalidity must be proven by clear and convincing evidence, evidence not previously presented to the PTO may carry more weight, and it may be easier for a challenger to sustain its burden where evidence was not previously considered by the examiner. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242, 2251 (2011).

*Second*, while the ultimate conclusion of obviousness-type double patenting is reviewed *de novo*, underlying factual determinations—including the existence of secondary factors such as unexpected results—are reviewed for *clear error*. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1376 (Fed. Cir. 2012); *In re Mayne*, 104 F.3d 1339, 1343 (Fed. Cir. 1997).

*Third*, credibility determinations—such as those the district court drew between Drs. Weinblatt and Lipsky—are within the "special province" of the district court. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982).

# ARGUMENT

## I. The Doctrine of Obviousness-Type Double Patenting Remains Robust and Applies Here

### A. Obviousness-Type Double Patenting Prevents Extension of Patent Protection Beyond the Statutory Term

Obviousness-type double patenting was created by courts to "prevent[] an applicant from extending patent protection for an invention beyond the statutory term by claiming a slight variant." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1378 (Fed. Cir. 2003); *see also Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 199 (1894) ("[A] letter patent may be granted where the invention is clearly distinct from, and independent of, one previously patented."). The doctrine is grounded in the legislative mandate that an inventor is entitled to "a patent" for his invention. 35 U.S.C. § 101; *see also In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997) ("The statute … permits only one patent to be obtained for a single invention.").

Allowing applicants to avoid the limit to "a patent" merely by claiming minor variants in successive patents would render the statute nugatory. Obviousness-type double patenting (or "non-statutory" double patenting) has been applied for decades to give full effect to the language of the statute and its legislative purpose. *See Geneva*, 349 F.3d at 1377-78. As this Court has explained, "[t]he fundamental reason for the rule [of obviousness-type double

29

patenting] is to prevent unjustified timewise extension of the right to exclude

granted by a patent no matter how the extension is brought about." *Eli Lilly & Co.*

*v. Barr Labs., Inc.*, 251 F.3d 955, 967-68 (Fed. Cir. 2001) (alterations in original)

(citation omitted).

This Court has emphasized that obviousness-type double patenting ties a

patentee's exclusionary right to the *statutory term* of his first patent on an

invention: "Obviousness-type double patenting is a judge-made doctrine that

prevents an extension of the patent right *beyond the statutory time limit*." *In re*

*Berg*, 140 F.3d 1428, 1431 (Fed. Cir. 1998) (emphasis added).[6] The rationale for

limiting an applicant to the statutory patent term derives from the fundamental

policy that

> [t]he public should ... be able to act on the assumption that upon the
> *expiration* of the patent it will be free to use not only the invention
> claimed in the patent but also modifications or variants which would
> have been *obvious* to those of ordinary skill in the art at the time the
> invention was made.

---

[6] *See also In re Emert*, 124 F.3d 1458, 1460 (Fed. Cir. 1997) ("An obviousness-type double patenting rejection prevents applicants from extending their patent term beyond *statutory limits* where an application claims merely an obvious variant of the claims in a prior patent." (emphasis added)); *In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("To prevent extension of the patent right *beyond statutory limits*, the doctrine of obviousness-type double patenting rejects application claims to subject matter different but not patentably distinct from the subject matter claimed in a prior patent." (emphasis added)).

*In re Longi*, 759 F.2d 887, 892-93 (Fed. Cir. 1985) (quoting *In re Zickendraht*, 319 F.2d 225, 232 (CCPA 1963)). Thus, "[w]hen the claims of a patent are obvious in light of the claims of an earlier commonly owned patent, the patentee can have no right to exclude others from practicing the invention encompassed by the later patent *after the date of the expiration of the earlier patent*." *Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1347 (Fed. Cir. 2010) (emphasis added).

Application of the doctrine is straightforward here. Kennedy was already granted "a patent" on its invention. As Kennedy concedes, that patent expired by statute in October 2012. K.Br. 3. That date is the "statutory time limit" for the exclusionary rights granted to Kennedy in exchange for the disclosure of its invention. *In re Berg*, 140 F.3d at 1431. Under this Court's long-standing precedent, Kennedy cannot extend its exclusionary rights by claiming obvious variants of its already-patented invention.

### B. The URAA Did Not Eviscerate Obviousness-Type Double Patenting

Kennedy argues that the change in patent term nearly 20 years ago eliminated any further need for the obviousness-type double patenting doctrine. K.Br. 19-23. But that argument is inconsistent with both the decisions of this Court and the actions of Congress.

Prior to 1995, patents expired 17 years from issuance. 35 U.S.C. § 154 (1988). This 17-year system was susceptible to the abusive practice of "submarine patenting," in which a patentee could file successive continuation applications, each claiming priority to the same original application, but delaying the issuance of a patent for many years while the public, unaware of the pending application, adopted the technology. Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. Rev. 63, 79-80 (2004). When these "submarine patents" finally surfaced and issued, they would enjoy a 17-year term, regardless of how many years had passed since the original application was filed. *Id.* at 80. The pernicious effect of such patents was to take the public by surprise by extending exclusivity over technology the public reasonably believed was no longer subject to patent protection. *Id.*

In 1995, the Uruguay Round Agreements Act ("URAA") went into effect, putting an end to submarine patenting by changing the statutory patent term to 20 years from the earliest claimed priority date. Pub. L. No. 103-465, 108 Stat. 4809 (1994). Under the 20-year regime, patent expiration is tied to priority date, eliminating any benefit from extended delays in prosecuting a patent. This Court has recognized that an early priority claim may now result in fewer years of enforceable patent life than under pre-URAA law. *Merck & Co. v. Kessler*, 80 F.3d 1543, 1552-53 (Fed. Cir. 1996) (holding that "[n]o patent issued on an

application filed after June 8, 1995 [the URAA effective date], has a guaranteed 17-year term").

