2013-1545

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

AbbVie Inc. and AbbVie Biotechnology Limited,

*Plaintiffs-Appellees*,

v.

The Mathilda and Terence Kennedy Institute of Rheumatology Trust,

*Defendant-Appellant*.

_____

Appeal From The United States District Court
For The Southern District of New York
In Case No. 11-cv-2541, Judge Paul A. Crotty.

_____

## REPLY BRIEF FOR APPELLANT

_____

John P. White
Norman H. Zivin
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400

Mark A. Perry
 *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Wayne M. Barsky
Timothy P. Best
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 552-8500

*Attorneys for Defendant-Appellant*
*The Mathilda and Terence Kennedy Institute of Rheumatology Trust*

# CERTIFICATE OF INTEREST

Counsel for appellant The Mathilda and Terence Kennedy Institute of Rheumatology Trust, certifies the following:

1.    The full name of every party or amicus represented by me is:

The Mathilda and Terence Kennedy Institute of Rheumatology Trust (currently known as The Kennedy Trust for Rheumatology Research).

2.    The name of the real party in interest (if the party in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| **Cooper & Dunham LLP** | **Gibson, Dunn & Crutcher LLP** |
|---|---|
| John P. White | Mark A. Perry |
| Norman H. Zivin | Wayne M. Barsky |
| Robert T. Maldonado | Timothy P. Best |
| | Megan Fluckiger |
| | Azar Mouzari |
| | Adam Yarian |
| | Charles J. Boudreau |
| | William G. Jenks |

/s/ Mark A. Perry

Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com

# TABLE OF CONTENTS

**<u>Page</u>**

ARGUMENT ................................................................................................1

    I.      The ODP Doctrine Is Inapplicable .......................................3

    II.    The '442 Patent Is Not Invalid For ODP ..............................9

         A.    Claim Construction ..................................................10

              1.    Active Disease ...............................................11

              2.    Co-Administering .........................................14

         B.    Patentable Distinctness ............................................20

              1.    Domination Is Not Double Patenting ...........21

              2.    No Reasonable Expectation Of Success ........24

              3.    Unexpected Results .......................................27

CONCLUSION ..........................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*,
    745 F.2d 1 (Fed. Cir. 1984) ................................................................... 14, 28

*Apple Inc. v. ITC*,
    725 F.3d 1356 (Fed. Cir. 2013) ........................................................27

*ArcelorMittal France v. AK Steel Corp.*,
    700 F.3d 1314 (Fed. Cir. 2012) ........................................................17

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    543 F.3d 657 (Fed. Cir. 2008) .........................................................4, 8

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
    709 F.3d 1348 (Fed. Cir. 2013) ........................................................13

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
    776 F.2d 281 (Fed. Cir. 1985) ..........................................................27

*Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*,
    592 F.3d 1340 (Fed. Cir. 2010) ..........................................................5

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) ................................................... 14, 27

*In re Dillon*,
    919 F.2d 688 (Fed. Cir. 1990) ..........................................................26

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
    689 F.3d 1368 (Fed. Cir. 2012) ........................................... 10, 22, 30

*In re Emert*,
    124 F.3d 1458 (Fed. Cir. 1997) ........................................................22

*In re Fallaux*,
    564 F.3d 1313 (Fed. Cir. 2009) ........................................................3, 5

*HTC Corp. v. IPCom GmbH & Co.*,
  667 F.3d 1270 (Fed. Cir. 2012) ..........................................................13

*In re Hubbell*,
  709 F.3d 1140 (Fed. Cir. 2013) .............................................................3

*Kao Corp. v. Unilever U.S., Inc.*,
  441 F.3d 963 (Fed. Cir. 2006) ...........................................................27

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
  No. 2012-1014, 2014 WL 667499 (Fed. Cir. Feb. 21, 2014)....................... 10, 19

*Magnivision, Inc. v. Bonneau Co.*,
  115 F.3d 956 (Fed. Cir. 1997) ..............................................................8

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) .........................................................................16

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011) .....................................................................23

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
  7 F.3d 1571 (Fed. Cir. 1993) .............................................................19

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
  215 F.3d 1281(Fed. Cir. 2000) ...........................................................19

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
  518 F.3d 1353 (Fed. Cir. 2008) ............................................................9

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................... 11, 20

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009) ...........................................................28

*Radio Corp. of Am. v. Radio Eng'g Labs., Inc.*,
  293 U.S. 1 (1934) ...........................................................................24

*In re Sarett*,
  327 F.2d 1005 (C.C.P.A. 1964)..........................................................22

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) ............................................................. 10, 12, 20

*In re Soni*,
   54 F.3d 746 (Fed. Cir. 1995) ................................................................................28

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
   611 F.3d 1381 (Fed. Cir. 2010) ...........................................................................6

*Symbol Techs., Inc. v. Opticon, Inc.*,
   935 F.2d 1569 (Fed. Cir. 1991) ...........................................................................9

*Takeda Pharm. Co. v. Doll*,
   561 F.3d 1372 (Fed. Cir. 2009) ...........................................................................6

*TecSec, Inc. v. IBM Corp.*,
   731 F.3d 1336 (Fed. Cir. 2013) .........................................................................16

*Victronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..................................................................... 17, 20

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997) ...............................................................................................10

*White v. Dunbar*,
   119 U.S. 47 (1886) ...............................................................................................16

**Statutes**

35 U.S.C. § 101 ...........................................................................................................5

35 U.S.C. § 112(b) .....................................................................................................16

35 U.S.C. § 120 ...........................................................................................................7

35 U.S.C. § 154(b)(2)(B) ...........................................................................................4

35 U.S.C. § 282 ...........................................................................................................4

Uruguay Round Agreements Act ("URAA"),
   Pub. L. 103-465, 108 Stat. 4809 (Dec. 8, 1994).................................................3

**Other Authorities**

*Manual of Patent Examining Procedure*
    (8th ed. Rev. 9, Aug. 2012) ............................................................ 4, 7, 22, 26, 28

# ARGUMENT

This appeal presents two issues: whether the non-statutory doctrine of obviousness-type double patenting ("ODP") is an available challenge to validity in this case; and, if so, whether AbbVie proved by clear and convincing evidence that claim 2 of Kennedy's '442 patent is invalid under that doctrine.  K.Br. 17-28, 28-64.