Kennedy's argument that the doctrine of obviousness-type double patenting has become superfluous is premised on the erroneous assumption that the URAA eliminated every way a patentee can improperly extend its statutory patent term. It did not. While the URAA certainly curbed submarine patenting, obviousness-type double patenting is aimed at preventing *all* improper extensions "no matter how the extension is brought about." *Eli Lilly*, 251 F.3d at 968 (citation omitted). Thus, the URAA change did not eliminate the need for the doctrine; it just made it less frequent.[7]

This case exemplifies why the doctrine remains necessary. As this case demonstrates, patentees can still obtain unjust extensions of patent term by designating a later priority date for a patent that claims merely obvious variations of an already-patented invention or by filing an entirely new patent application at a later date. Such gamesmanship strips the public of its ability to rely on a statutory expiration date as a measure of patent term—the fundamental basis underlying the doctrine. *In re Longi*, 759 F.2d at 892-93.

---

[7] Kennedy cites the Lemley and Moore article for the proposition that the problem of improper term extensions "will generally take care of itself" under the 20-year regime, K.Br. 24, but ignores the authors' premise that "the patents expire on the same day" due to a shared "first filing date," Lemley and Moore, at 81-82. That is not the case here.

Kennedy's attempt to cast this case as presenting a "question of first impression" falls flat.  K.Br. 19.  Indeed, this Court has applied obviousness-type double patenting to patent applications filed after the legislative change on multiple occasions.  *See In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009); *In re Hubbell*, 709 F.3d 1140 (Fed. Cir. 2013).  While Kennedy attempts to distinguish these cases as appeals from PTO decisions rather than district court decisions, K.Br. 21-22, Kennedy has suggested no meaningful difference in the distinction.

Likewise, Kennedy does not even attempt to address the fact that the PTO continues to routinely reject post-URAA patent applications for obviousness-type double patenting, as it did in the case of the '442 patent.  *E.g.*, A5842-53; A5937; *Ex parte Annis*, No. 2011-9711, 2012 WL 3296313 (BPAI Aug. 8, 2012); MPEP § 804.02(VI) (9th ed. Rev. Aug. 2012); Off. Gaz. Pat. & Trademark Office, 1202 OG 112 (Sept. 30, 1997) (instructing examiners to continue requiring terminal disclaimers to overcome judicially created double patenting rejections for post-URAA applications).  Nor does Kennedy offer an explanation for why it never raised its argument to the PTO, or failed to do so in the first fifteen months of the litigation below.

The pillars of sand on which Kennedy builds its argument are two narrow statements of dicta by this Court concerning the limited applicability of obviousness-type double patenting to post-URAA patents that expire on the same

date.  K.Br. 19, 21 (citing *In re Fallaux*, 564 F.3d 1313, and *Boehringer*, 592 F.3d 1340).  But neither of these cases suggest, much less hold, that the doctrine is inapplicable to all patent applications filed after the URAA, or that it has been eliminated.  Rather, they simply acknowledge that when a family of patents claims priority to the same date, they will usually expire at the same time, making improper extensions of patent term less frequent.  *In re Fallaux*, 564 F.3d at 1318 (noting only that the doctrine has "limited force" after the legislative change); *Boehringer*, 592 F.3d at 1346 (observing that the doctrine is an important check "at least" for patents issued under the prior regime).  Moreover, *In re Fallaux* expressly *rejected* the argument that obviousness-type double patenting should not apply to post-URAA patents, acknowledging that there remain circumstances, such as patent term adjustments or extensions, in which two patentably indistinct patents may expire at different times, thereby creating "an unjust time-wise extension." 564 F.3d at 1318-19.  Such is the case here, for Kennedy's '442 patent was adjusted to add 750 days of term, further exacerbating its unjust extension of exclusivity.  A70[¶251].

Kennedy asserts that applying obviousness-type double patenting to post-URAA patents would be "wholly without legislative authorization."  K.Br. 22.  But Kennedy points to nothing in the URAA or its legislative history to support a

congressional intent to eliminate the doctrine.  In fact, the legislative record is to the contrary.

As discussed above, obviousness-type double patenting is the judicial companion to statutory double patenting; the doctrines work together for the collective purpose of preventing improper extensions of patent term.  *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372-73 (Fed. Cir. 2005).  If Kennedy were correct that the URAA eliminated the need for obviousness-type double patenting, the same would be true of statutory double patenting as well.  After all, if there is no longer any problem with issuing multiple patents directed to nearly the same (i.e., obvious) inventions, there should be no problem with issuing multiple patents on the same invention.  But there is no question that statutory double patenting lives on, for neither in 1995 nor in the two decades since then has Congress suggested elimination of the doctrine.  Nor has it amended the Patent Act to allow "patents" (rather than "*a* patent") on a single invention.  35 U.S.C. § 101.  There is no basis to suggest that obviousness-type double patenting should be treated any differently.