As to the first issue, the Patent Act was amended in 1995 to make patent terms turn on priority date rather than grant date.  As a result, applicants claiming a later expiration date must now overcome intervening prior art, as Kennedy did here.  This Court has never approved the invalidation of a patent issued on a post-amendment application under the ODP doctrine.  As a matter of law, ODP is inapplicable in the circumstances of this case.

On the second issue, the district court obscured critical differences between the challenged and reference claims.  The '766 reference patent discloses a generic method of treating any patient with rheumatoid arthritis to achieve a minimally beneficial result.  The '442 patent, by contrast, claims a specific method of treating the sickest patients (those who have already failed treatment with the "gold standard," methotrexate, and who suffer from identified and severe manifestations of the disease) with a particular regimen to achieve a significantly greater clinical benefit.  Properly construed, the later-issued species is patentably distinct from the earlier-issued genus, and thus the challenged claim is not invalid for ODP.

Much of AbbVie's brief has nothing to do with either of these issues. AbbVie attacks Kennedy's attorneys (A.Br. 39, 51 n.14), accuses Kennedy of taking inconsistent positions during prosecution (A.Br. 16-17), presents arguments not made in the district court (A.Br. 45-46, 48-49), relies on "facts" that are immaterial (A.Br. 12-14) including some that are not even in evidence (A.Br. 48), and points to "credibility" determinations in response to legal challenges (A.Br. 58-60). AbbVie also repeatedly asserts that the district court preferred its expert, Dr. Weinblatt, to Kennedy's expert, Dr. Lipsky (A.Br. 20, 58-59), even though neither of the issues presented in this appeal requires the Court to resolve conflicting expert testimony. And AbbVie complains about paying royalties to Kennedy (A.Br. 1, 14), without acknowledging that such royalties are required by its sublicense (as an arbitrator has confirmed), or that the royalties received by the non-profit Kennedy are a small fraction of the tens of billions of dollars of profit AbbVie has made on one of the top-selling drugs in history.

Accordingly, while Kennedy vigorously disagrees with AbbVie's distorted presentation of the record, these points—and, indeed, most of AbbVie's extended "Statement of the Case" (A.Br. 5-26)—are irrelevant to the issues presented on appeal, about which AbbVie has comparatively little to say. The judgment of invalidity is infected with legal error and must be reversed or, at minimum, vacated.

## I.    The ODP Doctrine Is Inapplicable

An Article III court may not apply the ODP doctrine to invalidate a patent issued on an application filed after the June 8, 1995 effective date of the Uruguay Round Agreements Act ("URAA"), Pub. L. 103-465, 108 Stat. 4809 (Dec. 8, 1994).

**1.**    According to AbbVie, "this Court has applied obviousness-type double patenting to patent applications filed after the legislative change on multiple occasions." A.Br. 34 (citing *In re Fallaux*, 564 F.3d 1313 (Fed. Cir. 2009), and *In re Hubbell*, 709 F.3d 1140 (Fed. Cir. 2013)). AbbVie does not dispute, however, that: *Fallaux* and *Hubbell* are the *only* ODP cases this Court has decided involving post-URAA applications; both cases involve the common ownership rationale for ODP, *not* the term extension rationale at issue here; both cases were direct appeals from PTO rejections; the applicants *did not challenge* the general applicability of the ODP doctrine in either case; and, even in the absence of such a challenge, the Court recognized the "'limited force'" of the justification for ODP after the URAA. K.Br. 21 (quoting *Fallaux*, 564 F.3d at 1318).

This Court has *never* invalidated (or approved a district court's invalidation of) a patent *issued* on a post-URAA application under the ODP doctrine. Although AbbVie suggests that there is "no meaningful difference in the distinction" between "appeals from PTO decisions rather than district court decisions" (A.Br. 34), an issued patent is presumed valid and may be invalidated by a court *only* on the basis

3

of the grounds enumerated by statute.  35 U.S.C. § 282; *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661-63 (Fed. Cir. 2008).  ODP is not a listed challenge to validity, nor is it a "fact or act made a defense" by anything else in the Patent Act.  35 U.S.C. § 282(b)(4); *see also* K.Br. 17-19.  Rather, as AbbVie acknowledges, it is a "judge-made doctrine" that was "created by courts."  A.Br. 29-30.

AbbVie does not even cite Section 282 or *Aristocrat*, much less explain what in the current Patent Act authorizes a court to invalidate an issued patent for ODP. Instead, AbbVie cites 35 U.S.C. § 154(b)(2)(B) for the proposition that "Congress continues to recognize" the ODP doctrine.  A.Br. 37.  That provision acknowledges the enforceability of terminal disclaimers but says absolutely nothing about ODP as a basis for invalidating an issued patent.  AbbVie's other arguments similarly fail to tie the ODP doctrine to anything in the post-URAA Patent Act.

a.    AbbVie notes that Kennedy did not challenge the general applicability of ODP *during prosecution* (A.Br. 3, 15, 34), but the PTO is not bound by Section 282 and may provisionally reject applications on grounds that would *not* permit a court to invalidate an issued patent.  *See* MPEP § 804.02(II) (8th ed. Rev. 9, Aug. 2012).  An applicant may respond to such a provisional rejection in several ways (incuding by disclaimer), but if the applicant successfully traverses an administrative ODP rejection the issued patent is entitled to the full statutory term.  After

AbbVie raised its ODP challenge to the '442 patent in this litigation, Kennedy timely objected to the applicability of the doctrine and the district court rejected that position on the merits.  A110, A111-A114.  It is, accordingly, properly preserved.