Moreover, Congress confirmed the viability of obviousness-type double patenting in 1999 when it provided term adjustments for applications whose issuance is slowed due to administrative delays.  *See* American Inventors Protection Act, Pub. L. No. 106-113, 113 Stat. 1501, Title IV (1999).  In doing so,

Congress expressly acknowledged the continued use of terminal disclaimers, 35 U.S.C. § 154(b)(2)(B), the purpose of which is to overcome an obviousness-type double patenting rejection at the PTO, *e.g.*, *In re Bowers*, 359 F.2d 886 (CCPA 1966); *In re Robeson*, 331 F.2d 610 (CCPA 1964). If Congress had intended to eliminate obviousness-type double patenting for post-URAA patents, there would be no need to address terminal disclaimers in the patent term adjustment provisions.

The unavoidable conclusion is that Kennedy is overreaching in suggesting that the URAA eliminated the doctrine of obviousness-type double patenting. This Court and the PTO continue to apply the doctrine, and Congress continues to recognize it. Kennedy offers no meaningful evidence to the contrary. Its argument should be rejected.

### C.    Kennedy's Equitable Arguments Are Unfounded

In the alternative, Kennedy argues that, even if obviousness-type double patenting still exists, its '442 patent should be exempt as a matter of equity. K.Br. 23-27. In support, Kennedy asserts that it "earned" its additional term by overcoming intervening art between the 1992 priority date of the '766 patent and the 1995 priority date of the '442 patent. K.Br. 25. But the existence of different prior art as between the reference and challenged patent has never been a consideration in obviousness-type double patenting. To the contrary, in *Sun v.*

*Lilly*, this Court affirmed a district court's invalidation on obviousness-type double patenting grounds of a patent to a method of treating cancer with particular chemical compounds in view of an earlier-issued patent to the compounds themselves. *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381 (Fed. Cir. 2010). The mere fact that the later patent had to overcome additional prior art—including a priority application disclosing the compounds—did not preclude a finding of obviousness-type double patenting. *Id.* at 1387-89.

Kennedy suggests that it is illogical to consider the patentable distinctness of the '442 claims over the '766 claims because the '442 claims issued over the 1992 application to which the '766 patent claimed priority. K.Br. 26-27. But Kennedy overlooks that it is the specification of the *issued reference patent*, not its priority application, that is analyzed for purposes of construing claim terms. *Sun*, 611 F.3d at 1387-89.[8] The relevant question is not whether the '442 claims are patentable over the 1992 priority application; the question is whether they are patentable over the claims of the '766 patent, as construed in accordance with the specification of the issued patent.

---

[8] While the specification of the reference patent is not prior art under the obviousness-type double patenting inquiry, it is entirely appropriate to refer to it for claim construction. K.Br. 29; *see also In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1378 (Fed. Cir. 2008).

Finally, Kennedy criticizes the district court for observing that Kennedy repeatedly misled the PTO during prosecution of its patents, insisting that such misrepresentations could only be relevant to the issue of inequitable conduct, not double patenting. K.Br. 27. But the district court was merely responding to *Kennedy's* argument that the equities should render it impervious to the doctrine. A110[n.31]. And, as the district court found, Kennedy *did* make misleading and inconsistent arguments, again and again, through the course of prosecuting its patents and presenting its case below. *E.g.*, A46[n.14]; A53[n.15]; A84[¶311]; A99[¶372]. In any event, after playing the equity card, Kennedy should not be heard to complain that it is unhappy with the results, or that the equities were never relevant in the first place.

## II. The District Court Correctly Construed the Claims

Kennedy disputes the meanings of two claim terms: (1) "co-administering," recited in the '766 claims; and (2) "active disease," recited in the '442 claims. The district court's construction of both terms should be upheld.[9]

---

[9] Although claim construction is reviewed *de novo*, the issue is currently being reviewed en banc. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 500 F. App'x 951 (Fed. Cir. 2013). While AbbVie should prevail on *de novo* review, its case would be even more compelling under a deferential standard, given that the district court presided over a four-day trial, including testimony by both sides' experts, before issuing its constructions.

## A.    Co-administering

The '766 patent claims methods of treating rheumatoid arthritis by "co-administering" methotrexate and anti-TNFα antibodies.  As discussed above, there are only three ways to do so: (1) the patient can start on methotrexate, and the antibody can be "adjunctively" added; (2) the patient can start on the antibody, and methotrexate can be "adjunctively" added; or (3) the two drugs can be started "concomitantly" at the same time.  Accordingly, the patent describes co-administration and its relationship to "adjunctive" and "concomitant" administration as follows:

> The present invention is based on the discovery that treatment of patients suffering from a TNF-mediated disease with a tumor necrosis factor antagonist, such as an anti-tumor necrosis factor antibody, as adjunctive and/or concomitant therapy to methotrexate therapy produces a rapid and sustained reduction in the clinical signs and symptoms of the disease.
> * * * *
> As a result of Applicants' invention, a method is provided herein for treating and/or preventing a TNF-mediated disease in an individual comprising co-administering an anti-TNF antibody or a fragment thereof and methotrexate to the individual in therapeutically effective amounts.

A161[2:33-39, 2:48-53].   Consistent with this passage, the district court construed co-administering as including both adjunctive and concomitant therapy.  *See supra* at 21-23.

Kennedy's disagreement with the district court's claim construction rests on the idea that there is a yet *another* way the two drugs can be co-administered.

Specifically, Kennedy argues that a patient who discontinues methotrexate and then receives antibody "alone" (e.g., the MTX- group in Example 1) has also received "co-administration." K.Br. 36-43.

Kennedy's entire argument is inherently dubious, given that the plain meanings of the terms "alone" and "co-administration" are opposites of one another. Nonetheless, Kennedy argues for this additional category of "sequential" co-administration because, without it (as Kennedy admits), there is "nothing against which to compare the results of the '442 patent's adjunctive treatment." K.Br. 56.