**b.**    AbbVie says that "[i]f Kennedy were correct that the URAA eliminated the need for obviousness-type double patenting, the same would be true of statutory double patenting as well."  A.Br. 36.  Unlike ODP, statutory double patenting is a defense specifically contemplated by the Patent Act (35 U.S.C. § 101), and the 1995 amendment has nothing to do with this separate defense.  Moreover, AbbVie has never asserted a Section 101 challenge to the '442 patent, since it does not claim the same invention as the '766 patent.

**c.**    AbbVie also argues there is "nothing in the URAA or its legislative history to support a congressional intent to eliminate the [ODP] doctrine."  A.Br. 35-36.  Given that ODP is not in the statute *at all*, this is hardly surprising.  And AbbVie simply ignores this Court's previous observations that the URAA impacts the continued availability of an ODP defense.  *Boehringer Ingelheim Int'l GmbH v. Barr Labs., Inc.*, 592 F.3d 1340, 1346 (Fed. Cir. 2010); *Fallaux*, 564 F.3d at 1318.  AbbVie dismisses these as "statements of dicta" (A.Br. 34) without any analysis.

In changing patent terms to run from claimed priority date rather than grant date, Congress eliminated entirely certain recurring ODP scenarios—including "submarine" patents—as even AbbVie admits.  A.Br. 32.  Although AbbVie con-

cedes that the URAA "made [ODP] less frequent," it maintains that the amendment "did not eliminate the need for the doctrine" because a patentee may "designat[e] a later priority date" for a subsequent application or "fil[e] an entirely new patent application at a later date." A.Br. 33. What AbbVie fails to acknowledge is that if an applicant claims a later priority date, the applicant must overcome additional prior art (as Kennedy did here). K.Br. 20-21; *cf. Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1377 (Fed. Cir. 2009) (noting the hurdle that prior art arising between reference and challenged applications poses for an applicant). Any additional term of exclusive rights is a *quid pro quo* for overcoming this extra hurdle, and thus continued application of the ODP doctrine—at least to limit patent terms (as distinguished from ensuring common ownership)—would frustrate rather than further the statutory scheme.

    **2.**    AbbVie does not dispute that Kennedy overcame almost *four years* of additional prior art to earn the later priority date for the '442 patent. *See* A.Br. 37. Instead, AbbVie argues that "the existence of different prior art as between the reference and challenged patent has never been a consideration in obviousness-type double patenting." A.Br. 37 (citing *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381 (Fed. Cir. 2010)). But *Sun* turned on a legal proposition—"that a claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use" (*id.* at 1387 (in-

ternal quotation omitted))—not implicated here.  More generally, the question of intervening prior art rarely arose under the pre-URAA regime, in which the second patent would typically issue from a continuation of the first application and thus claim the same priority date.

Intervening prior art is critically important in the post-URAA world.  Here, the Examiner asserted a published version of the '766 patent's 1992 priority document as prior art against the '442 application (which claimed a 1996 priority date). K.Br. 24.  This reference served as the basis for a *statutory* obviousness rejection, which Kennedy would not have faced under pre-URAA law.  *See* A5933-A5937. Having overcome that objection, Kennedy earned the full term of the '442 patent, whose scope differs from that of the '766 patent.  *See* Part II, *infra*.  The additional period of exclusivity for the subject matter of the '442 claims is the *quid pro quo* for overcoming additional prior art.

AbbVie's only rejoinder is to say that "[t]he relevant question is not whether the '442 claims are patentable over the 1992 priority application; the question is whether they are patentable over the claims of the '766 patent."  A.Br. 38.  But by granting the '766 claims priority to the 1992 application (A5600, A5628), the Examiner had to agree that the 1992 application disclosed and enabled the full scope of the '766 claims.  *See* 35 U.S.C. § 120; MPEP § 201.11.  AbbVie does not explain how the '442 claims could be obvious over the *claims* of the '766 patent when they

are concededly not obvious over the content of the *entire application* (from which they derived priority). *See* K.Br. 26-27.

**3.** No court has ever invalidated a patent under the ODP doctrine on the basis of "inconsistent arguments." A.Br. 39. Nor is there any merit to AbbVie's accusation that Kennedy's '442 patent is part of some secret "scheme" to "extend the expiry date" of the '766 patent. A.Br. 1, 14-15. In fact, AbbVie knew about and sought a license to the application that matured as the '442 patent in 2005, almost immediately after its filing. A1119-A1121. While Kennedy vigorously denies any allegations of irregularity, AbbVie's repeated invocation of these irrelevant points (*see* A.Br. 1-2, 14-18, 39) amounts to mudslinging rather than principled legal argument. Absent inequitable conduct (which AbbVie did not even assert, let alone prove), such considerations cannot affect the validity or enforceability of an issued patent. *Aristocrat*, 543 F.3d at 663 (citing *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956 (Fed. Cir. 1997)).

*****

The applicability of ODP in these circumstances is a purely legal question of first impression. This Court has *never* applied ODP to invalidate a patent issued on a post-URAA application; thus, the Court will make new law by affirming *or* reversing. AbbVie's argument for affirmance ultimately rests on inertia, but fidelity to the statutory system requires reversal.

## II.    The '442 Patent Is Not Invalid For ODP

Assuming, *arguendo*, that ODP applies here, AbbVie had to prove, by clear and convincing evidence, that the properly construed claims of the challenged patent were obvious in light of the properly construed claims of the reference patent. *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991). The ultimate question is whether the "*differences*" between the claims as a whole make them "patentably distinct." *See Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008) (emphasis added); *see* A6007-A6008 (Reasons for Allowance).