Kennedy bases its "sequential" argument on the specification's statement that "TNF antagonists can be administered prior to, simultaneously with (in the same or different compositions) or sequentially with the administration of methotrexate." K.Br. 36-37 (quoting A169[18-58-60]). As the district court found, however, the references to "sequential" administration in the specification merely indicate that the anti-TNFα antibody and methotrexate need not be given on exactly the same schedule. A84[¶310]. For example, AbbVie's expert explained that methotrexate is typically administered weekly, whereas antibodies may be administered less frequently. A1224-25[225:21-226:15]. Regardless of whether the drugs are administered simultaneously or sequentially, it is still co-administration, as long as the patient is on a regimen of both drugs together.

41

Importantly, the specification *never* uses the term "co-administering" ("sequential" or otherwise) to refer to patients who discontinue methotrexate and receive only antibody alone. To the contrary, the specification *expressly identifies* such patients (the MTX- group) as having received antibody "alone," or "without methotrexate." *See supra* at 11. The specification then *contrasts* this antibody "alone" group with the claimed co-administration methods of the invention—never once referring to the MTX- monotherapy group as having received "sequential" or any other type of co-administration. *Id.*

Kennedy attempts to explain these references to the antibody "alone" group by arguing that those patients received *two* types of therapy—first sequential co-administration, and then monotherapy. K.Br. 42. But even if there were a scientific basis to interpret the clinical trial as Kennedy asserts—and Kennedy's own inventor testified that there is not—that interpretation is nowhere to be found in the patent specification. The specification treats the antibody "alone" group as the opposite of "co-administration," just as the words suggest. *See supra* at 11-12.

The prosecution history confirms this point. In order to convince the PTO to allow the '766 claims to co-administration, Kennedy argued that co-administration of the antibody and methotrexate was superior to administration of the antibody "alone" or antibody and methotrexate used "separately." *See supra* at 12-13. In doing so, Kennedy relied on the data in Example 1, *contrasting* the adjunctive co-

administration group with the others, stating that "combination therapy with methotrexate and a multiple dose regimen of an anti-TNFα antibody produced markedly superior results than the results obtained with each agent alone." A5516; *see also* A48-49[¶173] (noting high clinical response rates for combination therapy compared to "treatment with each therapeutic modality separately"). Kennedy *never* suggested to the examiner that the trial was comparing one form of "co-administration" to another. Nor would that make any sense, for by that logic, Kennedy would have been arguing that "co-administration is superior to co-administration." Thus, the prosecution history is irreconcilable with Kennedy's position.[10]

Other evidence likewise refutes Kennedy's construction. In their peer-reviewed articles and related communications, the inventors consistently characterized the MTX- group as antibody "alone" or antibody "monotherapy," *contrasting* that group with those receiving co-administration. *See supra* at 13-14. And Professor Maini admitted on cross-examination that he had *never* referred to the MTX- group as receiving co-administration ("sequential" or otherwise)

---

[10] Kennedy asserts that "during prosecution it was appropriate that Kennedy refer to patients receiving 'each agent alone'" because such references were only to "certain stages of trial." K.Br. 42. But this is unsupported attorney argument, for nowhere in the prosecution history did Kennedy state or suggest that its repeated characterizations were limited to "certain stages of trial."

because he didn't believe it was something he could scientifically support. *See supra* at 21-22.

Against the weight of this evidence, Kennedy argues that this Court should nevertheless construe the MTX- group as having received "sequential" co-administration based on a possible "carryover effect" when a patient discontinues methotrexate and switches to antibody alone. K.Br. 40-43. In support, Kennedy cites a page of the '766 prosecution history, A5544. But neither that page, nor any other page in the file history, even remotely supports Kennedy's assertion that switching from one drug to another is a type of "co-administration."[11] Rather, as the district court properly found, the evidence was to the contrary.

Kennedy also cites trial testimony as allegedly showing that the period of potential carryover effect is properly labeled "sequential" co-administration. K.Br. 40-41. But the cited testimony shows merely that some carryover effect may have existed—it does *not* support dubbing such an effect a period of "sequential" co-

---

[11] While Kennedy's point is less than clear, Kennedy appears to be suggesting that, because it distinguished the "Le" reference as not disclosing co-administration, and because the Le patients has discontinued methotrexate a month before beginning the antibody, that in the absence of such a "washout" period, there would be co-administration. But in addition to being faulty logic, Kennedy's assertion is belied on the very next page in the file history, in which the MTX- group, which had no washout period, was *also* characterized as the use of an antibody "alone," rather than as co-administration. A5545-46.

administration.[12]  Moreover, regardless of any such carryover effect, *nowhere* in the specification or prosecution history of the '766 patent is a patient who switches from methotrexate to antibody therapy referred to as having received "co-administration" as now urged by Kennedy—to the contrary, such patients are consistently *differentiated from* the claimed co-administration group.  It is axiomatic that Kennedy cannot construe its claims narrowly during prosecution to exclude the MTX- group, and then expand their scope to include that group when it suits its litigation purposes.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995).