Kennedy's principal brief catalogued the differences between claim 2 of the challenged patent and the closest claim of the reference patent. K.Br. 7-9, 30-32. AbbVie does not dispute that these two claims are the proper focus of the ODP inquiry, nor does AbbVie dispute the many differences. *See* A.Br. 24 & n.5. Yet, AbbVie never quotes the actual language of these claims or *compares* the claims as a whole.

AbbVie argues instead that the dispositive question is whether, "after being told to co-administer the two drugs by the '766 claims, it is an independently patentable idea to do so by giving methotrexate first, and then adding the antibody." A.Br. 53. That was the argument AbbVie successfully pressed on the district court, but the differences between the challenged and reference claims extend far beyond

the mode of administration. *See* K.Br. 31. AbbVie's intentionally myopic focus on a single (misconstrued) claim element is legally erroneous. *See Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1377 (Fed. Cir. 2012) ("differences cannot be considered in isolation—the claims must be considered as a whole"). The scope of a patent claim is determined by *all* of the claim limitations in combination. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

## A.    Claim Construction

The district court's improper conflation of the two patents stemmed from its misconstruction of two key claim terms—"active disease" in the '442 patent and "co-administering" in the '766 patent. As to each, the court erroneously elevated the testimony of AbbVie's expert over the *intrinsic* evidence provided by the patent claims, specification, and file history. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) ("Extrinsic evidence may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history") (internal quotation marks and alteration omitted). This Court reviews those constructions *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, No. 2012-1014, 2014 WL 667499, at *1 (Fed. Cir. Feb. 21, 2014) (en banc).

### 1.    Active Disease

The specification of the '442 patent explicitly defines the claim term "active disease." A142(20:35-39), A148(31:6-11). The patent itself uses the term "defined" and even AbbVie concedes that the cited text is a "definition." A.Br. 48. AbbVie's expert agrees. A1385. Yet the district court—at AbbVie's urging—adopted a *fundamentally different* definition of "active disease," thus abrogating the basic principle that a patentee is free to serve as its own lexicographer. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). In doing so, the court vitiated a key distinction between the scope of the reference and challenged claims. AbbVie's attempts to defend this maneuver must fail.

**a.** First, AbbVie asserts that the specification contains "merely a description of particular criteria that had been applied to certain patients" and does not "say more broadly that this definition 'is' the definition of active disease in other contexts." A.Br. 47-48 (emphasis omitted). A POSA, however, would understand claim 2 of the '442 patent to use the term in precisely the way it is *defined* in the specification. A1482, A1494, A1521, A1596.

AbbVie's observation that the method of claim 2 is not "limited to treating patients in clinical trials" (A.Br. 49) is a *non sequitur*. Indeed, the patients treated in the  patent's examples suffered from much *greater* levels of disease activity than the explicit definition of the minimal parameters of active disease provided by the

11

specification.  *Compare* A142(20:34-39) *with* A143(Table 1).  But claim 2 *is* limited to treating patients with "active disease," and the specification explicitly states that "[a]ctive disease was *defined* by the presence of" several objective measures of disease activity.  A142(20:34-39), A148(31:6-11) (emphasis added).  No other definition appears anywhere in the claims, the specification, or the file history.

AbbVie relies solely on extrinsic evidence—its expert's testimony in this lawsuit—to provide an alternative definition that *contradicts* the one and only definition set forth in the patent itself.  While AbbVie protests that Weinblatt's testimony was not "unsupported" (A.Br. 50), that assertion does not bear even cursory review.  AbbVie's citations (*see* A.Br. 50) show that the supposed "support" for Weinblatt's alternative definition comprises his "knowledge as a rheumatologist" and his opinion that patients discussed in various journal articles meet his own definition.  Untethered as it is to the intrinsic record, such testimony has zero value.  *See SkinMedica*, 727 F.3d at 1210 ("conclusory and incomplete" opinions "lack[ing] any substantive explanation tied to the intrinsic record" are entitled to no weight).

Moreover, while AbbVie argues that Kennedy evidenced no intention of defining the patient cohort whose treatment the '442 patent claims (A.Br. 47-48), Kennedy clarified during prosecution that all patients whose treatment was claimed suffered from "active disease" (A5996-A6002), and directed the Examiner to the *explicit definition* that Kennedy seeks in this action.  A5957-A5958.  The Examiner

found that this clarification put the application in condition for allowance. A6011. Other than a nonsubstantive objection to Kennedy's use of italics (A.Br. 61 n.17), AbbVie nowhere addresses these facts.

**b.** Second, AbbVie argues for the first time in this Court that the specification is ambiguous because it also refers to a supposed "definition" of "active disease" supplied by the American College of Rheumatology. A.Br. 48 & n.13. Tellingly, neither the ACR document to which AbbVie refers nor the cited website was introduced as evidence at trial or subjected to adversary testing. AbbVie's argument is therefore waived. *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1281 (Fed. Cir. 2012). AbbVie's invocation in this Court of non-record "evidence" to support an entirely new argument confirms that the district court's decision cannot be defended on its own terms.

In any event, the ACR materials newly cited by AbbVie merely provide criteria for the diagnosis of rheumatoid arthritis. They do not define "active disease" and AbbVie's contrary suggestion (like the district court's construction) contravenes the claim language requiring that patients *both* be "suffering from rheumatoid arthritis" *and* have "active disease [that] is incompletely controlled despite already receiving methotrexate." A150(35:1-4). Claims should not be construed to render terms superfluous. *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1356 (Fed. Cir. 2013).

Construing the "active disease" limitation in accordance with the specification is alone sufficient to establish that claim 2 of the '442 patent is patentably distinct from the reference claims. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 933 (2013); *cf. Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 7 (Fed. Cir. 1984) (patent claims nonobvious partially because formulation was "directed to a different class of users [patients with liver disease] with specific unique nutritional problems").