Finally, Kennedy argues that the district court erred in rejecting its claim construction because the patent allows for administering single doses of each drug.  K.Br. 37-38.  In support, Kennedy relies on claim differentiation, reference in the patent to "prophylactic" administration, and various hypothetical dosing regimens.  Kennedy's arguments are convoluted and largely irrelevant.  The question is not whether the '766 claims could hypothetically cover administration of a single dose of methotrexate or antibody.  Rather, the question is whether, after securing the '766 patent on the opposite premise, Kennedy should now be allowed to rewrite

---

[12] Kennedy's own expert essentially conceded that such therapy was never *actually* called "co-administration" in urging that "we really *should* view that as a sequential therapy," A1520[521:13-14] (emphasis added), and that it "*makes sense* to consider that sequential co-administration," A1607[608:7-8] (emphasis added).

history to assert that "adjunctive" administration is different from—and superior to—other forms of co-administration. Kennedy expressly represented to the examiner of the '766 patent that "[t]he superior therapeutic effects [in the T-14 trial] are due to the co-administration of methotrexate and a TNFα antagonist . . ." A5619. As a consequence, Kennedy surrendered its coverage of hypothetical types of administration that would not achieve the "unexpected" results it argued were common to all types of co-administration.

For all of these reasons, the district court's construction of "co-administering" should be upheld and Kennedy's construction rejected.

### B. Active Disease

The '442 patent claims are directed to treating patients with "active disease" despite prior therapy with methotrexate. The district court construed "active disease" as meaning "continuing signs and symptoms of rheumatoid arthritis," which included, but was not limited to, one set of criteria (six or more swollen joints, etc.) required for entry into the clinical trials discussed in the patent. A91-92[¶¶339-46].

Kennedy argues that the district court erred by failing to equate the construction of "active disease" with this narrow, clinical trial requirement, relying principally on the rule that a patentee may be his own lexicographer. K.Br. 32-36. But for a patentee to act as his own lexicographer, "[i]t is not enough … to simply

disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1375 (Fed. Cir. 2004) (finding that a specific usage of a term in the examples "is not a sufficient reason" to limit the claims to that usage). The mere fact that examples or embodiments of a patent use a claim term in a particular, narrow way "is not enough … to limit the patentee's clear, broader claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905 (Fed. Cir. 2004) (refusing to limit a claim term when "the written description of the invention is narrow, but the claim language is sufficiently broad that it can be read to encompass features not described in the written description"). In short, no skilled artisan reading the patent could come to a reasonable conclusion that, in describing a single set of entry criteria for specific clinical trials in patent examples, the applicants were redefining the term "active disease" generally, or otherwise trying to needlessly limit their claims.

Even the statement Kennedy points to as "defining" active disease is not written as a general definition of the term. It is merely a description of particular criteria that *had* been applied to certain patients—in the *past*—in specific clinical trials. The patent states that active disease "was" defined according to specific

criteria of swollen joints and other symptoms.  A142[20:34-39]; A148[31:7-12,

32:63-67].  Nowhere does the patent say more broadly that this definition "is" the

definition of active disease in other contexts.

Moreover, Kennedy's lexicographer theory fails because, even in the limited

context of the clinical trials, the specification does not set forth a single,

unambiguous, definition of "active disease":

> One hundred one (101) patients at six European centers who had been
> using methotrexate for at least 6 months, had been on a stable dose of
> 7.5 mg/wk for at least 4 weeks, and had **active disease** (according to
> the criteria for the American College of Rheumatology) with the
> erosive changes on X-Rays of hands and feet, were enrolled in the
> trial.  **Active disease** was defined by the presence of six or more
> swollen joints plus at least three of four secondary criteria (duration of
> morning stiffness ≥45 minutes; ≥6 tender or painful joints; erythrocyte
> sedimentation rate (ESR) ≥ 28 mm/hour; C-reactive protein (CRP)
> ≥20 mg/l.

A142[20:29-39] (emphases added); *see also* A148[31:1-11, 32:63-67].  While

Kennedy asserts that it was acting as its own lexicographer in the *second* sentence

of this excerpt, its assertion is undercut by reference, in the *first* sentence, to the

active disease criteria of the American College of Rheumatology ("ACR")—*which*

*were completely different.*[13]

---

[13] The differing ACR criteria are available at
http://www.rheumatology.org/Practice/Clinical/Classification/Classification_Criter
ia_for_Rheumatic_Diseases/.  They were also identified in AbbVie's pretrial
submissions, which doubled as AbbVie's claim construction brief.  A10417[¶15]
(citing PTX 1470, the same 1987 ACR criteria).

Thus, even in the limited context of the clinical trials, the patent sets forth multiple different criteria to define "active disease." This Court has refused to apply the lexicographer doctrine where a patent uses a term in multiple ways. *Abbott Labs. v. Syntron Bioresearch, Inc*., 334 F.3d 1343, 1355 (Fed. Cir. 2003) ("Because the specification provides two alternative definitions for the term at issue, the specification does not define the claim term in the manner required…."); *Johnson Worldwide Assocs., Inc. v. Zebco Corp*., 175 F.3d 985, 991 (Fed. Cir. 1999) ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.").

In contrast to Kennedy's narrow construction, the district court's construction of "active disease" encompasses both uses of the term in Example 1 of the patent, as well as the broader use of the term outside the clinical trial context. No one, especially not Kennedy, has suggested that the '442 claims are limited to treating patients in clinical trials. Indeed, Kennedy's own expert admitted that a skilled artisan would *not* look at the claims from the viewpoint of "designing clinical trials." A1589-90[590:18-591:17]. Dr. Weinblatt agreed, explaining that the clinical trial definition would not have been used by physicians. A1244-47[245:14-248:11].