### 2.    Co-Administering

The other disputed claim limitation is "co-administering" in the '766 patent claims. The district court "rejected Kennedy's argument that the MTX- group of the T-14 trial"—in which patients on methotrexate switched to antibody without an interruption in treatment—"fell within the definition of 'co-administration.'" A.Br. 21; A85-86(¶¶317-18). Instead, the court construed "co-administering" to include only concomitant administration and two modes of adjunctive administration. AbbVie repeatedly insists that these are the "only three possible ways to co-administer the two drugs." A.Br. 1, 9, 40. The patent, however, says otherwise.

The district court's claim construction cannot be reconciled with the specification, which teaches that "sequential" administration of the two drugs, in single *or* multiple doses, constitutes co-administration. A162(4:46-49). AbbVie all but

concedes this point when it acknowledges that co-administration is "a regimen of both drugs together." A.Br. 41. It is undisputed that the biological activity of "both drugs together" existed in the MTX- group for weeks after the switch from methotrexate to antibody. A1296-A1297, A1520, A1607. Furthermore, AbbVie admits that "antibody and methotrexate need not be given on exactly the same schedule." A.Br. 41. The district court's construction thus improperly excludes embodiments the specification discloses.

AbbVie offers up three defenses of the district court's claim construction. None suffices as a matter of law.

**a.** AbbVie first argues that carryover effects are merely "possible" or "potential" and so the patients described in the MTX- cohort of Example 1 cannot be considered to have received a period of co-administration. A.Br. 44. The undisputed evidence showed, and AbbVie's expert agreed, that these patients enjoyed a carryover effect of methotrexate for a period of time that could have extended up to one month. A1296-A1297, A1520, A1607. Even the district court accepted that there was a carryover effect. A87 n.22. AbbVie cannot now be heard to question this established fact on appeal.

**b.** The specification unequivocally states that "TNF antagonist and methotrexate can each be administered in single or multiple doses depending upon factors such as nature and extent of symptoms, kind of concurrent treatment and the

effect desired." A170(19:66-20:2), A162(4:46-49). The district court, however, construed "co-administering" to *exclude* any single dose embodiment. A85-A86(¶317). AbbVie does not dispute that these embodiments are excluded; rather, it argues that Kennedy disclaimed them. A.Br. 45-46. AbbVie did not make this argument in the district court, and it is therefore waived. And absent a disclaimer, AbbVie has effectively conceded that the construction is erroneous.

Disclaimer of claim scope must be "both clear and unmistakable." *TecSec, Inc. v. IBM Corp.*, 731 F.3d 1336, 1346 (Fed. Cir. 2013) (internal quotation marks omitted). Here there is not only no *explicit* statement disclaiming (from the scope of the '766 claims) embodiments in which a "single dose" of one or both drugs is administered—there is no such statement *at all*. Quite the contrary, dependent claim 9 differs from independent claim 8 by limiting itself to *multiple* doses of TNF antagonist (and so the other reference claims *must necessarily include* the administration of a single dose). A178(claims 8-9); K.Br. 37-38.

AbbVie is mistaken in asserting that "[t]he question is not whether the '766 claims could hypothetically cover administration of a single dose of methotrexate or antibody." A.Br. 45. There is nothing hypothetical about the scope of the claims. *See* 35 U.S.C. § 112(b); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996); *White v. Dunbar*, 119 U.S. 47, 51-52 (1886). The '766 claims unequivocally

cover a single dose of one or both drugs; thus, the district court's construction—which excludes single dose administration—cannot be correct.

Furthermore, Example 2 of the '766 patent belies AbbVie's assertion that a single dose of one or both drugs is merely "hypothetical" because it discloses *precisely such an actual embodiment*. The patients who were treated in the Example 2 trial received a *single dose* of antibody co-administered with ongoing methotrexate in therapeutically effective amounts for rheumatoid arthritis. A176-A177 (31:50-33:29). Thus, the district court's construction of co-administration, which excludes this disclosed treatment regimen, is wrong as a matter of law. *See*, *e.g.*, *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1321 (Fed. Cir. 2012); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

**c.**    Third, AbbVie tries to make the inventor's statements regarding treatment with antibody "alone" appear inconsistent with the patent. A.Br. 41. AbbVie goes so far as to say that "the plain meanings of the terms 'alone' and 'co-administration' are opposites of one another." A.Br. 41. That is pure sophistry. In plain English, each drug is given "alone" unless both are together in the same composition. A163(6:55-63), A169-A170(18:56-19:1), A1617. To get around this, AbbVie essentially argues that Kennedy somehow disclaimed sequential co-administration through statements in the specification, the '766 file history, and

17

post-invention articles published by the inventors. *See* A.Br. 42-43. Once again AbbVie is wrong.

Characterizing the MTX- cohort of patients as receiving antibody "alone" is consistent with the facts that (a) the specification teaches that the two drugs may be co-administered "simultaneously or *sequentially*" (A162(4:45-49) (emphasis added), A169(18:56-62)), and (b) the MTX- patients enjoyed the effects of both drugs due to sequentially co-administering first methotrexate and then the TNFα antagonist without any interruption in treatment during the trial. As Kennedy explained during prosecution of the '442 patent, the MTX- patients' sequential therapy contrasts with the adjunctive co-administration to the MTX+ patient cohort. A5909, A5911-A5912, A5987, A5989-A5990. In contrast, the file history of the '766 patent is explicit that two drugs administered with an intervening washout is not "co-administering" as the '766 claims require. A5544; *see also* A1670-A1671. The same Examiner reviewed both the '766 and '442 patents; he certainly was aware of the statements made in both prosecutions, and found nothing inconsistent.

Indeed, antibody was administered to the patients in the adjunctive (MTX+) arm of the trial only during the first 14 weeks of the 24-week trial; during the last ten weeks, methotrexate was administered. The district court correctly recognized the *entire 24 weeks* as co-administration within the meaning of the claims because the "the clinical effects [the antibody] produced extended beyond its final administra-

tion" at week 14.  A87 n.23.  Its determination that the reverse order of administra-

tion—methotrexate followed by antibody—was not co-administration is therefore as

inexplicable as it is erroneous.