Kennedy argues that the district court erred by relying on Dr. Weinblatt's testimony. K.Br. 34-35. But courts frequently consider expert testimony when

determining how those skilled in the art would view a claimed invention. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) ("[E]xpert testimony serves the permissible purposes of aiding our understanding of the technology and in helping us view the patent through the eyes of the skilled artisan."). Indeed, the rule of lexicography can only apply if "*a person of ordinary skill in the art* would . . . read the specification and conclude that the applicant has . . . acted as its own lexicographer." *Thorner*, 669 F.3d at 1368 (emphasis added).

Moreover, Kennedy is incorrect in asserting that Dr. Weinblatt's testimony was unsupported. To the contrary, it was based on his knowledge as a rheumatologist, the standard definitions used by clinicians in the 1990s, and a number of prior art references identifying patients with active disease. A1244-54[245:14-255:6]; A10000-08; A10135-57; A10186-94; A10207-08; A10396-406; A4030-39; A4043-48; A10670-74. As the district court recognized, Dr. Weinblatt's construction was "consistent with the prior art and prevailing practices in the field at the time of the invention." A92[¶346]. By contrast, Kennedy's expert testimony betrayed the contrived nature of its constructions. For example, Kennedy's expert offered completely different definitions of "active

disease" and "active rheumatoid arthritis," even though the "disease" being referred to in both terms *is rheumatoid arthritis*. A5387.[14]

## III. The District Court Correctly Found the '442 Claims Obvious Over the '766 Claims

Regardless of which constructions prevail, the '442 methods are obvious variations—indeed, the *most* obvious variations—of the '766 methods, rendering the claims invalid. Kennedy asserts otherwise, urging that: (i) a species may sometimes be separately patentable from its genus; (ii) even if the methods were otherwise obvious, the claims should survive because they define the patients treated and the results achieved differently; and (iii) unexpected results support patentability. But as explained below, Kennedy's arguments are unavailing.

### A. Adjunctive Therapy Was an Obvious Species of Co-administering

Kennedy's principal argument is that a claim is not necessarily invalid just because it is directed to a species encompassed within a broader, prior art genus. K.Br. 44-47. That is true.[15] But where a previously claimed genus is small and

---

[14] Even Kennedy's counsel could not keep its story straight, admitting at one point that the '442 claims are directed to patients "experiencing serious signs and symptoms of active rheumatoid arthritis," A1072[73:9-17], which is essentially the same construction Kennedy now disputes on appeal.

[15] Kennedy repeatedly asserts that the district court invalidated the '442 claims solely "because they were 'encompassed' by the reference claims." *E.g.*, K.Br. 13, 15, 44, 49. But that is a gross mischaracterization of the district court's decision, which was based on extensive and express findings that the genus of co-

well-defined, it not only renders obvious, but anticipates, the species within it.
*In re Gleave*, 560 F.3d 1331, 1337-38 (Fed. Cir. 2009) (holding that disclosure of a
limited genus anticipates every species within the genus when one of ordinary skill
in the art can envision each such species); *In re Petering*, 301 F.2d 676, 682
(CCPA 1962) (holding that a genus of 20 compounds anticipated a claim reciting a
species of that genus); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1363
(Fed. Cir. 2007) (holding claims to besylate salt obvious in view of a few preferred
compounds in a prior art genus).  Moreover, if the prior art would have "funneled"
a skilled artisan towards a "finite number of identified, predictable solutions," the
invention is obvious.  *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d
1341, 1350 (Fed. Cir. 2009); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421
(2007).

 Here, there is no "needle in a haystack."  At most, there is a needle in a
pincushion, and a tiny one at that.  It is important to remember that the question is
*not* whether co-administration would have been inventive in the abstract; Kennedy
already received one patent (the '766) on co-administration.  Likewise, the
question is *not* whether adjunctive therapy would have been inventive in the

---

(…continued)
administration was extremely limited, A93[¶¶347-49], that adjunctive therapy was
the most likely species of co-administration, A93-95[¶¶350-54], and that a skilled
artisan would have had a reasonable expectation of success in trying the adjunctive
methods in the '442 claims, A95[¶355].

abstract.  Rather, the question is whether, after being told to co-administer the two drugs by the '766 claims, it is an independently patentable idea to do so by giving methotrexate first, and then adding the antibody.

The answer, based on the evidence at trial, was a resounding no.  As Dr. Weinblatt testified, the genus of "co-administration" was extremely small, with only three members.  A1223[224:1-19].  Moreover, adjunctive therapy was the *most likely* of the three ways to co-administer the two drugs.  A1223-24[224:20-225:11]; A1207-12[208:1-213:1].  And the district court agreed, in factual findings that cannot be disturbed absent clear error.  A93-95[¶¶347-55].

This conclusion is confirmed by the teachings of the prior art.  Methotrexate was the "gold standard" treatment for rheumatoid arthritis by the early 1990s.  *See supra* at 5.  By the '442 patent's priority date, it was established practice for rheumatologists to add a second drug to ongoing methotrexate for patients who did not respond completely to methotrexate alone.  *See supra* at 6.  Patients received the second drug in addition to (rather than in lieu of) methotrexate because stopping methotrexate could cause patients' symptoms to flare.  *Id*.

What's more, the Schwieterman and Higgins prior art references expressly disclose the exact type of co-administration claimed in the '442 patent, *specifically directing* rheumatologists to adjunctively administer antibody therapy, in combination with methotrexate, in patients with active disease who did not

53

adequately respond to methotrexate alone.[16] A10004-05; A10208; A1209-12[210:17-213:1]; *see also Bayer*, 575 F.3d at 1350 (holding invention obvious when the prior art would have "funneled" a skilled artisan towards a "finite number of identified, predictable solutions").