Contrary to AbbVie's argument (A.Br. 27), the inventor did *not* disagree with

this construction of co-administering.  In fact, Dr. Maini testified that "I would say

that for the initial part of the MTX minus mono-therapy, we really should view that

as a sequential therapy where effects of methotrexate would still be present, most

likely in all patients."  A1520.  AbbVie chooses to ignore this testimony.  AbbVie's

attempted reliance on certain of the inventors' post-invention scientific articles to

narrow the claim scope is similarly improper.  As this Court has cautioned, "[a]

patent is to be interpreted by what it states rather than by what the inventor wrote in

a scientific publication."  *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571,

1578 (Fed. Cir. 1993); *see also N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d

1281, 1295-96 (Fed. Cir. 2000).

*****

"[T]he meaning and scope of a patent claim ... should be construed based on

publicly available materials in the record, and resolved for uniform application

throughout the nation ...."  *Lighting Ballast*, 2014 WL 667499, at *5.  The district

court's erroneous constructions rest on a post-hoc reading that nullifies significant

parts of the claims and specification.  AbbVie's attempts to contradict the patent

with extrinsic testimony from its expert witness, unanchored by support in the intrinsic evidence, was erroneous below and is erroneous now.  As this Court has previously counseled,  clear intrinsic evidence cannot be supplanted by unsupported, litigation-driven interpretations. *See*, *e.g.*, *SkinMedica*, 727 F.3d at 1208-10 (citing *Phillips*, 415 F.3d at 1318); *Vitronics*, 90 F.3d at 1583.

The district court's erroneous definition of "active disease" renders the patient population whose treatment the '442 patent claims *coextensive* with the patient population of the '766 patent, notwithstanding the explicit claim language to the contrary.  The incorrect construction of "co-administering" excludes embodiments explicitly described in the specification.  These erroneous constructions obscured the significant differences between the broad scope of the generic reference claims and the narrow scope of the challenged claim; correcting either or both of these errors requires reversal.

### B.     Patentable Distinctness

Properly construed, the challenged claim recites a specific method of treatment—for the hardest-to-treat patients, with the most severe disease manifestations, using a particular dosing regimen, to achieve a specified clinical result—that is patentably distinct from the generic method of treatment claimed in the reference patent.

### 1. Domination Is Not Double Patenting

AbbVie agrees that the challenged claim is a species of one or more reference claims. A.Br. 51-52. AbbVie also agrees that a patentee may validly claim a species after having claimed a genus including that species. A.Br. 51. These concessions are irreconcilable with the district court's repeated rulings that elements of the '442 claims are obvious *because* they are "encompassed" by the '766 claims—that is, because they are species of the genus. *See* K.Br. 44-47. AbbVie tries to bury this critical (and reversible) error in a single footnote, in which it says only that Kennedy's position on the genus-species problem "is a gross mischaracterization of the district court's decision." A.Br. 51 n.15. But the district court's own findings unequivocally show that the court did exactly what Kennedy has complained of:

- A POSA "would not consider this to be a meaningful distinction *because* the term 'therapeutically effective amount' clearly *encompasses* an amount that 'reduces or eliminates signs or symptoms associated with rheumatoid arthritis.'" A97(¶366) (emphasis added);

- A POSA would not find the patient populations distinct "*because* patients whose active rheumatoid arthritis is incompletely controlled despite already receiving methotrexate *would be included within* the population of patients with rheumatoid arthritis 'in need of treatment thereof.'" A95(¶354) (emphasis added);

- "[A]dministering anti-TNFα antibody either adjunctively and/or concomitantly—does not distinguish ... [the challenged claims] *because*, as noted above, co-administration *includes* adjunctive and/or concomitant therapy with methotrexate." A106-A107(¶400) (emphasis added).

"[I]t is elementary that readability of a claim on the subject matter of another claim (domination) is neither determinative of the double patenting issue nor

demonstrative that claims are directed to the same invention." *In re Sarett*, 327 F.2d 1005, 1014 (C.C.P.A. 1964). Indeed, "[d]omination and double patenting should not be confused. They are two separate issues.... Domination by itself, i.e., in the absence of statutory or nonstatutory double patenting grounds, cannot support a double patenting rejection." MPEP § 804(II). The district court committed precisely the error that these authorities warn against—*and AbbVie has no substantive response.*

Like the district court, AbbVie mistakenly characterizes the issue as which among three types of co-administering are nonobvious. A41-A42(¶145), A93(¶¶348-350), A95(¶354), A96(¶361), A97(¶¶363, 366); A.Br. 51-52 n.15, 53. AbbVie's argument that the generic claims of the '766 patent admit of only a few "predictable solutions" (A.Br. 52), such that the challenged specific claims were obvious, focuses only on a single claim element (the mode of administration). But the ODP doctrine requires a determination whether challenged claims, *each considered as a whole*, are patentably distinct over one or more reference claims, *each considered as a whole*. *See*, *e.g.*, *Eli Lilly*, 689 F.3d at 1377; *In re Emert*, 124 F.3d 1458, 1462 (Fed. Cir. 1997). AbbVie does not so much as mention such a comparison, much less attempt to perform it; nor does AbbVie quote a particular claim or compare a single challenged claim to a reference claim. These failings highlight

rather than absolve the district court's error in invalidating Kennedy's patent claims for ODP.