Moreover, the claims would be equally obvious, even under Kennedy's proposed construction of "co-administration." At most, Kennedy's proposal would add a fourth type of co-administration ("sequential" co-administration) to the mix. But picking one of four known options still is not patentable. *In re Gleave*, 560 F.3d at 1337-38; *In re Petering*, 301 F.2d at 682; *Pfizer*, 480 F.3d at 1363. And that is especially true here, given the district court's findings that methotrexate was the standard treatment at the time, that doctors would not have removed patients from methotrexate for fear of flare-ups, that the Higgins and Schwieterman references both taught adjunctive therapy, and that there would have been an expectation of success for adjunctive therapy, A94-95[¶¶351-55], all of which are reviewed for clear error.

---

[16] Kennedy never even *mentions* these references in its opening brief, despite the district court's extensive discussion of them. *E.g.*, A21-26[¶¶62-73, 79-82]; A94-95[¶¶351-53]. The reason is clear: they teach, in no uncertain terms, that adjunctive therapy was the most obvious and preferred method of co-administration by the '442 patent's priority date.

## B. The Recitation of a Specific Patient Population and Therapeutic Result in the '442 Claims Is Insufficient to Render Them Nonobvious

Kennedy also argues that the claims of the '442 patent are nonobvious because they describe the patients being treated, and the effects achieved, differently than the claims of the '766 patent. K.Br. 47-54. Specifically, Kennedy argues that the '442 claims are patentable because they recite a *sicker subset* of the same patients—those with "active disease" instead of those "in need" of treatment—and a *higher degree* of efficacy—"reduc[ing] signs and symptoms" instead of simply being "therapeutically effective." But AbbVie presented clear and convincing evidence that the claims are obvious, even under Kennedy's proposed constructions.

At the threshold, Kennedy's argument that skilled artisans would not expect the methods of the '766 patent to work for the patients and results claimed in the '442 patent must be rejected because both the patients and the results are *within the scope of the '766 patent claims*. Patents are presumed to be enabled across the entire scope of their claims. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). Kennedy cannot now argue that it is entitled to a second patent because a skilled artisan would not have expected its original claims to work across their scope. *See* K.Br. 15, 52-54 (arguing that the '766 claims would encompass an effect patients and doctors would not recognize or notice). If

Kennedy could obtain a new patent simply by casting doubts on the workability of its previously patented methods, there would be no limit on its ability to patent minor variations.

This is not a situation, as Kennedy argues, in which a species would have been unforeseeable from its broader genus. Kennedy is essentially arguing that even knowing that the claimed method should be used with patients "in need thereof" (from the '766 claims), it would not have been obvious to use that method in patients "with active disease." To begin with, that argument is so contrived that it is difficult to even follow: if the method is useful for patients "in need of" treatment, it would of course be obvious to use it in patients with "active disease," however that term is defined. Indeed, Kennedy's expert admitted that when the '442 patent was filed, *most* rheumatoid arthritis patients had persistent active disease. A1713[714:8-25]. He also admitted that his definition of "in need thereof" would include patients with "active disease," that nothing in the '766 patent would discriminate between treating patients with active disease versus those without, and that a skilled artisan would have expected the method claimed in the '766 patent to be used only in the severe cases. A1707[708:3-18]; A1714-15[715:1-716:4]. Professor Maini agreed, testifying that the patients referred to in the '766 claims were the most severe cases, not the mild ones. A1551-52[552:3-553:6]. Thus, even under Kennedy's definition of "active disease," the '442 claims

recite the subset of patients *most likely* to have been treated by the methods of the '766 claims.

Turning to the "efficacy" argument, Kennedy is effectively arguing that, even knowing that the method is "therapeutically effective" (from the '766 claims) it would not have been obvious to use it to "eliminate or reduce signs and symptoms" of the disease, as claimed in the '442 patent. Here again, Kennedy's strategy is to denigrate its prior claims by suggesting that a skilled artisan would not believe the methods to be clinically effective. But even if, as Kennedy asserts, the definition of "therapeutically effective" would include situations where signs and symptoms of disease are not reduced, there would be no reason for a skilled artisan to limit the method to such situations. Common sense dictates that a therapeutically effective amount is preferably one that reduces signs and symptoms of a disease.

But irrespective of this fact, it is well established that reciting the benefits of an already-patented process does not give rise to a new invention. *King Pharms., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1275 (Fed. Cir. 2010) ("[I]t is a general rule that merely discovering and claiming a new benefit of an old process cannot render the process again patentable." (citation omitted)); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) ("Newly discovered results of known processes directed to the same purpose are not patentable because

such results are inherent."). Thus, these alleged differences in claim language are both factually insignificant and legally irrelevant.

### C. There Are No Unexpected Results to Support Nonobviousness

Finally, Kennedy faults the district court for failing to consider evidence of alleged unexpected results. K.Br. 55-62. But the court did not "ignore[]" this evidence. K.Br. 56. Rather, it thoroughly considered and then *discounted* Kennedy's proffered evidence, because it was "contradicted by the data relied upon, the inventors' own words in their published articles and studies, the scientific record, and the inventors' own testimony." A99[¶372].

Kennedy admits that, under AbbVie's claim construction of "co-administration," the T-14 trial provides no unexpected results of adjunctive therapy versus other types of co-administration because there is "nothing against which to compare the results of the '442 patent's adjunctive treatment." K.Br. 56. Thus, if this Court affirms the district court's construction of "co-administration," Kennedy's "unexpected results" argument disappears. But even if this Court adopts Kennedy's "sequential" co-administration theory, Kennedy's arguments still fail, for at least four reasons.