The challenged and reference claims contain multiple claim elements, each of which differs. K.Br. 31 (claim comparison chart). Each of the limitations of the generic reference claims has multiple permutations (*see* K.Br. 7-9, 31), and thus the differences between the claims as a whole—including patient population, disease severity, mode of administration, dosage range, properties of the anti-TNFα antibody employed, and clinical result—are many times greater than the limited set AbbVie erroneously identifies. For example, even if AbbVie were correct that there are "only" three or four available modes of administration, each of the other claim elements has at least as many variations—meaning that there would still be scores of species encompassed by the generic reference claims. When the properly construed claims are compared as a whole, the challenged method is not merely an obvious variant of the genus.

AbbVie has not proffered—in the district court or in this Court—*clear and convincing evidence* that claim 2 is not patentably distinct from any reference claim. Indeed, without conducting a claim comparison, AbbVie could not possibly carry its burden. Nor did the district court hold AbbVie to this "'heavy burden of persuasion.'" *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011) (quoting

*Radio Corp. of Am. v. Radio Eng'g Labs., Inc.*, 293 U.S. 1, 8 (1934)).  Reversal is warranted on this basis alone.

### 2.    No Reasonable Expectation Of Success

AbbVie argues that statements Kennedy made in the file history of the '766 patent should estop Kennedy from arguing that a POSA would have lacked a reasonable expectation of successfully practicing the '442 claims in view of the '766 claims.  A.Br. 55-57.  AbbVie also argues that prior art as of the priority date—the Schwieterman and Higgins references—would have provided a POSA with a reasonable expectation of success.  A.Br.7-8, 61.  The evidence on which AbbVie relies actually shows the opposite.

**a.**    First, contrary to AbbVie's assertions (A.Br. 12-13, 55), Kennedy's statements during the '766 prosecution were not inconsistent with arguing that a POSA would lack a reasonable expectation of successfully achieving the results claimed in the '442 patent.  As Kennedy explained to the Examiner, the '766 claims are "functionally limited to therapeutically effective amounts."  A5619.  The '766 patent explicitly defines a "therapeutically effective amount" as merely that which inhibits the biological activity of TNFα and clarifies that such an amount need *not* lead to any reduction in signs or symptoms of rheumatoid arthritis.  K.Br. 52-53.  That standard is far less stringent than the functional limitations of the '442 claims, which require  a  "reduction or elimination of the *signs* and *symptoms*" of rheuma-

toid arthritis in patients with "active disease" incompletely controlled by metho-trexate. A150 (emphasis added). While the '766 claims are presumed enabled over their scope (A.Br. 55), this presumption does not reach the '442 patent's much more stringent efficacy limitations, because those limitations *were not recited in the '766 claims*.

> **b.** Second, even though AbbVie chose *not* to assert a statutory obvious-ness defense, it now argues that the '442 patent would have been obvious in light of the prior art.

According to AbbVie, the Schwieterman reference "taught that adjunctive therapy had 'become standard' by March 1995." A.Br. 61. The reference is the transcript of a panel discussion at a meeting of rheumatologists including Schwie-terman, an FDA representative, who actually said that it had "become standard" as of that date to perform *monotherapy clinical trials of new drugs before performing combination trials* with methotrexate. A10005. That passage neither mentions nor means that it had "become standard" to perform *adjunctive co-administration as claimed by the '442 patent*, as AbbVie asserts. Even Weinblatt was unwilling to interpret the statement that AbbVie trumpets as teaching that *adjunctive therapy* had "become standard." A1210-A1211.

Rather, Weinblatt noted at the same meeting that in 1995 "withdrawing peo-ple from methotrexate, ... is now *required* for Phase I and Phase II work." A10004

(emphasis added).  In other words, adjunctive therapy (*i.e.*, without a washout) was *forbidden* in early trials in the U.S. (which did not affect Kennedy's T14 trial because it was performed in Europe, and so was not limited by this FDA policy).  That is a far cry from such therapy having "become standard," let alone clear and convincing evidence.  Both AbbVie and the district court ignore this context, which directly refutes AbbVie's hypothesis that a skilled artisan would reasonably have expected to achieve success in practicing the '442 claims, which do not require a washout.

Moreover, contrary to AbbVie's contention, the Higgins reference (which the Examiner considered (A10675-A10712 at A10692, A118)) adds nothing.  Higgins adverts only to the "possibility" of combining a different antibody with methotrexate in the future (A10208), which cannot render the claimed method obvious since such trials had not even been designed, much less conducted.  Higgins therefore provides at most a motivation to try some undefined approach, not a reasonable expectation of success of achieving the invention claimed in the '442 patent.  Standing alone, "obvious-to-try" is not a basis for an ODP challenge (MPEP § 2141(III)), and would in any event be rebuttable by evidence of unexpected results.  *Cf. In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (en banc).

26

### 3.    Unexpected Results

AbbVie fails to address the district court's inexplicable decision to ignore certain substantial evidence of unexpected results.  As a principal example, the court made *no findings whatsoever* as to evidence that many patients treated with the invention claimed by the '442 patent unexpectedly achieved remission or near-remission of their disease (A146 (27:38-43), A147 (30:48-51)); indeed, the court's findings never use the word "remission."   Yet, even *AbbVie's expert* admitted such a result would have been unexpected.    A1322, A1324-A1326, A1672-A1673.  It is "error as a matter of law" not to "discuss" or accord "probative value" to the patentee's evidence of non-obviousness.  *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 307 (Fed. Cir. 1985); *see also Apple Inc. v. ITC*, 725 F.3d 1356, 1365 (Fed. Cir. 2013); *Cyclobenzaprine*, 676 F.3d at 1077-78; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 969-70 (Fed. Cir. 2006).

The district court disregarded Kennedy's other evidence of unexpected results on the basis of its erroneous construction of co-administration; correcting that error thus independently requires reversal.  K.Br. 55-59.  AbbVie's arguments to the contrary do not withstand scrutiny.