*First*, Kennedy's reliance on the testimony of its expert, Dr. Lipsky, is misplaced. Judge Crotty, who presided over the trial, chose to credit the testimony of AbbVie's expert, Dr. Weinblatt, over Kennedy's expert, Dr. Lipsky. A41[n.12].

Such credibility determinations are within the district court's special province. *Inwood*, 456 U.S. at 856. Moreover, the court's findings on unexpected results, A99-100[¶¶370-74], like the rest of its factual findings, cannot be reversed absent a showing of clear error. *In re Mayne*, 104 F.3d at 1343.

Kennedy has failed to show any such error here. While Kennedy disputes the district court's conclusion that the evidence of unexpected results was "not supported by the data," A99[¶373]; K.Br. 59-61, this conclusion was drawn not only from the data, but also from Dr. Maini's admission that he "could not scientifically support" Kennedy's position, A53[¶186]; A1277-79[278:1-280:16]. Kennedy also takes issue with the court's conclusion that "the results would not have been unexpected because the adjunctive administration group was receiving two therapies that had been shown to reduce the signs and symptoms of rheumatoid arthritis, instead of just one." A100[¶373]; K.Br. 61-62. But again, this conclusion was supported by Dr. Weinblatt's testimony that the improved results would have been expected for patients receiving the two-drug adjunctive therapy. A1279[280:17-25]. And finally, Kennedy disagrees with the court's conclusion that "the fact that patients who received adjunctive therapy showed positive residual effects of the treatment even after the level of antibody subsided would not be unexpected (particularly where the antibody treatment had an extended half-life)." A100[¶373]; K.Br. 62-63. But this conclusion was based on

expert testimony that the antibody's long half-life would have been expected to cause the extended effect. A1280[281:1-10]. Kennedy's arguments to the contrary—based principally on Dr. Lipsky's opposing view—are not grounds for reversal.

*Second*, Kennedy's argument of unexpected results fails because it is based on the *exact same data* Kennedy relied on in securing its '766 claims to "co-administration." *Compare, e.g.*, K.Br. 56-62 (pointing to data showing superior duration and magnitude of response, and reduced HACA response due to enhanced effects of methotrexate) *with* A5516, A5578, A5618-19 (pointing to the same data and results when prosecuting the '766 patent). Because Kennedy already argued that these superior results were *representative* of co-administration, *see supra* at 12-13, it cannot now argue that these results *distinguish* adjunctive therapy from other types of co-administration.

*Third*, even assuming, *arguendo*, that Kennedy has shown some evidence of unexpected results for adjunctive co-administration over other types of co-administration, it is insufficient to overcome the inescapable conclusion of obviousness here. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1293 (Fed. Cir. 2013) (finding claims obvious because the unexpected results were "not … sufficient to outweigh the other evidence of obviousness").

*Finally*, Kennedy relies throughout its brief on the fact that the examiner ultimately granted the '442 patent. *E.g.*, K.Br. 4, 30, 34, 50, 54-59, 63.[17] Of course, that is true of every patent challenged in court. That said, the examiner did not have the benefit of much of the invalidity evidence presented at trial, lessening the significance of the examiner's allowance. *Microsoft*, 131 S. Ct. at 2242. For example, the examiner was not made aware of the Schwieterman reference, which taught that adjunctive therapy had "become standard" by March 1995. A10005; A115-24. He did not get to hear Dr. Weinblatt's testimony that a skilled artisan would have viewed adjunctive administration as the most likely type of co-administration. A1223-24[224:20-225:11]; A1207-12[208:1-213:1]. And he was not privy to Professor Maini's admission that the T-14 study failed to scientifically support the very positions Kennedy urged to get its patent allowed. A1522-24[523:9-525:17]; A1563-69[564:14-570:24]. These are but a few examples of the overwhelming evidence of invalidity that was before the Court, but unknown to the examiner.

## **CONCLUSION**

AbbVie respectfully requests that this Court affirm the district court's decision.

---

[17] It also bears noting that Kennedy's characterizations of certain facts as "clearly significant" or "critical" to the examiner are based on Kennedy's elective addition of emphasis to portions of the examiner's statements. *E.g.*, K.Br. 34, 49-50, 53.

Dated: February 18, 2014            Respectfully submitted,


                                    /s/ Michael A. Morin
                                    Michael A. Morin
                                    David P. Frazier
                                    Casey L. Dwyer
                                    Cora R. Holt
                                    Finnegan, Henderson, Farabow,
                                      Garrett & Dunner, LLP
                                    901 New York Avenue, NW
                                    Washington, DC 20001
                                    (202) 408-4259

                                    *Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that today, February 18, 2014, the foregoing Brief for Plaintiffs-Appellees AbbVie Inc. and AbbVie Biotechnology Limited was filed electronically with the Court by ECF and served electronically by ECF on the following counsel:

Mark A. Perry
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

Wayne M. Barsky
Timothy P. Best
GIBSON DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 552-8500

John P. White
Norman H. Zivin
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400

*Attorneys for Defendant-Appellant*

Dated: February 18, 2014          Respectfully submitted,


                                  /s/ Kay Wylie_____
                                  Kay Wylie

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,347 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Local Rule 32(b); and

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated: February 18, 2014   Respectfully submitted,

          <u>/s/ Michael A. Morin    </u>
          Michael A. Morin