AbbVie contends that the district court's "factual" finding that the results were not unexpected was not clearly erroneous.  A.Br. 58-60.  But there were no factual disputes as to the experimental *data*, and it is indisputable that the Examiner

relied on those data to find unexpected results and allow the patent.  A5989-A5991, A6007-A6008.  The district court thought it could disregard the same data, however, because the experiments were not "powered" to provide statistically significant results.  A86-A87(¶320), A100(¶374).  That was a *legal* error:  As a matter of law, statistical significance is not required for patentability.  *In re Soni*, 54 F.3d 746, 751 (Fed. Cir. 1995); *see also* MPEP § 2107.03.

AbbVie bears the burden of proving that the results that Kennedy cited in support of the '442 claims (and the Examiner accepted) as unexpected were, in fact, expected at the time.  *Am. Hosp. Supply Corp.*, 745 F.2d at 8 ("the burden was on [challenger] to establish the lack of new and surprising results"); *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 997-98 (Fed. Cir. 2009).  AbbVie rests *entirely* on Weinblatt's unsubstantiated testimony that "the patients that got the [adjunctive] combination did better than those patients who received monoclonal antibody alone," which would not have been unexpected "[b]ecause they are on two drugs versus one drug."  A1279.  Accordingly, AbbVie argues that the district court correctly found that a POSA would have expected that patients receiving two drugs rather than one would show improved results.  A.Br. 59.

It is simply not true that two drugs *necessarily* produce better results than one.  In any event, AbbVie fails to take into account the *magnitude* of beneficial results from this particular two-drug combination: The response enjoyed by the MTX+

patients exceeded the sum of responses of patients in the MTX only and the MTX- arms of the trial. The superadditive benefit of adjunctive co-administration was supported by the data and several witnesses' testimony. *E.g.* A1299-A1300, A1526. AbbVie has no response.

Contrary to AbbVie's suggestion, Dr. Maini did *not* testify that he believed unexpected results to be unsupported by the data. A.Br. 59. Rather, he testified that the data were "a revelation" that "not only [we] but everybody else found very in- teresting." A1524. Dr. Maini noted the unexpected enhanced magnitude of re- sponse (A1526), the prolonged duration of response (A1525-A1526), and the re- duction of HACA response (A1526). Indeed, as Dr. Maini testified, these data "led to the validation of the concept that this may be the way forward for using anti-TNF treatment ... for treating rheumatoid arthritis ... [in] combination with methotrexate." A1525-A1526. This testimony accords with the unambiguous statements in the specification that the trial demonstrated a substantial magnitude of clinical benefit (A145(25:20-65, 26:20-65)-A146(27:1-56)), significantly improved duration of response (A144-A145(cols. 23-24 & Table 3), and suppressed HACA response (A146(27:57-28:65)-A147(29:1-27)).

AbbVie does not acknowledge this testimony discussing unexpected results of the method claimed in the '442 patent. Rather, AbbVie relies wholly on testi- mony regarding an unexpected finding for the sequentially treated MTX- patients

*whose treatment the '442 patent indisputably does not claim*. Even as to this, Dr. Maini testified that he found the experimental results to be "compelling" and "remarkable." A1522, A1569. His acknowledgment that the trial was not powered to *prove* this particular unexpected finding to statistical significance (A1569) simply reflects that the trial was not designed *in advance* to have a large enough size to statistically prove an *unexpected* finding. AbbVie's unsupported insistence on such a requirement would render meaningless the very notion that the finding was unexpected.

AbbVie ultimately objects that the "exact same data" cannot support the unexpected results derived from both the invention claimed by the '766 patent and that claimed by the '442 patent. A.Br. 60 (emphasis omitted). It is impermissible, however, to use the disclosure of the T14 trial in the '766 patent—which is the source of the cited unexpected results—as prior art against the '442 claims. *See*, *e.g.*, *Eli Lilly*, 689 F.3d at 1378-80. AbbVie itself admits elsewhere that "the specification of the reference patent is not prior art under the [ODP] inquiry." A.Br. 38 n.8. Just so.

*****

Claim 2 of the '442 patent recites a specific method of treating a specific hard-to-treat patient population by providing specific drugs in a specific mode of administration to achieve a specific and highly beneficial clinical result. This claim

is a species of the generic treatment methods claimed in the '766 reference patent, but that does not make it obvious.  It was AbbVie's burden to prove, by clear and convincing evidence, that challenged claim 2 *as a whole* is not patentably distinct from the reference claims.  The district court's judgment of invalidity was premised on multiple legal errors, including misconstruing key claim terms, confusing domination with distinctness, and misapprehending what a POSA would have expected at the time.  Correcting these errors leads ineluctably to the conclusion that the '442 patent claims are not obvious—as the Examiner expressly found.

## CONCLUSION

The judgment of invalidity should be reversed.


Dated:  March 18, 2014                Respectfully submitted.

By:  ___/s/ Mark A. Perry

John P. White                         Mark A. Perry
Norman H. Zivin                         *Principal Attorney*
Robert T. Maldonado                   GIBSON, DUNN & CRUTCHER LLP
COOPER & DUNHAM LLP                   1050 Connecticut Avenue, N.W.
30 Rockefeller Plaza                  Washington, D.C. 20036
New York, NY 10112                    T: (202) 955-8500
(212) 278-0400                        F: (202) 467-0539
                                      mperry@gibsondunn.com

                                      Wayne M. Barsky
                                      Timothy P. Best
                                      GIBSON, DUNN & CRUTCHER LLP
                                      2029 Century Park East
                                      Los Angeles, CA 90067
                                      (310) 552-8500

*Attorneys for Defendant-Appellant*
*The Mathilda and Terence Kennedy Institute of Rheumatology Trust*

32

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing on counsel of record on March 18, 2014, by CM/ECF.

By: /s/ Mark A. Perry

Mark A. Perry

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIRE-
MENTS, AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,987 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated:  March 18, 2014

By:  /s/ Mark A. Perry

Mark A. Perry

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
T:  (202) 955-8500
F:  (202) 467-0539
mperry@gibsondunn.com